IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| **FOODS, INC.,** | ) | Case No.  14-02689-11 |
| an Iowa corporation, | ) | (Joint Administration Pending) |
| | ) | |
| **DAHL'S FOOD MART, INC.,** | ) | Case No.  14-02690-11 |
| an Iowa corporation, | ) | (Joint Administration Pending) |
| | ) | |
| **DAHL'S HOLDINGS I, LLC,** | ) | Case No.  14-02691-11 |
| an Iowa limited liability company | ) | (Joint Administration Pending) |
| | ) | |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |
| | ) | |

**INTERIM ORDER (i) APPROVING POSTPETITION FINANCING,
(ii) AUTHORIZING USE OF CASH COLLATERAL, (iii) GRANTING SECURITY
INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT,
(iv) PROVIDING ADEQUATE PROTECTION, (v) MODIFYING AUTOMATIC STAY,
(vi) AND GRANTING ADEQUATE PROTECTION PURSUANT TO SECTIONS 363
AND 364 OF THE BANKRUPTCY CODE, AND (vii) SETTING FINAL HEARING,
PURSUANT TO 11 U.S.C. §§ 363, 364 AND 365 AND FEDERAL RULE
OF BANKRUPTCY PROCEDURE 4001**

THIS MATTER, along with an Objection filed by the Iowa Department of Revenue at docket number 31, have  come before the Court upon the ex parte request for an Expedited Hearing filed at docket number 17 filed on behalf of Foods, Inc. d/b/a Dahl's Foods, Inc. ("**Dahl's**" ), Dahl's Food Mart, Inc. ("**DFMI**"), and Dahl's Holdings I, LLC ("**Holdings**") as debtors and debtors-in-possession (collectively, the "**Debtors**"), seeking entry of interim and final orders including authority to:

(i)      Obtain credit and incur debt through a multiple-advance term loan up to the aggregate principal amount of **$6,649,623.00** of which up to **$3,000,000** will be used for certain working capital expenditures of the Debtors pursuant to the Debtors' Budget (as defined below), **$2,842,623.00** will be used for the refinancing of the Pre-Petition Credit Agreement Debt (as defined below), and up to **$825,000.00** of which will be used, to the extent necessary, solely to repay any amounts under the Debtors' Guaranty Reimbursement Obligation[1] (the "**DIP Loan**") secured by liens (as defined in Section 101(37) of Title 11 of the United States Code, as amended (the "**Bankruptcy Code**") and referred to herein as "**Liens**") on property of Debtors' estates

---

[1] Unless otherwise stated, capitalized terms shall have the meaning ascribed to them in the DIP Credit Agreement.

pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code.

(ii)      Establish that DIP Loan up to the aggregate principal amount of $**6,649,623.00** as provided in that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**"), substantially in the form attached as <u>Exhibit A</u> to this order (the "**Interim Financing Order**") by and between Debtors and Associated Wholesale Grocers, Inc. ("**AWG**") and incorporated herein by reference.

(iii)      Authorize the application of Advances under the DIP Loan in the amount of $**2,842,623.00** to refinance the Pre-Petition Credit Agreement Debt pursuant to the DIP Credit Agreement.

(iv)      Authorize AWG to apply any and all Post-Petition payments received from the Debtors with respect to the Open Account (as defined below) to the amounts due and payable under the Open Account, notwithstanding the occurrence of the Petition Date, and make Advances under the DIP Loan related to such payments.

(v)      Authorize AWG to extend, and the Debtors to accept, credit terms to the Debtors with respect to the Supply Agreement and the Open Account on the same terms and conditions as existed with respect to the Supply Agreement and the Open Account before the Petition Date, such that the amounts due and owing under the Open Account shall be paid in the ordinary course of the Debtors' business after the Petition Date, notwithstanding the occurrence of the Petition Date.

(vi)      Authorize and direct the Debtors to request Advances under DIP Loan to repay any amounts related to the Guaranty Reimbursement Obligation and authorize AWG to apply such Advances to reduce the amounts owing to AWG with respect to the Guaranty Reimbursement Obligation pursuant to the Pre-Petition Credit Agreement and the DIP Credit Agreement.

(vii)      Authorize, pursuant to Section 363(c)(2) and Bankruptcy Rule 4001, the Debtors' use of Cash Collateral as such term is defined in section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>") subject to the terms and conditions of the DIP Credit Agreement and this Interim Financing Order.

(viii)      Grant AWG valid, perfected, unavoidable, first-priority Liens to secure payment and performance of the Obligations (as defined in the DIP Credit Agreement) pursuant to Section 364(d) of the Bankruptcy Code on all assets of the Debtors as more fully described and as provided in and as contemplated by the DIP Credit Agreement as supplemented by this Interim Financing Order (the DIP Credit Agreement and all such instruments and documents as may be executed and delivered in connection therewith or which relate thereto are hereinafter collectively referred to as the "**Loan Documents**") subject to the Permitted Encumbrances.

(ix)      Grant AWG valid, perfected, unavoidable, Post-Petition Liens, junior only to the Liens granted under the Loan Documents and the Permitted Encumbrances (which Permitted

SLC-7339665-6

Encumbrances shall retain their relative pre-petition priority with respect to the applicable collateral on such holders claim a lien, including with respect to AWG), securing the Debtors' pre-petition obligations including obligations under the Supply Agreement, Leases, and Subleases (as defined herein), and as adequate protection for AWG's Liens and rights related to the Supply Agreement, Leases, and Subleases, and as adequate protection for the Debtors' use of AWG's Cash Collateral.

(i)      Grant AWG a first priority, perfected purchase money security interest ("**PMSI**") over any and all other claims or claimants in any Inventory supplied to the Debtors by AWG and in certain new product lines, including dairy products and pharmacy products.

