# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | ) |
| | ) Case No. 14-02689 |
| FOODS, INC. d/b/a DAHL'S FOODS *et al.*, | ) (Joint administration Pending) |
| | ) |
| Debtors. | ) Chapter 11 |
| | ) |
| | ) Hon. Anita L. Shodeen |
| | ) |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR POSTPETITION FINANCING AND USE OF CASH COLLATERAL

The Official Committee of Unsecured Creditors (the "*Committee*") of Foods, Inc. d/b/a Dahl's Foods and its affiliated debtor entities (collectively, "*Dahl's*" or the "*Debtors*"), by and through its undersigned proposed counsel, hereby submits this objection (the "*Objection*") to the motion for post-petition financing and authorization of use of cash collateral (the "*DIP Motion*") [ECF No. 22] filed by the Debtors. In support of the Objection, the Committee states as follows:

### Preliminary Statement[1]

Within a day of filing bankruptcy, the Debtors filed the DIP Financing Motion which contemplates, among other things, a post-petition financing arrangement that contains a number of onerous terms, including a roll-up of Associated Wholesale Grocers, Inc.'s ("*AWG*") substantial pre-petition debt, liens on chapter 5 causes of action, and the right for AWG to essentially terminate the Debtors' reorganization efforts if AWG does not support a proposed plan.

---

[1] Capitalized terms not defined in the Preliminary Statement are subsequently defined in this Objection.

The Committee submits that the DIP Motion cannot be granted in its current form because:

- o   The proposed Roll-Up of $2.8 million of AWG's pre-petition debt is unnecessary and could allow AWG to cure any deficiencies in the perfection of its pre-petition security interests, to the detriment of unsecured creditors;

- o   The proposed adequate protection, in the form of replacement liens and liens on chapter 5 causes of action, is unnecessary because AWG has a significant equity cushion in its collateral;

- o   The DIP Facility Agreement effectively strips the Debtors of their exclusive right to propose a plan by granting AWG the ability to terminate the Debtors' funding if AWG does not approve of any plan the Debtors propose; and

- o   The proposed budget seeks to marginalize the Committee by providing a disproportionately small carve-out for Committee professionals.

### **Relevant Factual Background**

On November 9, 2014 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors are operating their businesses and managing their property as a debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' bankruptcy schedules (the "*Schedules*") [ECF No. 1] indicate that they hold assets valued at approximately $44 million (not including the value of inventory, intellectual property, or equipment) and have liabilities of approximately $41 million. Schedule D indicates that AWG holds an alleged secured claim of approximately $36 million against the Debtors. Thus, according to the Debtors' own filings, AWG is oversecured by approximately $8 million.

The Debtors filed a motion to approve a key employee retention plan (the "*KERP Motion*") [ECF No. 21] on November 9, 2014, which seeks approval to pay approximately

$255,000 to certain "key employees," including payments to members of the Debtors' board of directors. The Debtors concede in the KERP Motion that the board members are insiders.

The Debtors filed the DIP Motion on November 10, 2014. The DIP Motion seeks approval of a debtor-in-possession loan (the "*DIP Facility*") by which the Debtors would be permitted to borrow nearly $9.8 million from AWG. The Debtors propose to use approximately $2.8 million of the DIP Facility to repay AWG on account of certain pre-petition indebtedness (the "*Roll-Up*"). The loan agreement for the DIP Facility (the "*DIP Facility Agreement*") provides that, in exchange for the DIP Facility, the Debtors will grant AWG: (i) adequate protection liens to the extent of diminution of the collateral securing the pre-petition debt, in the form of superpriority administrative claims and replacement liens in all assets of the Debtors, *including* chapter 5 causes of action to the extent of paying any professional fees; (ii) a release of claims against AWG unless the Committee challenges AWG's liens before the expiration of a 60-day challenge period; and (iii) a waiver of the right to surcharge AWG's collateral pursuant to section 506(c) of the Bankruptcy Code. The DIP Motion also provides for a carve-out (the "*Carve-Out*") for professional fees and quarterly U.S. Trustee fees, and grants other rights to AWG with respect to any proposed plan of reorganization.

