IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| **FOODS, INC.,** | ) | Case No.  14-02689-11 |
| an Iowa corporation, | ) | (Jointly Administered) |
| | ) | |
| **DAHL'S FOOD MART, INC.,** | ) | Case No.  14-02690-11 |
| an Iowa corporation, | ) | (Jointly Administered) |
| | ) | |
| **DAHL'S HOLDINGS I, LLC,** | ) | Case No.  14-02691-11 |
| an Iowa limited liability company | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | *Date entered on docket: December 3, 2014* |

**FINAL ORDER (i) APPROVING POSTPETITION FINANCING,
(ii) AUTHORIZING USE OF CASH COLLATERAL, (iii) GRANTING SECURITY
INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT,
(iv) PROVIDING ADEQUATE PROTECTION, (v) MODIFYING AUTOMATIC STAY,
AND (vi) AND GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§
363, 364 AND 365 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001**

THIS MATTER, along with an Objection filed by the Iowa Department of Revenue [Docket No. 76], West Coast Life Insurance Company [Docket No. 97]; the Official Committee of Unsecured Creditors (the "Creditors' Committee") [Docket No. 104]; Merchants Capital Resources, Inc., [Docket No. 114]; and  Joinder filed by Commerce Bank [Docket No. 112] (collectively, the "Objections") have come before the Court upon the Motion (the "**Motion**") of Foods, Inc. d/b/a Dahl's Foods, Inc. ("**Dahl's**" ), Dahl's Food Mart, Inc. ("**DFMI**"), and Dahl's Holdings I, LLC ("**Holdings**") as debtors and debtors-in-possession (collectively, the "**Debtors**"), seeking entry of interim and final orders including authority to:

(i)     Obtain credit and incur debt through a multiple-advance term loan up to the aggregate principal amount of **$6,647,973.15** of which up to $**3,000,000.00** will be used for certain working capital expenditures of the Debtors pursuant to the Debtors' Budget (as defined below), **$2,822,977.15** will be used for the refinancing of the Pre-Petition Credit Agreement Debt (as defined below), and up to **$825,000.00** of which will be used, to the extent necessary, solely to repay any amounts under the Debtors' Guaranty Reimbursement Obligation[1] (the "**DIP Loan**") secured by liens (as defined in Section 101(37) of Title 11 of the United States Code, as amended (the "**Bankruptcy Code**") and referred to herein as "**Liens**") on property of Debtors' estates pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code.

---

[1] Unless otherwise stated, capitalized terms shall have the meaning ascribed to them in the DIP Credit Agreement.

(ii)     Establish that DIP Loan up to the aggregate principal amount of **$6,647,973.15** as provided in that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**"), substantially in the form attached as <u>Exhibit A</u> to this order (the "**Final Financing Order**") by and between Debtors and Associated Wholesale Grocers, Inc. ("**AWG**") and incorporated herein by reference.

(iii)     Authorize the application of Advances under the DIP Loan in the amount of **$2,822,977.15** to refinance the Pre-Petition Credit Agreement Debt pursuant to the DIP Credit Agreement.

(iv)     Authorize AWG to apply any and all Post-Petition payments received from the Debtors with respect to the Open Account (as defined below) to the amounts due and payable under the Open Account, notwithstanding the occurrence of the Petition Date, and make Advances under the DIP Loan related to such payments.

(v)     Authorize AWG to extend, and the Debtors to accept, credit terms to the Debtors with respect to the Supply Agreement and the Open Account on the same terms and conditions as existed with respect to the Supply Agreement and the Open Account before the Petition Date, such that the amounts due and owing under the Open Account shall be paid in the ordinary course of the Debtors' business after the Petition Date, notwithstanding the occurrence of the Petition Date.

(vi)     Authorize and direct the Debtors to request Advances under the DIP Loan to repay any amounts related to the Guaranty Reimbursement Obligation and authorize AWG to apply such Advances to reduce the amounts owing to AWG with respect to the Guaranty Reimbursement Obligation pursuant to the Pre-Petition Credit Agreement and the DIP Credit Agreement.

(vii)     Authorize, pursuant to Section 363(c)(2) and Bankruptcy Rule 4001, the Debtors' use of Cash Collateral as such term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") subject to the terms and conditions of the DIP Credit Agreement and this Final Financing Order.

(viii)     Grant AWG valid, perfected, unavoidable, first-priority Liens to secure payment and performance of the Obligations (as defined in the DIP Credit Agreement) pursuant to Section 364(d) of the Bankruptcy Code on all assets of the Debtors as more fully described and as provided in and as contemplated by the DIP Credit Agreement as supplemented by this Final Financing Order (the DIP Credit Agreement and all such instruments and documents as may be executed and delivered in connection therewith or which relate thereto are hereinafter collectively referred to as the "**Loan Documents**") subject to the Permitted Encumbrances.

(ix)     Grant AWG valid, perfected, unavoidable, Post-Petition Liens, junior only to the Liens granted under the Loan Documents and the Permitted Encumbrances (which Permitted Encumbrances shall retain their relative pre-petition priority with respect to the applicable collateral on which such holders claim a lien, including with respect to AWG), securing the

2

Debtors' pre-petition obligations including obligations under the Supply Agreement, Leases, and Subleases (as defined herein), and as adequate protection for AWG's Liens and rights related to the Supply Agreement, Leases, and Subleases, and as adequate protection for the Debtors' use of AWG's Cash Collateral.

(x)      Grant AWG a first priority, perfected purchase money security interest ("**PMSI**") over any and all other claims or claimants in any Inventory supplied to the Debtors by AWG and in certain new product lines, including dairy products and pharmacy products.

(xi)     [omitted]

(xii)    Grant AWG a superpriority claim pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses  (a "**Superpriority Claim**") subject to the Carve Out (as defined below).

(xiii)   Authorize Debtors to pay all of AWG's reasonable costs and expenses, including outside legal expenses, associated with the preparation and approval of the DIP Credit Agreement, the Loan Documents, and related items from the proceeds of the DIP Credit Agreement.

(xiv)    Modify the automatic stay to the extent necessary and required by the DIP Credit Agreement.

(xv)     It appearing that absent the relief requested herein, Debtors will suffer immediate and irreparable harm; and it further appearing that notice of the Final Hearing (as defined below) is sufficient under the circumstances and complies with the requirements of Bankruptcy Rules 4001(c) and 4001(d); and for good cause shown:

IT IS HEREBY FOUND THAT:

A.      On November 9, 2014 (the "**Petition Date**"), Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

B.      The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1008.  No trustee or examiner has been appointed in these cases.

C.      On November 18, 2014, the Creditors' Committee was appointed in these cases.

D.      This Court has jurisdiction, pursuant to 28 U.S.C. §1334, over these proceedings, and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (G).

E.      The ability of Debtors to finance their operations and the availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to Debtors' ability to preserve and maintain Debtors' going-concern

value and their ability to consummate a successful reorganization.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of the Cash Collateral and the DIP Loan.  In the absence of the use of the Cash Collateral and the DIP Loan, serious and irreparable harm to the Debtors and their estates will occur.

F.     The Debtors' use of Cash Collateral and the DIP Loan are critical to Debtors' continued operations, because these are the primary sources of funds available to meet Debtors' anticipated expenses while they reorganize and seek to sell their assets and maximize the value of their estates.

G.     The Debtors have requested that AWG consent to the use of AWG's Cash Collateral and AWG is willing to give such consent subject to the terms and conditions contained herein.

H.     An immediate need exists for Debtors to obtain funds with which to purchase inventory, continue their operations, and administer and preserve the value of their estates.  The ability of Debtors to finance their operations requires the additional availability of working capital, the absence of which would immediately and irreparably harm Debtors, their estates and their creditors and the possibility for a successful reorganization.

I.     Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense.

J.     Debtors are also unable to obtain further secured credit, allowable only under Bankruptcy Code Sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and conditions than those provided in the Loan Documents and this Final Financing Order, including, without limitation, the requirement of the repayment of the Pre-Petition Debt.  Debtors are unable to obtain credit or money without (i) Debtors' granting to AWG pursuant to Section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b) (subject to the Carve Out, as defined below), and (ii) securing pursuant to Bankruptcy Code Sections 364(c)(2), 364(c)(3) and 364(d) such indebtedness and obligations with security interests in and Liens on substantially all of the assets of Debtors, as described below (subject to the Carve Out).

K.     The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of Debtors' businesses and the management and preservation of their property.

L.     It is in the best interest of Debtors' estates to be allowed to establish the DIP Loan contemplated by the Loan Documents.

M.     The terms and conditions of the use of Cash Collateral and of the DIP Loan and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

N.      The Loan Documents were negotiated in good faith and at arm's length between Debtors and AWG.  Credit to be extended under the DIP Loan will be so extended in good faith, in consequence of which AWG is entitled to the protection and benefits of Bankruptcy Code Section 364(e).

O.      On the Petition Date, Debtors were indebted to AWG pursuant to a Credit Agreement dated as of March 19, 2013 (as such Credit Agreement may have been amended, restated or otherwise modified from time to time before the Petition Date, the "**Pre-Petition Credit Agreement**"), the amount of such outstanding indebtedness being approximately $2,822,977.15, which amount consists of (a) the aggregate outstanding principal balance of the Term Loan under the Pre-Petition Credit Agreement of approximately $343,979.54 and (b) the outstanding balance of the advance provided under the Pre-Petition Credit Agreement pursuant to the Limited Guaranty of $2,478,993.61 (the "**Pre-Petition Credit Agreement Debt**").  The Debtors admit, acknowledge, and stipulate that the principal amount of all obligations, Obligations, and indebtedness of the Debtors to AWG, both absolute and contingent, existing prior to the commencement of the above-referenced Chapter 11 cases (the "**Cases**"), together with all interest, fees, commissions, costs, and expenses accrued and accruing with respect thereto, is secured pursuant to the Pre-Petition Credit Agreement, and all such instruments and documents as were executed and delivered in connection therewith or which relate thereto, including but not limited to, the Limited Guaranty, the Subleases, the AWG Limited Guaranty, the open account agreements, certain existing promissory notes, existing security agreements, collateral documents, pledge agreements, the membership agreement, and existing leases (hereinafter collectively referred to as the "**Pre-Petition Loan Documents**") and by the following collateral encumbered thereby (collectively, the "**Pre-Petition Credit Agreement Collateral**"): (i) perfected and valid security interests in, and liens upon, substantially all of the Debtors' existing and hereafter acquired Collateral and other security for the Pre-Petition Credit Agreement Debt as provided in the Pre-Petition Credit Agreement, including, but not limited to, the Debtors' real and personal property, consisting of, inter alia, accounts, chattel paper, contracts, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, inventory and investment property of Debtors and the Guarantors, and Debtors' real estates and AWG Equity, money, cash and cash equivalents relating thereto; and (ii) all profits, income, and proceeds derived therefrom, and all accessions, substitutions, renewals, improvement, replacements, and additions thereof, now owned or hereafter acquired by the Debtors, and all rights and property of any kind forming the subject matter of any of the foregoing existing as of the Petition Date, together with all Post-Petition proceeds and products thereof under 11 U.S.C. § 522(b).  The preceding admissions of the Debtors are without prejudice to the rights of the Creditors' Committee to file a Complaint within the Challenge Period (as defined below) with respect to, or otherwise object to, the Pre-Petition Credit Agreement Debt and the liens with respect to same, pursuant and subject to such rights and limitations set forth herein.

P.      AWG, a cooperative wholesaler of grocery and supermarket products of which Dahl's is a member, is the primary supplier to Debtors, accounting for approximately 85% of grocery purchases by the Debtors and approximately 73% percent of the aggregate purchases by Debtors.  Dahl's is a party to a supply agreement ("**Supply Agreement**") under which it

purchases products from AWG for sale in the stores.  Separate from but related to the Supply Agreement, are Dahl's existing Membership Agreement, existing Stock Power of Attorney, existing Non-Competition Agreements, and existing Use Restriction Agreements (collectively the "**Existing Related Agreements**"). The Debtors are also parties to Leases or Subleases with respect to the following real property: 1819 Beaver Avenue, Des Moines, Iowa; 4121 Fleur Drive, Des Moines, Iowa; 5440 NW 86th Street, Johnston, Iowa; 3425 Ingersoll Avenue &  3401 & 3407 Ingersoll Ave., Des Moines, Iowa; 15500 W. Hickman Road, Clive, Iowa; 4343 Merle Hay Drive, Des Moines, Iowa; 3330 and 3400 E. 33rd St., Des Moines, Iowa; 5003 EP True Pkwy, West Des Moines, Iowa. All of Debtors' obligations under the Supply Agreement, the Existing Related Agreements, and the Leases or Subleases are secured pursuant to the Pre-Petition Loan Documents by the Pre-Petition Credit Agreement Collateral and cross-defaulted by the terms of the Pre-Petition Loan Documents.

Q.    The Debtors further admit, acknowledge, and stipulate that the Pre-Petition Credit Agreement Debt and the Pre-Petition Open Account Debt is valid and enforceable and is not subject to offset, credit, or counterclaim, and that the Liens on the Pre-Petition Credit Agreement Collateral securing repayment of the Pre-Petition Credit Agreement Debt and the Pre-Petition Open Account Debt are valid, perfected, and unavoidable.

R.    Debtors purchase goods from AWG on an open account basis.  AWG requires that each member's account be secured by patronage certificates, a letter of credit, and/or certain other collateral based on such member's estimated weekly purchases from AWG.  Debtors' open account with AWG is secured by, among other things, a first-priority lien on, among other things, AWG membership stock, Debtors' right to receive monthly payments, and certain other rebates, refunds and other credit owed to Debtors by AWG (including, without limitation, capital stock, member deposit certificates, member savings, patronage refund certificates, direct patronage and/or year-end patronage and concentrated purchase allowances) (collectively the "**AWG Equity**").

S.    As of the Petition Date, Debtors owe AWG the aggregate amount of approximately $3,096,113.13 in connection with the Pre-Petition Credit Agreement related to the open account under the Supply Agreement (the "**Open Account**" and any amounts owed before the Petition Date thereunder, the "**Pre-Petition Open Account Debt**").

T.    In addition to their other rights under the Pre-Petition Loan Documents, AWG also has statutory rights pursuant to state law and Bankruptcy Code § 503(b)(9) as to all products delivered to Debtors within 20 days prior to the filing of the bankruptcy petition, and the right to impose a statutory trust and attach any proceeds realized by Debtors from sales of produce delivered by Debtors, pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C. § 499 ("**PACA**").

U.    On November 12, 2014, the Court entered its Interim Order i) Approving Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Security Interests and Superpriority Administrative Expense Treatment, (iv) Providing Adequate Protection, (v) Modifying Automatic Stay, (vi) Granting Adequate Protection Pursuant To Sections 363 and 364 of the Bankruptcy Code, and (vii) Setting Final Hearing, Pursuant To 11 U.S.C. §§ 363, 364 and

365 and Federal Rule of Bankruptcy Procedure 4001 [Docket No. 45] (the "**Interim Financing Order**").  Pursuant to the Interim Financing Order, a final hearing was held on November 25, 2014 to consider entry of a final order with respect to the Motion (the "**Final Hearing**").

V.      Each of the rights, claims, interests and encumbrances asserted by AWG, and the agreements, acknowledgements and admissions of the Debtors set forth in decretal paragraphs O, P, Q, R, S, and T herein, are without prejudice to the rights of Creditors' Committee to assert a Challenge within the Challenge Period (each as defined below) with respect to, or otherwise object to, the Pre-Petition Credit Agreement Debt, and the liens with respect to same, pursuant and subject to such rights and limitations set forth herein.

W.      As reflected in the certificates of service filed by Debtors on November 11, 2014 and November 13, 2014 [Docket Nos. 32 and 51] notice of the Final Hearing has been provided in the manner required by the Interim Financing Order.

X.      The notice of the Final Hearing has been provided by the Debtors to the United States Trustee, counsel to AWG, counsel to the Creditors' Committee, the twenty (20) largest unsecured creditors of the Debtors, and the Internal Revenue Service, and any parties who filed appearances and requested notice in the Cases and constitutes sufficient and adequate notice in accordance with Bankruptcy Rule 4001(c) and Bankruptcy Code Section 102(1), as required by Bankruptcy Code Sections 364(c) in light of the nature of the relief requested in the Motion.  No further notice of the relief sought in the Motion is required for the entry of this Final Financing Order.

Y.      The Court, having reviewed the Motion and materials submitted by the parties, and having considered the statements of counsel on the record, and the evidence adduced with respect to the Motion at the Final Hearing, and having considered the agreements announced by the parties, finds that good and sufficient cause has been shown for the entry of this Final Financing Order.  Among other things, the entry of this Final Financing Order will enable the Debtors to continue the operation of their businesses; increase the possibility for a successful reorganization; and will be in the best interest of the Debtors, their creditors, and their estates.

NOW, THEREFORE, on the Motion of Debtors and the record before the Court with respect to the Motion, and with the consent of Debtors and AWG to the form and entry of this Final Financing Order, and good cause appearing,

IT IS HEREBY ORDERED that:

1.      All objections to the Motion that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

2.      Pursuant to §364(e) of the Bankruptcy Code, the Motion is granted on a final basis in accordance with the terms of this Final Financing Order and based on the findings set forth above, is not subject to further objection of any party or further review or hearing by this Court.

## APPROVAL OF AND AUTHORIZATION TO
## BORROW UNDER THE DIP CREDIT AGREEMENT

3.      The Debtors are authorized to use Cash Collateral only in strict accordance with the terms of this Final Financing Order and the Loan Documents. The Debtors shall continue their operations and sales in the ordinary course of business and shall not use Cash Collateral outside of the ordinary course of business.

4.      The terms and conditions of the DIP Loan are hereby approved on final basis. Debtors are authorized to (a) establish the DIP Loan; (b) execute the Loan Documents; and (c) borrow up to a total of $**6,647,973.15**, under the terms and conditions of the DIP Credit Agreement.

5.      Debtors are hereby authorized, empowered, and directed to do and perform all acts, pay all fees and expenses, and to make, execute and deliver all instruments and documents which may be required or necessary by Debtors under the Loan Documents and the creation and perfection of the Liens described in and provided for by this Final Financing Order and the Loan Documents and to assure the priority thereof as contemplated herein; provided, however, that any amounts to be paid to AWG pursuant to the Budget to reimburse AWG for fees and expenses incurred by outside legal counsel shall not include any such amounts incurred by AWG related to the preparation, negotiation, and prosecution of its stalking horse bid for the Debtors' assets.

6.      The Pre-Petition Credit Agreement Debt of $2,822,977.15 and the Pre-Petition Open Account Debt of $3,096,113.13 shall constitute an Allowed Claim in an amount not less than these amounts (the "**Pre-Petition Debt**"). The Debtors are hereby authorized and directed to use a portion of the DIP Loan in the amount of $2,822,977.15 to pay the Pre-Petition Credit Agreement Debt in full and, if applicable, to repay any amounts under the Debtors' Guaranty Reimbursement Obligation. AWG is authorized, upon receipt of such payment, to immediately execute such filings necessary or desirable from time to time to extinguish, modify or extend the Pre-Petition Credit Agreement Collateral to effectuate the Post-Petition Liens. The Debtors and AWG are further authorized to apply any and all Post-Petition payments received from the Debtors with respect to the Open Account to reduce amounts as and when due, notwithstanding the occurrence of the Petition Date, and to make Advances under the DIP Loan related to such payments. AWG shall extend credit terms with respect to the Supply Agreement and the Open Account on the same terms and conditions as existed with respect to the Supply Agreement and the Open Account before the Petition Date, such that the any amounts due and owing under the Open Account shall be paid in the ordinary course of the Debtors' business as and when due, notwithstanding the occurrence of the Petition Date, after the Petition Date. Such payment of the Pre-Petition Debt shall be final and binding on all parties in interest in these Cases and their respective successors and assigns, including, without limitation, any Trustee, subject only to the Creditors' Committee's Challenge Rights. If the Creditors' Committee exercises its Challenge Rights within the Challenge Period, and such challenge is sustained by a final, non-appealable order, AWG shall disgorge such payment attributable to such unsecured claim to the extent such payment is not otherwise authorized by separate Court order, and to the extent the Challenge Rights result in the invalidation of a lien on particular Collateral, the Pre-Petition Credit

Agreement Debt shall not be secured by such Collateral, if any, notwithstanding its inclusion in the DIP Loan. Such disgorged monies shall, without further Court order, be applied by AWG first to the DIP Loan—solely to the extent of AWG's security interests in collateral of the Debtors that is not the subject of the Creditor Committee's successful Challenge. The Pre-Petition Debt shall be reinstated as an Allowed General Unsecured Claim to the extent of such disgorged monies.

7.    To induce AWG to provide the DIP Loan and to adequately protect AWG for the use of its Cash Collateral, Debtors grant to AWG pursuant to the Loan Documents and this Final Financing Order:

(a)    Pursuant to Bankruptcy Code Section 364(d), a valid, binding, enforceable, unavoidable, and perfected first priority Lien on all assets of the Debtors (excluding all claims and causes of action pursuant to chapter 5 of the Bankruptcy Code) which shall be senior to all creditors, including any creditors asserting statutory liens or reclamation rights pursuant to Section 546(c) of the Bankruptcy Code, and shall prime the interest of any existing creditors holding a lien on such assets with the exception of the Permitted Encumbrances; provided, however, that holders of such Permitted Encumbrances, including any obligations arising from claims asserted by entities other than AWG under PACA, shall retain their relative pre-petition priority with respect to the applicable collateral on which such holders claim a lien, including with respect to AWG; and

(b)    [omitted]

(c)    An administrative claim against the Debtors and their estates under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code, but only to the extent of the diminution in value of AWG's interests in the Cash Collateral as of the Petition Date; and

(d)    Valid, binding, enforceable, and duly-perfected replacement security interests in and liens upon all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds,[2] products, rents and profits thereof to the same extent that the same existed as of the Petition, to secure the amount of AWG's claims equal to the diminution, if any, subsequent to the Petition Date, in value of AWG's interests in the Cash Collateral, whether by depreciation, use, sale, loss, decline in market price, preservation or disposition of assets of the Debtors that do not constitute Pre-Petition Credit Agreement Collateral, imposition of the automatic stay, or otherwise (collectively, the "Replacement Liens" and, the

---

[2] For the avoidance of doubt, subject to the Debtors' rights under Section 365, the Liens extend only to the proceeds of leased real property and are not direct liens on the Debtors' leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

collateral securing the Replacement Liens, together with the Pre-petition Collateral, the "Replacement Collateral").  The Replacement Liens granted to AWG hereunder shall have first priority as to the Debtors' respective assets with the exception of the Permitted Encumbrances and subject to the Challenge Rights; and

(e)     AWG's pre-petition Liens with respect to the Pre-Petition Credit Agreement Collateral shall continue in full force and effect to secure the pre-petition indebtedness owed to AWG and, notwithstanding Section 552(a) of the Bankruptcy Code, the Post-Petition Advances under the DIP Credit Agreement, and any such pre-petition Liens of AWG shall not be released.  For the avoidance of doubt, with respect to any dispute related to the priority of the Permitted Encumbrances or otherwise, AWG's pre-petition lien priority shall continue except with respect to the Post-Petition Liens granted pursuant to the Loan Documents and this Final Financing Order.

8.     The Collateral will also secure repayment of pre-petition obligations owing by Debtors to AWG, including all interest thereon and all costs and fees incurred by AWG in connection with the DIP Loan.

9.     The Liens granted to AWG herein shall be subject to the Carve Out (as defined below) and shall secure all Obligations (as defined in the DIP Credit Agreement) incurred by Debtors pursuant to the Loan Documents.

10.     AWG shall receive adequate protection for its pre-petition Liens in accordance with this Final Financing Order, which shall not be altered, amended, or modified without the express written consent of AWG.

11.     Pursuant to Bankruptcy Code Section 361(2), any holder of a Lien junior to the Lien granted to AWG by this Final Financing Order shall be granted a replacement Lien on all Collateral as adequate protection of their interests securing such holder's secured claim with such replacement Liens being held in their same respective priorities as against such other holders (other than AWG) as such holder's secured claim had before the Petition Date.

## GENERAL PROVISIONS

12.     The automatic stay imposed under Bankruptcy Code Section 362(a)(4) is hereby modified solely to the extent necessary to permit the creation and perfection of the aforesaid Liens and to perform Debtors' Obligations and obligations to AWG under the DIP Loan and the Loan Documents.

13.     Each officer of Debtors, acting singly, and such other individuals as may be so authorized by the Board of Directors of Debtors, likewise acting singly, is hereby authorized to execute and deliver each of the Loan Documents, such execution and delivery to be conclusive of their respective authority to do so in the name of and on behalf of Debtors.

14.     This Final Financing Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of AWG's Liens upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of AWG in and to the Collateral or to entitle AWG to the priorities granted herein; provided, however, that AWG may file or record financing statements or other instruments to evidence and to perfect the Liens authorized hereby; provided further, however, that no such filing or recordation shall be necessary or required in order to create or perfect any such Lien; provided further, however that any existing pre-petition Liens of AWG shall continue in full force and effect and existing financing statements or other instruments or documents shall be evidence of the continued validity, perfection, and priority of such Liens on the Pre-Petition Credit Agreement Collateral.

15.     AWG, in its discretion, may file a photographic copy of this Final Financing Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property as evidence of a mortgage lien and/or fixture filing, and in such event, the subject filing or recording officer shall file or record such copy of this Final Financing Order, which shall not be subject to stamp tax or similar tax as set forth in Section 1146 of the Bankruptcy Code.

16.     The DIP Credit Agreement and each of the Loan Documents shall constitute and evidence the valid and binding obligations of Debtors, which obligations shall be enforceable against Debtors in accordance with their terms.