(ii)      Grant AWG a valid, perfected, unavoidable, first-priority Lien to secure payment and performance of the Obligations pursuant to Section 364(c)(2) of the Bankruptcy Code on the action and claim of the Debtors under Chapter 5 of the Bankruptcy Code (the "**Chapter 5 Causes of Action**") to the extent necessary to reimburse AWG for any fees and expenses paid to professional persons employed by the Debtors or the Creditors' Committee pursuant to Section 327 of the Bankruptcy Code.

(iii)      Grant AWG a superpriority claim pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses  (a "**Superpriority Claim**") subject to the Carve Out (as defined below).

(iv)      Authorize Debtors to pay all of AWG's costs and expenses, including outside legal expenses, associated with the preparation and approval of the DIP Credit Agreement, the Loan Documents, and related items from the proceeds of the DIP Credit Agreement.

(v)      Modify the automatic stay to the extent necessary and required by the DIP Credit Agreement.

(vi)      Schedule a final hearing (the "**Final Hearing**") to consider the entry of an order authorizing the DIP Credit Agreement, the Loan Documents, and the relief granted in this Interim Financing Order on a final basis (the "**Final Financing Order**"), as set forth in the Motion and approve the manner and form of notice with respect to the Final Hearing.

The filed documents and statements made at the time of the telephonic hearing conducted on November 10, 2014 set forth and represent the following:

A.      On November 9, 2014 (the "**Petition Date**"), Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

B.      The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1008.  No trustee or examiner has been appointed in this case.

C.      No Official Committee of Unsecured Creditors (a "**Creditors' Committee**") has been appointed in this case.

SLC-7339665-6

D.     This Court has jurisdiction, pursuant to 28 U.S.C. §1334, over these proceedings, and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (G).

E.     The ability of Debtors to finance their operations and the availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to Debtors' ability to preserve and maintain Debtors' going-concern value and their ability to consummate a successful reorganization.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of the Cash Collateral and the DIP Loan.  In the absence of the use of the Cash Collateral and the DIP Loan, serious and irreparable harm to the Debtors and their estates will occur.

F.     The Debtors' use of Cash Collateral and the DIP Loan are critical to Debtors' continued operations, because these are the primary sources of funds available to meet Debtors' anticipated expenses while they reorganize and seek to sell their assets and maximize the value of their estates.

G.     The Debtors have requested that AWG consent to use of AWG's Cash Collateral and AWG is willing to give such consent subject to the terms and conditions contained herein.

H.     An immediate need exists for Debtors to obtain funds with which to purchase inventory, continue their operations, and administer and preserve the value of their estates.  The ability of Debtors to finance their operations requires the additional availability of working capital, the absence of which would immediately and irreparably harm Debtors, their estates and their creditors and the possibility for a successful reorganization.

I.     Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense.

J.     Debtors are also unable to obtain further secured credit, allowable only under Bankruptcy Code Sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and conditions than those provided in the Loan Documents and this Interim Financing Order, including, without limitation, the requirement of the repayment of the Pre-Petition Debt.  Debtors are unable to obtain credit or money without (i) Debtors' granting to AWG pursuant to Section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b) (subject to the Carve Out, as defined below), and (ii) securing pursuant to Bankruptcy Code Sections 364(c)(2), 364(c)(3) and 364(d) such indebtedness and obligations with security interests in and Liens on substantially all of the assets of Debtors, as described below (subject to the Carve Out).

K.     The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of Debtors' businesses and the management and preservation of their property.

4

L.      It is in the best interest of Debtors' estates to be allowed to establish the DIP Loan contemplated by the Loan Documents.

M.      The terms and conditions of the use of Cash Collateral and of the DIP Loan and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

N.      The Loan Documents were negotiated in good faith and at arm's length between Debtors and AWG.  Credit to be extended under the DIP Loan will be so extended in good faith, in consequence of which AWG is entitled to the protection and benefits of Bankruptcy Code Section 364(e).

O.      On the Petition Date, Debtors were indebted to AWG pursuant to a Credit Agreement dated as of March 19, 2013 (as such Credit Agreement may have been amended, restated or otherwise modified from time to time before the Petition Date, the "**Pre-Petition Credit Agreement**"), the amount of such outstanding indebtedness being approximately $2,842,623.00, which amount consists of (a) the aggregate outstanding principal balance of the Term Loan under the Pre-Petition Credit Agreement of approximately $345,629.00 and (b) the outstanding balance of the advance provided under the Pre-Petition Credit Agreement pursuant to the Limited Guaranty of $2,478,994.00 (the "**Pre-Petition Credit Agreement Debt**").  The Debtors admit, acknowledge, and stipulate that the principal amount of all obligations, Obligations, and indebtedness of the Debtors to AWG, both absolute and contingent, existing prior to the commencement of the above-referenced Chapter 11 cases (the "**Cases**"), together with all interest, fees, commissions, costs, and expenses accrued and accruing with respect thereto, is secured pursuant to the Pre-Petition Credit Agreement, and all such instruments and documents as were executed and delivered in connection therewith or which relate thereto, including but not limited to, the Limited Guaranty, the Subleases, the Workers' Compensation Letter of Credit, the open account agreements, certain existing promissory notes, existing security agreements, collateral documents, pledge agreements, the membership agreement, and existing leases (hereinafter collectively referred to as the "**Pre-Petition Loan Documents**") and by the following collateral encumbered thereby (collectively, the "**Pre-Petition Credit Agreement Collateral**"): (i) perfected and valid security interests in, and liens upon, substantially all of the Debtors' existing and hereafter acquired Collateral and other security for the Pre-Petition Credit Agreement Debt as provided in the Pre-Petition Credit Agreement, including, but not limited to, the Debtors' real and personal property, consisting of, inter alia, accounts, chattel paper, contracts, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, inventory and investment property of Debtors and the Guarantors, and Debtors' real estates and AWG Equity, money, cash and cash equivalents relating thereto; and (ii) all profits, income, and proceeds derived therefrom, and all accessions, substitutions, renewals, improvement, replacements, and additions thereof, now owned or hereafter acquired by the Debtors, and all rights and property of any kind forming the subject matter of any of the foregoing existing as of the Petition Date, together with all Post-Petition proceeds and products thereof under 11 U.S.C. § 522(b).  The preceding admissions of the Debtors are without prejudice to the rights of the Creditors' Committee to file a Complaint within the Challenge Period (as defined below) with respect to, or otherwise object to, the Pre-