Also on November 10, 2014, the Debtors filed a motion to approve bidding procedures (the "*Bid Procedures Motion*") [ECF No. 19], which seeks approval of certain procedures (the "*Bid Procedures*") for the solicitation of bids and an auction of the Debtors' assets. The Bid Procedures Motion also seeks approval of AWG as a stalking horse bidder (the "*Stalking Horse*"), a break-up fee (which actually appears to be an expense reimbursement) in the amount of $315,000 (the "*Break-Up Fee*") to be awarded to AWG if it is not chosen as the winning bidder, and grants AWG the right to participate in the decision-making process for selecting qualified bidders and the winning bidder for the purchase of the Debtors' assets.

On November 18, 2014, the Office of the United States Trustee appointed the Committee as an official committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102 of the Bankruptcy Code.

### Objections

The Committee submits that the DIP Financing Motion provides excessive and unwarranted protections to AWG as the pre-petition lender and these protections are at the expense of unsecured creditors. In particular, the Committee objects to the DIP Motion because (1) the Roll-Up is unnecessary and unwarranted under existing law, (2) there is no demonstrated need to grant AWG adequate protection liens, (3) there is no demonstrated need to grant AWG liens on chapter 5 causes of action, (4) the terms of the DIP Facility Agreement deprive the Debtors of the exclusive right to propose a plan of reorganization, (5) the terms of the DIP Facility Agreement do not contemplate a full, fair, and robust marketing of the Debtors' assets, (6) the Carve-Out unfairly discriminates against the Committee, and (7) the proposed budget for the DIP Facility wrongfully contemplates payment to AWG's counsel as an administrative expense.

**I.      The Proposed Roll-Up is Unnecessary and Violates the Bankruptcy Code's Priority Scheme.**

By the Roll-Up, the Debtors and AWG seek to repay $2.8 million of AWG's pre-petition debt from the post-petition DIP Facility. Specifically, paragraph 6 of the proposed final order (the "*Final DIP Order*") provides, *inter alia*,

> The Pre-Petition Credit Agreement Debt and Pre-Petition Open Account Debt shall constitute an Allowed Claim in an amount not less than $5,924,623.00 (the "**Pre-Petition Debt**"). The Debtors are hereby authorized and directed . . . to use a portion of the DIP Loan in the amount of $2,822,977.15 to pay the Pre-Petition Credit Agreement in full . . . .

(Final DIP Order, ¶ 6).

4

The Roll-Up circumvents the priority scheme set forth in the Bankruptcy Code. *See In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494-1496 (11th Cir. 1992) (noting that a roll-up is inconsistent with bankruptcy law because (a) it is not authorized as a means of post-petition financing pursuant to Section 364, and (b) it is directly contrary to the fundamental priority scheme of the Bankruptcy Code); *In re Monarch Circuit Industries, Inc.,* 41 B.R. 859, 862 (Bankr. E.D. Pa. 1984). In a case with facts very similar to these, a court specifically prohibited a roll-up where the secured creditor sought to pay off a pre-petition loan balance with a post-petition line of credit. *In re Equalnet Commcn's Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000). There, the court held that " . . . based on the Eleventh Circuit's ruling in the case of *Saybrook* . . . a secured creditor's pre-petition debt balance may not be paid off and/or 'rolled into' a postpetition line of debtor-in-possession financing, with resultant enhancement of collateral position and administrative priority." *Id.*

The Committee, moreover, was only recently appointed and has not had an opportunity to examine the validity, priority, and extent of AWG's pre-petition liens. If AWG has, in fact, failed to properly perfect security interests in all of the Debtors' assets to secure its prepetition debt, the Roll-Up would encumber assets which were previously unencumbered, leaving fewer assets available for distribution to unsecured creditors. The Roll-Up is entirely unnecessary to the Debtors' reorganization because it could potentially deprive unsecured creditors of previously unencumbered assets, and the $2.8 million will not be used for the Debtors' operations or to pay administrative expenses.