## ADMINISTRATIVE CLAIMS

17.     AWG, for the Debtors' obligations under the DIP Credit Agreement and, if and to the extent that the adequate protection for the use of AWG's Cash Collateral described herein is insufficient to provide adequate protection to AWG for any diminution in value of its interests in the Collateral and Cash Collateral from and after the Petition Date, shall be allowed an administrative expense claim (the "**AWG Superpriority Claim**") with priority and payment over all administrative expense claims, now existing and hereafter arising, of any kind or nature whatsoever including without limitation, administrative expenses of the kind specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 330 (except as otherwise provided below) 331, 503(a), 503(b), 507(a), 507(b), 546(c), and 1114, that have been or may be incurred in these proceedings or any successor case provided that the rights of AWG with respect to any Chapter 5 Causes of Action (or the proceeds thereof) shall have equal priority with other administrative expenses under Section 507(a)(1) of the Bankruptcy Code solely to the extent necessary to reimburse AWG for any fees paid to professional persons employed by the Debtors or Creditors' Committee pursuant to Bankruptcy Code Section 327.   Except as otherwise provided herein, or in the DIP Credit Agreement, and to the fullest extent allowed by applicable law, no cost or expense which may be incurred in connection with or on account of the preservation and/or disposition of any Collateral or which otherwise could be chargeable to AWG or the Collateral pursuant to Bankruptcy Code Sections 105, 506(c), 552 or otherwise,

shall be so chargeable.  AWG shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to AWG with respect to proceeds, products, offspring or profits of any of the Collateral.  To the fullest extent permitted by applicable law, except as otherwise specifically allowed herein, no costs  or  expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Collateral, AWG or any of its respective claims pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of AWG, and no such consent shall be implied from any other action, inaction, or acquiescence by AWG.

18.    AWG shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the Collateral.

19.    Unless AWG has provided their prior written consent, there shall be no order entered in these proceedings, or in any successor cases, authorizing any of the following:

(a)    Debtors to obtain credit or incur debt that is secured by a security interest, mortgage, or other collateral interest or lien on all or any portion of the Collateral, and/or which is entitled to superpriority administrative status under Bankruptcy Code § 364(c)(1), which is equal or senior to that granted to AWG; or

(b)    Debtors' return of any goods constituting Collateral pursuant to Bankruptcy Code § 546(h).

(c)    [omitted]

20.    Without limiting the provisions and protections set forth above, if at any time prior to the repayment in full of all Obligations and the termination of AWG's obligations to make loans and advances under the DIP Credit Agreement or Loan Documents, including subsequent to the confirmation of any Plan of Reorganization respecting Debtors, Debtors or any Trustee subsequently appointed shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d), then all of the cash proceeds derived from such credit or debt shall immediately be turned over to AWG to reduce the Obligations.

21.    The Obligations of Debtors to AWG under the DIP Credit Agreement and the Loan Documents, are due and payable upon the earliest to occur of:

(a)    March 31, 2015 (or such later date to which AWG and Debtors agree in writing);

(b)    the date that is 14 days after the date on which the Debtors cease to be primarily supplied by AWG;

(c)    the date on which the Debtors fail to meet any of the Sale Milestones contained in this Final Financing Order in paragraphs 32-37, unless such dates are extended in writing at the sole discretion of AWG;

(d)    the occurrence of an Event of Default (as defined in the DIP Credit Agreement);

(e)     the closing of a sale of substantially all of the Debtors' operating assets; or

(f)     the effective date of a confirmed Plan of Reorganization in a Case or these Cases.

22.     Unless and until the Obligations (as defined in the DIP Credit Agreement) are repaid in full, the protections afforded to AWG under its Loan Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting any of these Cases into a successor case, and the Liens in and to the Collateral and the AWG Superpriority Claims shall continue in these proceedings and in any successor case, and such Liens and AWG Superpriority Claims shall maintain their priority as provided by this Final Financing Order until the Obligations have been satisfied in full.

23.     Unless otherwise agreed to by AWG in its sole discretion, the time and manner of payment of the Obligations pursuant to the DIP Credit Agreement and the Liens in and to the Collateral and the AWG Superpriority Claims shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed or by any further order which may hereafter be entered.

24.     Debtors may use Cash Collateral and the proceeds of the DIP Loan and advances made pursuant to the DIP Credit Agreement only for the purposes specifically set forth in the DIP Credit Agreement and the Loan Documents and in the budget attached hereto as <u>Exhibit B</u> (the "**Budget**" which Budget may be modified by prior written agreement between Debtors and AWG, with consultation with the Committee, without further notice, hearing, or order from this Court and, as modified, shall be deemed the Budget) and any subsequent period budgets as required by the DIP Credit Agreement which period budgets must be approved by AWG (thereafter such subsequent budgets shall become the Budget) with allowance for a ten percent (10%) line item variance and five (5%) aggregate variance measured on a weekly basis; <u>provided however</u>, no variance shall be permitted with respect to the Carve-Out.  Debtors shall provide AWG and the Creditors' Committee with a reconciliation of actual revenues, expenses and disbursements against the Budget on a weekly basis on the Thursday following the prior calendar week.  All Budgets approved by AWG subsequent to the entry of this Final Financing Order or entry of a Final Financing Order shall be filed of record for notice purposes with the Court.  The Debtors' authority to use cash collateral subject to the Post-Petition Liens of AWG and DIP Loan advances or other extensions of credit shall continue until expiration of the Budget or an Event of Default and be used only to pay *bona fide* operating expenses Debtors incur in the ordinary course of operating Debtors' business per the Budget.  Also notwithstanding anything herein or in the DIP Credit Agreement to the contrary, no such loans or any proceeds of the Collateral, including, without limitation, any Cash Collateral, may be used by Debtors, the Creditors' Committee or any other person or entity to object to or contest in any manner, or raise any defenses to, the validity, extent, perfection, priority or enforceability of the Debtors' obligations to AWG or any Liens or security interests with respect thereto or any other rights or interests of AWG; <u>provided</u>, <u>however</u>, that the Creditors' Committee may use up to $25,000 (the "**Creditors' Committee Investigation Carve Out**") of its allotted Carve Out to investigate and assert its Challenge Rights (including the filing of an adversary complaint or a contested proceeding in the Bankruptcy Court) pursuant to paragraph 39 of this Final Financing Order.

## ATTORNEY FEES AND CARVE OUT

25.    Notwithstanding any provision of this Final Financing Order or the Loan Documents to the contrary, the Liens and Superpriority Claims granted to AWG pursuant to such Loan Documents and this Final Financing Order are subject and subordinate to the Carve Out for (a) the payment of all accrued and unpaid allowed professional fees and expenses of attorneys, accountants, financial advisors and consultants retained by Debtors or the Creditors' Committee pursuant to Bankruptcy Code Sections 327 or 1103(a) incurred prior to the occurrence of an Event of Default (the "**Professional Fees and Expenses**"); provided, however, that the Professional Fees and Expenses to be included in the Carve Out and entitled to priority over the AWG Superpriority Claim shall not exceed those amounts authorized pursuant to the Budget; provided further, however, that if an Event of Default shall have occurred, the Carve Out for Professional Fees and Expenses shall be limited to those fees and expenses incurred prior to the notice of the date of the Event of Default and limited to the amount allowed for such Professional Fees and Expenses covered in any applicable Budget through and including the notice of the date of the Event of Default, and (b) quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a) and any fees payable to the Clerk of the Bankruptcy Court (collectively the "**Carve Out**").  The Carve Out shall be calculated as of the first notice of the occurrence of any Event of Default under either the DIP Credit Agreement or the Final Financing Order and shall not increase after that date, subject to the rights of the Debtors and the Creditors' Committee to challenge the existence of an Event of Default as set forth in this Final Financing Order.  Except for the Creditors' Committee Investigation Carve Out, the Carve Out shall exclude, and shall not be used to fund any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding application, motion, objection, defenses or other contested matters, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, subordinating, in whole or in part, (i) the Obligations or (ii) AWG's Liens or (B) preventing, hindering or delaying whether directly or indirectly, AWG's assertions or enforcement of the Liens, security interests, or realization upon any Collateral or of the rights and remedies granted pursuant to this Final Financing Order; (y) in using cash collateral of AWG, selling or otherwise disposing of any other Collateral, or incurring any Indebtedness not permitted under the DIP Credit Agreement without AWG's consent or (z) arising after the conversion of any of the Chapter 11 cases to a case under chapter 7 of the Bankruptcy Code.  Except as otherwise provided in this paragraph, nothing contained in this Final Financing Order shall be deemed a consent by AWG to any charge, lien, assessment or claim against the Collateral under Sections 105, or 506 (c) of the Bankruptcy Code or otherwise.  The foregoing shall not be construed as consent by AWG to the allowance of any Professional Fees and Expenses and shall not affect the right of AWG to object to the allowance and payment of such amounts.

## EVENTS OF DEFAULT

26.    Any automatic stay otherwise applicable to AWG shall be modified to permit AWG to exercise rights and remedies under the DIP Credit Agreement as follows:

(a)    Upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), AWG shall provide written notice of such occurrence to

14

Debtors, Debtors' counsel, counsel for the Creditors' Committee, and the United States Trustee.

(b)    The Debtors shall have the right to cure such Event of Default within five (5) days of the date such notice.

(c)    Following the giving of notice by AWG of the occurrence of an Event of Default, Debtors or the Creditors' Committee shall be entitled to an emergency hearing before this Court within such five (5) days for the purpose of contesting whether an Event of Default has occurred or asserting any other grounds on which the exercise of remedies by AWG should be stayed. The automatic stay shall remain in effect pending entry of an order pursuant to any requested hearing.

(d)    If Debtors cure such Event of Default within said five (5) days or the Debtors do not contest the right of AWG to exercise its remedies within such time period, or if Debtors do timely contest AWG's rights, or if an emergency hearing on the occurrence of an Event of Default is not held within the five-day notice period or if the Court, after hearing, declines to stay the enforcement thereof, the automatic stay of Bankruptcy Code Section 362(a), as to AWG, shall automatically terminate at the end of such five (5) day period without further order of the Court and without regard to any additional stay applicable pursuant to Bankruptcy Rule 4001(a)(3). For purposes of this provision, AWG and Debtors agree that twenty-four hour prior telephonic notice of an emergency hearing on the occurrence of any Event of Default provided to counsel for AWG and such other parties as the Court may direct shall be proper notice and that such hearing may be conducted telephonically.

(e)    Notwithstanding Debtors' right to contest the existence of an Event of Default, after AWG furnishes such notice of an Event of Default, (i) Debtors shall continue to deliver and cause the delivery of the proceeds of Collateral to AWG as provided in the DIP Credit Agreement and this Final Financing Order; (ii) AWG shall continue to apply such proceeds in accordance with the provisions of this Final Financing Order and of the DIP Credit Agreement; (iii) Debtors shall have no right to use any of such proceeds, or any other cash collateral (as defined in Bankruptcy Code Section 363(a)) other than towards the satisfaction of the Obligations and the Carve Out; and (iv) any obligation otherwise imposed on AWG to provide any loan or advance or other extension of credit to Debtors pursuant to the DIP Loan or on the Open Account shall be suspended.

27.    If AWG exercises any of its rights and remedies upon the occurrence of an Event of Default under the Loan Documents, AWG may retain one or more agents to sell, lease, or otherwise dispose of the Collateral. In any exercise of its rights and remedies upon an Event of Default under the Loan Documents, AWG is authorized to proceed under or pursuant to the Loan Documents.

28.    In the exercise of AWG's rights and remedies upon default,

(a) AWG may by written notice to Debtors and the Creditors' Committee require Debtors to file a Motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to AWG.  Debtors shall file such Motion within ten (10) business days of AWG's request and shall diligently prosecute such Motion.  If Debtors fail to so file the Motion, AWG may, file and prosecute such a Motion in the name of Debtors; and/or

(b) AWG may, by written notice to Debtors and the Creditors' Committee, require Debtors to file a Motion or Motions seeking to sell, assume, assign, or otherwise dispose of any or all of the real estates (including, without limitation, leasehold interests) of Debtors pursuant to Sections 363 and 365 of the Bankruptcy Code, on terms acceptable to AWG.  Debtors shall file such Motion or Motions within ten (10) business days of AWG's request and shall diligently prosecute such Motion.  If Debtors fail to so file such Motion, AWG may, file and prosecute such a Motion(s) in the name of Debtors; and/or

(c) AWG may proceed under or pursuant to the DIP Credit Agreement and other Loan Documents; and/or

(d) In the event of a sale by AWG or Debtors to AWG of any of the Collateral, such sale shall be deemed to be commercially reasonable in all respects and for fair market value; and/or

(e) In the event of a public or private sale of any of the Collateral to foreclose or otherwise enforce a lien, the proceeds of such sale shall be deemed to be fair market value for purposes of credit on the Obligations.

All net proceeds realized from any of the foregoing shall be turned over to AWG for application to the Obligations under, and in accordance with the provisions of, the DIP Credit Agreement and other Loan Documents.

29.    In connection with AWG's exercise of its remedies upon default, including, without limitation, the conduct of any sale or other disposition of the Collateral in accordance with the terms and conditions of this Final Financing Order or the Loan Documents:

(a) All parties and persons of every nature and description, including, but not limited to, landlords, utilities, governmental agencies, sheriffs, marshals, and other public officers, creditors, and all those acting for or on their respective behalf, shall be, restrained and enjoined from interfering, in any way with, or otherwise impeding the conduct of any such sale or other disposition at any location of Debtors; the maintenance of inventory at such locations; the use of such operational infrastructure; or from seeking process before any court or other administrative body (other than this Court), the object of which is to directly or indirectly impede, in any way, the conduct of any such sale or other

16

disposition; <u>provided</u>, <u>however</u>, that this provision shall be inapplicable to AWG.

(b) The conduct of any such sale or other disposition may be made without compliance with any licensing law, statute, ordinance, or regulation of any governmental authority; <u>provided</u>, <u>however</u>, that the foregoing shall not affect in any way any obligation of AWG or any such agent to comply with any law, statute, ordinance, or regulation of any governmental authority incident to the protection of public safety.

30.     Nothing included herein shall prejudice, impair, or otherwise affect AWG's rights to seek any other or supplemental relief in respect of the Debtors', nor AWG's, rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans under the DIP Loan.

31.     AWG's exercise of its remedies with respect any landlords under a Lease in an event of default shall be subject to: (x) pre-existing rights of AWG and the applicable landlord under applicable non-bankruptcy law, (y) consent of the applicable landlord, or (z) further order of the Court following notice and a hearing.

## <u>SALE MILESTONES AND BID PROCEDURES</u>

32.     Immediately upon the Petition Date, the Debtors' shall be permitted to market some or all of the Debtors' assets.  The deadlines and requirements in the following five (5) paragraphs shall be deemed the "**Sale Milestones**."

33.     No later than five (5) business days after the Petition Date, the Debtors shall have filed a motion or motions reflecting the requirements of the DIP Credit Agreement, including, without limitation, the Marketing Plan, with the Bankruptcy Court (the "**Sale and Bidding Procedures Motion**") to authorize, and to establish bidding procedures for, a sale of substantially all of their assets under Section 363 of the Bankruptcy Code (the "**363 Sale**").

34.     No later than December 5, 2014, the Bankruptcy Court shall have entered the orders reflecting the requirements of the DIP Credit Agreement, including, without limitation the Marketing Plan, approving the Sale and Bidding Procedures Motion (the "**Bidding Procedures Order**"), which will provide, among other things, that objections to and bids in respect of the 363 Sale will be submitted no later than January 12, 2015.

35.     No later than January 19, 2015, an auction with respect to the 363 Sale, if necessary, shall have commenced in accordance with the Bidding Procedures Order, and will have concluded by January 21, 2015.

36.     No later than January 31, 2015, the Bankruptcy Court shall have conducted a hearing and entered an order or orders (the "**Sale Order**"), in form and substance satisfactory to AWG, approving the 363 Sale as contemplated under the Bidding Procedures Order.

37.    No later than March 2, 2015, the 363 Sale shall be completed and all transactions contemplated thereby shall have closed in accordance with the Sale Order.

## MISCELLANEOUS PROVISIONS

38.    AWG's failure to seek relief or otherwise exercise its rights and remedies under the DIP Credit Agreement, the Loan Documents, the DIP Loan, or this Final Financing Order shall not constitute a waiver of any of its rights hereunder, thereunder, or otherwise.

39.    The Creditors' Committee shall be granted a period of ninety (90) days after its appointment , or such longer period as agreed upon in writing between AWG and the Creditors' Committee (the "**Challenge Period**"), during which the Creditors' Committee may investigate, seek standing to challenge, and challenge (each, a "**Challenge**"):   (i) the validity, priority, perfection or extent of AWG's Pre-Petition Date liens and security interests in any of the Debtors' assets; (ii) the nature of a setoff, counterclaim, objection or defense to the Pre-Petition Debt (including, without limitation, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code); (iii) AWG's asserted statutory trust rights and claims under PACA; and (iv) any other claims or causes of action against AWG, including, but not limited to, claims under Chapter 5 of the Bankruptcy Code   (collectively, the "**Challenge Rights**"); provided, however, that nothing contained this paragraph shall create any substantive rights or claims in or for the Debtors or the Creditors' Committee that did not exist as of the Petition Date; and, provided further that AWG does not acknowledge the existence of any such claims or causes of action, and AWG does not waive, and this Final Financing Order shall not impair, any rights or defenses to any such claims or causes of action brought by the Creditors' Committee pursuant to the Challenge Rights, including, without limitation, rights of offset and recoupment and any and all such rights and defenses are hereby expressly reserved.    If the Creditors' Committee does not initiate a Complaint or contested matter before the expiration of the Challenge Period, on the basis of the Challenge Rights, the Creditors' Committee shall be bound by all releases, waivers and admissions of the Borrower contained in the DIP Credit Agreement and in the Interim Financing Order and this Final Financing Order.

40.    The Creditors' Committee shall be granted a period of ninety (90) days after its appointment (the "**Challenge Period**"), during which the Creditors' Committee may investigate, seek standing to challenge, and challenge the validity of AWG's pre-petition liens and security interests (the "**Challenge Rights"**).  If the Creditors' Committee does not initiate a Complaint or contested matter, or seek standing to initiate a Complaint or contested matter (provided, however, that the Creditors' Committee must have obtained such standing by no later than 60 days after filing a motion seeking such standing, and must file a Complaint or contested matter no later than 14 days after entry of an order granting such standing), before the expiration of the Challenge Period, on the basis of the Challenge Rights, the Creditors' Committee shall be bound by all releases, waivers and admissions of the Borrower contained in the DIP Credit Agreement and in the Interim Financing Order and this Final Financing Order.

41.    The payments made, and the Liens and Superpriority Claims granted to AWG under the DIP Credit Agreement and this Final Financing Order, and the priority thereof, shall be binding on Debtors, and their respective successors and assigns, including, without limitation,

any successor Trustee for Debtors, and all creditors of Debtors, as provided in Bankruptcy Code Section 364(e).  If any or all of the provisions of this Final Financing Order are hereafter modified, vacated or stayed by subsequent order of this Court, or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of any lien, security interest, priority, or other benefit authorized hereby with respect to any Post-Petition debt incurred prior to the effective date of such subsequent order (and all such liens, security interests, priorities and other benefits shall be governed in all respects by the original provisions of this Final Financing Order).

42.    If any provision of this Final Financing Order is hereafter modified, vacated or stayed by subsequent order of this or any other Court for any reason, such modification, vacation, or stay shall not affect the validity of any liability incurred pursuant to this Final Financing Order and the effective date of such modification, vacation, or stay was established, nor the validity, priority, or enforceability of any Lien granted by Debtors to AWG.

43.    All depository banks, blocked account banks, and credit card processors shall comply, for the benefit of AWG, with the terms and conditions of any Blocked Account Agreement, DDA Notifications, or Credit Card Notifications received or furnished in connection with the DIP Credit Agreement notwithstanding any prior notifications received by such banks or processors.

44.    By executing the Loan Documents and taking any other actions pursuant to this Final Financing Order, AWG shall not (1) be deemed to be in control of the operations of Debtors; or (2) be deemed to be acting as a "responsible person" with respect to the operation or management of Debtors.

45.    Except as otherwise explicitly set forth in this Final Financing Order, this Final Financing Order does not create any rights for the benefit of any third party, creditor, or any direct, indirect, or incidental beneficiary.

46.    The provisions of this Final Financing Order shall inure to the benefit of the Debtors, AWG, and any assignee or successor to each of the foregoing, including any trustee thereafter appointed in these Cases, and shall also be binding upon all creditors of the Debtors and other parties in interest.

47.    In consultation with the Creditors' Committee,  Debtors and AWG may amend or waive any provision of the DIP Credit Agreement, provided that such amendment or waiver, in the judgment of Debtors and AWG, is either non-prejudicial to the rights of third parties or is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the parties hereto and approved by the Court.

48.    Lender shall offset and recoup up to the amount of the Debtors' Member Certificates solely against the amount of the first payment due to Lender under the Open Account (notwithstanding the occurrence of the Petition Date) in the week immediately following the entry of this Final Financing Order as contained in the Budget.  Lender reserves

the right to further offset and recoup additional amounts (up to the amount of the Debtors' Member Certificates) due and owing under the Open Account in its sole and absolute discretion. The Member Certificates shall be redeemed and used to offset and recoup in the following order: the Member Deposit Certificate, the 2011 Patronage A Certificate; the 2012 Patronage A Certificate; and the Patronage B Certificate.

49.    This Final Financing Order does not preclude the Iowa Department of Revenue ("**IDR**") from attempting to establish that funds held or received by the debtor-in-possession or any secured creditor are held in trust and are not part of the bankruptcy estate, and shall not preclude the IDR from seeking additional relief with respect to such claims. Nothing in this paragraph, however, shall preclude the Debtors, the Creditors' Committee, or any secured creditor from challenging any such assertions or contending that such funds are not held in trust for the IDR. The security interests provided for in the Final Financing Order shall not diminish in any way the rights of the IDR as a trust fund claimant, if any, to obtain possession of funds subject to its trust claims. In addition, any funds that the Court, after notice and hearing, determines are trust funds of the IDR shall not constitute collateral of any secured creditor.

50.    As adequate protection pursuant to Section 363 of the Bankruptcy Code, the Debtors are authorized and directed to pay the applicable portion of the Budget amount contained within the "Northmarq- E.P. True Lease" line item that constitutes the regular loan payment and tax escrow to West Coast Life (Protective Life). The parties reserve all rights with respect to the application of any payments to West Coast Life (Protective Life).

IT IS SO ORDERED.

~~DATE~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

/s/ **Anita L. Shodeen**

United States Bankruptcy Judge

Reviewed and approved:

/s/ *Jeffrey D. Goetz,*
Jeffrey D. Goetz, Esq.
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX
*Proposed General Reorganization Counsel for Debtors*

/s/ *Devon J. Eggert*
Richard S. Lauter (admitted *pro hac vice*)
Thomas R. Fawkes (admitted *pro hac vice*)
Elizabeth L. Janczak (admitted *pro hac vice*)
Devon J. Eggert (admitted *pro hac vice*)
Freeborn & Peters LLP
311 South Wacker Drive, Ste. 3000
Chicago, Illinois 60606-6677
Telephone: 312.360.6000
Facsimile:  312.360.6520
*Proposed Counsel for Official Committee of Unsecured*
*Creditors of Foods, Inc., d/b/a Dahl's Foods, et al.*


/s/ *Mark T. Benedict*
Mark T. Benedict (admitted *pro hac vice*)
John J. Cruciani (admitted *pro hac vice*)
Matthew Gartner (admitted *pro hac vice*)
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112-2551
Direct:  816.983.8000
Fax:  816.983.8080
*Counsel for Associated Wholesale Grocers, Inc.*


/s/      Joseph A. Peiffer
Joseph A. Peiffer    IS9999471
Ronald C. Martin    IS9998294
Abram V. Carls    IS9997749
Day Rettig Peiffer, P.C.
PO Box 2877
Cedar Rapids, Iowa   52406-2877
Telephone:  (319) 365-0437
Fax:  (319) 365-5866
*Attorneys for Creditors Commerce Bank and*
*Merchants Capital Resources, Inc.*


/s/ *Julie Johnson McLean*
Julie Johnson McLean (AT#005185)
Davis, Brown, Koehn,
Shors & Roberts, P.C.
215 10th Street, Suite 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Facsimile: (515) 243-0654
*Attorney for West Coast Life Insurance Company*

21

Parties receiving this Order from the Clerk of Court:
Electronic Filers in this Chapter Case

## Exhibit A

**DIP Credit Agreement**

SLC-7339665-6

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "***Agreement***"), dated as of November 9, 2014, is between FOODS, INC., an Iowa corporation ("***Foods***"), DAHL'S FOOD MART, INC., an Iowa corporation ("***DFMI***"), and DAHL'S HOLDINGS I, LLC, an Iowa limited liability company ("***Holdings***," and individually, collectively, jointly and severally with Foods and DFMI, "***Borrower***"), and ASSOCIATED WHOLESALE GROCERS, INC. ("***Lender***").

## RECITALS

The following Recitals are a material part of this Agreement:

A.      On November 9, 2014 (the "***Petition Date***"), Borrower commenced Chapter 11 Case No. 14-02689-11, Chapter 11 Case No. 14-02690-11, and Chapter 11 Case No. 14-02691-11 (each a "***Chapter 11 Case***" and, together, the "***Chapter 11 Cases***") by filing voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "***Bankruptcy Code***"), with the United States Bankruptcy Court for the Southern District of Iowa (the "***Bankruptcy Court***").  Borrower continues to operate its businesses and manage its properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.      Prior to the Petition Date, Lender provided financing to Foods pursuant to that certain Credit Agreement, dated as of March 19, 2013, between Foods and Lender (as amended, modified or supplemented through the Petition Date, the "***Pre-Petition Loan Agreement***"), which financing was guaranteed by DFMI and Holdings.

C.      In addition, prior to the Petition Date, Borrower and Lender entered into the Leases, Subleases, and Supply Protection Agreements, which obligations of Borrower thereunder shall continue Post-Petition (collectively, the "***Continuing Pre-Petition Obligations***").

D.      Borrower has requested that Lender provide a senior secured, super-priority term credit facility to Borrower of up to **Six Million Six Hundred Forty-Nine Thousand Six Hundred Twenty-Three Dollars ($6,649,623.00)** in the aggregate to fund the working capital requirements of Borrower during the pendency of the Chapter 11 Cases and to refinance the Pre-Petition Loan Obligations. In addition, Borrower further requested that Lender provide credit terms for the purchase of grocery and supermarket products.  Such credit terms included, among other things, payment of Friday statement balances, in the ordinary course of the Borrower's businesses, by Borrower with respect to the Open Account through wire transfers effectuated on Monday.

E.      Lender is willing to make a certain Post-Petition Loan and other extensions of credit to Borrower of up to such amounts in a transaction whereby the Pre-Petition Liens shall continue, and shall secure both the Continuing Pre-Petition Obligations and all Obligations, and Post-Petition Liens shall be granted to secure all Obligations, all upon the terms and conditions set forth herein.

F.      Borrower has agreed to secure all of the Obligations by granting to Lender a security interest in and lien upon all of its existing and after-acquired personal and real property.