Petition Credit Agreement Debt and the liens with respect to same, pursuant and subject to such rights and limitations set forth herein.

P.      AWG, a cooperative wholesaler of grocery and supermarket products of which Dahl's is a member, is the primary supplier to Debtors, accounting for approximately 85% percent of the aggregate purchases by Debtors.  Dahl's is a party to a supply agreement ("**Supply Agreement**") under which it purchases products from AWG for sale in the stores.  Separate from but related to the Supply Agreement, are Dahl's existing Membership Agreement, existing Stock Power of Attorney, existing Non-Competition Agreements, and existing Use Restriction Agreements (collectively the "**Existing Related Agreements**"). The Debtors are also parties to Leases or Subleases with respect to the following real property: 1819 Beaver Avenue, Des Moines, Iowa; 4121 Fleur Drive, Des Moines, Iowa; 5440 NW 86th Street, Johnston, Iowa; 3425 Ingersoll Avenue &  3401 & 3407 Ingersoll Ave., Des Moines, Iowa; 15500 W. Hickman Road, Clive, Iowa; 4343 Merle Hay Drive, Des Moines, Iowa; 3330 and 3400 E. 33rd St., Des Moines, Iowa; 5003 EP True Pkwy, West Des Moines, Iowa. All of Debtors' obligations under the Supply Agreement, the Existing Related Agreements, and the Leases or Subleases are secured pursuant to the Pre-Petition Loan Documents by the Pre-Petition Credit Agreement Collateral and cross-defaulted by the terms of the Pre-Petition Loan Documents.

Q.      The Debtors further admit, acknowledge, and stipulate that the Pre-Petition Credit Agreement Debt and the Pre-Petition Open Account Debt is valid and enforceable and is not subject to offset, credit, or counterclaim, and that the Liens on the Pre-Petition Credit Agreement Collateral securing repayment of the Pre-Petition Credit Agreement Debt and the Pre-Petition Open Account Debt are valid, perfected, and unavoidable.  The preceding admissions of the Debtors are without prejudice to the rights of Creditors' Committee to file a Complaint within the Challenge Period (as defined below) with respect to, or otherwise object to, the Pre-Petition Credit Agreement Debt and the liens with respect to same, pursuant and subject to such rights and limitations set forth herein.

R.      Debtors purchase goods from AWG on an open account basis.  AWG requires that each member's account be secured by patronage certificates, a letter of credit, and/or certain other collateral based on such member's estimated weekly purchases from AWG.  Debtors' open account with AWG is secured by, among other things, a first-priority lien on, among other things, AWG membership stock, Debtors' right to receive monthly payments, and certain other rebates, refunds and other credit owed to Debtors by AWG (including, without limitation, capital stock, member deposit certificates, member savings, patronage refund certificates, direct patronage and/or year-end patronage and concentrated purchase allowances) (collectively the "**AWG Equity**").

S.      As of the Petition Date, Debtors owe AWG the aggregate amount of approximately $3.2 Million in connection with the Pre-Petition Credit Agreement related to the open account under the Supply Agreement (the "**Open Account**" and any amounts owed before the Petition Date thereunder, the "**Pre-Petition Open Account Debt**").

T.      In addition to their other rights under the Pre-Petition Loan Documents, AWG also has statutory rights pursuant to state law and Bankruptcy Code § 503(b)(9) as to all products

6

delivered to Debtors within 20 days prior to the filing of the bankruptcy petition, and the right to impose a statutory trust and attach any proceeds realized by Debtors from sales of produce delivered by AWG, pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C. § 499.

U.     The notice of this interim hearing has been provided by the Debtors to the United States Trustee, counsel to AWG, counsel to the Creditors' Committee (if any), the twenty (20) largest unsecured creditors of the Debtors, and the Internal Revenue Service, and constitutes sufficient and adequate notice in accordance with Bankruptcy Rule 4001(c) and Bankruptcy Code Section 102(1), as required by Bankruptcy Code Sections 364(c) in light of the emergency nature of the relief requested in the Motion.  No further notice of the relief sought in the Motion is required for the entry of this Interim Financing Order.

V.     Good and sufficient cause has been shown for the entry of this Interim Financing Order.  Among other things, the entry of this Interim Financing Order will enable the Debtors to continue the operation of their businesses; increase the possibility for a successful reorganization; and will be in the best interest of the Debtors, their creditors, and their estates.

NOW, THEREFORE, on the Motion of Debtors and the record before the Court with respect to the Motion, and good cause appearing,

IT IS HEREBY ORDERED pending entry of a Final Order[2]:

1.     The objection filed by the Iowa Department of Revenue is sustained.   The following terms and conditions are applicable to any collateral and amounts subject to collection by this taxing authority, notwithstanding any language in this interim order to the contrary.