Finally, the Debtors' attempts to justify the Roll-Up are without merit. The Debtors cite to the fact that AWG is providing $3 million in new post-petition funds, AWG continues to provide revolving credit, and AWG is serving as the stalking horse bidder for the Debtors' assets. The Debtors' own filings establish that AWG is oversecured on its pre-petition debt by

approximately $8 million, yet the Debtors still offer a superpriority lien on all the Debtors' assets to secure the DIP Facility.  (DIP Financing Motion, ¶ 29).  AWG needs no additional incentive to lend funds post-petition.  The Roll-Up is inappropriate and should not be approved.

II.     **The Debtors Have Not Demonstrated the Need to Grant AWG Adequate Protection Liens.**

The DIP Facility would also grant AWG adequate protection liens to the extent of diminution of the collateral securing the pre-petition indebtedness in the form of superpriority administrative claims and replacement liens in all assets of the Debtors. (Final DIP Order, ¶¶ 7, 17).  The Committee objects to these provisions because AWG is already adequately protected through the substantial equity cushion in the Debtors' assets.

Section 364(d)(1) provides: "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1).  Regardless of form, the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case. *In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987).  To determine whether a secured creditor is entitled to adequate protection, "a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case." *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995). *See*

*also Martin v. U.S. Commodity Credit Corp. (In re Martin)*, 761 F.2d 472, 476–77 (8th Cir. 1985); *In re Weiser*, 74 B.R. 111, 115 (Bankr. S.D. Iowa 1986).

As stated above, AWG is oversecured and has an equity cushion of approximately $8 million, or 22% of its total debt. "'Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.'" *Mendoza v. Temple–Inland Mortg. Corp. (In re Mendoza)*, 111 F.3d 1264, 1272 (5th Cir. 1997) (quoting *In re Kost*, 102 B.R. 829, 831 (Bankr. D. Wyo. 1989)); *see also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 305-06 (Bankr. D. Del. 2011); *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (surveying adequate protection cases and finding case law agreement on a 20% equity cushion being sufficient, 10% being insufficient, and cases conflicting in the middle). Further, the Debtors have offered no evidence regarding actual or anticipated diminution in the value of AWG's collateral. Accordingly, the Debtors have not demonstrated a need to grant AWG adequate protection liens in the form of superpriority administrative claims and replacement liens in all assets of the Debtors.

**III.    The Debtors Have Not Demonstrated the Need to Grant AWG Liens on Chapter 5 Causes of Action.**

The DIP Facility also grants AWG a lien on the Debtors' chapter 5 causes of action (such as preference and fraudulent transfer claims), to the extent of any payments made to professionals. (Final DIP Order, ¶ 7(b)). The Committee objects to this provision because there is no need to grant AWG liens on chapter 5 actions, as it is oversecured and this lien would deprive unsecured creditors of an asset that is generally reserved for them.

Courts often refuse to grant liens on chapter 5 actions because "neither a trustee in bankruptcy, nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference." *See In re Texas General Petroleum Corp. v. Evans (In re Texas*

7

*General Petroleum Corp.)*, 58 B.R. 357, 35 (Bankr. S.D. Tex. 1986). In fact, even when in exchange for valuable consideration and where contracts explicitly provide for the assignment of an avoidance action, certain courts have refused to give any effect to such assignment. *See United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D. N.Y. 1981).

The Debtors have not even demonstrated a need to encumber chapter 5 causes of action. AWG has an $8 million equity cushion, providing it with more than sufficient protection for the payment of any professionals. Further, there is no evidence suggesting that the value of AWG's collateral has declined or is declining. This provision would deprive the estates of an asset that is traditionally reserved for the benefit of unsecured creditors without any justification for doing so. As such, the Committee requests that the Court strike this provision from the Final DIP Order.

**IV.    The DIP Facility Agreement's Proposed Terms Violate the Debtors' Exclusive Right to Propose a Plan of Reorganization.**

In addition to the above-discussed protections, the Final DIP Order grants AWG essentially unrestricted veto rights over any plan of reorganization proposed by the Debtors or any other party-in-interest. Paragraph 19 of the Final DIP Order states:

> Unless AWG has provided their [*sic*] prior written consent, there shall be no order entered in these proceedings, or in any successor cases, authorizing any of the following:
>
> (c)    Confirming a plan of reorganization which is not wholly acceptable to AWG in its sole discretion (an "**Acceptable Plan of Reorganization**").