G.    Lender has agreed, subject to, and wholly conditioned upon, the terms and conditions contained in this Agreement, to fund: (i) conditioned upon entry of the Interim Order (as defined in the Agreement) approving such funding, up to the Interim Maximum Tranche B Amount; (ii) conditioned upon entry of a Final Order (as defined in this Agreement) approving such funding, up to the remainder of the Maximum Tranche B Amount after subtracting any Tranche B Advances advanced before the date of the entry of the Final Order; and (iii) conditioned upon entry of a Final Order approving such funding as described in this Agreement, the Tranche A Loan for repayment of the Pre-Petition Loan Obligations.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1.    DEFINITIONS

1.1    <u>Defined Terms</u>.  Capitalized terms used herein and in the other Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to this Agreement:

"***Account Debtor***" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"***Accounting Changes***" has the meaning ascribed thereto in <u>Annex C</u>.

"***Accounts***" means all "accounts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to any Credit Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Credit Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Credit Party), (e) all health care insurance receivables and (f) all collateral security of any kind, given by any Account Debtor or any other Person with respect to any of the foregoing.

"***Advance***" means any advance under the Loan.

"***Affiliate***" has the meaning set forth in Section 101(2) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the term "<u>Affiliate</u>" shall specifically exclude Lender.

KCP-4525702-12

"***Agreement***" means this Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement by and among Borrower, the other Credit Parties party hereto, if any, and Lender, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"***Appendices***" means all Annexes, Disclosure Schedules, Exhibits and other attachments hereto or expressly identified in this Agreement.

"***AWG Limited Guaranty***" means the Guaranty from Lender to UMB issued in connection with the Pre-Petition Loan Agreement, whereby Lender guaranteed repayment of amounts advanced by UMB pursuant to that certain irrevocable stand-by letter of credit issued by UMB for the benefit of Borrower in the amount of $**825,000**.

"***Bankruptcy Code***" has the meaning ascribed to it in the recitals to this Agreement.

"***Bankruptcy Court***" has the meaning ascribed to it in the recitals to this Agreement.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"***Borrower***" has the respective meanings ascribed thereto in the preamble to this Agreement.

"***Budget***" has the meaning ascribed to it in Section 4.4(b).

"***Budget Reconciliation***" means a reconciliation of actual revenues, expenses and disbursements incurred by Borrower against the Budget.

"***Business Day***" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of Kansas or Iowa.

"***Capital Expenditures***" means, with respect to any Person, all expenditures (by the expenditure of cash or the incurrence of Indebtedness) by such Person during any measuring period for any fixed assets or improvements or for replacements, substitutions or additions thereto that have a useful life of more than one year and that are required to be capitalized under GAAP.

"***Capital Lease***" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"***Capital Lease Obligation***" means, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

"***Carve-Out Amount***" has the meaning ascribed to it in Section 2.13(c).

"***Carve-Out Expenses***" has the meaning ascribed to it in Section 2.13(c).

"***Cash Collateral***" has the meaning ascribed to it in Section 4.4(b).

"***Challenge Period***" means that period of sixty (60) days after entry of the Interim Order during which the Creditors' Committee may exercise its Challenge Rights.

"***Challenge Rights***" means rights of a Creditors' Committee granted in the Interim Order and Final Order to investigate, seek standing to challenge, and challenge the validity of AWG's pre-petition liens and security interests during the Challenge Period. If the Creditors' Committee does not initiate a Complaint or contested matter, before the expiration of the Challenge Period, on the basis of the Challenge Rights, the Creditors' Committee shall be bound by all releases, waivers and admissions of the Borrower contained in this Agreement and in the Interim Order and Final Order.

"***Change of Control***" means any event, transaction or occurrence as a result of which (a) Borrower ceases to own and control all of the economic and voting rights associated with all of the outstanding Stock of any of its Subsidiaries, or (b) the Persons holding the Minority Interest hold, in the aggregate, more shares of the outstanding Stock of Borrower than such Persons held on the Closing Date.

"***Chapter 11 Case***" has the meaning ascribed to it in the recitals to this Agreement.

"***Charges***" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"***Chattel Paper***" means any "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Credit Party.

"***Closing Checklist***" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with this Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as Annex A.

"***Closing Date***" means November 10, 2014.

"***Code***" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Kansas; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided, further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Kansas, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"***Collateral***" means the property covered by the Security Agreement and the other Collateral Documents and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest

or Lien in favor of Lender, to secure the Obligations, INCLUDING, WITHOUT LIMITATION, AVOIDANCE ACTIONS OF BORROWER UNDER CHAPTER 5 OF THE BANKRUPTCY CODE; provided, however, that the lien on Chapter 5 causes of action shall be limited to reimbursement to Lender of any Carve-Out Amounts paid pursuant to the Budget.

"***Collateral Documents***" means the Security Agreement, the Pledge Agreements, the Guaranties, the Mortgages, the Intellectual Property Security Agreement and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

"***Committees***" means collectively, the official committee of unsecured creditors and any other committee formed, appointed, or approved in any Chapter 11 Case and each of such Committees shall be referred to herein as a Committee.

"***Commitment Termination Date***" means the earliest of (a) March 31, 2015 (b) the date of termination of Lender's obligations to make Advances or permit the existing Loan to remain outstanding pursuant to Section 9.2(b), (c) the date of indefeasible prepayment in full by Borrower of the Loan, (d) five (5) Business days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) forty-five (45) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Final Order, if by that time Borrower has not paid Lender the fees required to be paid thereunder, unless Lender agrees otherwise, (h) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in any Chapter 11 Case that has not been consented to by Lender and fails to provide for the payment in full in cash of all Obligations under this Agreement and the other Loan Documents on the effective date of such plan, (i) the date of the closing of a sale of all or substantially all of Borrower's assets pursuant to Section 363 of the Bankruptcy Code, a confirmed plan of reorganization or a liquidation pursuant to Chapter 7 of the Bankruptcy Code, and (j) if a plan of reorganization that has been consented to by Lender or that provides for payment in full in cash of all Obligations under this Agreement and the other Loan Documents has been confirmed by order of the Bankruptcy Court, the earlier of the effective date of such plan of reorganization or the sixtieth day after the date of entry of such confirmation order.

"***Compliance Certificate***" shall be in the form set forth on Annex E.

"***Consolidated Fixed Charges***" means, for the period in question, the sum of (a) the aggregate amount of all principal payments required to be made by Borrower and each Subsidiary on all Indebtedness during such period (including the principal portion of payments in respect of Capital Leases and the Loan, plus (b) Consolidated Interest Expense during such period (excluding interest expense not payable in cash), plus (c) cash dividends paid by Borrower during such period, including distributions made to the ESOP to permit the ESOP to satisfy ESOP Repurchase Liabilities, plus (d) Income Taxes, plus (e) Capital Expenditures.

"***Consolidated Interest Expense***" means, for the period in question, without duplication, all gross interest expense of Borrower and each Subsidiary for such period, all determined on a consolidated basis and in accordance with GAAP, except that Consolidated Interest Expense not payable in cash will be excluded from Consolidated Interest Expense when determining Consolidated Fixed Charges.

KCP-4525702-12

"***Consolidated Net Income***" means the after-tax net income (or loss) of Borrower and each Subsidiary for the period in question, determined on a consolidated basis and in accordance with GAAP.

"***Continuing Pre-Petition Obligations***" has the meaning ascribed to it in the recitals of this Agreement.

"***Contracts***" means all "contracts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any Credit Party may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"***Copyright License***" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"***Copyrights***" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof; and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"***Credit Parties***" means Borrower, each Guarantor, and each of their respective Subsidiaries.

"***Creditors' Committee***" means an Official Committee of Unsecured Creditors, if any such Committee is formed in the Cases.

"***Default***" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"***Default Rate***" has the meaning ascribed to it in <u>Section 2.4(d)</u>.

"***Deposit Accounts***" means all "deposit accounts" as such term is defined in the Code, now or hereafter held in the name of any Credit Party.

"***Disclosure Schedules***" means the Schedules prepared by Borrower and denominated as <u>Disclosure Schedules (2.4) through (7.7)</u> in the Index to this Agreement.

"***Documents***" means all "documents," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"***Dollars***" or "<u>$</u>" means lawful currency of the United States of America.

"***EBITDA***" means, for any period, the sum of (a) Consolidated Net Income during such period <u>plus</u> (b) to the extent deducted in determining such Consolidated Net Income, the sum of (i) Consolidated Interest Expense during such period, <u>plus</u> (ii) all provisions and expense for any Income Taxes made by Borrower and each Subsidiary during such period (whether paid or

deferred), plus (iii) all depreciation and amortization expenses of Borrower and each Subsidiary during such period, plus (iv) any losses from the sale or other disposition of assets other than in the ordinary course of business during such period, plus (v) any noncash expense item resulting from the forgiveness of the "Purported Expenses Loan" as such term is defined in the Stock Redemption Agreement, minus (c) to the extent added in determining such Consolidated Net Income, any gains from the sale or other disposition of assets other than in the ordinary course of business during such period, all determined on a consolidated basis in accordance with GAAP.

"**Employee Benefit Plan**" means an "employee benefit plan" as defined by Section 3(3) of ERISA and all other bonus, incentive compensation, deferred compensation, profit sharing, stock option, stock appreciation right, stock bonus, stock purchase, employee stock ownership, savings, severance, change-in-control, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, accident, group insurance, vacation, holiday, sick-leave, fringe benefit, group legal services, educational assistance, dependent care assistance, adoption assistance, cafeteria, welfare or other employee benefit plan, agreement or arrangement (whether qualified or nonqualified, written or unwritten). For the avoidance of doubt, the ESOP is an "Employee Benefit Plan".

"*Environmental Laws*" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. § 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"*Environmental Liabilities*" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

7

"***Environmental Permits***" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"***Equipment***" means all "equipment," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located and, in any event, including all such Credit Party's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"***ERISA Affiliate***" means, with respect to any Credit Party, any trade or business (whether or not incorporated) that, together with such Credit Party, are treated as a single employer within the meaning of Sections 414(b), (c), (n) or (o) of the IRC.

"***ERISA Event***" means, with respect to any Credit Party or any ERISA Affiliate, (a) with respect to a Title IV Plan, any event described in Section 4043(c) of ERISA for which notice to the PBGC has not been waived; (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan in a distress termination described in Section 4041(c) of ERISA or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) with respect to a Title IV Plan, the existence of an "accumulated funding deficiency" (as defined in Section 412 of the IRC or Section 302 of ERISA) whether or not waived, or the failure to make by its due date a required installment under Section 412(m) of the Code or the failure to make any required contribution to a Multiemployer Plan; (g) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to a Title IV Plan; (h) the making of any amendment to any Title IV Plan which could result in the imposition of a lien or the posting of a bond or other security; (i) with respect to a Title IV Plan an event described in Section 4062(e) of ERISA; (j) any other event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (k) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (l) the loss of a Qualified Plan's qualification or tax exempt status; or (m) the termination of a Plan described in Section 4064 of ERISA.

"***ESOP***" means the plan and trust created as a part of the Dahl's Employee Stock Ownership Plan and Trust, as amended and restated as of January 22, 2013, and as the same

8

has been or may in the future be modified from time to time, subject in all respects to the provisions of Section 6.11(a).

"***ESOP Repurchase Liability***" means the obligation under applicable Law, of the ESOP to repurchase beneficial interests owned by its participants.

"***Event of Default***" has the meaning ascribed to it in Section 9.1.

"***Existing Employee Benefit Plan***" has the meaning ascribed to it in Section 4.18(a).

"***Fair Labor Standards Act***" means the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

"***Federal Reserve Board***" means the Board of Governors of the Federal Reserve System.

"***Fees***" means any and all fees payable to Lender pursuant to this Agreement or any of the other Loan Documents, including without limitation, the Guaranty Fee.

"***Final Order***" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Lender's claims.

"***Financial Covenants***" means the financial covenants set forth in Section 7.10.

"***Financial Statements***" means the consolidated and consolidating income statements, statements of cash flows and balance sheets of Borrower delivered in accordance with Section 4.4 and Annex B.

"***Fiscal Period***" means each of the four (4) thirteen (13) week periods comprising Borrower's Fiscal Year, as may be applicable to cause Borrower's Fiscal Year to end on the last Saturday in the month of September.

"***Fiscal Year***" means Borrower's fiscal year consisting of four (4) Fiscal Periods ending on the last Saturday in September of each year.

"***Fixed Charge Coverage Ratio***" means, with respect to any Person, the ratio of EBITDA to Consolidated Fixed Charges.

"***Fixtures***" means all "fixtures" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"***Funded Debt***" means, with respect to any Person, without duplication, all Indebtedness for borrowed money evidenced by notes, bonds, debentures, or similar evidences of

KCP-4525702-12

Indebtedness that by its terms matures more than one year from, or is directly or indirectly renewable or extendible at such Person's option under a revolving credit or similar agreement obligating the lender or lenders to extend credit over a period of more than one year from the date of creation thereof and specifically including Capital Lease Obligations, current maturities of long-term debt, revolving credit and short-term debt extendible beyond one year at the option of the debtor, and also including, in the case of Borrower, the Obligations and, without duplication, Guaranteed Indebtedness consisting of guaranties of other Persons.

"**GAAP**" means generally accepted accounting principles in the United States of America consistently applied, as such term is further defined in Annex C to this Agreement.

"**General Intangibles**" means all "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contract, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"**Goods**" means all "goods" as defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including embedded software to the extent included in "goods" as defined in the Code, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Guaranteed Indebtedness**" means as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any Indebtedness, lease, dividend, or other obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than

10

product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof.  The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"*Guaranties*" means, collectively, the guaranty previously executed and delivered by the Guarantors in connection with the Pre-Petition Loan Agreement, and any other guaranty executed by any Guarantors in favor of Lender in respect of the Obligations.

"*Guarantors*" means, each Person, if any, that executes a guaranty or other similar agreement in favor of Lender, in connection with the transactions contemplated by this Agreement and the other Loan Documents.

"*Guaranty Advance*" means the amount advanced under the Pre-Petition Loan Agreement and paid to UMB in satisfaction of a guaranty from Lender to UMB securing a loan from UMB to Borrower.

"*Guaranty Fee*" has meaning ascribed to it in <u>Section 2.1(c)(ii)</u>

"*Hazardous Material*" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "`hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"*Income Taxes*" means all federal, state, local, foreign and other Taxes levied on the income or profits of the applicable Person

"*Indebtedness*" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred 6 months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are unsecured and not overdue by more than 6 months unless being contested in good faith, (b) all reimbursement and other obligations with respect to bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value (discounted at the Prime Rate as in effect on the Closing Date) of future rental payments under all synthetic leases, (f) all obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (g) all obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether

11

contingent or matured, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (i) the Obligations.

"*Indemnified Liabilities*" has the meaning ascribed to it in Section 2.8.

"*Indemnified Person*" has the meaning ascribed to it in Section 2.8.

"*Instruments*" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"*Intellectual Property*" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"*Intellectual Property Security Agreement*" means the Intellectual Property Security Agreement previously made in favor of Lender, by each applicable Credit Party, in connection with the Pre-Petition Loan Agreement, as amended from time to time, and any intellectual property security agreements entered into after the Closing Date by any Credit Party (as required by this Agreement or any other Loan Document).

"*Interest Expense*" means, with respect to any Person for any fiscal period, interest expense (whether cash or non-cash) of such Person determined in accordance with GAAP for the relevant period ended on such date, including, interest expense with respect to any Funded Debt of such Person and interest expense for the relevant period that has been capitalized on the balance sheet of such Person.

"*Interim Maximum Tranche B Amount*" has the meaning ascribed to it in Section 2.1.

"*Interim Order*" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit A-1.

"*Inventory*" means all "inventory," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

12

"***Investment Property***" means all "investment property" as such term is defined in the Code now owned or hereafter acquired by any Credit Party, wherever located, including (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of any Credit Party, including the rights of any Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts of any Credit Party; (iv) all commodity contracts of any Credit Party; and (v) all commodity accounts held by any Credit Party.

"***IRC***" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

"***IRS***" means the Internal Revenue Service.

"***Leases***" means, collectively, the lease agreements whereby Lender, as tenant, leased certain Stores from various landlords.

"***Lender***" has the meaning ascribed to it in the Preamble of this Agreement.

"***Lender Guaranty Obligations***" means all obligations of Lender, from time to time, under the AWG Limited Guaranty.

"***License***" means any Copyright License, Patent License, Trademark License or other License of rights or interests now held or hereafter acquired by any Credit Party.

"***Lien***" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"***Litigation***" means any action, writ, Order, injunction, judgment, decree, claim, notice, suit, arbitration, grievance, charge, proceeding, investigation or inquiry, whether civil, criminal or administrative, including, but not limited to, bankruptcy proceedings of all types.

"***Loan***" means collectively, the Tranche A Loan and the Tranche B Loan, as may be amended, restated or modified from time to time.

"***Loan Account***" has the meaning ascribed to it in <u>Section 2.7</u>.

"***Loan Documents***" means this Agreement, the Note, the Collateral Documents, the Pre-Petition Loan Agreement, the Pre-Petition Loan Documents, and all other agreements, instruments, documents and certificates identified in the Closing Checklist executed and delivered to, or in favor of, Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Credit Party, or any employee of any Credit Party, and delivered to Lender in connection with this Agreement or the transactions

contemplated thereby, including the Interim Order and the Final Order.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"***Margin Stock***" has the meaning ascribed to it in <u>Section 4.8</u>.

"***Marketing Plan***" has the meaning ascribed to it in <u>Section 6.14.</u>

"***Material Adverse Effect***" means a material adverse effect, other than the filing of the Chapter 11 cases, on (a) the business, assets, operations, prospects or financial or other condition of any Credit Party, (b) Borrower's ability to pay any of the Loan or any of the other Obligations in accordance with the terms of this Agreement, (c) the Collateral or Lender's Liens on the Collateral or the priority of such Liens, or (d) Lender's rights and remedies under this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, any event or occurrence adverse to one or more Credit Parties which results or could reasonably be expected to result in losses, costs, damages, liabilities or expenditures in excess of [$50,000] shall constitute a Material Adverse Effect.

"***Maximum Amount***" means **Six Million Six Hundred Forty-Nine Thousand Six Hundred Twenty-Three Dollars ($6,649,623.00).**

"***Maximum Tranche B Amount***" means up to **Three Million Eight Hundred Twenty-Five Thousand Dollars ($3,825,000.00)** consisting of: (i) up to **Three Million Dollars ($3,000,000.00)** for use by the Borrower as working capital pursuant to the Budget and (ii) up to **Eight Hundred Twenty-Five Thousand Dollars ($825,000.00)** in restricted use funds for the sole purpose of the repayment of any Guaranty Reimbursement Obligations].

"***Member Certificates***" means, collectively, certain of the certificates held by Lender as a part of the Collateral, identified as: (i) that certain Member Deposit Certificate number 54024 issued March 18, 2012 in the amount of $52,088.70 (the "**Member Deposit Certificate**"); (ii) that certain "Patronage A" certificate number 30824 for "Qualified Purchases" in fiscal year 2011 issued on December 31, 2011, in the face amount of $393,489.51 (the "***2011 Patronage A Certificate***"); (iii) that certain "Patronage A"  certificate number 31488 for "Qualified Purchases" in fiscal year 2012 issued on December 29, 2012, in the face amount of $648,252.84 (the "***2012 Patronage A Certificate***"); (iv) that certain "Patronage B" certificate number 216 for "Qualified Purchases" in fiscal year 2013 issued on March 23, 2014, in the face amount of $618,448.27 (the "***Patronage B Certificate***").

"***Mortgages***" means each of the mortgages, deeds of trust, leasehold mortgages, leasehold deeds of trust, collateral assignments of leases or other real estate security documents previously executed and delivered by any Credit Party to Lender with respect to the Real Estate in connection with the Pre-Petition Loan Agreement all in form and substance reasonably satisfactory to Lender.

"***Multiemployer Plan***" means a "multiemployer plan" as defined in Sections 3(37) or 4001(a)(3) of ERISA, and to which any Credit Party or ERISA Affiliate is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

14

"***Non-Competition Agreement***" means the Non-Competition Agreement executed by Borrower in favor of Lender, dated as of June 15, 2011, as the same is amended, pursuant to the certain First Amendment of Non-Competition Agreement, dated as of March 19, 2013, and as the same may be amended, restated, supplemented or modified from time to time.

"***Note***" or "***Notes***" means collectively, the Tranche A Note and the Tranche B Note, as may be amended, restated or modified from time to time.

"***Obligations***" means all loans, advances, debts, notes, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to Lender or any Affiliate of Lender, including Super Market Developers, Inc. and Valu Merchandisers Company, and all covenants and duties regarding such amounts, of any kind or nature, present or future, matured or unmatured, voluntary or involuntary, earned or unearned, monetary or non-monetary, joint or several or otherwise, whether or not evidenced by any note, agreement or other instrument, including, without limitation, (a) all loans, advances, debts, liabilities and obligations arising under or in connection with this Agreement, the Pre-Petition Loan Agreement, or any of the other Loan Documents, including all Guaranty Reimbursement Obligations, (b) all loans, advances, debts, liabilities and obligations arising under or in connection with any other contract, lease or sublease, of every kind nature and description, including, without limitation, the Leases, and the Subleases, (c) all Supply Protection Agreements, (d) all general promotional, advertising or marketing obligations or accounts relating thereto; and (e) under any open account arrangement between Credit Party and Lender or any Affiliate of Lender, and all of the foregoing, whether present or future, however evidenced, created or incurred, whether primary or secondary, direct or indirect (by guaranty or otherwise), absolute or contingent, due or not due, now existing or hereafter arising and however acquired or extended, matured or unmatured, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, earned or unearned, monetary or non-monetary, joint or several or otherwise, whether or not such notes, loans, advances, debts, liabilities, indebtedness, obligations, contracts, covenants and duties are of the same kind or quality or related to the same transactions or the same series of transactions, or under any open account arrangement between any Credit Party, any Affiliate of any Credit Party and Lender or any Affiliate of Lender and all costs and expenses, including but not limited to attorneys' fees incurred by Lender in securing, collecting (including but not limited to those arising in any bankruptcy proceeding), enforcing or compromising any of said notes, loans, advances, debts, liabilities, indebtedness, obligations, contracts, covenants and duties.  This term includes all principal, interest (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of any Credit Party, whether or not allowed in such proceeding), lease payments and obligations, fees, charges, expenses, attorneys' fees and any other sum chargeable to any Credit Party under this Agreement, the Pre-Petition Loan Agreement, any of the other Loan Documents, the Leases, the Subleases or the Supply Protection Agreements.

"***Open Account***" means the open account maintained by Lender for the benefit of Borrower pursuant to the terms of the Supply Agreement.

"***Outside Accounting Firm***" means FMS Solutions or another accounting firm acceptable to Lender.

"***Patent License***" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"***Patents***" means all of the following in which any Credit Party now holds or hereafter acquires any interest: (a) all letters patent of the United States or of any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"***PBGC***" means the Pension Benefit Guaranty Corporation.

"***Pension Plan***" means a Plan described in Section 3(2) of ERISA.

"***Permitted Encumbrances***" means the following encumbrances: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable or which are being contested in accordance with Section 6.2(b) or to the extent that Borrower does not take any action (including, without limitation, by way of motion or application to the Bankruptcy Court) to pay, and are permitted under the Bankruptcy Code to not pay, such charges; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Credit Party is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to Equipment, Fixtures and/or Real Estate; (e) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business and securing liabilities in an outstanding aggregate amount not in excess of $50,000 at any time, so long as such Liens attach only to Inventory; (f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Credit Party is a party; (g) any attachment or judgment lien not constituting an Event of Default under Section 9.1(j); (h) zoning restrictions, easements, Licenses, or other restrictions on the use of any Real Estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such Real Estate; (i) presently existing or hereafter created Liens in favor of Lender; (j) Liens created pursuant to the Perishable Agricultural Commodities Act of 1930, as amended, in the ordinary course of business, so long as such Liens attach only to Inventory, (k) Liens in existence on the date hereof and summarized on Disclosure Schedule (7.7) securing the Indebtedness described on Disclosure Schedule (7.3) and permitted refinancings, extensions and renewals thereof, including extensions or renewals of any such Liens; provided that the principal amount of the Indebtedness so secured is not increased and the Lien does not attach to any other property; and (l) liens under and in accordance with the Interim Order and Final Order in favor of Lender.

"***Person***" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

KCP-4525702-12

"***Petition Date***" has the meaning ascribed to it in the recitals to this Agreement.

"***Pledge Agreements***" means the Pledge Agreement previously executed and delivered by Borrower in favor of Lender in connection with the Pre-Petition Loan Agreement, pledging all Stock of its Subsidiaries, if any, and all intercompany notes owing to or held by it, and any pledge agreements entered into after the Closing Date by any Credit Party (as required by this Agreement or any other Loan Document).

"***Post-Petition***" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"***Post-Petition Liens***" means liens created on the Collateral in favor of Lender Post-Petition.

"***Pre-Petition***" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"***Pre-Petition Indebtedness***" means all Indebtedness of any of Borrowers outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases other than Indebtedness under the Pre-Petition Loan Agreement.

"***Pre-Petition Liens***" means liens created on the Collateral in favor of Lender Pre-Petition.

"***Pre-Petition Loan Agreement***" has the meaning ascribed to it in the recitals to this Agreement.

"***Pre-Petition Loan Documents***" has the meaning ascribed to the term "Transaction Documents" in the Pre-Petition Loan Agreement.

"***Pre-Petition Loan Obligations***" has the meaning ascribed to it in Section 2.1(a).

"***Pre-Petition Open Account Debt***" means the amount outstanding on the Open Account Pre-Petition.

"***Pre-Petition Term Loan***" means the Term Loan made pursuant to, and as defined in, the Pre-Petition Loan Agreement.

"***Prime Rate***" means that variable interest rate which is periodically determined, established and distributed by UMB (or any successor to such bank) as its "base lending rate" to its officers and employees for their guidance in making loans, whether or not otherwise published or announced, as the same may be adjusted from time to time.  Borrower acknowledges that the Prime Rate is not necessarily, and need not be, the lowest interest rate charged by UMB to any of its customers

"***Proceeds***" means "proceeds," as such term is defined in the Code, including (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Credit Party from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to any Credit Party from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of governmental

authority), (c) any claim of any Credit Party against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the goodwill associated with any Trademark or Trademark License, (d) any recoveries by any Credit Party against third parties with respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"***Qualified Plan***" means a Pension Plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"***Real Estate***" means all real property owned or leased by any Credit Party.