> This Order does not preclude the Iowa Department of Revenue (IDR) from attempting to establish that funds held or received by the debtor in possession or any secured creditor are held in trust and are not part of the bankruptcy estate, and shall not preclude the IDR from seeking additional relief with respect to such claims. Nothing in this paragraph, however, shall preclude the debtor-in-possession or any secured creditor from challenging any such assertions or contending that such funds are not held in trust for the IDR. The security interests provided for in the Order shall not diminish in any way the rights of the IDR as a trust fund claimant, if any, to obtain possession of funds subject to its trust claims. In addition, any funds that the Court, after notice and hearing, determines are trust funds of the IDR shall not constitute collateral of any secured creditor.

---

[2] This Interim Order shall not be interpreted to revise the negotiations and agreements in place between the Debtors and AWG.  Further this Interim Order shall not restrict or prohibit any entity from raising objections to any of the terms agreed to between the Debtors and AWG related to use of cash collateral, DIP Financing, Adequate Protection, Super-priority Administrative Treatment or Stay Relief or other identified issues that are contemplated and the terms of which are proposed to be included in a Final Order pending a hearing on November 25, 2014.

SLC-7339665-6

2.      Pursuant to §364(e) of the Bankruptcy Code, the Motion is granted on an emergency and interim basis in accordance with the terms set forth below based upon the filed documents and representations identified above pending final hearing and entry of a final Order.

## APPROVAL OF AND AUTHORIZATION TO
## BORROW UNDER THE DIP CREDIT AGREEMENT

3.      The Debtors are authorized to use Cash Collateral only in strict accordance with the terms of this Interim Financing Order and the Loan Documents. The Debtors shall continue their operations and sales in the ordinary course of business and shall not use Cash Collateral outside of the ordinary course of business.

4.      The terms and conditions of the DIP Loan are hereby approved on an interim basis through the date of the Final Hearing.  Debtors are authorized to (a) establish the DIP Loan; (b) execute the Loan Documents; (c) borrow up to $1,300,000.00 under the terms and conditions of the DIP Credit Agreement, pending the Final Hearing; and (d) borrow up to a total of $6,649,623.00, inclusive of any amounts borrowed under subsection (c) above, under the terms and conditions of the DIP Credit Agreement, after entry of a Final Financing Order approving such funding.

5.      Repayment of the obligation owing under the Pre-petition Credit Agreement identified in the filed document in the amount of $2,842.623.00 is not authorized under this interim order.   Ordinary course payments may continue pending final hearing in a manner consistent with the parties' pre-petition transactions under the Credit Agreement.

6.      Debtors are hereby authorized, empowered, and directed to do and perform all acts, pay all fees and expenses, and to make, execute and deliver all instruments and documents which may be required or necessary by Debtors under the Loan Documents and the creation and perfection of the Liens described in and provided for by this Interim Financing Order and the Loan Documents and to assure the priority thereof as contemplated herein.

7.      To induce AWG to provide the DIP Loan and to adequately protect AWG for the use of its Cash Collateral, Debtors grant to AWG pursuant to the Loan Documents and this Interim Financing Order:

      (a) Pursuant to Bankruptcy Code Section 364(d), a valid, binding, enforceable, unavoidable, and perfected first priority Lien on all assets of the Debtors which shall be senior to all creditors, including any creditors asserting statutory liens or reclamation rights pursuant to Section 546(c) of the Bankruptcy Code,  and shall prime the interest of any existing creditors holding a lien on such assets with the exception of the Permitted Encumbrances; provided, however, that holders of such Permitted Encumbrances, including any obligations arising from claims asserted by entities other than AWG under the Perishable Commodities Agricultural Act (PACA)  shall retain their relative pre-petition priority with respect to the

8

applicable collateral on which such holders claim a lien, including with respect to AWG, and

(b) Pursuant to Bankruptcy Code Section 364(c)(2), a valid, binding, enforceable, unavoidable and perfected first priority Lien on the Chapter 5 Causes of Action, solely to the extent of any funds AWG extends to Debtors for any fees and expenses paid to professional persons employed by the Debtors or the Creditors' Committee pursuant to Section 327 of the Bankruptcy Code.

(c) An administrative claim against the Debtors and their estates under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code to the extent of the diminution in value of AWG's interests in the Cash Collateral as of the Petition Date.  The amount of any such diminution shall be determined based upon a valuation of assets that comports with the representation by AWG that it was oversecured on the Petition Date.

(d) Valid, binding, enforceable, and duly-perfected replacement security interests in and liens upon all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds, products, rents and profits thereof to the same extent that the same existed as of the Petition, to secure the amount of AWG's claims equal to the diminution, if any, subsequent to the Petition Date, in value of AWG's interests in the Cash Collateral, whether by depreciation, use, sale, loss, decline in market price, preservation or disposition of assets of the Debtors that do not constitute Pre-Petition Credit Agreement Collateral, imposition of the automatic stay, or otherwise (collectively, the "Replacement Liens" and, the collateral securing the Replacement Liens, together with the Pre-petition Collateral, the "Replacement Collateral").  The Replacement Liens granted to AWG hereunder shall have first priority as to the Debtors' respective assets with the exception of the Permitted Encumbrances.

(e) AWG's pre-petition Liens with respect to the Pre-Petition Credit Agreement Collateral shall continue in full force and effect to secure the pre-petition indebtedness owed to AWG and, notwithstanding Section 552(a) of the Bankruptcy Code, the Post-Petition Advances under the DIP Credit Agreement, and any such pre-petition Liens of AWG shall not be released.  For the avoidance of doubt, with respect to any dispute related to the priority of the Permitted Encumbrances or otherwise, AWG's pre-petition lien priority shall continue except with respect to the Post-Petition Liens granted pursuant to the Loan Documents and this Interim Financing Order.