(Final DIP Order, ¶ 19(c)). Further, the entire DIP Facility shall become due and owing if the Debtors propose a plan that is not an Acceptable Plan of Reorganization. (*Id.* at ¶ 21(e)). The Committee strongly objects to these provisions, as they are violative of the Bankruptcy Code and

8

would permit AWG to hold the Debtors hostage unless its demands related to a plan – no matter how unreasonable they may be – are met.

Section 1121(b) of the Bankruptcy Code provides that only a debtor may file a plan of reorganization in the first 120 days after filing for bankruptcy relief. Section 1121 serves two purposes: (1) allowing a debtor reasonable time to confirm a plan without the threat of a competing plan, and (2) ensuring that the debtor will not unreasonably delay its bankruptcy case. *Matter of Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993). These provisions do not further the purposes of section 1121, but rather permit AWG to commandeer the Debtors' exclusivity rights and give AWG the authority to essentially terminate the Debtors' reorganization efforts.

Further, paragraph 19 of the Final DIP Order would prevent this Court from entering an order confirming a chapter 11 plan unless AWG gives its approval. This provision usurps this Court's authority to confirm a chapter 11 plan and, accordingly, should be stricken.

V.   **The DIP Facility's Proposed Terms Do Not Permit a Full, Fair and Robust Marketing of the Debtors' Assets.**

The Final DIP Order provides that the entire DIP Facility becomes immediately due under several scenarios, including the failure to meet certain milestones with respect to the Debtors' sale of their assets (the "*Sale Milestones*"). (Final DIP Order, ¶ 21(c)). Paragraphs 32 through 37 of the Final DIP Order identify the Sale Milestones the Debtors must meet or risk AWG terminating the DIP Facility. Paragraphs 35 and 36 require that the Debtors conduct an auction of the Debtors' assets no later than January 19, 2015 and hold a final sale hearing no later than January 26, 2015. These deadlines are less than 80 days after the Petition Date, and are not in the best interests of creditors because they do not permit the Debtors and their professionals sufficient time to appropriately market the Debtors' assets. In addition, the due

9

diligence period will be significantly truncated, which is likely to have a chilling effect on bidding.

Simply put, these deadlines do not support a robust marketing and sale of the Debtors' assets designed to maximize the value of the Debtors' estates for the benefit of their creditors. Instead, this overly-aggressive timeline only benefits AWG, who appears poised to purchase the Debtors' assets out of bankruptcy at a steep discount,[2] and possibly resell the assets for a profit. The Court should not approve a process that does not allow the Debtors sufficient time to complete a thorough marketing and sale effort. Consequently, the Committee objects to the DIP Motion and requests that the Court require that the Debtors be given adequate time to fully and fairly market their assets.

## VI. The Carve-Out Unfairly Discriminates Against the Committee.

The proposed budget (the "*Budget*") for the DIP Facility provides that the Committee is granted a bi-weekly Carve-Out of $5,500 for its professionals, while the Debtors' professionals have a bi-weekly budget of over $67,000 – more than 12 times the Committee's Carve-Out. The Committee's budgeted fees represent approximately **5%** of the total budgeted professional fees.

The Budget marginalizes the Committee and prevents it from carrying out its statutory duties, including investigating the validity, priority, and extent of AWG's pre-petition liens and ensuring a full and fair sale process in order to maximize the value of the Debtors' estates. *See* 11 U.S.C. § 1103(c) (permitting the Committee to, *inter alia*, investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors and the operation of the Debtors' businesses, and participate in the formulation of a plan).

---

[2] AWG's stalking horse bid is $4.8 million plus the value of the Debtors' inventory, while the Debtors' Schedules value the assets at over $44 million without including the value of the inventory. This indicates AWG's total proposed purchase price is substantially lower than the value of the Debtors' assets.