"***Release***" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"***Restricted Payment***" means, with respect to any Credit Party (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Credit Party's Stock or any other payment or distribution made in respect thereof; either directly or indirectly; (c) any payment or prepayment of principal of; premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any subordinated debt; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Credit Party now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of:, any shares of such Credit Party's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Credit Party other than payment of compensation in the ordinary course of business to Stockholders who are employees of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Credit Party to any Stockholder of such Credit Party or its Affiliates.

"***Security Agreement***" means the Security Agreement previously entered into by and among Lender and each Credit Party that is a signatory thereto in connection with the Pre-Petition Loan Agreement, and any security agreements entered into after the Closing Date by any Credit Party (as required by this Agreement or any other Loan Document).

"***Software***" means all "software" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

18

"***Stock***" means all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"***Stockholder***" means, with respect to any Person, each holder of Stock of such Person.

"***Stores***" means the retail grocery stores operated by Borrower.

"***Subleases***" means, collectively, the sublease agreements whereby Lender, as sublandlord, leased certain Stores to Foods, as subtenant.

"***Subsidiary***" means, with respect to any Person, (a) any corporation of which an aggregate of more than 50% of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of 50% or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than 50% or of which any such Person is a general partner or may exercise the powers of a general partner.  Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of a Borrower.

"***Supply Agreement***" means that certain Supply Agreement, dated as of June 15, 2011, as amended by that certain First Amendment to Supply Agreement, dated as of September 23, 2011, and by that certain Second Amendment to Supply Agreement, dated as of March 19, 2013, each between Borrower and Lender, as the same may be amended, restated, supplemented or modified from time to time.

"***Supply Protection Agreements***" means collectively, the Supply Agreement, the Non-Competition Agreement and the Use Restrictions.  Any reference in this Agreement or any other Loan Document to a Supply Protection Agreement shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement as the same may be in effect at any and all times such reference becomes operative.

"***Supporting Obligations***" means all "supporting obligations" as such term is defined in the Code, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

"***Taxes***" means taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of Lender by the jurisdictions under the laws of which Lender is organized or conducts business or any political subdivision thereof.

19

"***Termination Date***" means the date on which (a) the Loan has been indefeasibly repaid in full IN CASH, (b) all other Obligations under this Agreement and the other Loan Documents, including the Guaranty Reimbursement Obligations, have been completely discharged, and (c) Borrower shall not have any further right to borrow any monies under this Agreement.

"***Title IV Plan***" means a Pension Plan (other than a Multiemployer Plan), that is subject to Title IV of ERISA or Section 412 of the IRC, and that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"***Trademark License***" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"***Trademarks***" means all of the following now owned or hereafter existing or adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof; and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"***Tranche A Loan***" has the meaning ascribed to it in Section 2.1(a).

"***Tranche A Note***" has the meaning ascribed to it in Section 2.1(d).

"***Tranche B Advance***" has the meaning ascribed to it in Section 2.1(b).

"***Tranche B Loan***" has the meaning ascribed to it in Section 2.1(b).

"***Tranche B Note***" has the meaning ascribed to it in Section 2.1(d).

"***UMB***" means UMB Bank, NA.

"***Unfunded Pension Liability***" means, at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of five (5) years following a transaction which might reasonably be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by any Credit Party or any ERISA Affiliate as a result of such transaction.

"***Use Restrictions***" means the Use Restrictions executed by Borrower in favor of Lender, regardless of when executed, as the same may be amended, restated, supplemented, or modified from time to time.

1.2     <u>Accounting Terms</u>.  Rules of construction with respect to accounting terms used in this Agreement or the other Loan Documents shall be as set forth in <u>Annex C</u>.  All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition in Article or Division 9 shall control.  Unless otherwise specified, references in this Agreement or any of the Appendices to a Section, subsection or clause refer to such Section, subsection or clause as contained in this Agreement.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement or any such Annex, Exhibit or Schedule.

1.3     <u>Rules of Construction</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations.  Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance or that such Credit Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

## 2.     AMOUNT AND TERMS OF CREDIT

2.1     <u>Loan Facility</u>.

(a)     <u>Tranche A Loan</u>.  Subject to the terms and conditions hereof, and conditioned upon entry of the Final Order approving such funding, Lender agrees to make a term loan to Borrower (the "***Tranche A Loan***"), to repay the following amounts outstanding under the Pre-Petition Loan Agreement (collectively, the "***Pre-Petition Loan Obligations***"):

| | | |
|---|---|---|
| Guaranty Advance | - | $2,478,994.00 |
| Pre-Petition Term Loan | - | $345,629.00 |
| Total | - | $2,824,623.00 |

(i)     On or after the date of the entry of the Final Order, Lender shall make an Advance under the Tranche A Loan to pay the Guaranty Advance and the Pre-Petition Term Loan.

(b)     <u>Tranche B Loan</u>.  Subject to the terms and conditions hereof, Lender agrees to make a term loan to Borrower that is funded sequentially in accordance with the following: (i) conditioned upon entry of the Interim Order approving such funding and prior to the entry of a Final Order as described herein, Lender will advance up to **One Million Three Hundred Thousand Dollars ($1,300,000.00)** (the "***Interim Maximum Tranche B Amount***"), and (ii) conditioned upon entry of a Final Order which (A) approves such funding, (B) includes

approval of the Tranche A Loan in Section 2.1(a) and (C) is subject to the conditions precedent contained in Section 3.3, Lender will advance up to the Maximum Tranche B Amount (the "***Tranche B Loan***"), and agrees to make Advances to Borrowers under the Tranche B Loan (each a "***Tranche B Advance***") as follows:

(i) Lender shall make a Tranche B Advance upon receipt of a written request from Borrower, together with a duly completed and executed Compliance Certificate.

(ii) Each written request for a Tranche B Advance must be given no later than 12:00 p.m. central time on the date which is no less than three (3) Business Days prior to the date such Tranche B Advance is requested.

(iii) Notwithstanding anything to the contrary contained herein, Lender shall not be required to make more than one Tranche B Advance in any calendar week.

(iv) Pursuant to the terms of the Supply Agreement and the Pre-Petition Loan Agreement, Borrowers shall pay any amounts due and owing with respect to the Open Account as and when due, notwithstanding the occurrence of the Petition Date, in the ordinary course of the Borrowers' businesses from the Borrowers' cash flow and pursuant to the Budget. If, upon the due date of any amounts owing to AWG under the Open Account, the Borrower does not have sufficient funds available to satisfy such current amount due, Lender shall make Advances under the Tranche B Loan to pay the amounts due and owing with respect to the Open Account, notwithstanding the occurrence of the Petition Date.

(v) As described below, Lender shall, immediately upon a Guaranty Reimbursement Obligation (as defined below) arising, make a Tranche B Advance on behalf of the Borrowers to repay Lender for any and all amounts due and owing by the Borrower to Lender pursuant to the Guaranty Reimbursement Obligation including any Guaranty Fee.

(vi) For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, before entry of a Final Order which includes approval of such funding and approval of the Tranche A Loan in <u>Section 2.1(a)</u>, and subject to the conditions contained in <u>Section 3.3</u> below, Lender shall not be required to advance any amount in excess of the Interim Maximum Tranche B Amount.

(vii) For the avoidance of doubt, the Interim Maximum Tranche B Amount is a subset of and wholly contained within the Maximum Tranche B Amount such that the Maximum Tranche B Amount shall be reduced dollar-for-dollar for any Tranche B Advances during the period from the entry of the Interim Order to the entry of the Final Order.

(c) <u>Guaranty Reimbursement Obligations</u>. Pursuant to the terms of the Pre-Petition Loan Agreement, Lender issued the AWG Limited Guaranty to UMB.

(i) To the extent Lender is required to pay any amount under the AWG Limited Guaranty for any reason, the entire amount of such payment shall immediately be due and payable by Borrower to Lender (such obligation is herein referred to as the "***Guaranty Reimbursement Obligation***") without notice. Borrower hereby promises to

immediately pay to Lender all Guaranty Reimbursement Obligations, and to and reimburse Lender for all Lender Guaranty Obligations, including all payments made under and in connection with any AWG Limited Guaranty, whether liquidated, unliquidated or contingent or currently due and owing.

(ii)    Borrower shall, in addition, pay to Lender a fee for the issuance of the AWG Limited Guaranty in an amount equal to fifty basis points (.50%) per annum, multiplied by the maximum amount of Lender Guaranty Obligations from time to time (the "**Guaranty Fee**").  The Guaranty Fee shall be paid by Borrower to Lender weekly, in advance, on each Payment Due Date.

(iii)    Lender may, as provided above, Advance the restricted use funds portion of the Tranche B Loan to repay Lender for Borrowers' Guaranty Reimbursement Obligation and any applicable Guaranty Fee.

(iv)    For the avoidance of doubt, in no circumstance shall the $825,000.00 in Tranche B Loan restricted use funds be used for any other purpose than for the repayment to Lender of Borrowers' Guaranty Reimbursement Obligation and Guaranty Fee and Lender shall not be required to make any other Advance with respect to such restricted use funds.

(d)    <u>Member Certificate Recoupment</u>. Subject to the terms and conditions hereof, and conditioned upon entry of the Final Order, Lender shall offset and recoup up to the amount of the Debtors' Member Certificates solely against the amount of the first payment due to Lender under the Open Account (notwithstanding the occurrence of the Petition Date) in the week immediately following the entry of the Final Order as contained in the Budget.  Lender reserves the right to further offset and recoup additional amounts (up to the amount of the Debtors' Member Certificates) due and owing under the Open Account in its sole and absolute discretion. The Member Certificates shall be redeemed and used to offset and recoup in the following order: the Member Deposit Certificate, the 2011 Patronage A Certificate; the 2012 Patronage A Certificate; and the Patronage B Certificate.

(e)    The Tranche A Loan shall be evidenced by a promissory note in form satisfactory to Lender (the "**Tranche A Note**").  The Tranche A Note shall represent the obligation of Borrower to pay the amount of the Tranche A Loan made to Borrower, together with interest thereon as prescribed in Section 2.4 of this Agreement. The Tranche B Loan shall be evidenced by a promissory note in form satisfactory to Lender (the "**Tranche B Note**").  The Tranche B Note shall represent the obligation of Borrower to pay the amount of the Tranche B Loan made to Borrower, together with interest thereon as prescribed in Section 2.4 of this Agreement. Amounts repaid under the Notes may not be readvanced.

(f)    Borrower shall pay the aggregate outstanding principal balance of the Loan and all accrued interest in immediately available funds on the Commitment Termination Date, if not sooner paid in full.

(g)    Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any notice believed by Lender to be genuine.  Lender may assume that each Person executing and delivering such a notice was duly authorized, unless the responsible individual acting thereon for Lender has actual knowledge to the contrary.

2.2    <u>Prepayments</u>.

(a)    Borrower may at any time on at least five (5) days' prior written notice by Borrower to Lender voluntarily prepay all or part of the Loan.  Any partial prepayment of the Loan made by or on behalf of Borrower shall be applied as set forth in subsection (c) below.

(b)    Borrower shall be required to repay the Loan as follows:

(i)    Upon the sale of substantially all of Borrower's assets in accordance with <u>Section 6.14</u>, Borrower shall pay to Lender all of the proceeds of the sale sufficient to pay the Loan and all other Obligations in full.

(ii)    In the event that the distributions paid to Borrower by the ESOP during any weekly period as the result of the sale of Borrower's Stock by the ESOP, then Borrower shall pay to Lender the full amount of such distribution as a prepayment of the Loan.

(c)    Any prepayments made pursuant to <u>Section 2.2</u> shall be applied as follows: <u>first</u>, to Fees and reimbursable expenses of Lender then due and payable pursuant to any of the Loan Documents; <u>second</u>, to interest then due and payable on the Loan; <u>third</u>, to prepay the Tranche A Loan and/or the Tranche B Loan, in amounts that are at Lender's discretion, and <u>fourth</u>, to be held by Lender as cash collateral to secure the Guaranty Reimbursement Obligations which may arise under the AWG Limited Guaranty.

(d)    Nothing in this <u>Section 2.2</u> shall be construed to constitute Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

2.3    <u>Use of Proceeds</u>.  Borrower shall utilize the proceeds of the Loan (net of any amounts used on the Closing Date to pay Fees) as follows:

(a)    The proceeds of the Tranche A Loan shall be used to refinance the Pre-Petition Loan Obligations in full; and

(b)    The proceeds of the Tranche B Loan shall be used (i) for working capital and general corporate purposes including payment of amounts due and owing under the Open Account and including certain fees and expenses of professionals retained by Borrower, subject to the Carve-Out Amount, but excluding in any event the making of any Restricted Payment not specifically permitted by <u>Section 7.13</u>; (ii) to repay Lender for any and all amounts due and owing by the Borrower to Lender pursuant to the Guaranty Reimbursement Obligation including any Guaranty Fee, and (iii) certain other pre-petition expenses that are approved by the Bankruptcy Court and consented to by Lender.  Borrower shall not be permitted to use the proceeds of the Loan: (A) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Pre-Petition Loan Agreement or any of the Pre-Petition Loan Documents, including, without limitation, any challenges to the Pre-Petition Loan Obligations under the Pre-Petition Loan Agreement, or the validity, perfection, priority, or enforceability of any Lien securing such claims or any payment made thereunder, (B) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, (C) to make any distribution under a plan of reorganization in any Chapter 11

24

Case and (D) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender. Disclosure Schedule (2.3) contains a description of Borrower's sources and uses of funds as of the Closing Date, including the Loan to be made or incurred on that date, and a funds flow memorandum detailing how funds from each source are to be transferred to particular uses.

    2.4    <u>Interest</u>.

    (a)    The Loan and any outstanding Guaranty Reimbursement Obligations shall accrue interest at a fixed rate equal to six percent (6%) per annum.

    (b)    If any payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

    (c)    All computations of Fees calculated on a per annum basis and interest shall be made by Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such interest and Fees are payable.  Each determination by Lender of an interest rate and Fees hereunder shall be presumptive evidence of the correctness of such rates and Fees.

    (d)    So long as any Event of Default has occurred and is continuing and at the election of Lender and without notice, motion or application to, hearing before, or order from the Bankruptcy Court, the interest rate applicable to the Loan and the Guaranty Reimbursement Obligations shall be increased by four percentage points (4%) per annum above the rate of interest or the rate of such Fees otherwise applicable hereunder (the "***Default Rate***"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

    (e)    Notwithstanding anything to the contrary set forth in this <u>Section 2.4</u>, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "***Maximum Lawful Rate***"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; <u>provided</u>, <u>however,</u> that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.  In no event shall the total interest received by Lender pursuant to the terms hereof exceed the amount that Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.

    2.5    <u>Receipt of Payments</u>.  Borrower shall make each payment under this Agreement not later than 2:00 p.m. (Central time) on the day when due in immediately available funds in Dollars to the Collection Account.  For purposes of computing interest and Fees, all payments shall be deemed received on the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. Central time.  Payments received after

2:00 p.m. Central time on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

2.6     Application and Allocation of Payments.

(a)     As to each payment (other than a prepayment under Section 2.2), and as to all payments made when a Default or Event of Default shall have occurred and be continuing or following the Commitment Termination Date, Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of Borrower, and Borrower hereby irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the Obligations of Borrower as Lender may deem advisable notwithstanding any previous entry by Lender in the Loan Account or any other books and records. In the absence of a specific determination by Lender with respect thereto, payments shall be applied to amounts then due and payable in the following order: first, to Fees and reimbursable expenses of Lender then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Loan; third, to prepay the outstanding principal balance of the Loan, fourth, to be held by Lender as cash collateral to secure all Guaranty Reimbursement Obligations existing as of such date or which could potentially exist in the future, and fifth, to all other Obligations.

(b)     Lender is authorized to, and at its sole election may, issue an Advance and cause to be paid all Fees, expenses, Charges, costs (including insurance premiums in accordance with Section 6.4(a)) and interest and principal, owing by Borrower under this Agreement or any of the other Loan Documents if and to the extent Borrower fails to pay promptly any such amounts as and when due, even if the amount of such charges would exceed the Maximum Amount. At Lender's option and to the extent permitted by law, any charges so made shall constitute part of the Loan hereunder.

2.7     Loan Account and Accounting. Lender shall maintain a loan account (the "**Loan Account**") on its books to record: all Advances of the Loan, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Loan or any other Obligations. All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations. Lender, upon written request of Borrower, which may be made by Borrower no more frequently than monthly, shall render to Borrower a periodic accounting of transactions with respect to the Loan setting forth the balance of the Loan Account. Unless Borrower notifies Lender in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof, each and every such accounting shall be presumptive evidence of all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by Borrower. Notwithstanding any provision herein contained to the contrary, Lender may elect (which election may be revoked) to dispense with the issuance of a Note to Lender and may rely on the Loan Account as evidence of the amount of Obligations from time to time owing to it.

2.8     Indemnity. Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless Lender and its Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "**Indemnified Person**"), from and against any and all suits, actions, proceedings, claims, damages, losses,

KCP-4525702-12

liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "***Indemnified Liabilities***"); <u>provided</u> that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct. No Indemnified Person shall be responsible or liable to any other Party to any Loan Document, any successor, assignee or third party beneficiary of such person or any other person asserting claims derivatively through such Party, for indirect, punitive, exemplary or consequential damages which may be alleged as a result of credit having been extended, suspended or terminated under any Loan Document or as a result of any other transaction contemplated hereunder or thereunder.

2.9    <u>Access</u>. Each Credit Party that is a party hereto shall, during normal business hours, from time to time upon two (2) Business Days prior notice, as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees, consultants, financial advisors, agents and other designees access to its properties, facilities, advisors, officers and employees of each Credit Party and to the Collateral, (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from any Credit Party's books and records, and (c) permit Lender, and its officers, employees, consultants, financial advisors, agents and other designees, to inspect, review, evaluate and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party. If an Event of Default has occurred and is continuing, each such Credit Party shall provide such access to Lender and its officers, employees, consultants, financial advisors, agents and other designees at all times and without advance notice. Furthermore, so long as any Event of Default has occurred and is continuing, Borrower shall provide Lender with access to its suppliers and customers. Each Credit Party shall make available to Lender and its counsel reasonably promptly originals or copies of all books and records that Lender may reasonably request, including, without limitation, the work product of any financial advisors, investment bankers or other consultants retained by any Credit Party. Each Credit Party shall deliver any document or instrument necessary for Lender, as it may from time to time reasonably request, to obtain records from any service bureau or other Person that maintains records for such Credit Party, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Credit Party.

2.10    <u>Taxes</u>.

(a)    Any and all payments by Borrower hereunder or under the Note shall be made, in accordance with this <u>Section 2.10</u>, free and clear of and without deduction for any and all present or future Taxes. If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note, (i) the sum payable shall be increased as much as shall be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 2.10</u>), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Within thirty (30) days

27

after the date of any payment of Taxes, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof.

(b)     Each Credit Party that is a signatory hereto shall jointly and severally indemnify and, within ten (10) days of demand therefore, pay Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this <u>Section 2.10</u>) paid by Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

2.11     <u>Capital Adequacy; Increased Costs; Illegality</u>.

(a)     If any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law), in each case, adopted after the Closing Date, from any central bank or other Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by Lender and thereby reducing the rate of return on Lender's capital as a consequence of its obligations hereunder, then Borrower shall from time to time upon demand by Lender (with a copy of such demand to Lender) pay to Lender additional amounts sufficient to compensate Lender for such reduction.  A certificate as to the amount of that reduction and showing the basis of the computation thereof submitted by Lender to Borrower shall be presumptive evidence of the matters set forth therein.

(b)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to Lender of agreeing to make or making, funding or maintaining any Loan, then Borrower shall from time to time, upon demand by Lender, pay to Lender additional amounts sufficient to compensate Lender for such increased cost.  A certificate as to the amount of such increased cost, submitted to Borrower by Lender, shall be presumptive evidence of the matters set forth therein.  Lender agrees that, as promptly as practicable after it becomes aware of any circumstances referred to above which would result in any such increased cost, Lender shall, to the extent not inconsistent with Lender's internal policies of general application, use reasonable commercial efforts to minimize costs and expenses incurred by it and payable to it by Borrower pursuant to this <u>Section 2.11(b)</u>.

2.12     <u>Single Loan</u>.  The Advances made under the Loan and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured, until the Termination Date, by all of the Collateral.

2.13     <u>Super Priority Nature of Obligations and Lender's Liens</u>.

(a)     The priority of Lender's Liens on the Collateral owned by Borrower shall be set forth in the Interim Order and the Final Order.  The Pre-Petition Liens shall continue to secure the Continuing Pre-Petition Obligations and shall secure the Obligations.  The Post-Petition Liens shall secure the Obligations.

(b)      All Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code.  Subject to the Carve-Out Amount, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case(s) or any subsequent proceeding or case under the Bankruptcy Code. The Liens granted to Lender on the Collateral owned by Borrower, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) senior to all claims and interests other than the Carve-Out Expenses up to the Carve-Out Amount.

(c)      Lender's Liens on the Collateral owned by Borrower and Lender's administrative claims under Sections 364(c)(1) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the following (hereafter referred to as the "**Carve-Out Expenses**"): fees and disbursements incurred and allowed on and after the Petition Date by professionals retained by Borrower, the Committee and any statutorily mandated costs and fees of the United States Trustee with respect to the Chapter 11 Case, up to a maximum aggregate amount unpaid on the Commitment Termination Date not to exceed the amount provided in the Budget (such dollar amount being referred to herein as the "**Carve-Out Amount**"); provided, that the Carve-Out Expenses shall not include any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses or any professional fees and expenses of a Chapter 7 trustee and, provided, further, that Carve-Out Expenses shall not include any fees or disbursements (A) arising after the conversion of the Chapter 11 Case or Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code or (B) of the type described in the second sentence of Section 2.3 hereof or otherwise related to the investigation of, preparation for, or commencement or prosecution of, any claims or proceedings against (i) Lender or its claims or security interests in or Liens on, the Collateral whether under this Agreement or any other Loan Document; and (ii) Lender under the Pre-Petition Loan Agreement or its claims or security interests in connection with the Pre-Petition Loan Agreement or any of the Pre-Petition Loan Documents.   Except as set forth herein or in the Final Order, no other claim having a priority superior or pari passu to that granted to Lender by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding; provided, however, that the Carve-out Expenses to be included in the Carve Out Amount and entitled to priority over the AWG Superpriority Claim shall not exceed those amounts authorized pursuant to the Budget; provided further, however, that if an Event of Default shall have occurred, the Carve Out Expenses shall be limited to those fees and expenses incurred prior to the date of the Event of Default and limited to the amount allowed for such Carve-out Expenses covered in any applicable Budget through and including the date of the Event of Default, and (b) quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a) and any fees payable to the Clerk of the Bankruptcy Court.  Except for the Carve-Out Expenses up to the Carve-Out Amount, no costs or expenses of administration shall be imposed against Lender or any of the collateral, or of Lender under the Pre-Petition Loan Agreement or the collateral (as defined in the Pre-Petition Loan Agreement), under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender, including under the Pre-Petition Loan Agreement.

29

2.14    Payment of Obligations.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

2.15    No Discharge; Survival of Claims.  Borrower agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to Lender pursuant to the Interim Order and Final Order and described in Section 2.13 and the Liens granted to Lender pursuant to the Interim Order and Final Order and described in Section 2.13 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

2.16    Release.  Subject only to the Creditors' Committee's Challenge Rights during the Challenge Period, Borrower hereby acknowledges effective upon entry of the Final Order, that Borrower or any of its Subsidiaries has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of Borrower's or its Subsidiaries' liability to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender. Borrower, in its own right and with respect to Borrower, on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge Lender and all of Lender's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "***Released Parties***") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

2.17    Waiver of any Priming Rights.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

3.    **CONDITIONS PRECEDENT**

3.1    <u>Conditions to the Initial Advance under the Tranche B Loan up to the Interim Maximum Tranche B Amount</u>.  Lender shall not be obligated to make any Advance on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner reasonably satisfactory to Lender, or waived in writing by Lender:

(a)    <u>Credit Agreement; Loan Documents</u>.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to, each Credit Party and Lender; and Lender shall have received such documents, instruments, agreements and legal opinions as Lender shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist attached hereto as <u>Annex A</u>, each in form and substance reasonably satisfactory to Lender.

(b)    <u>Approvals</u>.  Lender shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, in connection with the filing of the Chapter 11 Cases and to the execution, delivery and performance of this Agreement and the other Loan Documents, or (ii) an officer's certificate in form and substance reasonably satisfactory to Lender affirming that no such consents or approvals are required.

(c)    <u>Payment of Fees</u>.  Borrower shall have paid the Fees required to be paid on the Closing Date.

(d)    <u>Capital Structure: Other Indebtedness</u>.  The capital structure of each Credit Party and the terms and conditions of all Indebtedness of each Credit Party shall be acceptable to Lender in its sole discretion.

(e)    <u>Interim Order</u>.  Entry by the Bankruptcy Court of the Interim Order, by no later than 5 Business Days after the Petition Date in form and substance satisfactory to Lender, among other things, (i) approving the transactions contemplated hereby, (ii) granting a first priority perfected security interest in the Collateral subject only to the Carve-Out Expenses and Permitted Encumbrances up to the Carve-Out Amount, and (iii) modifying the automatic stay to permit the creation and perfection of Lender's Liens and to effectuate any actions allowed under this Agreement and automatically vacating the automatic stay to permit enforcement of Lender's default-related rights and remedies under this Agreement, the other Loan Documents and applicable law.

(f)    <u>First Day Orders</u>.  The "first day" orders described on <u>Disclosure Schedule 3.1</u> in form and substance satisfactory to Lender shall have been entered in the Chapter 11 Cases.

3.2    <u>Further Conditions to Each Advance</u>.  Except as otherwise expressly provided herein, Lender shall not be obligated to fund any Advance if, as of the date thereof:

(a)    <u>Exceeding the Commitment</u>.  The Advance requested would cause the aggregate outstanding amount of the Loan to exceed the lesser of:  (i) the Maximum Amount, or (ii) the amount then authorized by the Interim Order or the Final Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered, or any appeal of such order shall have been timely filed.

31

(b)    <u>Representations and Warranties</u>.  (i) Any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect as of such date as determined by Lender, except to the extent that such representation or warranty expressly relates to an earlier date and except for changes therein expressly permitted or expressly contemplated by this Agreement and (ii) Lender has determined not to make such Advance as a result of the fact that such warranty or representation is untrue or incorrect.