9

8.     The Collateral will also secure repayment of pre-petition obligations owing by Debtors to AWG, including all interest thereon and all costs and fees incurred by AWG in connection with the DIP Loan.

9.     The Liens granted to AWG herein shall be subject to the Carve Out (as defined below) and shall secure all Obligations (as defined in the DIP Credit Agreement) incurred by Debtors pursuant to the Loan Documents.

10.     AWG shall receive adequate protection for its pre-petition Liens in accordance with this Interim Financing Order, which shall not be altered, amended, or modified without the express written consent of AWG.

11.     Pursuant to Bankruptcy Code Section 361(2), any holder of a Lien junior to the Lien granted to AWG by this Interim Financing Order shall be granted a replacement Lien on all Collateral as adequate protection of their interests securing such holder's secured claim with such replacement Liens being held in their same respective priorities as against such other holders (other than AWG) as such holder's secured claim had before the Petition Date.

## GENERAL PROVISIONS

12.     The automatic stay imposed under Bankruptcy Code Section 362(a)(4) is hereby modified solely to the extent necessary to permit the creation and perfection of the aforesaid Liens and to perform Debtors' Obligations and obligations to AWG under the DIP Loan and the Loan Documents.

13.     Each officer of Debtors, acting singly, and such other individuals as may be so authorized by the Board of Directors of Debtors, likewise acting singly, is hereby authorized to execute and deliver each of the Loan Documents, such execution and delivery to be conclusive of their respective authority to do so in the name of and on behalf of Debtors.

14.     This Interim Financing Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the AWG's Liens upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of AWG in and to the Collateral or to entitle AWG to the priorities granted herein; provided, however, that AWG may file or record financing statements or other instruments to evidence and to perfect the Liens authorized hereby; provided further, however, that no such filing or recordation shall be necessary or required in order to create or perfect any such Lien; provided further, however that any existing pre-petition Liens of AWG shall continue in full force and effect and existing financing statements or other instruments or documents shall be evidence of the continued validity, perfection, and priority of such Liens on the Pre-Petition Credit Agreement Collateral.

15.     AWG, in its discretion, may file a photographic copy of this Interim Financing Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real

10

or personal property as evidence of a mortgage lien and/or fixture filing, and in such event, the subject filing or recording officer shall file or record such copy of this Interim Financing Order, which shall not be subject to stamp tax or similar tax as set forth in Section 1146 of the Bankruptcy Code.

16.     The DIP Credit Agreement and each of the Loan Documents shall constitute and evidence the valid and binding obligations of Debtors, which obligations shall be enforceable against Debtors in accordance with their terms.

## ADMINISTRATIVE CLAIMS

Pending a final Order on the Motion and subject to the conditions set forth in the above section identified as Approval of and Authorization to Borrow under the DIP Credit Agreement paragraph 7.

17.     AWG, for the Debtors' obligations under the DIP Credit Agreement and, if and to the extent that the adequate protection for the use of AWG's Cash Collateral described herein is insufficient to provide adequate protection to AWG for any diminution in value of its interests in the Collateral and Cash Collateral from and after the Petition Date, shall be allowed an administrative expense claim (the "**AWG Superpriority Claim**") with priority and payment over all administrative expense claims, now existing and hereafter arising, of any kind or nature whatsoever including without limitation, administrative expenses of the kind specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 330 (except as otherwise provided below) 331, 503(a), 503(b), 507(a), 507(b), 546(c), and 1114, that have been or may be incurred in these proceedings or any successor case provided that the rights of AWG with respect to any Chapter 5 Causes of Action (or the proceeds thereof) shall have equal priority with other administrative expenses under Section 507(a)(1) of the Bankruptcy Code solely to the extent necessary to reimburse AWG for any fees paid to professional persons employed by the Debtors or Creditors' Committee pursuant to Bankruptcy Code Section 327.Except as otherwise provided herein, or in the DIP Credit Agreement, and to the fullest extent allowed by applicable law, no cost or expense which may be incurred in connection with or on account of the preservation and/or disposition of any Collateral or which otherwise could be chargeable to AWG or the Collateral pursuant to Bankruptcy Code Sections 105, 506(c), 552 or otherwise, shall be so chargeable.  AWG shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to AWG with respect to proceeds, products, offspring or profits of any of the Collateral.  To the fullest extent permitted by applicable law, except as otherwise specifically allowed herein, no costs  or  expenses of administration which have been or may be incurred in the Case at any time shall be charged against the Collateral, AWG or any of its respective claims pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of AWG, and no such consent shall be implied from any other action, inaction, or acquiescence by AWG.

18.     Pending a Final Order on this Motion AWG shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the Collateral.

SLC-7339665-6

19.     Pending a Final Order on this Motion unless AWG has provided their prior written consent, there shall be no order entered in these proceedings, or in any successor cases, authorizing any of the following:

(a) Debtors to obtain credit or incur debt that is secured by a security interest, mortgage, or other collateral interest or lien on all or any portion of the Collateral, and/or which is entitled to superpriority administrative status under Bankruptcy Code § 364(c)(1), which is equal or senior to that granted to AWG;

(b) Debtors' return of any goods constituting Collateral pursuant to Bankruptcy Code § 546(h); or

(c) Confirming a plan of reorganization which is not wholly acceptable to AWG in its sole discretion (an "**Acceptable Plan of Reorganization**").

20.     Without limiting the provisions and protections set forth above, if at any time prior to the repayment in full of all Obligations and the termination of AWG's obligations to make loans and advances under the DIP Credit Agreement or Loan Documents, including subsequent to the confirmation of any Plan of Reorganization respecting Debtors, Debtors or any Trustee subsequently appointed shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d), then all of the cash proceeds derived from such credit or debt shall immediately be turned over to AWG to reduce the Obligations.