Undoubtedly, in complex chapter 11 cases, an investigation pursuant to section 1103(c) will require a committee and its professionals to expend significant resources. However, as contemplated by the Budget, the Committee will be severely restricted in its ability to conduct a meaningful investigation in accordance with section 1103(c), compared against the Debtors' and AWG's generously-funded professionals. While AWG does not have a specific statutory duty to fund a Committee's professionals, notions of equity demand that AWG treat the Committee in a manner commensurate with the Debtors, and that this Court redress the inequity that AWG seek to impose. *See In re Ames Department Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("[I]t has been the uniform practice in this court …to insist on a carve out from a super-priority status and post-petition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system. Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced."); s*ee also In re Evanston Beauty Supply, Inc.*, 136 B.R. 171, 176 (Bankr. N.D. Ill. 1992) (stating that carve-outs are necessary to foster the reorganization process and designed to accommodate all classes of creditors, not just the pre-petition lender).

Further, the DIP Motion states that the Carve-Out may not be used to prosecute claims against AWG or in seeking to invalidate, challenge or dispute AWG's liens. (DIP Motion, ¶ 56; DIP Facility Agreement § 2.13(c)). Again, the Debtors and AWG seek to limit the Committee's ability to perform its statutory duties and preserve the adversarial system by refusing the fund the Committee's efforts to take action that is in the best interests of <u>all</u> creditors. The Committee requests that this provision be stricken and that the Committee should be permitted to use up to $25,000 of its Carve-Out to investigate and, if appropriate, challenge AWG's liens and claims.

The Carve-Out is insufficient to permit the Committee to carry out its statutory duties and does not preserve the adversary system that the appointment of a Committee is meant to foster.

11

Therefore, the Committee objects to the DIP Motion and the proposed Budget as it relates to the Carve-Out for the Committee's professionals as well as to the provision excluding the Committee's investigation, and possible challenge, of the validity, priority and extent of AWG's liens and AWG's claims. Further, the Committee requests that the Court require that the Committee's professionals be afforded the same funding provided to the Debtors' professionals.

**VII.    The Proposed Budget Wrongfully Contemplates Payment to AWG's Counsel as an Administrative Expense.**

In additional to marginalizing the Committee's professionals, the Budget includes a specific line item for AWG's attorneys' fees of $37,333 every two weeks – nearly 7 times the Committee's allotted professional fees. The Committee objects to this line item because AWG's fees do not constitute an administrative expense of the Debtors' estates.

The attorneys' fees of AWG cannot qualify as administrative expenses of the Debtors' estates. Section 503(b)(1)(A) of the Bankruptcy Code provides for administrative expenses status for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Courts have held that "a claim will be afforded priority under section 503 if the debt both (1) arises from a transaction with the debtor-in-possession; and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (internal quotation marks omitted) (citation omitted). These fees represent work performed for the benefit of AWG, a secured creditor, not for the Debtors' estates. Accordingly, the Committee objects to the line item for AWG's attorneys' in the Budget and requests that the line item be stricken.

<u>**Conclusion**</u>

For the foregoing reasons, the Committee submits that the DIP Motion contains several provisions that could negatively impact the recovery to unsecured creditors and should not be

approved. The aggressive deadlines and restrictive terms of the Final DIP Order would limit the Committee's role, provide unnecessary protections to AWG, and prevent the Debtors from conducting a robust sale process. Only AWG benefits from these provisions. The Committee requests that the Final DIP Order be modified consistent with the objections raised herein.

Dated: November 24, 2014

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF FOODS, INC. d/b/a DAHL'S FOODS,** *et al.*

By: /s/ Richard S. Lauter
       Its Proposed Counsel

Richard S. Lauter*
Thomas R. Fawkes*
Elizabeth L. Janczak*
FREEBORN & PETERS LLP
311 South Wacker Drive, Ste. 3000
Chicago, Illinois 60606-6677
Telephone: 312.360.6000
Facsimile: 312.360.6520
rlauter@freeborn.com
tfawkes@freeborn.com
ejanczak@freeborn.com

*Pro hac vice* admission pending

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on November 24, 2014, the *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Postpetition Financing and Use of Cash Collateral* was served electronically upon those parties receiving electronic notification through the Court's CM/ECF system and further as set forth below.

                                                             /s/ Richard S. Lauter

**U.S. Mail Service List**

United States Trustee
James L. Snyder, Esq.
Federal Building, Room 793
210 Walnut Street
Des Moines, IA 50309