(c)    <u>Default or Event of Default</u>.  Any Default or Event of Default has occurred and is continuing or would result after giving effect to any Advance.

(d)    <u>No Final Order</u>.  (i) The Bankruptcy Court shall not have entered the Final Order on or before the date that is 45 days after the Petition Date, (ii) the Bankruptcy Court shall not have entered the Final Order following the expiration of the Interim Order, (iii) the Interim Order or the Final Order, as the case may be, shall have been vacated, STAYED, reversed, modified or amended without Lender's consent or shall otherwise not be in full force and effect, (iv) a motion for reconsideration of any such order shall have been timely filed or (v) an appeal of any such order shall have been timely filed and such order in any respect is the subject of a stay pending appeal.

(e)    <u>Approval of Orders</u>.  All orders entered by the Bankruptcy Court on or prior to the entry of the Final Order shall be satisfactory in form and substance to Lender and its counsel, including, without limitation, the provision, by and through such orders of adequate protection for Lender.

The request and acceptance by any Borrower of the proceeds of any Advance shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that the conditions in this <u>Section 3.2</u> have been satisfied, and (ii) a reaffirmation by Borrower of the granting and continuance of Lender's Liens pursuant to the Collateral Documents.

3.3    <u>Conditions to any Advance in excess of the Interim Maximum Tranche B Amount</u>. Except as otherwise expressly provided herein, Lender shall not be obligated to make any Advance in excess of the Interim Maximum Tranche B Amount, until the following conditions have been satisfied or provided for in a manner reasonably satisfactory to Lender, or waived in writing by Lender:

(a)    <u>Entry of Final Order</u>.  (i) The Bankruptcy Court shall have entered the Final Order on or before the date that is 45 days after the Petition Date, (ii) the Bankruptcy Court shall have entered the Final Order following the expiration of the Interim Order, (iii) the Interim Order or the Final Order, as the case may be, shall not have been vacated, STAYED, reversed, modified or amended without Lender's consent or shall otherwise not be in full force and effect, (iv) a motion for reconsideration of any such order shall not have been timely filed or (v) an appeal of any such order shall have not been timely filed and such order in any respect is the subject of a stay pending appeal.

(b)    <u>Repayment of the Pre-Petition Loan Obligations</u>.  The Pre-Petition Loan Obligations shall have been repaid in cash from the proceeds of the Tranche A Loan.

3.4    <u>Conditions to any Advance under the Tranche A Loan</u>. Except as otherwise expressly provided herein, Lender shall not make any Advance with respect to the Tranche A Loan until the following conditions have been satisfied:

(a)     Entry of Final Order.  (i) The Bankruptcy Court shall have entered the Final Order approving such funding in a manner consistent with the terms of this Agreement on or before the date that is 45 days after the Petition Date, (ii) the Bankruptcy Court shall have entered the Final Order following the expiration of the Interim Order, (iii) the Interim Order or the Final Order, as the case may be, shall not have been vacated, STAYED, reversed, modified or amended without Lender's consent or shall otherwise not be in full force and effect, (iv) a motion for reconsideration of any such order shall not have been timely filed or (v) an appeal of any such order shall have not been timely filed and such order in any respect is the subject of a stay pending appeal.

## 4.     REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loan, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

4.1    Corporate Existence; Compliance with Law.  Each Credit Party (a) is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization set forth in Disclosure Schedule (4.1); (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (c) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (d) subject to specific representations regarding Environmental Laws, has, to the best of Borrower's knowledge, all Licenses, permits, consents or approvals from or by, and has, to the best of Borrower's knowledge, made all material filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its charter and bylaws or operating agreement, as applicable; and (f) subject to specific representations set forth herein regarding ERISA, Environmental Laws, tax and other laws, is, to the best of Borrower's knowledge, in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

4.2    Executive Offices, Collateral Locations, FEIN.  As of the Closing Date, each Credit Party's name as it appears in official filings in its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and the current location of each Credit Party's chief executive office and the warehouses and premises at which any Collateral is located are set forth in Disclosure Schedule (4.2), none of such locations has changed within the four (4) months preceding the Closing Date and each Credit Party has only one state of incorporation or organization.  In addition, Disclosure Schedule (4.2) lists the federal employer identification number of each Credit Party.

4.3    Corporate Power, Authorization, Enforceable Obligations.  Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) the execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (a) are within such Person's power; (b) have been

duly authorized by all necessary corporate or limited liability company action; (c) do not contravene any provision of such Person's charter, bylaws or operating agreement as applicable; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Person is a party or by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Lender pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, except those referred to in <u>Section 3.1(b)</u>, all of which will have been duly obtained, made or complied with prior to the Closing Date.  Each of the Loan Documents shall be duly executed and delivered by each Credit Party that is a party thereto and, subject to the entry of the Interim Order (or the Final Order, when applicable), each such Loan Document shall constitute a legal, valid and binding obligation of such Credit Party enforceable against it in accordance with its terms.

4.4    <u>Financial Statements; Budget</u>.  Except for the Budget, all Financial Statements concerning the Credit Parties that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the financial position of the Persons covered thereby as at the dates thereof and the results of their operations and cash flows for the periods then ended.

(a)    The following Financial Statements attached hereto as <u>Disclosure Schedule (4.4(a))</u> have been delivered on the date hereof:

(i)    The unaudited balance sheet(s) at September 27, 2014 and the related statement(s) of income and cash flows of Borrower and its Subsidiaries for the 2014 Fiscal Year then ended.

(b)    The budget attached hereto as <u>Disclosure Schedule (4.4(b))</u> was prepared by Borrower and reflects, on a line-item basis, anticipated cash receipts and expenditures and includes all necessary and required expenses that Borrower expects to incur during the period described therein (the "***Budget***").  Borrower agrees that it shall use its cash, negotiable instruments, documents or title, securities, deposit accounts, accounts receivable or other cash equivalents and the proceeds thereof ("***Cash Collateral***"), only for payment of such items as set forth in the Budget, with allowance for a ten percent (10%) line item variance and five (5%) aggregate variance measured on a weekly basis; <u>provided</u> however, there shall not be permitted a variance to any Budget items for Carve-Out Expenses.

4.5    <u>Material Adverse Effect</u>.  Between March 31, 2014 and the Closing Date: (a) no Credit Party has incurred any obligations, contingent or noncontingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that are not reflected in the Pro Forma and that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (b) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted that has had or could reasonably be expected to have a Material Adverse Effect, and (c) no Credit Party is in default other than the commencement of the Chapter 11 Cases and to the best of Borrower's knowledge no third party is in default under any material contract, lease or other agreement or

34

instrument, other than those obligations as noted in the Borrower's Chapter 11 Petition and Schedules, that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Since March 31, 2014, no event has occurred, that alone or together with other events, could reasonably be expected to have a Material Adverse Effect other than the commencement of the Chapter 11 Case.

4.6   <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness</u>. Except as set forth in <u>Disclosure Schedule (4.6)</u>, as of the Closing Date, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person.  All of the issued and outstanding Stock of each Credit Party is owned by each of the Stockholders and in the amounts set forth in <u>Disclosure Schedule (4.6)</u>. Except as set forth in <u>Disclosure Schedule (4.6)</u>, there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries.  All outstanding Indebtedness and Guaranteed Indebtedness of each Credit Party as of the Closing Date (except for the Obligations) is described in <u>Section 7.3</u> (including <u>Disclosure Schedule (7.3)</u>).

4.7   <u>Government Regulation</u>.  No Credit Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940.  No Credit Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder.  The making of the Loan by Lender to Borrower, the application of the proceeds thereof and repayment thereof will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

4.8   <u>Margin Regulations</u>.  No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "***Margin Stock***").  No Credit Party owns any Margin Stock, and none of the proceeds of the Loan or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Loan or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board.  No Credit Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

4.9   <u>Brokers</u>.  Except as set forth in <u>Disclosure Schedule (4.9)</u>, no broker or finder brought about the obtaining, making or closing of the Loan, and neither Borrower nor any Affiliate of Borrower has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

4.10   <u>Liens</u>.  The Liens granted to Lender pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Encumbrances as provided in <u>Section 7.7</u>.

4.11   <u>Insurance</u>.

KCP-4525702-12

(a)    Set forth in <u>Disclosure Schedule (4.11(a))</u> is a list and description of all policies of fire, liability, product liability, workers compensation and other forms of insurance (other than insurance policies related to Existing Employee Benefit Plans) presently in effect with respect to the business and properties of the Credit Parties.

(b)    All such policies are valid, outstanding and enforceable policies and provide insurance coverage for the assets and operations of the Credit Parties, and no such policy (nor any previous policy) provides for or is subject to any currently enforceable retroactive rate or premium adjustment (with the possible exception of worker's compensation audits, which are not subject to material unpaid retroactive assessment), loss sharing arrangement or other actual or contingent liability arising wholly or partially out of events arising prior to the date hereof.  All premiums and other payments due under any such policy have been paid.

(c)    Each Credit Party is in compliance in all material respects with such policies and no Credit Party has received written notice of cancellation or termination with respect to any such policy and there has been no act or omission which could result in cancelation of any such policy prior to its scheduled expiration date.

4.12    <u>Deposit and Disbursement Accounts</u>.  <u>Disclosure Schedule (4.12)</u> lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, including any Disbursement Accounts, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

4.13    <u>Government Contracts</u>.  Except as set forth in <u>Disclosure Schedule (4.13)</u>, as of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727) or any similar state or local laws.

4.14    <u>No Conflict; Required Filings and Consents</u>.

(a)    The execution and delivery of this Agreement and the other Loan Documents, the performance by Borrower of its obligations hereunder or thereunder, and the consummation of the transactions contemplated hereby and thereby, will not:  (i) conflict with any Credit Party's articles of incorporation or bylaws or similar documents or (ii) except as set forth in <u>Disclosure Schedule (4.14(a))</u>, violate, breach, be in conflict with or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the acceleration of the maturity of or the performance of any obligation of any Credit Party under, or result in the creation or imposition of any Lien upon any assets of any Credit Party under, any note, bond, indenture, mortgage, deed of trust, lease, permit, authorization, license, contract, instrument or other material agreement or commitment to which any Credit Party is a party or by which any Credit Party or any of its assets are bound or encumbered.

(b)    Except as set forth in <u>Disclosure Schedule (4.14(b))</u>, the execution and delivery of this Agreement or the documents delivered in connection herewith or therewith and the consummation by Borrower of the transactions contemplated hereby and thereby (i) will not materially violate any Law or Order, and (ii) will not require any other authorization, consent, approval, exemption or other action by or notice to any Governmental Authority to be made or obtained by any Credit Party in connection with the execution, delivery and

36

performance of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby.

4.15    <u>No Litigation</u>.  No Litigation is now pending or, to the knowledge of any Credit Party, threatened against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators, (a) that challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) that has a reasonable risk of being determined adversely to any Credit Party and that, if so determined, could reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Disclosure Schedule (4.15)</u>, as of the Closing Date there is no Litigation pending or, to any Credit Party's knowledge, threatened, that seeks damages in excess of $100,000 or injunctive relief against, or alleges criminal misconduct of, any Credit Party.

4.16    <u>Taxes</u>.  All Federal and other material tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority, and all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof excluding Charges or other amounts being contested in accordance with <u>Section 6.2(b)</u> and unless the failure to so file or pay would not reasonably be expected to result in fines, penalties or interest in excess of $100,000 in the aggregate.  Proper and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in full and complete compliance with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities. <u>Disclosure Schedule 4.16</u> sets forth as of the Closing Date those taxable years for which any Credit Party's tax returns are currently being audited by the IRS or any other applicable Governmental Authority, and any assessments or threatened assessments in connection with such audit, or otherwise currently outstanding.  Except as described in <u>Disclosure Schedule (4.16)</u>, as of the Closing Date, no Credit Party has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges.  None of the Credit Parties and their respective predecessors are liable for any Charges: (a) under any agreement (including any tax sharing agreements) or (b) to each Credit Party's knowledge, as a transferee. As of the Closing Date, no Credit Party has agreed or been requested to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise, which would reasonably be expected to have a Material Adverse Effect.

4.17    <u>Labor Matters</u>.

(a)    <u>Disclosure Schedule (4.17(a))</u> contains a complete list of (i) all collective bargaining agreements and (ii) all organizations representing the employees of each Credit Party.  Except as described in <u>Disclosure Schedule (4.17(a))</u>, as of the Closing Date, there is no strike, picketing, work stoppage, collective bargaining agreement dispute or material labor disturbance, pending or threatened, which involves any employees or assets of any Credit Party.

(b)    <u>Disclosure Schedule (4.17(b))</u> contains (as of the Closing Date) a list of all pending unfair employment or labor practice charges filed with any Governmental Authority by or on behalf of any employee of any Credit Party.

4.18    Employee Benefit Plans.

(a)    Disclosure Schedule (4.18(a)) lists each Employee Benefit Plan in effect immediately prior to Closing that (i) is maintained or contributed to by any Credit Party and (ii) provides benefits to, or describes policies or procedures applicable to, any current or former director, officer, employee, or service provider of any Credit Party, or the dependents of any thereof, regardless of how (or whether) liabilities for the provision of benefits are accrued or assets are acquired or dedicated with respect to the funding thereof (each, an "***Existing Employee Benefit Plan***").

(b)    Except as set forth in Disclosure Schedule (4.18(b)), all amounts owed by any Credit Party under the terms of any Existing Employee Benefit Plan have been timely paid in full. Except as set forth in Disclosure Schedule (4.18(b)), each Credit Party has paid in full all required insurance premiums, subject only to ordinary retrospective adjustments in the ordinary course of business, with regard to each Existing Employee Benefit Plan.

(c)    Each Existing Employee Benefit Plan has been operated in compliance in all material respects with ERISA, the IRC and all other applicable Laws and the written plan documents.  Each Credit Party has properly booked any unfunded liability with respect to any Existing Employee Benefit Plan.

(d)    No Existing Employee Benefit Plan that is intended to be qualified under Section 401(a) of the IRC has received a revocation of a favorable determination or opinion letter from the IRS or is based on a form of plan that has received such a revocation. No circumstance exists that would reasonably be expected to result in revocation of any favorable determination or opinion letter from the IRS with respect to an Existing Employee Benefit Plan.  Each trust created under any such qualified Existing Employee Benefit Plan has been determined to be exempt from taxation under Section 501(a) of the IRC, and no circumstance exists that would reasonably be expected to result in a revocation of such exemption.  Any Existing Employee Benefit Plan that is intended to meet the requirements of IRC Section 501(c)(9) has received a determination of tax exemption from the IRS.  No circumstance exists that would reasonably be expected to give rise to a loss of any intended tax consequence or to any Tax under Section 511 of the IRC with respect to any Existing Employee Benefit Plan.

(e)    To the Borrower's best knowledge, there is no pending Litigation relating to any Existing Employee Benefit Plan and no such Litigation is threatened.  No Credit Party nor any fiduciary of an Existing Employee Benefit Plan has breached any fiduciary duty or engaged in a transaction with respect to any Existing Employee Benefit Plan that could subject any Credit Party to a Tax or penalty imposed by Section 4975 of the IRC or Section 502(l) of ERISA.

(f)    Other than the continuation coverage requirements of COBRA or as listed in Disclosure Schedule (4.18(f)), no Credit Party has any obligation or potential liability for medical, health, life insurance or other welfare type benefits to employees, former employees or their dependents following termination of employment or retirement under any Existing Employee Benefit Plan.

(g)    No Credit Party contributes to, has any obligation to contribute to, or has any liability with respect to, any "employee pension benefit plan" within the meaning of

38

Section 3(2) of ERISA that is a "defined benefit plan" within the meaning of Section 3(35) of ERISA.

(h)    No Credit Party contributes to, has any obligation to contribute to, or has any liability with respect to, a Multiemployer Plan.  The Credit Parties have properly withdrawn from, and have no unpaid withdrawal liabilities with respect to, all of the Multiemployer Plans listed in <u>Disclosure Schedule (4.18(h))</u>.  <u>Disclosure Schedule (4.18(h))</u> lists all Multiemployer Plans to which any Credit Party contributed to, had any obligation to contribute to or had any liability with respect to but has withdrawn from prior to the Closing Date.

(i)    No fact or circumstance exists related to any Existing Employee Benefit Plan that could result in the imposition of any Tax, penalty or interest on any Person pursuant to Section 409A of the IRC.

(j)    Except as listed in <u>Disclosure Schedule (4.18(j))</u>, no Credit Party has any Unfunded Pension Liability.

4.19    <u>Real Property and Assets</u>.  <u>Disclosure Schedule (4.19)</u> lists all leased and owned Real Estate of the Credit Parties.  The Credit Parties have (a) good, marketable, and fee simple title and right to all owned Real Estate; (b) a valid right through the applicable leases to use the leased Real Estate; and (c) good title and right to all other assets, in each case that are necessary for the conduct of the business of the Credit Parties including, without limitation, all such properties (tangible and intangible) reflected in the most recent balance sheet delivered to Lender, except for Inventory disposed of in the ordinary course of business since the date of such balance sheet, free and clear of all Liens except those permitted pursuant to <u>Section 7.7.</u>

4.20    <u>Intellectual Property</u>.  A true, correct and complete list of all of the Intellectual Property of each Credit Party is set forth in <u>Disclosure Schedule (4.20)</u>  Except as set forth in <u>Disclosure Schedule (4.20)</u>, there are no licenses, agreements or other arrangements which allow any Affiliate of any Credit Party or other third party to use any of the Intellectual Property.

4.21    <u>Environmental Matters</u>.

(a)    Except as set forth in <u>Disclosure Schedule (4.21(a))</u>, each Credit Party is in material compliance with all limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws or contained in any regulations, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder.  Except as set forth in <u>Disclosure Schedule (4.21(a))</u>, each of the Stores has been maintained by the Credit Parties in compliance with all Environmental Laws, except where the failure to so comply, or any aggregation of such failures, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth in <u>Disclosure Schedule (4.21(b))</u>, no conditions exist with respect to the Stores or owned Real Estate that could result in any Claim or liability to or against any Credit Party by any third party (including without limitation, any Governmental Authority) for matters regulated under Environmental Laws, except in any such case which would not would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect

4.22    <u>ESOP</u>.

(a)    The ESOP is a duly organized trust, validly existing under the Laws of the State of Iowa and of the United States of America, including ERISA and the IRC.

(b)    The trustees of the ESOP have sole responsibility for any and all fiduciary duties to the ESOP with respect to all matters related to the transactions contemplated by this Agreement, Borrower agrees that Lender and its Affiliates and their respective employees, counsel or agents have no fiduciary responsibility to the ESOP in connection with the Loan Documents or the Supply Protection Agreements or the transactions contemplated thereby.

(c)    The ESOP and the Trustees are not in violation of, any Laws or Orders, including ERISA, determined after taking into account all of the facts and circumstances.

(d)    The ESOP is qualified under Section 401(a) of the IRC and is an employee stock ownership plan under Section 4975(e) of the IRC, and the ESOP is exempt from tax under Section 501(a) of the IRC.

4.23    Section 409(p) of the IRC.    None of Borrower's Employee Benefit Plans or other agreements or arrangements (including all Existing Employee Benefit Plans, Employee Benefit Plans entered into after the Closing Date and all other agreements and arrangements, whether entered into or effective prior to or following the Closing Date), have resulted in any excise Taxes becoming due or owing at any time pursuant to Section 4979A of the IRC.

4.24    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing for the approval of the interim order, and (z) the hearing for the approval of the Final Order.  Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out Expenses up to the Carve-Out Amount.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

4.25    Full Disclosure.  No information contained in this Agreement, any of the other Loan Documents, Financial Statements or other written reports from time to time prepared by any Credit Party and delivered hereunder or any written statement prepared by any Credit Party and furnished by or on behalf of any Credit Party to Lender pursuant to the terms of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  The Liens granted to Lender pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Encumbrances as set forth in Section 7.7.

## 5.    FINANCIAL STATEMENTS AND INFORMATION

5.1    Reports and Notices.  Each Credit Party hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Lender the Financial Statements, notices, Budgets and other information at the times, to the Persons and in the manner set forth in Annex B.

5.2    Communication with Accountants.  Each Credit Party authorizes Lender to communicate directly with its independent certified public accountants, financial advisors, investment bankers and consultants, including the Outside Accounting Firm, and authorizes and shall instruct those accountants, financial advisors, investment bankers and consultants to communicate to Lender information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party.

5.3    Retention of Outside Accounting Firm.  Each Credit Party shall seek to retain the Outside Accounting Firm as a professional person under Section 327 of the Bankruptcy Code.

## 6.    AFFIRMATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

6.1    Maintenance of Existence and Conduct of Business.  Except as occasioned by the Chapter 11 Cases, each Credit Party shall: do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its material rights and franchises; continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices; and transact business only in such corporate and trade names as are set forth in Disclosure Schedule (6.1).

6.2    <u>Payment of Charges</u>.

(a)    Subject to <u>Section 6.2(b)</u>, each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it, including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees, in each case, before any thereof shall become past due; provided, no Borrower shall be required to pay any Charges, Taxes or Claims the nonpayment of which is permitted by the Bankruptcy Code.

(b)    Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in <u>Section 6.2(a)</u>; <u>provided</u>, that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges; (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest and (iv) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this <u>Section 6.2(b)</u> are no longer met.

6.3    <u>Books and Records</u>.  Each Credit Party shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements attached as <u>Disclosure Schedule (4.4(a))</u>.

6.4    <u>Insurance</u>.

(a)    Each Credit Party shall (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Credit Parties (including policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, business interruption employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Credit Parties) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties, including, without limitation, the policies of insurance described in <u>Disclosure Schedule 4.11(a)</u>.

(b)    Without in any way limiting the provisions of <u>Section 6.4(a)</u> above, Borrower shall maintain and cause to be maintained, directors and officer's liability coverage in amounts, with carriers and in substantially the same form and pursuant to the same policies as are in place as of the Closing Date.

(c)    Each Credit Party shall cause all such insurance relating to any property or business of Credit Parties to name Lender as additional insured or loss payee, as appropriate, and each such policy, including the policies referred to in <u>Section 6.4(b)</u>, shall

42

provide that no cancellation, material addition or reduction in amount or other change in coverage shall be effective until after 30 days' notice thereof to Lender.

6.5 <u>Compliance with Laws</u>. Each Credit Party shall comply with all federal, state, local and foreign laws and regulations applicable to it, including those relating to ERISA, labor laws, and Environmental Laws and Environmental Permits, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

6.6 <u>Supplemental Disclosure</u>. From time to time as may be reasonably requested by Lender (which request will not be made more frequently than once each year absent the occurrence and continuance of an Event of Default) or at Credit Parties' election, the Credit Parties shall supplement each Disclosure Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter hereafter arising that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or that is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); <u>provided</u> that (a) no such supplement to any such Disclosure Schedule or representation shall amend, supplement or otherwise modify any Disclosure Schedule or representation, or be or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as consented to by Lender in writing, and (b) no supplement shall be required or permitted as to representations and warranties that relate solely to the Closing Date.

6.7 <u>Intellectual Property</u>. Each Credit Party will conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and shall comply in all material respects with the terms of its Licenses.

6.8 <u>Environmental Matters</u>. Each Credit Party shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate in all material respects; (c) notify Lender promptly after such Credit Party becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities in excess of $100,000; and (d) promptly forward to Lender a copy of any order, notice, request for information or any communication or report received by such Credit Party in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in Environmental Liabilities in excess of $100,000, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter. If Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected to have a

43

Material Adverse Effect, then each Credit Party shall, upon Lender's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at Borrower's expense, as Lender may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Lender and shall be in form and substance reasonably acceptable to Lender, and (ii) permit Lender or its representatives to have access to all Real Estate for the purpose of conducting such environmental audits and testing as Lender deems appropriate, including subsurface sampling of soil and groundwater.  Borrower shall reimburse Lender for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

6.9    <u>Landlords' Agreements, Mortgagee Agreements and Bailee Letters</u>.  As reasonably requested by Lender and to the extent not otherwise addressed to Lender's reasonable satisfaction in the Final Order, each Credit Party shall use commercially reasonable efforts to obtain a landlord's agreement, mortgagee agreement or bailee letter, as applicable, from the lessor of each leased property (other than Lender or its Affiliates), mortgagee of owned or leased property (other than Lender or its Affiliates) or bailee with respect to any warehouse, processor or converter facility or other location where Collateral is stored or located, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to Lender.  After the Closing Date, no real property or warehouse space shall be leased by any Credit Party and no Collateral shall be shipped to a processor or converter under arrangements established after the Closing Date without the prior written consent of Lender or, unless and until a reasonably satisfactory landlord agreement or bailee letter, as appropriate, shall first have been obtained with respect to such location.  Each Credit Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located.

6.10    <u>VCP and Determination Letter Request; VCP Supplement</u>.  Borrower shall:

(a)    Notify Lender immediately of each response and communication, and provide to Lender a copy of any such written communication and a description of any such oral communication, received by Borrower from the IRS with respect or relating to the ESOP, including, without limitation, any communication relating to the VCP and Determination Letter Request and/or the VCP Supplement (an "***IRS Communication***");

(b)    Promptly after receiving an IRS Communication, provide Lender with a copy of any proposed response to the IRS Communication along with all back up and additional documents, including all proposed amendments to the ESOP (the "***Borrower Response***") for Lender's review and approval and agree to make such revisions to the Borrower Response as Lender may reasonably request.

(c)    Timely submit the Borrower Response approved by Lender to the IRS and adopt amendments and take such further action as provided in the approved Borrower Response or otherwise required by the IRS, and take such further action as may be necessary to receive a favorable determination letter with respect to the ESOP and a signed compliance statement, exemption or agreement from or with the IRS with respect to the ESOP.

6.11    <u>ESOP</u>.  Foods shall remain the plan sponsor of the ESOP at all times.  In addition, Borrower shall:

(a)     Not amend, alter or modify, or consent to or suffer to exist any amendment, alteration or modification of, the ESOP without Lender's consent provided, Lender's consent shall not be unreasonably withheld or delayed to the extent the amendment is necessary to maintain the qualification and compliance of the ESOP under Sections 401(a), 501(a) and 4975(e)(7) of the IRC, and if Borrower proposes any such amendment, Borrower shall provide written notice of such proposed amendment to Lender as soon as reasonably practicable, but in any event not less than thirty (30) days prior to the deadline for adoption of such amendment; and

(b)     Cause the ESOP not to take any action that has the effect of waiving a restriction on vesting of, or vesting, any right created pursuant to the ESOP, or accelerating any obligations of any Person to repurchase Borrower's capital stock;

(c)     Cause the ESOP to take all reasonable actions, to the extent permitted under applicable Law, to reduce and minimize ESOP Repurchase Liabilities.