21.     Pending a Final Order the Obligations of Debtors to AWG under the DIP Credit Agreement and the Loan Documents, are due and payable upon the earliest to occur of:

(a) 35 days after the Petition Date (or such later date to which AWG and Debtors agree in writing), unless a Final Financing Order approving the Motion (in a form acceptable to AWG in its reasonable discretion) has been entered by such date, in which event the foregoing date shall be extended to March 31, 2015 (or such later date to which AWG and Debtors agree in writing);

(b) the date that is 14 days after the date on which the Debtors ceases to be primarily supplied by AWG;

(c) the date on which the Debtors fails to meet any of the Sale Milestones contained in this Interim Financing Order in paragraphs 31-36, unless such dates are extended at the sole discretion of AWG;

(d) the occurrence of an Event of Default (as defined in the DIP Credit Agreement);

(e) the proposal by any of the Debtors of any plan of reorganization which is not an Acceptable Plan of Reorganization; or

(f) the effective date of a confirmed Acceptable Plan of Reorganization in a Case or these Cases, unless, pursuant to such Acceptable Plan of Reorganization, AWG has agreed to different payment terms, in which circumstances, the terms of the Acceptable Plan of Reorganization will govern the treatment of the DIP Loan.

22.     Unless and until the Obligations (as defined in the DIP Credit Agreement) are repaid in full, the protections afforded to AWG under its Loan Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting any of these Cases into a successor case, and the Liens in and to the Collateral and the AWG Superpriority Claims shall continue in these proceedings and in any successor case, and such Liens and AWG Superpriority Claims shall maintain their priority as provided by this Interim Financing Order until the Obligations have been satisfied in full.

23.     Unless otherwise agreed to by AWG in its sole discretion, the time and manner of payment of the Obligations pursuant to the DIP Credit Agreement and the Liens in and to the Collateral and the AWG Superpriority Claims shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed or by any further order which may hereafter be entered.

24.     Debtors may use Cash Collateral and the proceeds of the DIP Loan and advances made pursuant to the DIP Credit Agreement only for the purposes specifically set forth in the DIP Credit Agreement and the Loan Documents and in the budget attached hereto as <u>Exhibit B</u> (the "**Budget**" which Budget may be modified by prior written agreement between Debtors and AWG without further notice, hearing, or order from this Court and, as modified, shall be deemed the Budget) and any subsequent period budgets as required by the DIP Credit Agreement which period budgets must be approved by AWG (thereafter such subsequent budgets shall become the Budget) with allowance for a ten percent (10%) line item variance and five (5%) aggregate variance measured on a weekly basis; <u>provided</u> <u>however</u>, no variance shall be permitted with respect to the Carve-Out. Debtors shall provide a reconciliation of actual revenues, expenses and disbursements against the Budget on a weekly basis on the Thursday following the prior calendar week. All Budgets approved by AWG subsequent to the entry of this Interim Financing Order or entry of a Final Financing Order shall be filed of record for notice purposes with the Court. The Debtors' authority to use cash collateral subject to the Post-Petition Liens of AWG and DIP Loan advances or other extensions of credit shall continue until expiration of the Budget or an Event of Default and be used only to pay *bona fide* operating expenses Debtors incur in the ordinary course of operating Debtors' business per the Budget. Also notwithstanding anything herein or in the DIP Credit Agreement to the contrary, no such loans or any proceeds of the Collateral, including, without limitation, any Cash Collateral, may be used by Debtors, the Creditors' Committee or any other person or entity to object to or contest in any manner, or raise any defenses to, the validity, extent, perfection, priority or enforceability of the Debtors' obligations to AWG or any Liens or security interests with respect thereto or any other rights or interests of AWG.

<u>**ATTORNEY FEES AND CARVE OUT**</u>

25.    Payment or recovery of AWG reasonable attorneys' fees and costs as described on page 9 of the Motion are not permitted during the interim period and are deferred pending entry of a Final Order.

26.    The lien requested or to be granted on Chapter 5 causes of action to the extent of payment of professional fees is deferred pending entry of a Final Order.

27.    Notwithstanding any provision of this Interim Financing Order or the Loan Documents to the contrary, the Liens and Superpriority Claims granted to AWG pursuant to such Loan Documents and this Interim Financing Order are subject and subordinate to the Carve Out for (a) the payment of all accrued and unpaid allowed professional fees and expenses of attorneys, accountants, financial advisors and consultants retained by Debtors or the Creditors' Committee pursuant to Bankruptcy Code Sections 327 or 1103(a) incurred prior to the occurrence of an Event of Default (the "Professional Fees and Expenses"); provided, however, that the Professional Fees and Expenses to be included in the Carve Out and entitled to priority over the AWG Superpriority Claim shall not exceed those amounts authorized pursuant to the Budget; provided further, however, that if an Event of Default shall have occurred, the Carve Out for Professional Fees and Expenses shall be limited to those fees and expenses incurred prior to the date of the Event of Default and limited to the amount allowed for such Professional Fees and Expenses covered in any applicable Budget through and including the date of the Event of Default, and (b) quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a) and any fees payable to the Clerk of the Bankruptcy Court (collectively the "Carve Out"). The Carve Out shall be calculated as of the first occurrence of any Event of Default under either the DIP Credit Agreement, the Interim Financing Order, or the Final Financing Order and shall not increase after that date. The Carve Out shall exclude, and shall not be used to fund any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding application, motion, objection, defenses or other contested matters, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, subordinating, in whole or in part, (i) the Obligations or (ii) AWG's Liens or (B) preventing, hindering or delaying whether directly or indirectly, AWG's assertions or enforcement of the Liens, security interests, or realization upon any Collateral or of the rights and remedies granted pursuant to this Interim Financing Order; (y) in using cash collateral of AWG, selling or otherwise disposing of any other Collateral, or incurring any Indebtedness not permitted under the DIP Credit Agreement without AWG's consent or (z) arising after the conversion of any of the Chapter 11 cases to a case under chapter 7 of the Bankruptcy Code. Except as otherwise provided in this paragraph, nothing contained in this Interim Financing Order shall be deemed a consent by AWG to any charge, lien, assessment or claim against the Collateral under Sections 105, or 506 (c) of the Bankruptcy Code or otherwise. The foregoing shall not be construed as consent by AWG to the allowance of any Professional Fees and Expenses and shall not affect the right of AWG to object to the allowance and payment of such amounts.