(d)     Without Lender's prior written consent, not take any action to allow or permit any act by the ESOP (or any other Employee Benefit Plan) to incur, create, assume, guarantee or otherwise become liable in respect of any indebtedness for borrowed money or other obligations, except to fund statutorily required diversification, or to make distributions pursuant to the terms of the ESOP (or other Employee Benefit Plan), or to fund expenses that are properly charged to the ESOP (or other Employee Benefit Plan) under applicable Laws;

(e)     Cause each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the IRC, including the ESOP, to at all times be operated and administered so as to be in compliance with the applicable qualification and tax exemption requirements under Sections 401(a) and 501(a) of the IRC, respectively, and cause the ESOP to qualify as an "employee stock ownership plan," within the meaning of Section 4975(e)(7) of the IRC, and to be operated and administered in substantial compliance with all applicable requirements of ERISA and the IRC;

(f)     Cause a legal opinion to be issued and delivered to Lender within 30 days of each anniversary of the Closing Date by a law firm representing Borrower as the sponsor of the ESOP, that is satisfactory to Lender, which such legal opinion shall be in form and content acceptable to Lender, and which shall, among other things, provide that the form of the ESOP is in compliance with all requirements of the IRC;

(g)     Retain a consultant, acceptable to Lender, to review (i) the ESOP's compliance with all applicable laws and the ESOP documents, (ii) the ESOP appraisals, audits, and annual reports, and, based on such review, to issue a written compliance review annually, within 60 days following the completion of the ESOP's recordkeeping as of each Employee Benefit Plan year ending after the Closing Date but no later than 30 days following the due date of the ESOP's annual filing with the IRS on IRS Form 5500 for such year (including extensions), in a manner reasonably acceptable to Lender, which such review shall provide that the operation of the ESOP is in compliance with all applicable laws and the ESOP documents, subject to such qualifications as Lender reasonable accepts. Borrower shall deliver a copy of such report to Lender within five (5) days of Borrower's receipt of the report.

(h)     Take any and all actions necessary to avoid any excise taxes becoming due with respect to the ESOP (including, without limitation, avoiding a violation of IRC Section 409(p)), and to provide Lender a copy of the 409(p) test and analysis related thereto for the prior

45

year and a projected 409(p) test and analysis related thereto for the current year, in each case by the last day of the sixth month of each plan year.

(i)    To the extent permitted by ERISA, if requested by Lender, make such changes to the ESOP as may be necessary or appropriate to prevent or remedy any conflict or inconsistency between the terms of such ESOP and any Loan Document.

(j)    At the written request of Lender issued any time prior to the third (3rd) anniversary of the Closing Date, take all steps necessary to cause an independent institutional trustee chosen by Borrower and approved by Lender, with substantial experience acting as a fiduciary for ESOP trusts of the size and nature of the ESOP, to be appointed as trustee of the ESOP to replace the existing trustee(s) within 60 days of such request.

(k)    Inform Lender, within 45 days following the Closing Date, of the accounting treatment taken by Borrower and the ESOP with respect to the transactions and matters contemplated or covered by the Stock Redemption Agreement.

(l)    Inform Lender immediately upon discovery of any defect relating to the qualification of the ESOP under IRC Sections 401(a) or 4975(e)(7), or the tax exempt status of the ESOP trust under Section 501(a) of the IRC, and cooperate fully with Lender in connection with the resolution of any defect relating to such qualification or tax exempt status.

6.12    <u>No Amendments to Existing Employee Benefit Plans; No Further Employee Benefit Plans</u>.

(a)    Borrower shall not amend any if its existing Employee Benefit Plans without the prior written approval of Lender.

(b)    Borrower shall not adopt or become liable to contribute to any Employee Benefit Plan or Multiemployer Plan other that the Employee Benefit Plans listed on <u>Disclosure Schedule 4.18</u>.

6.13    <u>Further Assurances</u>.  Each Credit Party executing this Agreement agrees that it shall and shall cause each other Credit Party to, at such Credit Party's expense and upon the reasonable request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement and each Loan Document.

6.14    <u>Sale of Assets</u>.  Borrower has delivered a sale and marketing proposal for the sale of substantially all of Borrower's assets, a copy of which is attached hereto as <u>Disclosure Schedule (6.14)</u>, which includes: (a) a specific timeline for the marketing process; (b) a deadline of December 1, 2014 for solicitation and acceptance of a "stalking horse" bid; (c) a deadline of December 22, 2014 for solicitation and acceptance of competing bids; and (d) in the event of competing bids in excess of the "stalking horse" bid, an auction of the facilities shall occur no later than December 29, 2014 (the "**Marketing Plan**"). Each Credit Party agrees to comply with the terms of the Marketing Plan.

KCP-4525702-12

7.    **NEGATIVE COVENANTS**

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof until the Termination Date:

7.1    Mergers, Subsidiaries, Etc.  No Credit Party shall directly or indirectly, by operation of law or otherwise, (a) form or acquire any Subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person.

7.2    Investments; Loans and Advances.  Except as otherwise expressly permitted by this Section 7, no Credit Party shall make or permit to exist any investment in, or make, accrue or permit to exist Loan or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise, except that: (a) Borrower may hold investments comprised of notes payable, or stock or other securities issued by Account Debtors to any Borrower pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business; and (b) each Credit Party may maintain its existing investments in its Subsidiaries as of the Closing Date.

7.3    Indebtedness.  No Credit Party shall create, incur, assume or permit to exist any Indebtedness, except (without duplication) (a) Indebtedness under the Loan Documents; (b) Indebtedness in existence on the date hereof and set forth in Disclosure Schedule (7.3); and (c) other Indebtedness which shall be consented to by Lender in writing in advance, in Lender's sole discretion, and if required by Lender, subordinated to the Obligations by a written agreement satisfactory to Lender in form and substance.

7.4    Employee Loans and Affiliate Transactions.

(a)    No Credit Party shall enter into or be a party to any transaction with any other Credit Party or any Affiliate thereof except (i) statutorily required ESOP diversification, (ii) with the prior written consent of Lender, loans to the ESOP not prohibited by the prohibited transaction rules of ERISA in a principal amount not to exceed the minimum amount of required distributions and expenses properly charged to the ESOP under applicable Laws, and (iii) transactions in the ordinary course of and pursuant to the reasonable requirements of such Credit Parties' business and upon fair and reasonable terms that are no less favorable to such Credit Party than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of such Credit Party; provided, that in any event Credit Parties shall deliver to Lender a copy of any such agreement with an Affiliate within 10 Business Days following execution of the same.  All such transactions existing as of the date hereof are described in Disclosure Schedule (7.4(a)).

(b)    No Credit Party shall enter into any lending or borrowing transaction with any employees of any Credit Party.

7.5    Capital Structure and Business.  No Credit Party shall issue additional Stock.  No Credit Party shall amend its charter or bylaws or operating agreement in a manner that would adversely affect Lender or such Credit Party's duty or ability to repay or perform the Obligations.  No Credit Party shall engage in any business other than the businesses currently engaged in by it.

47

7.6    <u>Guaranteed Indebtedness</u>.  No Credit Party shall create, incur, assume or permit to exist any Guaranteed Indebtedness except (a) by endorsement of instruments or items of payment for deposit to the general account of any Credit Party, and (b) for Guaranteed Indebtedness incurred for the benefit of any other Credit Party if the primary obligation is expressly permitted by this Agreement.  **NOTWITHSTANDING THE FOREGOING, AND EXCEPT FOR THE CARVE-OUT EXPENSES UP TO THE CARVE-OUT AMOUNT, NO GUARANTEED INDEBTEDNESS UNDER <u>SECTION 7.6</u> SHALL BE PERMITTED TO HAVE AN ADMINISTRATIVE EXPENSE CLAIM STATUS UNDER THE BANKRUPTCY CODE SENIOR TO OR PARI PASSU WITH THE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS OF LENDER AS SET FORTH HEREIN AND IN THE INTERIM AND FINAL ORDERS.**

7.7    <u>Liens</u>.  No Credit Party shall create, incur, assume or permit to exist any Lien on or with respect to its Accounts or any of its other properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.  Notwithstanding the foregoing, Liens permitted under <u>Subsections (k)</u> and (l) of the defined term "Permitted Encumbrances" shall at all times remain in order of priority to the Liens under the Loan Documents and the Interim Order and Final Orders (other than the Carve-Out Expenses up to the Carve-Out Amount), as such Permitted Encumbrances existed Pre-Petition.  In addition, no Credit Party shall become a party to any agreement, note, indenture or instrument, or take any other action, that would prohibit the creation of a Lien on any of its properties or other assets in favor of Lender, as additional collateral for the Obligations, except operating leases, Capital Leases or Licenses which prohibit Liens upon the assets that are subject thereto.  The prohibition provided for in this <u>Section 7.7</u> specifically includes, without limitation, any effort by any Borrower, any Committee, or any other party-in-interest in any Chapter 11 Case to prime or create pari passu to any claims, Liens or interests of Lender any Lien (other than for the Carve-Out Expenses up to the Carve-Out Amount) irrespective of whether such claims, Liens or interests may be "adequately protected."

7.8    <u>Sale of Stock and Assets</u>.  No Credit Party shall sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) or any of its Accounts, other than (a) the sale of Inventory in the ordinary course of business, and (b) the sale of substantially all of Borrower's assets pursuant to the terms of the Marketing Plan and <u>Section 6.14</u>.

7.9    <u>ERISA</u>.  No Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur (i) an event that could result in the imposition of a Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA or (ii) an ERISA Event to the extent such ERISA Event would reasonably be expected to result in Taxes, penalties and other liabilities in an aggregate amount in excess of $25,000 in the aggregate.

7.10    <u>Financial Covenants</u>.  Borrower shall not breach or fail to comply with any of the requirements of the Budget.

7.11    <u>Hazardous Materials</u>.  No Credit Party shall cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any of the Real Estate or any of the Collateral, other than such violations or Environmental Liabilities that could not reasonably be expected to have a Material Adverse Effect.

KCP-4525702-12

7.12    <u>Sale-Leasebacks</u>.  No Credit Party shall engage in any sale-leaseback, synthetic lease or similar transaction involving any of its assets.

7.13    <u>Restricted Payments</u>.  No Credit Party shall make any Restricted Payment, except such payments set forth in the Budget.

7.14    <u>Change of Corporate Name, State of Incorporation or Location; Change of Fiscal Year</u>.  No Credit Party shall (a) change its name as it appears in official filings in the state of its incorporation or other organization, (b) change its chief executive office, principal place of business, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization or incorporate or organize in any additional jurisdictions, in each case without at least thirty (30) days prior written notice to Lender and after Lender's written acknowledgment that any reasonable action requested by Lender in connection therewith, including to continue the perfection of any Liens in favor of Lender in any Collateral, has been completed or taken, and <u>provided</u> that any such new location shall be in the continental United States.  No Credit Party shall change its Fiscal Year.

7.15    <u>No Impairment of Intercompany Transfers</u>.  No Credit Party shall directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions or the making or repayment of intercompany Loan by a Subsidiary of any Credit Party to any Credit Party or between Credit Parties.

7.16    <u>No Indemnification of ESOP Fiduciaries</u>.  No Credit Party shall, directly or indirectly, enter into or become bound by any agreement, instrument, indenture or other obligation that provides for the indemnification by any Credit Party of any fiduciary of the ESOP with respect to a breach by such fiduciary of his or her fiduciary duty other than as permitted by Section 410b of ERISA, and only to the extent insured in a manner reasonably acceptable to Lender.

7.17    <u>Operating Leases</u>.  No Credit Party shall enter into any operating lease or leases (as such terms are used in accordance with GAAP) from and after the Closing Date (or enter into any modification of any operating lease or leases which exist as of the Closing Date which has the effect of increasing the rental payment obligations thereunder) if the aggregate rental payment obligations thereunder (with respect to leases entered into following the Closing Date) and increases in rental payment obligations (with respect to leases existing as of the Closing Date) exceed $50,000 in rental payment obligations in the aggregate per year.

7.18    <u>No Speculative Transactions</u>.  No Credit Party shall engage in any transaction involving commodity options, futures contracts or similar transactions.

7.19    <u>Repayment of Indebtedness</u>.  Except pursuant to a confirmed reorganization plan and except as specifically permitted hereunder, Borrower shall not, without the express prior written consent of Lender or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

7.20    <u>Reclamation Claims</u>.  No Credit Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $25,000.

7.21    <u>Chapter 11 Claims</u>.  No Credit Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claims of Lender against Borrower, except as set forth in <u>Section 2.13(b)</u>.

7.22    <u>Cancellation of Indebtedness</u>.  No Credit Party shall cancel any claim or debt owing to it, except for reasonable consideration negotiated on an arm's length basis and in the ordinary course of its business consistent with past practices.

## 8.    TERM

8.1    <u>Termination</u>.  This Agreement shall be in effect until the Commitment Termination Date, and the Loan, the Guaranty Reimbursement Obligations, and all other Obligations shall be automatically due and payable in full on such date.

8.2    <u>Survival of Obligations Upon Termination of Financing Arrangements</u>.  Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of Lender relating to any unpaid portion of the Loan, any Guaranty Reimbursement Obligations, whether then existing or thereafter arising, or any other Obligations, including any obligations under the Supply Protection Agreements, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.  Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; <u>provided</u>, that the provisions of <u>Section 10</u>, the payment obligations under <u>Sections 2.10</u> and <u>2.11</u>, and the indemnities contained in the Loan Documents shall survive the Termination Date.

## 9.    EVENTS OF DEFAULT; RIGHTS AND REMEDIES

9.1    <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, and subject to <u>Section 9.2(b)</u>, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "***Event of Default***" hereunder:

(a)    Borrower (i) fails to make any payment of principal of, or interest on, or Fees owing in respect of, the Loan, the Guaranty Reimbursement Obligations, or any of the

50

other Obligations, including payments under or in connection with any Lease, Sublease or Supply Protection Agreement, when due and payable, or (ii) fails to pay or reimburse Lender or any Affiliate of Lender for any expense reimbursable hereunder or under any other Loan Document within five (5) days following Lender's demand for such reimbursement or payment of expenses.

(b)     Borrower fails or neglects to perform, keep or observe any of the provisions of Sections 2.3, 6.4 or 7 or any provisions set forth in Annex C.

(c)     Borrower fails or neglects to perform, keep or observe any of the provisions of Section 5.1 or any provisions set forth in Annex B, respectively, and the same shall remain unremedied for three (3) Business Days or more.

(d)     Any Credit Party fails or neglects to perform, keep or observe any other provision of this Agreement or of any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 9.1) and the same shall remain unremedied for twenty (20) days or more.

(e)     Borrower fails or neglects (prior to the expiration of any applicable cure period, if any, and except as otherwise provided in this Section 9.1) to perform, keep or observe any provision of, or default or event of default, however defined, occurs under, any Supply Protection Agreement or any other document, instrument or agreement evidencing or relating to any of the Obligations.

(f)     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply, a default or breach occurs under any other agreement, document or instrument entered into either (i) Pre-Petition and which is affirmed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (ii) Postpetition, to which any Credit Party is a party that is not cured within any applicable grace period therefor, and such default or breach (A) involves the failure to make any payment when due in respect of any Indebtedness or Guaranteed Indebtedness (other than the Obligations) of any Credit Party in excess of $25,000 in the aggregate (including (x) undrawn committed or available amounts and (y) amounts owing to all creditors under any combined or syndicated credit arrangements), or (B) causes, or permits any holder of such Indebtedness or Guaranteed Indebtedness or a trustee to cause, Indebtedness or Guaranteed Indebtedness or a portion thereof in excess of $25,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(g)     Any information contained in any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to Lender by any Credit Party is untrue or incorrect in any material respect as of the date when made or deemed made.

(h)     Assets of any Credit Party are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Credit Party and such condition continues for thirty (30) days or more.

(i)    A final non-appealable judgment or judgments is entered against Borrower, or an action or proceeding is filed or is pending against Borrower which Lender reasonably believes is not based on a frivolous or clearly defensible claim, in either case for the payment of money in excess of $50,000.

(j)    Any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Credit Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document ceases to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(k)    Borrower receives written notice from the IRS that the ESOP is disqualified.

(l)    Borrower (i) receives any notice of deficiency from any taxing authority with respect to its status as an S corporation under the IRC or shall at any time be liable for any (A) U.S. federal income tax, or (B) state or local income tax (or franchise tax  imposed in lieu of an income tax), or (ii) fails at any time to meet all requirements to be an S corporation for U.S. federal income tax purposes, or (iii) fails to timely comply with any informational requests or other inquiries from the IRS with respect to its status as an S corporation under the IRC or otherwise fails to diligently defend such status.

(m)    Any Change of Control occurs.

(n)    The occurrence of any of the following in any Chapter 11 Case:

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by a Borrower in any Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (x) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (y) except as provided in the Interim or Final Order, as the case may be, to use Cash Collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (z) any other action or actions adverse to Lender or their rights and remedies hereunder or their interest in the Collateral;

(ii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a borrower or any other person to which Lender does not consent or otherwise agree to the treatment of its claims;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order

52

without the written consent of Lender or the filing of a motion for reconsideration with respect to the Interim Order of the Final Order;

(v)        the Final Order is not entered immediately following the expiration of the Interim Order;

(vi)        the payment of, or application for authority to pay, any pre-petition claim without Lender's prior written consent unless otherwise permitted under this Agreement;

(vii)        the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Lender or any of the collateral or against Lender or any Collateral (as defined in the Pre-Prepetition Loan Agreement);

(viii)        the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower; or the sale without Lender's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations and termination of Lender's commitment to make Loan;

(ix)        the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Credit Party shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(x)        the entry of an order by the Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(xi)        the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than a Credit Party or a Subsidiary, officer or employee of a Credit Party, the continuation thereof without dismissal for thirty (30) days after service thereof on Lender, that asserts or seeks by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, (a) a claim in excess of $[50,000], (b) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of Lender under the Loan Documents to any other claim, (c) would otherwise have a material adverse effect, or (d) have a material adverse effect on the rights and remedies of Lender under any Loan Document or the collectability of all or any portion of the Obligations;

(xii)        the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiii)    the failure of Borrower to perform any of its obligations under the Interim Order or the Final Order; or

(xiv)    the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to Lender.

9.2    <u>Remedies</u>.

(a)    If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the Loan facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan and/or the Guaranty Reimbursement Obligations, to the Default Rate.

(b)    If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the Loan facility with respect to further Advances; (ii) reduce the Maximum Amount from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by each Credit Party; (iv) direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code), (v) enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral, or (vi) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise their remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, <u>provided, however</u>, notwithstanding anything to the contrary contained herein, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of any Borrower in the Collateral only upon 3 days' prior written notice to Borrower and counsel approved by the Bankruptcy Court for the Committee.  Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Loan Documents, Borrower shall assist Lender in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to Lender.

9.3    <u>Waivers by Credit Parties</u>.  Except as otherwise provided for in this Agreement or by applicable law, each Credit Party waives (including for purposes of <u>Section 13</u>): (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights,

KCP-4525702-12

documents, instruments, chattel paper and guaranties at any time held by Lender on which any Credit Party may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 10.   MISCELLANEOUS

10.1   <u>Complete Agreement; Modification of Agreement</u>.  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in <u>Section 10.2</u>.  Any letter of interest, commitment letter, fee letter or confidentiality agreement, if any, between any Credit Party and Lender, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

10.2   <u>Amendments and Waivers</u>.  No amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and Borrower.

10.3   <u>Fees and Expenses</u>.  Borrower shall reimburse (i) Lender for all fees, costs and expenses (including the reasonable fees and expenses of all of its counsel, advisors, consultants and auditors) and (ii) Lender for all fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors (including environmental and management consultants and appraisers), incurred in connection with the negotiation, preparation and filing and/or recordation of the Loan Documents, the Interim Order and the Final Order and incurred in connection with:

(a)   any amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the syndication and administration of the Loan or any Guaranty Reimbursement Obligation made pursuant hereto or its rights hereunder or thereunder;

(b)   any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, any Credit Party or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof; in connection with a case commenced by or against any or all of the Credit Parties or any other Person that may be obligated to Lender by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loan or any Guaranty Reimbursement Obligation during the pendency of one or more Events of Default; <u>provided</u>, that no Person shall be entitled to reimbursement under this <u>clause (b)</u> in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final, non-appealable judgment);

(c)   any attempt to enforce any remedies of Lender against any or all of the Credit Parties or any other Person that may be obligated to Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any

55

KCP-4525702-12

work-out or restructuring of the Loan or the Guaranty Reimbursement Obligations during the pendency of one or more Events of Default;

(d)     any workout or restructuring of the Loan or any Guaranty Reimbursement Obligation during the pendency of one or more Events of Default;

(e)     the obtaining of approval of the Loan Documents by the Bankruptcy Court;

(f)     the preparation and review of pleadings, documents and reports related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; and

(g)     efforts to (i) monitor the Loan, the Guaranty Reimbursement Obligations, or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral; including, as to each of clauses (a) through (g) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this <u>Section 10.3</u>, all of which shall be payable, on demand, by Borrower to Lender.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

10.4    <u>No Waiver</u>.  Lender's failure, at any time or times, to require strict performance by the Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance herewith or therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type.  Subject to the provisions of <u>Section 10.2</u>, none of the undertakings, agreements, warranties, covenants and representations of any Credit Party contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by any Credit Party shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender, and directed to Borrower specifying such suspension or waiver.

10.5    <u>Remedies</u>.  Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

10.6    <u>Severability</u>.  Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under

applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

10.7 <u>Conflict of Terms</u>. Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, AND SUBJECT TO THE IMMEDIATELY FOLLOWING SENTENCE, if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control. NOTWITHSTANDING THE FOREGOING, IF ANY PROVISION IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT CONFLICTS WITH ANY PROVISION IN THE INTERIM ORDER OR FINAL ORDER, THE PROVISION IN THE INTERIM ORDER OR FINAL ORDER SHALL GOVERN AND CONTROL.

10.8 <u>Confidentiality</u>. Lender agrees to use commercially reasonable efforts (equivalent to the efforts Lender applies to maintaining the confidentiality of its own confidential information) to maintain as confidential all confidential information provided to it by the Credit Parties and designated as confidential for a period of two (2) years following receipt thereof except that Lender may disclose such information (a) to Persons employed or engaged by Lender; (b) to any bona fide participant or potential participant that has agreed to comply with the covenant contained in this <u>Section 10.8</u> (and any such bona fide participant or potential participant may disclose such information to Persons employed or engaged by them as described in <u>clause (a)</u> above); (c) as required or requested by any Governmental Authority or reasonably believed by Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any Litigation to which Lender is a party; (f) that ceases to be confidential through no fault of Lender, or (g) Persons employed by Lender's strategic marking partners.

10.9 <u>GOVERNING LAW</u>. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF KANSAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE) AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE). EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; <u>PROVIDED</u>, THAT LENDER AND THE CREDIT PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED</u>, <u>FURTHER</u>, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER. EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND

EACH CREDIT PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  EACH CREDIT PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN ANNEX I OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH CREDIT PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.

10.10   Notices.  All notices, demands, requests, directions and other communications required or expressly authorized to be made by this Agreement shall, whether or not specified to be in writing but unless otherwise expressly specified to be given by any other means, be given in writing and addressed to the party to be notified and (i) delivered in person, (ii) sent by telecopy or registered or certified mail, return receipt requested and postage prepaid, to the address or facsimile number indicated in Annex D or (iii) addressed to such other address as shall be notified in writing (A) in the case of Borrower and Lender, to the other parties hereto and (B) in the case of all other parties, to Borrower and Lender.  Such notices shall be deemed effective on the day on which delivered or sent if delivered in person or sent by telecopy (with answerback confirmation received), or on the third (3rd) Business Day after the day on which mailed, if sent by registered or certified mail.  Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrower or Lender) designated in Annex D to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

10.11   Section Titles.  The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

10.12   Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

10.13   WAIVER OF JURY TRIAL.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG LENDER AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

10.14   <u>Reinstatement</u>.  This Agreement shall remain in full force and effect and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof; is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

10.15   <u>Advice of Counsel</u>.  Each of the parties represents to each other party hereto that it has discussed this Agreement and, specifically, the provisions of <u>Sections 10.9</u> and <u>10.13</u>, with its counsel.

10.16   <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.17   <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the estate of Borrower, and any trustee, other estate representative or any successor in interest of any Borrower in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and its assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its Liens under applicable law.  No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of Lender shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party and Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

10.18   <u>Pre-Petition Loan Documents</u>.  Borrower hereby agrees that (a) this Agreement is separate and distinct from the Pre-Petition Loan Agreement and (b) the Pre-Petition Loan Agreement is in full force and effect.  Borrower further agrees that by entering into this Agreement, Lender does not waive any Default or Event of Default under the Pre-Petition Loan Documents or any of their liens, claims, priorities, rights and remedies thereunder.

10.19   K<u>.S.A. §§  16-117, 16-118</u>.  THIS IS THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN BORROWER AND LENDER, AND THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR ORAL AGREEMENT OR OF A

59

CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER. BORROWER AND LENDER ACKNOWLEDGE THAT ALL NONSTANDARD TERMS OF THIS AGREEMENT AND ALL PRIOR ORAL AGREEMENTS AND CONTEMPORANEOUS ORAL AGREEMENTS BETWEEN THEM ARE SUFFICIENTLY SET FORTH HEREIN EXCEPT (IF NONE, WRITE "NONE"):  NONE.

BORROWER AND LENDER FURTHER ACKNOWLEDGE THAT THE ABOVE SPACE IS SUFFICIENT FOR DISCLOSURE OF TERMS AND AGREEMENTS, IF ANY, NOT SET FORTH IN THIS AGREEMENT.

(a)     BORROWER AND LENDER AFFIRM THAT NO UNWRITTEN ORAL AGREEMENT BETWEEN THEM EXISTS.

Borrower's initials:     _____

Lender's initials:     _____

(remainder of page intentionally left blank)

KCP-4525702-12

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**Borrower:**                                   FOODS, INC.

                                                By: _____
                                                Name:_____
                                                Title: _____


                                                DAHL'S FOOD MART, INC.