## EVENTS OF DEFAULT

<u>Pending entry of a Final Order the following terms and conditions govern the Debtors and AWG during the interim period:</u>

28.    Any automatic stay otherwise applicable to AWG shall be modified to permit AWG to exercise rights and remedies under the DIP Credit Agreement as follows:

(a)    Upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), AWG shall provide written notice of such occurrence to Debtors, Debtors' counsel, counsel for a Creditors' Committee, if any, and the United States Trustee.

(b)    The Debtors shall have the right to cure such Event of Default within five (5) days of the date such notice.

(c)    Following the giving of notice by AWG of the occurrence of an Event of Default, Debtors shall be entitled to an emergency hearing before this Court within such five (5) days for the purpose of contesting whether an Event of Default has occurred or asserting any other grounds on which the exercise of remedies by AWG should be stayed.  The automatic stay shall remain in effect pending entry of an order pursuant to any requested hearing.

(d)    If Debtors cure such Event of Default within said five (5) days or the Debtors does not contest the right of AWG to exercise its remedies within such time period, or if Debtors do timely contest AWG's rights, or if an emergency hearing on the occurrence of an Event of Default is not held within the five-day notice period or if the Court, after hearing, declines to stay the enforcement thereof, the automatic stay of Bankruptcy Code Section 362(a), as to AWG, shall automatically terminate at the end of such five (5) day period without further order of the Court and without regard to any additional stay applicable pursuant to Bankruptcy Rule 4001(a)(3).  For purposes of this provision, AWG and Debtors agree that twenty-four hour prior telephonic notice of an emergency hearing on the occurrence of any Event of Default provided to counsel for AWG and such other parties as the Court may direct shall be proper notice and that such hearing may be conducted telephonically.

(e)    Notwithstanding Debtors' right to contest the existence of an Event of Default, after AWG furnishes such notice of an Event of Default, (i) Debtors shall continue to deliver and cause the delivery of the proceeds of Collateral to AWG as provided in the DIP Credit Agreement and this Interim Financing Order; (ii) AWG shall continue to apply such proceeds in accordance with the provisions of this Interim Financing Order and of the DIP Credit Agreement; (iii) Debtors shall have no right to use any of such proceeds, or any other cash collateral (as defined in Bankruptcy Code Section 363(a)) other than towards the satisfaction of the Obligations and the Carve Out; and (iv) any obligation otherwise imposed on AWG to provide any loan or advance or other extension

15

of credit to Debtors pursuant to the DIP Loan or on the Open Account shall be suspended.

29.     If AWG exercises any of its rights and remedies upon the occurrence of an Event of Default under the Loan Documents, AWG may retain one or more agents to sell, lease, or otherwise dispose of the Collateral.  In any exercise of its rights and remedies upon an Event of Default under the Loan Documents, AWG is authorized to proceed under or pursuant to the Loan Documents.

30.     In the exercise of AWG's rights and remedies upon default,

(a) AWG may by written notice to Debtors require Debtors to file a Motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to AWG.  Debtors shall file such Motion within ten (10) business days of AWG's request and shall diligently prosecute such Motion.  If Debtors fail to so file the Motion, AWG may, file and prosecute such a Motion in the name of Debtors; and/or

(b) AWG may by written notice to Debtors require Debtors to file a Motion or Motions seeking to sell, assume, assign, or otherwise dispose of any or all of the real estates (including, without limitation, leasehold interests) of Debtors pursuant to Sections 363 and 365 of the Bankruptcy Code, on terms acceptable to AWG.  Debtors shall file such Motion or Motions within ten (10) business days of AWG's request and shall diligently prosecute such Motion.  If Debtors fail to so file such Motion, AWG may, file and prosecute such a Motion(s) in the name of Debtors; and/or

(c) AWG may proceed under or pursuant to the DIP Credit Agreement and other Loan Documents; and/or

(d) In the event of a sale by AWG or Debtors to AWG of any of the Collateral, such sale shall be deemed to be commercially reasonable in all respects and for fair market value; and/or

(e) In the event of a public or private sale of any of the Collateral to foreclose or otherwise enforce a lien, the proceeds of such sale shall be deemed to be fair market value for purposes of credit on the Obligations.

All net proceeds realized from any of the foregoing shall be turned over to AWG for application to the Obligations under, and in accordance with the provisions of, the DIP Credit Agreement and other Loan Documents.