                                                By: _____
                                                Name:_____
                                                Title: _____


                                                DAHL'S HOLDINGS I, LLC

                                                By: _____
                                                Name:_____
                                                Title: _____


**Lender:**                                     ASSOCIATED WHOLESALE GROCERS, INC.

                                                By: _____
                                                Name: Robert Z Walker
                                                Title: Executive Vice President & CFO

KCP-4525702-12

CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER. BORROWER AND LENDER ACKNOWLEDGE THAT ALL NONSTANDARD TERMS OF THIS AGREEMENT AND ALL PRIOR ORAL AGREEMENTS AND CONTEMPORANEOUS ORAL AGREEMENTS BETWEEN THEM ARE SUFFICIENTLY SET FORTH HEREIN EXCEPT (IF NONE, WRITE "NONE"): NONE.

BORROWER AND LENDER FURTHER ACKNOWLEDGE THAT THE ABOVE SPACE IS SUFFICIENT FOR DISCLOSURE OF TERMS AND AGREEMENTS, IF ANY, NOT SET FORTH IN THIS AGREEMENT.

(a) BORROWER AND LENDER AFFIRM THAT NO UNWRITTEN ORAL AGREEMENT BETWEEN THEM EXISTS.

Borrower's initials: _____

Lender's initials: _____

(remainder of page intentionally left blank)

60

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**Borrower:**

FOODS, INC.

By: _____

Name: _____

Title: _____

DAHL'S FOOD MART, INC.

By: _____

Name: _____

Title: _____

DAHL'S HOLDINGS I, LLC

By: _____

Name: _____

Title: _____

**Lender:**

ASSOCIATED WHOLESALE GROCERS, INC.

By: _____

Name: Robert Z Walker

Title: Executive Vice President & CFO

KCP-4525702-12

## ANNEX A (Section 3.1(a))
### to
## CREDIT AGREEMENT

## CLOSING CHECKLIST

In addition to, and not in limitation of, the conditions described in Section 3.1 of the Agreement, pursuant to Section 3.1(a), the following items must be received by Lender in form and substance satisfactory to Lender on or prior to the Closing Date (each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in Section 1.1 of the Agreement):

     A.    Appendices.  All Appendices to the Agreement, in form and substance satisfactory to Lender.

     B.    Note.  A duly executed original of each Note payable to the order of Lender, dated the Closing Date.

     C.    Insurance.  Satisfactory evidence that the insurance policies required by Section 6.4 are in full force and effect, together with appropriate evidence showing loss payable and/or additional insured clauses or endorsements, as reasonably requested by Lender, in favor of Lender.

     D.    Security Interests and Code Filings.

     (a)    Evidence satisfactory to Lender that Lender has a valid and perfected first priority security interest in the Collateral, including (i) such documents duly executed by each Credit Party (including financing statements under the Code and other applicable documents under the laws of any jurisdiction with respect to the perfection of Liens) as Lender may request in order to perfect its security interests in the Collateral and (ii) copies of Code search reports listing all effective financing statements that name any Credit Party as debtor, together with copies of such financing statements, none of which shall cover the Collateral, except for those relating to Permitted Encumbrances.

     (b)    Evidence reasonably satisfactory to Lender, including copies, of all UCC-1 and other financing statements filed in favor of any Credit Party with respect to each location, if any, at which Inventory may be consigned.

     (c)    Control Letters from (i) all issuers of uncertificated securities and financial assets held by Borrower, (ii) all securities intermediaries with respect to all securities accounts and securities entitlements of Borrower, and (iii) all futures commission agents and clearing houses with respect to all commodities contracts and commodities accounts held by any Borrower.

     E.    Charter and Good Standing.  For each Credit Party, such Person's (a) charter and all amendments thereto, (b) good standing certificates (including verification of tax status) in its state of incorporation and (c) good standing certificates (including verification of tax status) and certificates of qualification to conduct business in each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, each dated a recent date prior to the Closing Date and certified by the applicable Secretary of State or other authorized Governmental Authority.

KCP-4525702-12

F.    <u>Bylaws and Resolutions</u>.  For each Credit Party, (a) such Person's bylaws, together with all amendments thereto and (b) resolutions of such Person's Board of Directors and stockholders, approving and authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and the transactions to be consummated in connection therewith, each certified as of the Closing Date by such Person's corporate secretary or an assistant secretary as being in full force and effect without any modification or amendment.

G.    <u>Incumbency Certificates</u>.  For each Credit Party, signature and incumbency certificates of the officers of each such Person executing any of the Loan Documents, certified as of the Closing Date by such Person's corporate secretary or an assistant secretary as being true, accurate, correct and complete.

H.    <u>[Reserved]</u>.

I.    <u>Accountants' Letters</u>.  A letter from the Credit Parties to their independent auditors authorizing the independent certified accountants of the Credit Parties to communicate with Lender in accordance with <u>Section 5.2</u>.

J.    <u>Officer's Certificate</u>.  Lender shall have received duly executed originals of a certificate of the Chief Executive Officer and Chief Financial Officer of Borrower, dated the Closing Date, stating that, except for the commencement of the Chapter 11 Cases, since March 31, 2014 (a) no Litigation has been commenced which, if successful, would have a Material Adverse Effect or could challenge any of the transactions contemplated by the Agreement and the other Loan Documents; and (b) there have been no Restricted Payments made by any Credit Party.

K.    <u>Waivers</u>.  Lender shall have received landlord waivers and consents, bailee letters and mortgagee agreements or entry of the Final Order providing for collateral access, each in form and substance reasonably satisfactory to Lender, in each case as required pursuant to <u>Section 6.9</u>.

L.    <u>Collateral Documents</u>.  Borrowers have previously delivered the Collateral Documents in connection with the Pre-Petition Loan Agreement covering all of the Collateral, including, without limitation, the Real Estate.  On or prior to the Closing Date, the Interim Order shall have been entered by the Bankruptcy Court providing Lender, with a first priority priming security interest in the Collateral, including, without limitation, the Real Estate.

M.    <u>Financials; Financial Condition</u>.  Lender shall have received the Financial Statements, the Budget, and other materials set forth in <u>Section 4.4</u>, certified by Borrower's Chief Financial Officer, in each case in form and substance reasonably satisfactory to Lender, and Lender shall be satisfied, in its sole discretion, with all of the foregoing.

N.    <u>INTERIM ORDER</u>.  THE INTERIM ORDER, IN FORM AND SUBSTANCE SATISFACTORY TO LENDER, SHALL HAVE BEEN ENTERED BY THE BANKRUPTCY COURT.

O.    <u>Other Documents</u>.  Such other certificates, documents and agreements respecting any Credit Party as Lender may reasonably request.

## ANNEX A-1 (Section 4.15, 4.21(a), and 6.1))

## To

## CREDIT AGREEMENT

## DISCLOSURES

1. Litigation has been filed by prior CEO, David Sinwell, in regards to a claim for severance pay.

2. Borrower's location at Merle Hay requires the repair and possible replacement of an underground tank that has not been utilized for approximately one year.

3. Borrower has had issues with their Frozen Food cases at EP True, West Des Moines, Iowa location and which has led to complaints by the Iowa Food Safety group. Borrower actually had days the Iowa Food Safety group required the Borrower to remove product and not utilize the frozen food case for a period of time. The result of this equipment problem may require attention and a significant repair/replacement cost even though the Borrower has the equipment in storage.

KCP-4525702-12

## Disclosure Schedule (2.3)

Distributions with respect to the DIP Loan will be made in accordance with the DIP Credit Agreement and the Interim and Final Orders and will be used only as required herein.

**Disclosure Schedule (3.1)**

**"First Day" Orders**

1)        Interim Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Security Interests and Superpriority Administrative Expense Treatment, (IV) Providing Adequate Protection, (V) Modifying Automatic Stay, (VI) and Granting Adequate Protection Pursuant to Sections 363 and 364 of the Bankruptcy Code, and (VII) Setting Final Hearing, Pursuant to 11 U.S.C. §§ 363, 364 and 365 and Federal Rule of Bankruptcy Procedure 4001

**Disclosure Schedule (4.1)**

List of corporate entities and respective jurisdiction of incorporation or organization

| Entity Name | Corporate From | Jurisdiction of incorporation or organization |
|---|---|---|
| FOODS, INC. | corporation | Iowa |
| DAHL'S FOOD MART, INC. | corporation | Iowa |
| DAHL'S HOLDINGS I, LLC | limited liability company | Iowa |

<u>**Disclosure Schedule (4.2)**</u>

# Dahl's Foods

EIN

| Entity | EIN |
|---|---|
| Dahl's Holdings I, LLC | 26-3377738 |
| Foods, Inc. | 42-0803702 |
| Dahl's Food Mart, Inc. | 42-1040714 |

| | Address | Owned or Leased |
|---|---|---|
| Beaver | 1819 Beaver DM 50310 | L |
| Ingersoll | 3125 Ingersoll DM 50312 | L |
| Fleur Drive | 4121 Fleur Dr DM 50309 | L |
| Hickman | 8700 Hickman Rd Uban 50325 | O |
| Euclid | 1320 E Euclid Ave DM 50316 | O |
| Merle Hay | 4343 Merle Hay Dr DM 50310 | L |
| EP True | 5003 EP True Pkwy WDM 50265 | O |
| Johnston | 5440 NW 86th st John 50131 | L |
| West Hickman | 15500 W Hickman Rd Clive 50325 | L |
| East 33rd | 3400 E 33rd St DM 50317 | L |

**Disclosure Schedule (4.4(a))**

**Disclosure Schedule (4.4(b))**

SLC-7379262-3

**Disclosure Schedule (4.6)**

# Dahl's Foods

Stockholders

As of 9/27/14

| NAME | STOCK OWNED | % |
|---|---|---|
| David W. Sinnwell | 65,000 | 1.14% |
| Mark A. Brase | 36,500 | 0.64% |
| Timothy G. Davis | 700 | 0.01% |
| Kenneth Kane | 500 | 0.01% |
| John P. Herold | 1,000 | 0.02% |
| Michael R. Hixson | 1,000 | 0.02% |
| David S. Wilson | 3,338 | 0.06% |
| Joseph A. McDonald | 1,000 | 0.02% |
| Loyd Nickel | 750 | 0.01% |
| Donald W. Mark | 21,000 | 0.37% |
| Douglas L. Schreck | 1,500 | 0.03% |
| Michael J. Hoffman | 3,000 | 0.05% |
| Jason Polich | 200 | 0.00% |
| Richard S. Rissman | 9,000 | 0.16% |
| Marilyn J. Aldrich | 13,500 | 0.24% |
| Trustees | 5,500,000 | 96.87% |
| Lillian Alice Crusan | 6,500 | 0.11% |
| Larry Keleher | 600 | 0.01% |
| Robert R. Keleher | 600 | 0.01% |
| Katherine M. Frame | 2,300 | 0.04% |
| NON VOTING STOCK | 10,000 | 0.18% |
| **TOTAL SHARES** | **5,677,988** | **100.00%** |

**Affiliate Companies**

| |
|---|
| Foods, Inc. |
| Dahl's Holdings I, LLC |
| Dahl's Food Mart, Inc. |

**Disclosure Schedule (4.9)**

None

**Disclosure Schedule (4.11(a))**

## Dahl's Foods
### Insurance

| Coverage | Carrier | Deductible | Basis | Effective Date |
|---|---|---|---|---|
| Blanket Building and Contents | EMC | $100,000 | Blanket Coverage | 9/15/2014-9/15/2015 |
| Computer Coverage | EMC | $100,000 | Blanket Coverage | 9/15/2014-9/15/2015 |
| Blanket Buisness Icome & Extra Expense | EMC | $100,000 | Blanket Coverage | 9/15/2014-9/15/2015 |
| Equipment Failure | Travelers | | Per Occurrence | 9/15/2014-9/15/2015 |
| Commercial General Liability(Fixed Costs) | EMC | | 1,000,000 | 9/15/2014-9/15/2015 |
|    Loss Pick | | | | |
| Automobile liability | EMC | | 1,000,000 | 9/15/2014-9/15/2015 |
| Workers' Compensation(Fixed Costs) | United Heartland | | Statutory | 9/15/2014-9/15/2015 |
|    Loss Pick | | | | |
| Umbrella Liability | EMC | | 20,000,000 | 9/15/2014-9/15/2015 |
| Excess Liability | Liberty Mutual | | 20,000,000 | 9/15/2014-9/15/2015 |
| Directors & Officers Liability | HCC | | 10,000,000 | 9/15/2014-9/15/2015 |

**Disclosure Schedule (4.12)**

## Foods Inc DIP accounts

| New Accounts | Old Accounts |
|---|---|
| 4120550876 | 1352602294 |
| 4120550900 | 1352622516 |
| 4120550918 | 1352628513 |
| 4120550926 | 1841557398 |
| 4120550884 | 4164803371 |
| 4120550942 | 1841612607 |

Sub accounts ZBA into 4120550884 which ZBA's into 4120550876
4944414051
4944695121
4944159169
4944159177
4944159185
4944159193
4944159201
4944159219
4944159227
4944159235
4944159243
4944159250
4944159268
4944159276
4944765445
4945496669
4945496693

ABA for new DIP accounts will be 121000248

# Dahl's Foods

## Bank Account

Wells Fargo Bank, N.A.

666 Walnut Street
Des Moines, IA 50309

| GENERAL ACCOUNT | | ACCT# BANK | 1352602294 (IA) 073000228 | WELLS FARGO |
|---|---|---|---|---|

| RESERVE ACCOUNT | | ACCT# BANK | 1352628513 (IA) 073000228 | WELLS FARGO |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| PAYROLL ACCOUNT | | ACCT# | 1352622516 | WELLS FARGO |
| | | BANK | 073000228 | |

| | | | | |
|---|---|---|---|---|
| DRAFT ACCOUNT #'S | | | | |
| | CURRENTLY NOT USING | BEER | 1841560111 | WELLS FARGO |
| | | GIFT CERT | 1841557398 | |
| | CURRENTLY NOT USING | UTILITIES | 1841552381 | |

| | | | |
|---|---|---|---|
| | | 4164803371 (IA) | WELLS FARGO |
| DEBIT/CREDIT CARD DEPOSITS | ACCT# | | |
| CASH/CK DPSTS FRM STRS | BANK | 121000248 | |
| RETURNED CHECKS | | | |
| MISC ADJ'S | (DAILY "ZBA CREDIT TRANSFER" TO GENERAL ACCT) | | |

| | | | |
|---|---|---|---|
| DAHL'S SUB ACCOUNT #'S | | | WELLS FARGO |
| | BEAVER | 4944159169 | |
| BANK    121000248 | INGERSOLL | 4944159177 | |
| | C.HILLS | 4944159185 | |
| | FLEUR | 4944159193 | |
| | HICKMAN | 4944159243 | |
| | EUCLID | 4944159227 | |
| | HUBBELL | 4944159201 | |
| | MERLE HAY | 4944159235 | |
| | UNIVERSITY | 4944159250 | |
| | EP TRUE | 4944159268 | |
| | JOHNSTON | 4944159276 | |
| | W.HICKMAN | 4944414051 | |
| | ANKENY | 4944695121 | |
| | AMES | 4945496669 | |
| | MH C-STORE | 4944765445 | |
| | ING C-STORE | 4945496693 | |

# Dahl's Foods

## Bank Account

UMB Bank, N.A.
1010 Grand Boulevard
Kansas City, MO
64106

| | | | | |
|---|---|---|---|---|
| <u>GENERAL ACCOUNT</u> | | ACCT# BANK | 9871873331 101000695 | UMB |
| <u>FLEXIBLE ACCOUNT</u> | | ACCT# BANK | 9872027434 101000695 | UMB |
| <u>PAYROLL ACCOUNT</u> | | ACCT# BANK | 9872027604 101000695 | UMB |
| <u>DRAFT ACCOUNT #'S</u> | | BEER | 9872027612 | UMB |
| | CURRENTLY NOT USING | GIFT CERT | 9872027582 | |
| | | UTILITIES | 9872027590 | |
| | (DAILY "ZBA CREDIT TRANSFER" TO GENERAL ACCT) | | | |
| <u>DAHL'S SUB ACCOUNT #'S</u> | | BEAVER INGERSOLL C.HILLS FLEUR | 9872027450 9872027442 9872027388 9872027396 | UMB |

<u>CASH/CK DPSTS</u>

| | | | |
|---|---|---|---|
| <u>FRM STRS</u> | | HICKMAN | 9872027418 |
| <u>CHANGE ORDERS</u> | | EUCLID | 9872027426 |
| <u>RETURNED CHECKS</u> | | MERLE HAY | 9872027469 |
| <u>MISC ADJ'S</u> | | EP TRUE | 9872027477 |
| | | JOHNSTON | 9872027620 |
| | | W.HICKMAN | 9872027493 |
| | | E. 33RD | 9872027507 |
| | | ANKENY | 9872027515 |
| | | AMES | 9872027523 |
| | CURRENTLY NOT USING | MH C-STORE | 9872027655 |
| | CURRENTLY NOT USING | ING C-STORE | 9872027663 |

(DAILY "ZBA CREDIT TRANSFER" TO GENERAL ACCT)

**Disclosure Schedule (4.13)**

None.

**Disclosure Schedule (4.14(a))**

None.

**Disclosure Schedule (4.14(b))**

None.

**Disclosure Schedule (4.15)**

1.      Litigation has been filed by prior CEO, David Sinwell, in regards to a claim for severance pay.

2.      Litigation has been filed by DAWAYNE BRYON LEACH in the Iowa District Court for Polk County, Case No. LACL130953

**Disclosure Schedule (4.16)**

None

**<u>Disclosure Schedule (4.17(a))</u>**


None

**Disclosure Schedule (4.17(b))**

None

<u>**Disclosure Schedule (4.18(a))**</u>

# Dahl's Foods

ESOP and 401(k) Plans

| Name | Sponsor | Tax ID | EIN |
|------|---------|--------|-----|
| Dahl's 401(k) Plan | Foods Inc. | | 42-0803702 |
| Dahl's Employee Stock Ownership Plan | | 26-0049888 | 42-0803702 |

**Disclosure Schedule (4.18(b))**

Foods, Inc. has two employee benefit plans, a 401(k) plan and an Employee Stock Ownership Plan ("ESOP").  Food's Inc. is required to make a matching contribution to the ESOP based on an employee's contribution to the 401(k) plan on an annual basis.  The Foods, Inc. matching obligation for Plan Year ending in 2013 was $608,299.48.  On September 12, 2014, the Board of Directors of Foods Inc. approved the payment to the ESOP Trust by issuing 1,206,188 shares of its Class A Common Stock to the ESOP Trustee on August 15, 2014 based on the then current market value of the shares of $253,299.48 as partial satisfaction of its matching obligation.  The remaining balance of the obligation due of $355,000 was required to be paid in the form of cash to contribute to the ESOP to satisfy its remaining matching obligation.  Foods, Inc. had not made either the cash portion or Foods Inc. shares portion of the matching contribution to the ESOP as of the Filing Date.


In addition, the Board of Directors on September 12, 2014 approved discontinuing the matching contribution the ESOP effective as of November 1, 2014.  For the Plan Year 2014, $483,913.27 was due to the ESOP as of November 1, 2014.  The obligation was not paid as of the Filing Date.

**<u>Disclosure Schedule (4.18(f))</u>**

None

**<u>Disclosure Schedule (4.18(h))</u>**

None

**Disclosure Schedule (4.18(j))**

None

**Disclosure Schedule (4.19)**

**ALL LEASED AND OWNED REAL ESTATE**

|     | Address | Leased/Owned |
| --- | --- | --- |
| 1. | 5003 EP True Pkwy<br>West Des Moines, Iowa 50265<br>(Polk County) | Owned |
| 2. | 8700 Hickman Road<br>Clive, Iowa 50325<br>(Polk County) | Owned |
| 3. | 1320 E. Euclid Avenue<br>Des Moines, Iowa 50316<br>(Polk County) | Owned |
| 4. | 4121 Fleur Drive<br>Des Moines, Iowa 50321<br>(Polk County) | Leased |
| 5. | 3425 Ingersoll Avenue<br>Des Moines, Iowa 50312<br>(Polk County) | Leased |
| 6. | 1819 Beaver Avenue<br>Des Moines, Iowa 50310<br>(Polk County) | Leased |
| 7. | 4343 Merle Hay Drive<br>Des Moines, Iowa 50310<br>(Polk County) | Leased |
| 8. | 5440 NW 86th Street<br>Johnston, Iowa 50131<br>(Polk County) | Leased |
| 9. | 15500 W. Hickman Road<br>Clive, Iowa 50325<br>(Dallas County) | Leased |
| 10. | 3400 E. 33rd Street<br>Des Moines, Iowa 50317<br>(Polk County) | Leased |

**Disclosure Schedule (4.20)**

**FOODS, INC – REGISTERED TRADEMARKS**
**10/28/2014**

| MARK | REG. NO. | REG. DATE | GOODS/SERVICES | STATUS/NEXT ACTION |
|---|---|---|---|---|
| "D" Logo  | 1,138,993 | 8/26/1980 | Class 29: Meats, fish and poultry<br><br>Class 30: Pies, Cakes, Breads, Rolls and Cookies<br><br>Class 34: Ash trays and matches<br><br>Class 42: Retail grocery store services, restaurant services, catering services, and retail drugstore services and delicatessen services | 8/26/2019<br>Sect. 8/9 |
| DAHL'S | 1,175,705 | 11/3/1981 | Class 3: Hand cream<br><br>Class 34: Matches and ash trays<br><br>Class 42: Retail grocery store services, restaurant services, catering services, and retail drugstore services and delicatessen services | 11/3/2020<br>Sect. 8/9 |
| Dahl's Foods & Logo  | 3,132,732 | 8/22/2006 | Class 16: Grocery bags<br><br>Class 21: Drinking cups; Portable coolers<br><br>Class 35: Retail bakery shops; retail delicatessen services; retail drug store services; retail drug stores; retail grocery stores; retail pharmacy services. | 8/22/2016<br>Sect. 8/9 |
|  | 4,417,589 | 10/15/2013 | Class 41: Providing a website to featuring links to purchase tickets for entertainment performances, art, sports, and special events. | 10/15/2018<br>Sect 8/15 |

| | | | | |
|---|---|---|---|---|
|  | 4,413,921 | 10/08/2013 | Class 35: Community support and relations services, namely, organizing, promoting, and conducting community service programs, events and projects. | 10/8/2018 Sect 8/15 |
|  | 4,428,151 | 11/05/2013 | Class 35: Retail store services featuring smoked meats. | 11/05/2018 Sect 8/15 |
|  | 4,377,964 Supp. Register | 7/30/2013 | Class 09: Magnetically encoded savings card for use with identified merchants | 7/30/2018 Sect 8 |
|  | 4,413,943 | 10/08/2013 | Class 35: Retail store services featuring fruits and vegetables. | 10/08/2018 Sect 8/15 |
| | 4,413,948 | 10/08/2013 | Class 43: Providing a web site featuring recipes. | 10/08/2018 Sect 8/15 |

| Logo | Reg. No. | Date | Description | Section |
|---|---|---|---|---|
|  | 4,414,180 | 10/08/2013 | Class 35: Community support and relations services, namely, organizing, promoting, and conducting community service programs, events and projects. | 10/08/2018 Sect 8/15 |
|  | 4,417,660 | 10/15/2013 | Class 35: Online digital photoservices, namely, ordering photographs; Class 39: Online digital photo services, namely, providing a website for the electronic storage of digital photos; Class 40: Digital on-demand printing services of cards, photo books, photo calendars, and other documents; photographic and photograbure printing. | 10/15/2018 Sect 8/15 |
|  | 4,417,661 | 10/13/2013 | Class 35: Retail store services featuring floral services. | 10/15/2018 Sect 8/15 |
|  | 4,410,503 | 10/1/2013 | Class 35: Retail pharmacy services. | 10/1/2018 Sect 8/15 |
|  | 4,414,039 | 10/8/2013 | Class 35: Retail store services featuring wine and spirits.<br><br>TEAS Plus | 10/8/2018 Sect 8/15 |
|  | 4,417,701 | 10/15/2013 | Class 43: Cafeteria services. | 10/15/2018 Sect 8/15 |
|  | 4,410,550 | 10/1/2013 | Class 43: Catering services. | 10/1/2018 Sect 8/15 |

00206516-2

| Mark | Reg. No. | Date | Services | Status |
|---|---|---|---|---|
| | 4,410,549 | 10/1/2013 | Class 35: Retail delicatessen services. | 10/1/2018 Sect 8/15 |
| | 4,410,552 | 10/1/2013 | Class 35: Retail store services featuring bakery goods. | 10/1/2018 Sect 8/15 |
| | 4,417,755 | 10/15/2013 | Class 35: Retail store services featuring meat | 10/15/2018 Sect 8/15 |
| | 4,406,652 | 9/24/2013 | Class 35: Retail store services featuring produce | 9/24/2018 Sect 8/15 |
| | 4,410,559 | 10/1/2013 | Class 35: Discount savings program for use with identified merchants | 10/1/2018 Sect 8/15 |
| | 4,410,561 | 10/1/2013 | Class 35: Retail store services featuring seafood. | 10/1/2018 Sect 8/15 |

**<u>Disclosure Schedule (4.21(a))</u>**

None

**<u>Disclosure Schedule (4.21(b))</u>**

None

**Disclosure Schedule (6.1)**

1. Foods, Inc.
2. Dahl's Foods
3. Dahl's Fuels
4. Dahl's Food Markets
5. Dahl's Food Marts
6. Dahl's

**Disclosure Schedule (6.14)**

Marketing Plan Summary

Borrower has engaged the services of The Food Partners, LLC, an investment banking firm focusing on the food industry, to actively market the Borrower's assets to potential strategic and financial purchasers.   The Borrower will execute an Asset Purchase Agreement with ASSOCIATED WHOLESALE GROCERS, INC. ("AWG") which the Borrower will support as a "Stalking Horse Bid" in a sale of substantially all of the Borrower's assets pursuant 11 U.S.C. § 363 subject to higher and better bids as provided for in a Bidding Procedures Order in a form acceptable to AWG as described, and on the timeline, below:

1.       No later than five (5) business days after the filing of the Borrower's petitions for relief under Chapter 11 of Title 11 of the United States Code, the Borrower shall have filed a motion or motions reflecting the requirements of the DIP Credit Agreement, with the Bankruptcy Court (the "**Sale and Bidding Procedures Motion**") to authorize, and to establish bidding procedures for, a sale of substantially all of their assets under Section 363 of the Bankruptcy Code (the "**363 Sale**").