31.     In connection with AWG's exercise of its remedies upon default, including, without limitation, the conduct of any sale or other disposition of the Collateral in accordance with the terms and conditions of this Interim Financing Order or the Loan Documents:

16

(a) All parties and persons of every nature and description, including, but not limited to, landlords, utilities, governmental agencies, sheriffs, marshals, and other public officers, creditors, and all those acting for or on their respective behalf, shall be, restrained and enjoined from interfering, in any way with, or otherwise impeding the conduct of any such sale or other disposition at any location of Debtors; the maintenance of inventory at such locations; the use of such operational infrastructure; or from seeking process before any court or other administrative body (other than this Court), the object of which is to directly or indirectly impede, in any way, the conduct of any such sale or other disposition; provided, however, that this provision shall be inapplicable to AWG.

(b) The conduct of any such sale or other disposition may be made without compliance with any licensing law, statute, ordinance, or regulation of any governmental authority; provided, however, that the foregoing shall not affect in any way any obligation of AWG or any such agent to comply with any law, statute, ordinance, or regulation of any governmental authority incident to the protection of public safety.

32.     Nothing included herein shall prejudice, impair, or otherwise affect AWG's rights to seek any other or supplemental relief in respect of the Debtors', nor AWG's, rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans under the DIP Loan.

## MISCELLANEOUS PROVISIONS

33.     AWG's failure to seek relief or otherwise exercise its rights and remedies under the DIP Credit Agreement, the Loan Documents, the DIP Loan, or this Interim Financing Order shall not constitute a waiver of any of its rights hereunder, thereunder, or otherwise.

34.     Pending entry of a Final Order the Creditors' Committee – should one be formed in this Case – shall be granted a period of sixty (60) days after its appointment  (the "**Challenge Period**"), during which such Creditors' Committee may investigate, seek standing to challenge, and challenge the validity of AWG's pre-petition liens and security interests (the "**Challenge Rights**").  If the Creditors' Committee does not initiate a Complaint or contested matter, before the expiration of the Challenge Period, on the basis of the Challenge Rights, the Creditors' Committee shall be bound by all releases, waivers and admissions of the Borrower contained in the Final Order.

26.

35.     The payments made, and the Liens and Superpriority Claims granted to AWG under this Interim Financing Order, and the priority thereof, shall be binding on Debtors, and their respective successors and assigns, including, without limitation, any successor Trustee for Debtors, and all creditors of Debtors, as provided in Bankruptcy Code Section 364(e). If any or all of the provisions of this Interim Financing Order are hereafter modified, vacated or stayed by

SLC-7339665-6

subsequent order of this Court, or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of any lien, security interest, priority, or other benefit authorized hereby with respect to any Post-Petition debt incurred prior to the effective date of such subsequent order (and all such liens, security interests, priorities and other benefits shall be governed in all respects by the original provisions of this Interim Financing Order).

36.     If any provision of this Interim Financing Order is hereafter modified, vacated or stayed by subsequent order of this or any other Court for any reason, such modification, vacation, or stay shall not affect the validity of any liability incurred pursuant to this Interim Financing Order and the effective date of such modification, vacation, or stay was established, nor the validity, priority, or enforceability of any Lien granted by Debtors to AWG.

37.     All depository banks, blocked account banks, and credit card processors shall comply, for the benefit of AWG, with the terms and conditions of any Blocked Account Agreement, DDA Notifications, or Credit Card Notifications received or furnished in connection with the DIP Credit Agreement notwithstanding any prior notifications received by such banks or processors.

38.     By executing the Loan Documents and taking any other actions pursuant to this Interim Financing Order, AWG shall not (1) be deemed to be in control of the operations of Debtors; or (2) be deemed to be acting as a "responsible person" with respect to the operation or management of Debtors.

39.     Except as otherwise explicitly set forth in this Interim Financing Order, this Interim Financing Order does not create any rights for the benefit of any third party, creditor, or any direct, indirect, or incidental beneficiary.

40.     The provisions of this Interim Financing Order shall inure to the benefit of the Debtors, AWG, and any assignee or successor to each of the foregoing, including any trustee thereafter appointed in these Cases, and shall also be binding upon all creditors of the Debtors and other parties in interest.

41.     Debtors and AWG may amend or waive any provision of the DIP Credit Agreement, provided that such amendment or waiver, in the judgment of Debtors and AWG, is either non-prejudicial to the rights of third parties or is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the parties hereto and approved by the Court.

42.     The Final Hearing is hereby scheduled for **November 25, 2014**, at 1:00 p.m. in Courtroom 2 United States Bankruptcy Court for the Southern District of Iowa, and may be continued from time to time.

43.     Debtors shall, no later than three (3) business days after entry of this Interim Financing Order serve by U.S. mail copies of the notice of entry of this Interim Financing Order, together with a copy of this Interim Financing  Order and proposed Final Financing Order to (i)

18

parties having been given notice of the emergency hearing (ii) any other party which has filed a request for special notice with this Court and served such request upon Debtors' counsel, (iii) counsel for any statutory committee, (iv) all creditors who have recorded a UCC-1 financing statement on the personal property of Debtors or a Lien on any of Debtors' real estates; (v) all immediate landlords that are direct parties to leases with Debtors;  (vi) counsel to AWG; (vii) the United States Trustee; and (viii) Attorneys General and state taxing authorities for all jurisdictions in which Debtors do business.   Debtors shall also serve all creditors, including taxing authorities and potential consignment claimants, with this Interim Financing Order (without exhibits), advising them of the Final Hearing and offering to provide a copy of this Interim Financing Order upon request.   Any objection to the entry of a Final Financing Order must be filed with the Court and served upon counsel for the Debtors, AWG, and the United States Trustee, no later than seventy-two hours prior to the commencement of such Final Hearing.   Any timely and properly filed and served objection will be heard at the Final Hearing.


IT IS SO ORDERED.


/s/ Anita L. Shodeen
United States Bankruptcy Judge

## Exhibit A

**DIP Credit Agreement**

SLC-7339665-6

## Exhibit B

**Budget**