2.       No later than December 1, 2014,[1] the Bankruptcy Court shall have entered the orders reflecting the requirements of the DIP Credit Agreement, approving the Sale and Bidding Procedures Motion (the "**Bidding Procedures Order**"), which will provide, among other things, that objections to and bids in respect of the 363 Sale will be submitted no later than January 12, 2015.

3.       No later than January 19, 2015, an auction to conduct bidding with respect to the 363 Sale, if necessary, shall have occurred in accordance with the Bidding Procedures Order.

4.       No later than January 26, 2015, the Bankruptcy Court shall have conducted a hearing and entered an order or orders (the "**Sale Order**"), in form and substance satisfactory to AWG, approving the 363 Sale as contemplated under the Bidding Procedures Order.

5.       No later than March 2, 2015, the 363 Sale shall be completed and all transactions contemplated thereby shall have closed in accordance with the Sale Order.

---

[1] The deadlines contained in this marketing plan summary are subject to approval by the Bankruptcy Court and may be amended at the sole discretion of AWG.

**Disclosure Schedule (7.3)**

# Dahl's Foods

## Long-Term Debt

Balance as of 11/7/14

| | |
|---|---|
| Revolver | $2,478,994 |
| AWG Equipment Loan | $343,980 |
| West Coast Life Mortgage EP True | $4,540,993 |

**Disclosure Schedule (7.4(a))**

None

## Disclosure Schedule (7.7)

1. Commerce Bank, N.A. (Master Lease Schedules 001 & 002)

2. General Electric Capital Corporation

3. GE Capital Commercial, Inc.

4. Merchants Capital Resources (Commerce Bank Master Lease Schedule 003)

5. Bankers Leasing Company

6. Associated Wholesale Grocers, Inc.

7. West Coast Life (Protective Life)

**ANNEX B (Section 5.1(a))**
to
**CREDIT AGREEMENT**

**FINANCIAL STATEMENTS AND BUDGET – REPORTING**


Borrower shall deliver or cause to be delivered to Lender the following:

(a)      Budget.  By Thursday of each calendar week, a Budget Reconciliation for the prior calendar week.

(b)      Fiscal Period Financials.  Within thirty (30) days after the end of each Fiscal Period, financial information regarding Borrower and its Subsidiaries, certified by the Chief Financial Officer of Borrower, consisting of consolidated (i) unaudited balance sheets as of the close of such Fiscal Period and the related statements of income and cash flows for that portion of the Fiscal Year ending as of the close of such Fiscal Period and (ii) unaudited statements of income and cash flows for such Fiscal Period, setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Budget, prepared in accordance with GAAP (subject to normal year-end adjustments).  Such financial information shall be accompanied by the certification of the Chief Financial Officer of Borrower that (A) such financial information presents fairly in accordance with GAAP (subject to normal year-end adjustments) the financial position and results of operations of Borrower and its Subsidiaries, on a consolidated basis, in each case as at the end of such Fiscal Period and for that portion of the Fiscal Year then ended and (B) any other information presented is true, correct and complete in all material respects and that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default.  Such financial information shall also be accompanied by a Compliance Certificate showing the calculations used in determining compliance with each of the Financial Covenants which is tested on a period basis and the certification of the Chief Financial Officer of Borrower that such financial information presents fairly in accordance with GAAP (subject to normal year-end adjustments) the financial position, results of operations and statements of cash flows of Borrower and its Subsidiaries on a consolidated basis as at the end of such Fiscal Period and for that portion of the Fiscal Year then ended.

(c)      Management Letters.  Within five (5) Business Days after receipt thereof by Borrower, copies of all management letters, exception reports or similar letters or reports received by Borrower from its independent certified public accountants.

(d)      Default Notices.  As soon as practicable, and in any event within five (5) Business Days after an executive officer of Borrower has actual knowledge of the existence of any Default, Event of Default or other event that has had a Material Adverse Effect, telephonic or telecopied notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof, which notice, if given telephonically, shall be promptly confirmed in writing on the next Business Day.

(e)      Supplemental Schedules.  Supplemental disclosures, if any, required by Section 7.6.

(f)     Litigation.  Promptly upon learning thereof, written notice of any Litigation commenced or threatened against Borrower that (i) seeks damages in excess of $50,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Existing Employee Benefit Plan, its fiduciaries or its assets or against Borrower or any ERISA Affiliate in connection with any Existing Employee Benefit Plan, (iv) alleges criminal misconduct by Borrower, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Liabilities, (vi) alleges that any Credit Party is infringing or interfering with, or has infringed or interfered with, any Intellectual Property of another Person or that any Credit Party has failed to comply with the terms of its Licenses, or (vii) involves any product recall.

(g)     Insurance Notices.  Disclosure of losses or casualties required by Section 6.4.

(h)     Lease Default Notices.  To Lender, (i) within two (2) Business Days after receipt thereof, copies of any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located, (ii) monthly within three (3) Business Days after payment thereof, evidence of payment of lease or rental payments as to each leased or rented location for which a landlord or bailee waiver has not been obtained and (iii) such other notices or documents as Lender may reasonably request.

(i)     Lease Amendments.  To Lender, copies of all material amendments to any real estate lease.

(j)     ESOP Documents.  To Lender, within two (2) Business Days after receipt thereof, copies of any written communications from the IRS in connection with the ESOP.

(k)     Reports Regarding the ESOP.  Within 30 days of the end of each of calendar quarter, Borrower shall deliver to Lender a report regarding the activity of the ESOP during such quarter, which report shall include a general description of all actions by or regarding the ESOP, including without limitation (i) all amounts received by  the ESOP, (ii) all distributions or other payments made by the ESOP, (iii) the occurrence of each event, or the passing of each date, by which any ESOP awards or plan accounts may have vested, (iv) the occurrence of each event that may permit an ESOP participant to require Borrower to repurchase any interest in ESOP or in Borrower distributed to, or held directly or indirectly by such participant, with a description of the terms, timing and amounts for such repurchase, (v) the proposed or actual release from pledge of Borrower's capital stock or other assets subject to Borrower's or any other entity's security interest in assets of the ESOP, (vi) the proposed borrowing, or creation of the right to borrow or incur liabilities by the ESOP and (vii) such other matters concerning the ESOP as to which Lender may request information or reports; provided, however, that with respect to any of the actions described in (i) through (viii) above, that involves or may involve, individually or in the aggregate, amounts in excess of $100,000 (excluding events or matters previously reported to Lender), Borrower shall notify Lender of each such event or matter as soon as practicable.

(l)     Other Documents.  Such other financial and other information respecting Borrower's business or financial condition as Lender shall from time to time reasonably request.

B-2

### ANNEX C
**to**
### CREDIT AGREEMENT

### [Reserved]

C-1

**ANNEX D (Section 10.10)**
to
**CREDIT AGREEMENT**

**NOTICE ADDRESSES**


(A)    If to Lender, at

Associated Wholesale Grocers, Inc.
5000 Kansas Avenue
Kansas City, KS  66106
Attention: General Counsel
Telecopier No.:  913-288-1573
Telephone No.:  913-288-1511

with copies to:

Husch Blackwell LLP
4801 Main Street
Suite 1000
Kansas City, Missouri 64112
Attention: Christopher J. Rockers, Esq.
Telecopier No.:  816-983-8080
Telephone No.:  816-283-4608

(B)    If to Borrower or any other Credit Party, at

Foods, Inc.
4343 Merle Hay Drive
Des Moines, IA 50310
Attention: David Sinnwell, Chairman, CEO
Telecopier No.:  515-278-0012
Telephone No.:  515-278-1657

With copies to:

Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
Attention: Jeffrey D. Goetz
Telecopier No.: 515-246-5808
Telephone No.: 515-246-5817

And:

Crowe & Dunlevy
324 Robinson Avenue, Suite 100
Oklahoma City, OK 73102
Attn:  Roger A. Stong

Phone: 405.239.6614
Fax: 405.272.5255

<u>**ANNEX E**</u>
to
<u>**CREDIT AGREEMENT**</u>

<u>**COMPLIANCE CERTIFICATE**</u>

TO:     Associated Wholesale Grocers, Inc. ("**AWG**")

    This Compliance Certificate (this "***Certificate***") is furnished to AWG, as Lender, pursuant to that certain Credit Agreement (the "***Agreement***") dated as of _____, 2014, between AWG, and Foods, Inc. ("***Borrower***") as borrower.   Unless otherwise defined herein, all capitalized terms used in this Certificate have the meanings as provided them in the Agreement.

    The Undersigned certifies that:

1.  I am (a) the duly elected Chief Financial Officer of Borrower, and (b) issuing this Certificate on behalf Borrower.

2.  I have reviewed the terms of the Agreement and I have conducted a detailed review of the transactions and conditions of Borrower and its Subsidiaries during the Calendar Week or Fiscal Periods covered by the accompanying financial statements referenced in <u>paragraph 4</u> below (the "***Covered Fiscal Periods***").

3.  Subject to <u>paragraph 6</u> below, the examinations described in <u>paragraph 2</u>, above, did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the Covered Fiscal Periods or as of the date of this Certificate, except as specifically set forth below.

4.  The financial statements/Budget Reconciliation required by <u>ANNEX B</u> (<u>Section 5.1</u>) of the Agreement are delivered simultaneously with this Certificate and are true, correct, complete, and fairly present in accordance with GAAP (subject to normal year-end adjustments) the financial position, results of operations of Borrower and its Subsidiaries, on a consolidated basis, as of the date of such financial statements and for Covered Fiscal Periods.   Additionally, I am not aware of any conditions or circumstances existing which would make the financial statements untrue, incorrect or incomplete.

5.  The <u>Schedule A</u> attached hereto sets forth financial data and computations evidencing Borrower's compliance with certain covenants of the Agreement, all of which data and computations are, to the best of my knowledge, true, correct and complete and have been made in accordance with the relevant sections of the Agreement.

6.  Described below are the exceptions, if any, to <u>paragraph 3</u>, above, by listing, in detail, the nature of the condition or event, the period which it has existed and the action which Borrower or its Subsidiaries has taken, is taking or proposes to take with respect to each such condition or event, it being understood that the disclosure of any such exceptions in this <u>paragraph 6</u> does not constitute (a) an express or implied waiver by Lender of any Default or Event of Default described

below or (b) consent to any such exception to the extent the same constitutes a breach of any provision of any Loan Document.

The foregoing certifications, together with the computations set forth in <u>Schedule A</u> hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this ___ day of _____, 201_.

<u>**FOODS, INC.**</u>

By:_____

Name:_____

Title: Chief Financial Officer

E-2

**<u>Exhibit B</u>**

**Budget**

**Dahl's Cash Budget**

| Week / Week Ending | 1 Friday 11/14/14 | Actual Friday 11/14/14 | 2 Friday 11/21/14 | Actual Friday 11/21/14 | 3 Friday 11/28/14 | Actual Friday 11/28/14 | 4 Friday 12/05/14 | 5 Friday 12/12/14 | 6 Friday 12/19/14 | 7 Friday 12/26/14 | 8 Friday 01/02/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Cash Receipts:** | 2,730,429 | 2,697,070 | 2,634,135 | 2,483,492 | 3,048,045 | 3,144,347 | 2,495,496 | 2,794,250 | 2,802,081 | 3,110,450 | 2,699,682 |
| **Disbursements:** | | | | | | | | | | | |
| AWG Weekly Payment | (1,250,000) | (1,445,063) | (1,369,504) | (1,415,459) | (1,422,000) | (1,422,763) | (1,471,702) | (1,262,101) | (1,207,928) | (1,345,355) | (1,348,957) |
| ACH Fuel Purchase - Keck | (132,000) | (117,500) | (132,000) | (94,100) | (132,000) | (168,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) |
| ACH Customer Service Counter | (378,015) | (100,000) | (187,065) | (272,593) | (230,328) | (355,967) | (187,065) | (172,637) | (171,177) | (230,328) | (245,088) |
| Chain Orders - UMB | (210,000) | (251,900) | (210,000) | (203,200) | (210,000) | (225,500) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) |
| Deposits to Vendors | - | (73,000) | | | | | | | | | - |
| Purchases - Product | (353,408) | (24,070) | (317,047) | (185,084) | (347,206) | (181,482) | (250,933) | (398,140) | (394,424) | (342,742) | (362,880) |
| Supplies | (17,547) | | (15,148) | | (15,737) | (21,122) | (11,092) | (20,123) | (19,895) | (15,463) | (17,540) |
| Utilities | (62,023) | | (50,809) | | (53,565) | (390) | (31,848) | (74,066) | (73,000) | (52,285) | (61,989) |
| Utility Deposit - EST | (33,903) | | | | | | | | | | |
| Misc. Expense | - | (12,194) | (27,046) | (85,015) | (28,731) | (10,690) | (13,806) | (41,267) | (40,615) | (27,949) | (33,883) |
| Pre Petition Ins Premiums | (54,823) | | | | | | | | | (188,000) | |
| Maintenance Expense | - | (87,166) | (51,430) | (44,084) | (52,264) | (8,882) | (39,784) | (58,468) | (58,146) | (51,876) | (54,813) |
| Payroll Expense - Wells | - | | (554,875) | (554,957) | | | (567,406) | | (628,550) | | (551,582) |
| United Healthcare | | (99,900) | (100,000) | (90,965) | (110,000) | (125,014) | (100,000) | (95,000) | | | |
| Sales Tax - UMB | (93,000) | | | | | | | | | | |
| Property Tax Expense | (122,500) | | | | | | | | | | |
| Credit Card Fee Expense | | | | | | | | (118,750) | | | |
| AWG Capital Lease Payment | | | | | | | (273,583) | | | | |
| Commerce Lease | | | | | | | (51,064) | | | | |
| GE Capital Lease | | | | | | | | | | | |
| Northmarq- E.P. True Lease | | | | | | | (51,943) | | | | |
| Centro Haymarket-Merle Hay | | | | | | | (16,666) | | | | |
| Graylake Eastwood LLC - E 33rd | | | | | | | (33,987) | | | | |
| Redemption of AWG Certificates | | | | | | | 1,471,702 | | | | |
| Bradshaw Law | | | | | | | (80,833) | | | | |
| Dickinson, Mackaman | | | (32,667) | | | | (32,667) | | (32,667) | | (32,667) |
| Husch Blackwell | | | (9,333) | | | | (9,333) | | (9,333) | | (9,333) |
| Crowe & Dunlevy | | | (37,333) | | | | (37,333) | | (37,333) | | (37,333) |
| The Food Partners | | | (9,333) | | | | (9,333) | | (9,333) | | (9,333) |
| Unsecured Creditor Committee Exp | | | (5,833) | | | | | | (5,833) | | (5,833) |
| U.S Trustee Fee | | | (22,000) | | | | (22,000) | | (22,000) | | (22,000) |
| **Total Disbursements** | (2,707,219) | (2,210,793) | (3,131,424) | (2,945,457) | (2,601,831) | (2,519,810) | (2,162,676) | (2,582,553) | (3,052,235) | (2,657,999) | (3,135,232) |
| **Net Cash Flow** | 23,210 | 486,277 | (497,289) | (461,965) | 446,214 | 624,537 | 332,820 | 211,697 | (250,155) | 452,451 | (435,549) |
| Beginning Cash Balance | 550,000 | 696,342 | 573,210 | 1,182,619 | 525,921 | 720,654 | 522,134 | 854,954 | 1,066,651 | 816,497 | 1,268,948 |
| Change in Cash | 23,210 | 486,277 | (497,289) | (461,965) | 446,214 | 624,537 | 332,820 | 211,697 | (250,155) | 452,451 | (435,549) |
| Advance (Repayment) on DIP Loan | | | 450,000 | | (450,000) | | | | | | |
| Ending Cash Balance | 573,210 | 1,182,619 | 525,921 | 720,654 | 522,134 | 1,345,191 | 854,954 | 1,066,651 | 816,497 | 1,268,948 | 833,398 |
| | | | | | | | | | | | |
| DIP Loan Balance | - | - | 450,000 | | - | | - | - | - | - | - |

Changes
reduce sales by 2.9%
add line for vendor deposits
Reduce Bradshaw Law fees and increase Unsecured Creditors Committee expense by an equivalent about

**Dahl's Cash Budget**

| Week Ending | 9 Friday 01/09/15 | 10 Friday 01/16/15 | 11 Friday 01/23/15 | 12 Friday 01/30/15 | 13 Friday 02/06/15 | 14 Friday 02/13/15 | 15 Friday 02/20/15 | 16 Friday 02/27/15 | 17 Friday 03/06/15 | 18 Friday 03/13/15 | 19 Friday 03/20/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Cash Receipts:** | 2,437,077 | 2,384,585 | 2,529,531 | 2,498,167 | 2,640,167 | 2,578,679 | 2,698,192 | 2,412,313 | 2,617,771 | 2,469,118 | 2,900,987 |
| **Disbursements:** | | | | | | | | | | | |
| AWG Weekly Payment | (1,490,807) | (1,301,854) | (1,181,055) | (1,156,909) | (1,223,584) | (1,209,157) | (1,274,477) | (1,246,193) | (1,301,169) | (1,169,664) | (1,264,175) |
| ACH Fuel Purchase - Keck | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) |
| ACH Customer Service Counter | (230,328) | (187,065) | (172,637) | (171,177) | (230,328) | (187,065) | (230,328) | (187,065) | (172,637) | (171,177) | (230,328) |
| Chain Orders - UMB | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) |
| Deposits to Vendors | - | - | - | - | - | - | - | - | - | - | - |
| Purchases - Product | (165,140) | (345,693) | (365,697) | (357,151) | (173,170) | (368,232) | (297,347) | (348,913) | (260,784) | (355,168) | (259,394) |
| Supplies | (5,912) | (16,989) | (18,217) | (17,692) | (6,405) | (18,372) | (14,023) | (17,187) | (11,696) | (17,487) | (11,611) |
| Utilities | (7,636) | (59,417) | (65,155) | (62,703) | (9,939) | (65,881) | (45,552) | (60,341) | (34,673) | (61,742) | (34,274) |
| Utility Deposit - EST | - | - | - | - | - | - | - | - | - | - | - |
| Misc. Expense | 999 | (32,310) | (35,818) | (34,319) | (409) | (36,263) | (23,832) | (32,875) | (15,533) | (33,731) | (16,936) |
| Pre Petition Ins Premiums | (32,457) | (54,035) | (55,771) | (55,029) | (33,154) | (55,991) | (49,839) | (54,314) | (40,639) | (54,738) | (46,426) |
| Maintenance Expense | (116,000) | - | (172,000) | - | - | (93,000) | - | (87,000) | - | (85,000) | - |
| Payroll Expense - Wells | - | (545,469) | - | (557,124) | - | (566,097) | - | (553,220) | - | (557,124) | - |
| United Healthcare | (84,000) | - | - | - | (116,000) | - | - | - | (116,000) | - | - |
| Sales Tax - UMB | - | - | - | - | - | - | - | - | - | - | - |
| Property Tax Expense | - | - | - | - | - | - | - | - | - | - | - |
| Credit Card Fee Expense | (273,583) | - | - | - | (273,583) | - | - | - | (273,583) | - | - |
| AWG Capital Lease Payment | (51,064) | - | - | - | (51,064) | - | - | - | (51,064) | - | - |
| Commerce Lease | - | - | - | - | (20,009) | - | - | - | (20,009) | - | - |
| GE Capital Lease | - | - | - | - | - | - | - | - | - | - | - |
| Northmarq- E.P. True Lease | (51,943) | - | - | - | (51,943) | - | - | - | (51,943) | - | - |
| Centro Haymarket -Merle Hay | (16,666) | - | - | - | (16,666) | - | - | - | (16,666) | - | - |
| Graystake Eastwood LLC - E 33rd | (33,987) | - | - | - | (33,987) | - | - | - | (33,987) | - | - |
| Redemption of AWG Certificates | - | - | - | - | - | - | - | - | - | - | - |
| Bradshaw Law | - | (32,667) | - | (32,667) | - | (32,667) | - | (32,667) | - | (32,667) | - |
| Dickinson, Mackaman | - | (9,333) | - | (9,333) | - | (9,333) | - | (9,333) | - | (9,333) | - |
| Husch Blackwell | - | (37,333) | - | (37,333) | - | (37,333) | - | (37,333) | - | (37,333) | - |
| Crowe & Dunlevy | - | (9,333) | - | (9,333) | - | (9,333) | - | (9,333) | - | (9,333) | - |
| The Food Partners | - | (5,833) | - | (5,833) | - | (5,833) | - | (5,833) | - | (5,833) | - |
| Unsecured Creditor Committee Exp | - | (22,000) | - | (22,000) | - | (22,000) | - | (22,000) | - | (22,000) | - |
| U.S Trustee Fee | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | (2,900,523) | (3,108,833) | (2,438,351) | (2,870,605) | (2,582,240) | (3,174,809) | (2,277,398) | (3,045,607) | (2,742,383) | (3,070,581) | (2,205,143) |
| **Net Cash Flow** | (463,446) | (724,247) | 91,181 | (372,439) | 57,926 | (596,129) | 420,794 | (633,294) | (124,613) | (601,462) | 695,844 |
| Beginning Cash Balance | 833,398 | 369,952 | 95,705 | 186,886 | 114,447 | 172,373 | 326,244 | 747,038 | 113,744 | 189,131 | 137,669 |
| Change in Cash | (463,446) | (724,247) | 91,181 | (372,439) | 57,926 | (596,129) | 420,794 | (633,294) | (124,613) | (601,462) | 695,844 |
| Advance (Repayment) on DIP Loan | - | 450,000 | - | 300,000 | - | 750,000 | - | - | 200,000 | 550,000 | 100,000 |
| Ending Cash Balance | 369,952 | 95,705 | 186,886 | 114,447 | 172,373 | 326,244 | 747,038 | 113,744 | 189,131 | 137,669 | 933,513 |
| DIP Loan Balance | - | 450,000 | 450,000 | 750,000 | 750,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,700,000 | 2,250,000 | 2,350,000 |

Changes
reduce sales by 2.9%
add line for vendor deposits
Reduce Bradshaw Law fees and incre:

**Dahl's Cash Budget**

| Week | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
|---|---|---|---|---|---|---|---|
| Week Ending | Friday 03/27/15 | Friday 04/03/15 | Friday 04/10/15 | Friday 04/17/15 | Friday 04/24/15 | Friday 05/01/15 | Friday 05/08/15 |
| **Total Cash Receipts:** | 2,356,858 | 2,500,118 | 2,539,053 | 2,495,103 | 2,453,905 | 2,500,118 | 2,469,118 |
| **Disbursements:** | | | | | | | |
| AWG Weekly Payment | (1,195,794) | (1,394,454) | (1,144,154) | (1,210,054) | (1,227,964) | (1,207,747) | (1,188,796) |
| ACH Fuel Purchase - Keck | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) | (132,000) |
| ACH Customer Service Counter | (187,065) | (172,637) | (171,177) | (230,328) | (187,065) | (172,637) | (171,177) |
| Chain Orders - UMB | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) |
| Deposits to Vendors | - | - | - | - | - | - | - |
| Purchases - Product | (343,843) | (252,216) | (251,255) | (281,513) | (257,836) | (363,615) | (187,685) |
| Supplies | (16,792) | (11,170) | (11,111) | (12,968) | (11,515) | (18,005) | (7,211) |
| Utilities | (58,494) | (27,216) | (26,940) | (35,618) | (28,827) | (59,164) | (8,709) |
| Utility Deposit - EST | - | - | - | - | - | - | - |
| Misc. Expense | (31,745) | (14,031) | (15,509) | (20,815) | (16,663) | (35,213) | (2,714) |
| Pre Petition Ins Premiums | - | - | - | - | - | - | - |
| Maintenance Expense | (53,755) | (39,896) | (45,719) | (48,345) | (46,290) | (55,471) | (34,295) |
| Payroll Expense - Wells | (551,582) | - | (542,838) | - | (551,582) | - | (542,838) |
| United Healthcare | - | (116,000) | - | - | - | - | (116,000) |
| Sales Tax - UMB | - | - | (90,000) | - | (177,000) | - | - |
| Property Tax Expense | - | (754,069) | - | - | - | - | - |
| Credit Card Fee Expense | - | - | (112,500) | - | - | - | (106,250) |
| AWG Capital Lease Payment | - | (273,583) | - | - | - | - | (273,583) |
| Commerce Lease | - | (51,064) | - | - | - | - | (51,064) |
| GE Capital Lease | - | (20,009) | - | - | - | - | (20,009) |
| Northmarq- E.P. True Lease | - | (51,943) | - | - | - | - | (51,943) |
| Centro Haymarket -Merle Hay | - | (16,666) | - | - | - | - | (16,666) |
| Grayslake Eastwood LLC - E 33rd | - | (104,918) | - | - | - | - | (33,987) |
| Redemption of AWG Certificates | - | - | - | - | - | - | - |
| Bradshaw Law | (32,667) | - | (32,667) | - | (32,667) | - | (32,667) |
| Dickinson, Mackaman | (9,333) | - | (9,333) | - | (9,333) | - | (9,333) |
| Husch Blackwell | (37,333) | - | (37,333) | - | (37,333) | - | (37,333) |
| Crowe & Dunlevy | (9,333) | - | (9,333) | - | (9,333) | - | (9,333) |
| The Food Partners | (5,833) | - | (5,833) | - | (5,833) | - | (5,833) |
| Unsecured Creditor Committee Exp | (22,000) | - | (22,000) | - | (22,000) | - | (22,000) |
| U.S Trustee Fee | - | - | - | - | - | - | - |
| **Total Disbursements** | (2,897,571) | (3,641,872) | (2,869,704) | (2,181,642) | (2,963,243) | (2,253,853) | (3,271,427) |
| **Net Cash Flow** | (540,713) | (1,141,754) | (330,651) | 313,460 | (509,339) | 246,265 | (802,309) |
| Beginning Cash Balance | 933,513 | 392,799 | (98,955) | (429,606) | (116,145) | (625,484) | (379,219) |
| Change in Cash | (540,713) | (1,141,754) | (330,651) | 313,460 | (509,339) | 246,265 | (802,309) |
| Advance (Repayment) on DIP Loan | - | 650,000 | - | - | - | - | - |
| Ending Cash Balance | 392,799 | (98,955) | (429,606) | (116,145) | (625,484) | (379,219) | (1,181,528) |
| DIP Loan Balance | 2,350,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |

Changes
reduce sales by 2.9%
add line for vendor deposits
Reduce Bradshaw Law fees and incre: