# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Lead Case No.      14-02689-als11 |
| | ) | Affiliated Cases:    14-02690-als11 |
| FOODS, INC. d/b/a DAHL'S FOODS, et al. | ) | 14-02691-als11 |
| | ) | |
| Debtors and Debtors in Possession | ) | Chapter 11 Cases (Jointly Administered) |
| | ) | |
| 4343 Merle Hay Road | ) | Hon. Anita L. Shodeen |
| Des Moines, IA 50310 | ) | |
| | ) | |
| EIN:  42-0803702 | ) | |
| _____ | ) | **NOTICE OF NON-MATERIAL** |
| | ) | **MODIFICATIONS TO** |
| | ) | **STALKING HORSE ASSET** |
| And Affiliated Cases | ) | **PURCHASE AGREEMENT** |
| | ) | |
| _____ | ) | |

**PLEASE TAKE NOTICE THAT:**

1.      Foods, Inc. d/b/a Dahl's Foods, Dahl's Food Mart, Inc., and Dahl's Holdings I, LLC (collectively, the "Debtors") and the Stalking Horse Bidder[1] have made certain non-material modifications to the Asset Purchase Agreement made effective as of November 9, 2014 by and among Foods, Inc. d/b/a Dahl's Foods, Dahl's Food Mart, Inc., Dahl's Holdings I, LLC, and Associated Wholesale Grocers, Inc. (as defined in the Bidding Procedures Order as the "Stalking Horse APA").  A copy of the Stalking Horse APA as so amended with a redline marked to show the changes from the Stalking Horse APA is attached hereto as Exhibit A.

2.      The modifications summarized below effectuate the severance of the sale of the 8700 Hickman Real Property from the Stalking APA in order that the 8700 Hickman Real Property may be sold to a third-party purchaser as originally contemplated in the Stalking Horse APA and clarify the intent of certain provisions of the Stalking Horse APA.  The formal severance of the sale of the 8700 Hickman Real Property at the request of the Debtors and the third-party purchaser will provide additional time for the parties to finalize and close the sale of that asset on the same timeframe as the larger transaction.

3.      The revisions to the Stalking Horse APA include the following:

- Removal of the 8700 Hickman Real Property and associated Equipment and Inventory from the Assets to be purchased under the Stalking Horse APA.

---

[1] Unless otherwise noted, capitalized terms not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order [Docket No. 157]

- Confirming the prior adjustment in the Base Purchase Price as a result of the contemplated severance of the 8700 Hickman Real Property transaction.

- An agreement by the Stalking Horse Bidder to provide Back-Up Purchase support in the event that the sale of the 8700 Hickman Real Property to the third-party purchaser fails to close as expected in an amount consistent with the original purchase price allocation to the 8700 Hickman Real Property in the Stalking Horse APA.

- A clarification in the definition of Assumed Leases to make clear that Assumed Leases are those to which AWG is a counter-party.

Date:  January 6, 2015

/s/ *Jeffrey D. Goetz*

Jeffrey D. Goetz, Esq., IS #9999366
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel for
Foods, Inc. d/b/a Dahl's Foods, Dahl's
Food Mart, Inc., and Dahl's Holdings I,
LLC, Debtors and Debtors-in-Possession

## AMENDED ASSET PURCHASE AGREEMENT

**THIS AMENDED ASSET PURCHASE AGREEMENT** is made effective as of January __, 2015 (the "**Effective Date**"), by and among **FOODS, INC. D/B/A DAHL'S FOODS**, an Iowa corporation ("**Dahl's**"), **DAHL'S FOOD MART, INC.**, an Iowa corporation ("**DFMI**"), **DAHL'S HOLDINGS I, LLC**, an Iowa limited liability company, ("**Holdings**" and, together with **Dahl's** and **DFMI**, the "**Sellers**" as debtors-in-possession), and **ASSOCIATED WHOLESALE GROCERS, INC.**, a Kansas corporation ("**AWG**" or "**Buyer**").

### R E C I T A L S :

**The following Recitals are a material part of this Agreement and are being relied upon by Buyer and Sellers in connection with the transaction contemplated hereby:**

A.    Sellers own the supermarket stores (the "**Stores**"), listed on <u>Exhibit A-1</u> to this Agreement.

B.    Sellers lease the real property associated with those Stores listed on <u>Exhibit A-2</u>, under the respective lease(s), including amendments thereto, (the "**Leases**") described on <u>Exhibit A-2</u> to this Agreement.

C.    Sellers hold fee simple interest in the real property associated with the following Stores: (i) the real property associated with the Store located at 5003 EP True Parkway, West Des Moines, Iowa, which is owned by Holdings and leased to Dahl's, legally described on <u>Exhibit A-3</u> (the "**EP True Real Property**"), which is subject to a mortgage granted to NorthMarq Capital (Protective Life/West Coast Life Insurance Company) ("**NorthMarq**"), (ii) a fee simple interest in the real property associated with the Store located at 8700 Hickman Road, Clive, Iowa, legally described on <u>Exhibit A-4</u> (the "**8700 Hickman Real Property**"), and (iii) a fee simple interest in the real property associated with the Store located at 1320 E. Euclid Avenue, Des Moines, Iowa, legally described on <u>Exhibit A-5</u> (the "**Euclid Real Property**" and together with the EP True Real Property and the 8700 Hickman Real Property, the "**Owned Real Property**").

D.    The Sellers occupy the respective leased premises as described in each Lease (the "**Leased Premises**") as well as the respective owned premises associated with the Owned Real Property.

E.    Sellers' leasehold interest in the Leased Premises pursuant to each Lease and Sellers' interests in the Owned Real Property, together with those additional items described in <u>Article 2</u> of this Agreement relating to the Purchased Leased Premises, hereinafter collectively are referred to as the "**Assets**."

F.    Sellers desire to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

G.    Until the Stores are sold, Sellers intend to continue to own and/or operate such Stores as retail grocery stores.

H.    In entering into this Agreement, the Parties acknowledge Buyer intends to act as a facilitator to establish a conduit mechanism for the sale of the Assets, including the sale of the Stores to one or more of Buyer's Affiliates or retail members or customers, or other third-parties (each, an "**Ultimate Purchaser**"), all within the terms and conditions set forth herein.

I.    Sellers filed voluntary petitions (the "**Petitions**") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Iowa (the "**Bankruptcy Court**") on November 9, 2014 (the "**Filing Date**") and have operated their businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  Such cases are being administered under case nos. 14-02689-11, 14-02690-11, and 14-02691-11 (the "**Bankruptcy Cases**").

J.    The Sellers and the Buyer had previously entered into that certain Asset Purchase Agreement made effective as of November 9, 2014 by and among Foods, Inc. d/b/a Dahl's Foods, Dahl's Food Mart, Inc., Dahl's Holdings I, LLC, and Associated Wholesale Grocers, Inc. (the "**Original APA**").

K.    On November 9, 2014, the Debtors filed the Debtors' Motion for Order (1) Approving Auction and Bidding Procedures; (2) Approving Cost and Cost and Expense Reimbursement; (3) Prescribing Manner of Notice; and (4) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances, Subject to Higher or Better Offers [Docket No. 19].

L.    On December 3, 2014, the Court entered an Order approving, among other things, the Bid Procedures governing the submission of competing bids for the Debtors' assets and approving the assumption of the Original APA. [Docket No. 157].

M.    Pursuant to Article 3.1(b) of the Original APA, the Sellers and Buyer agreed that, only with respect to the 8700 Hickman Real Property and under certain circumstances, the sale of the 8700 Hickman Real Property could be servered from the assets to be sold under the Original APA, with a corresponding reduction in the Base Purchase Price in the amount of $1,300,000.

N.    At the request of the Seller and in order to facilitate the sale of the 8700 Hickman Real Property in a separate transaction to Equity Ventures Commercial Development, L.C. (the "**8700 Hickmann Buyer**"), the Buyer has agreed to amend the Original APA to sever the sale of the 8700 Hickman Real Property including the Inventory, Equipment, and other assets related to the Store located at the 8700 Hickman Real Property from the transaction contemplated by this Agreement and to make minor clarifications of the Original APA.

**IN CONSIDERATION OF THE FOREGOING AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

# ARTICLE 1

### DEFINED TERMS

Capitalized terms as used in this Agreement will have the following meanings when used herein.

Section 1.1    "8700 Hickman Real Property" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.2    "8700 Hickmann Buyer" will have the meaning assigned in paragraph N of the Recitals to this Agreement.

Section 1.3    "Adequate Assurance Information" will mean financial and other information as may be reasonably requested by Sellers to demonstrate to the Bankruptcy Court that Landlords and Subtenants under the respective Assumed Leases and counterparties to the Assumed Contracts are adequately assured of the applicable Buyer's or the respective Ultimate Purchaser's future performance under the Assumed Leases or Assumed Contracts, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's or the Ultimate Purchaser's obligations under the Leases or Contracts by an Affiliate of such Buyer or Ultimate Purchaser, as applicable, with sufficient assets to provide adequate assurance of future performance.

Section 1.4    "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

Section 1.5    "Agreement" will mean this Amended Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

Section 1.6    [Reserved].

Section 1.7    "Alternate Transaction" will have the meaning set forth in Section 14.1(h).

Section 1.8    "Assets" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

Section 1.9    "Assumed Contracts" will mean any agreements to which Sellers are a party that relate to a Store or Stores and are assignable to Buyer and/or the Ultimate Purchaser and that Buyer or the Ultimate Purchaser elects to assume by written notice given prior to the expiration of the Designation Period; provided, however, that the Assumed Contracts shall include the Supply Agreement by and between Dahl's and AWG.

Section 1.10    "Assumed Leases" will mean all of the Leases identified on Exhibit A-2 to this Agreement to which AWG is a counterparty. For the avoidance of doubt, any Leases to which AWG is not a counterparty are Contracts which may be assumed or rejected pursuant the Buyer's Designation Rights during the Designation Period.

Section 1.11    "Auction" will mean the auction established pursuant to the Bid Procedures.

Section 1.12    "Back-Up Purchase" will have the meaning assigned in Article 3.8 to this Agreement.

Section 1.13    "Back-Up Purchaser" will have the meaning assigned in Article 3.8 to this Agreement.

Section 1.14    "Bankruptcy Code" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

Section 1.15    "Bankruptcy Court" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

Section 1.16    "Bankruptcy Court Approval" will mean the entry of the Sale Order with respect to the Stores by the Bankruptcy Court.

Section 1.17    "Bankruptcy Cases" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

Section 1.18    "Base Purchase Price" will mean the amount set forth in Section 3.1 of this Agreement.

Section 1.19    "Bid Procedures" shall mean those certain bid procedures pursuant to order of the Bankruptcy Court entered subsequent to the Effective Date hereof, as amended or modified thereafter.

Section 1.20    "Bid Protections" will have the meaning assigned in Exhibit L of this Agreement.

Section 1.21    "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit C to this Agreement, pursuant to which Sellers will sell and convey to Buyer or Ultimate Purchaser, as applicable, at each Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the Stores being transferred at such Closing.

Section 1.22    "Break-Up Fee" will have the meaning ascribed thereto in Exhibit L to this Agreement.

Section 1.23    "Buildings" will have the meaning assigned in Section 2.1 of this Agreement.

Section 1.24    "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Des Moines, Iowa.

Section 1.25    "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

Section 1.26    "Buyer's Escrowed Items" will have the meaning assigned in Section 13.3 of this Agreement.

SLC-7413198-1

Section 1.27 "<u>Closing</u>" means the consummation of the assignment, assumption, sale and purchase of Assets pursuant to this Agreement as indicated by delivery of the conveyance instruments and other documents contemplated by <u>Article 13</u> of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

Section 1.28 "<u>Closing Allocation</u>" will have the meaning assigned in <u>Section 3.5</u> of this Agreement.

Section 1.29 "<u>Closing Date</u>" will mean the date as to a particular Store or Stores designated by Buyer in writing, and reasonably acceptable to Sellers, that is no later than 11:59 p.m. Prevailing Central Time on March 31, 2015 , or such other date as mutually agreed to by the parties in writing, but in any event shall be no earlier than forty-two (42) days after entry of the Sale Order.

Section 1.30 "<u>Closing Statement</u>" will mean a statement in a commercially reasonable form mutually agreeable to Buyer and Sellers.

Section 1.31 "<u>Contracts</u>" will mean those contracts and equipment leases listed on Exhibit M to this Agreement.

Section 1.32 "<u>Contract Warranties</u>" will have the meaning assigned in <u>Section 19.1</u> of this Agreement.

Section 1.33 "<u>Creditors' Committee</u>" will mean any Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases.

Section 1.34 "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Assumed Contracts, Assumed Leases, and the Subleases designated by Buyer for assumption, as discussed in <u>Section 2.2</u> hereof.

Section 1.35 "<u>Deposit</u>" will have the meaning assigned in <u>Section 3.2</u> of this Agreement.

Section 1.36 "<u>Designation Notice</u>" will have the meaning assigned in <u>Section 2.3(d)</u> of this Agreement.

Section 1.37 "<u>Designation Period</u>" will have the meaning assigned in <u>Section 2.3(a)</u> of this Agreement.

Section 1.38 "<u>Designation Rights</u>" will have the meaning assigned in <u>Section 2.3</u> of this Agreement.

Section 1.39 "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

Section 1.40 "<u>EP True Real Property</u>" will have the meaning assigned in <u>paragraph C</u> of the Recitals to this Agreement.

Section 1.41    "Environmental Laws" will mean any federal, state or local laws, statutes, ordinances, regulations or policies relating to the environment, health and safety, any Hazardous Materials (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof) or to industrial hygiene or the environmental conditions applicable to the Assets, including, without limitation, soil, subsurface and ground water conditions.

Section 1.42    "Equipment" will mean (other than those items that are Excluded Personal Property) all trade fixtures, equipment, Supplies, machinery, telephone and computer lines, control devices, totes, Small Wares, supplies that are not included within the definition of Supplies, outdoor signage and sign faces complete with all additions, accessories and attachments thereto owned or to be owned by Sellers on or before the Closing Date and/or located at the Leased Premises and, in any such case, utilized in connection with Sellers' business, whether located at the Leased Premises, its corporate offices or otherwise.

Section 1.43    "Escrow Agent" will be the escrow and closing agent chosen by mutual written agreement of Buyer and Sellers.

Section 1.44    "Estoppel Certificate" will have the meaning assigned in Section 7.3 of this Agreement.

Section 1.45    "Euclid Real Property" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.46    "Excluded Inventory" will mean those items of Inventory described on Exhibit F to this Agreement and any items of Inventory associated with the 8700 Hickman Real Property

Section 1.47    "Excluded Personal Property" will mean:

(a)    All cash, cash equivalents, money orders, undeposited, uncollected and returned checks, food stamps, coupons, accounts receivable, bank deposits, operating accounts, refunds, credits, rebates and long-term investments of the Sellers;

(b)    All claims, demands, causes of actions and other rights which the Sellers have or may have against third parties (except any such claims, demands, causes of actions and other rights that the Sellers may have against AWG or any of its affiliates), including, but not limited to, claims under chapter 5 of the Bankruptcy Code and claims against current or former officers, directors, and/or managing members of the Sellers;

(c)    The unexpired leases and contracts that the Buyer does not assume;

(d)    Rights to (i) any tax refunds or credits for tax periods (or portions thereof) with respect to any Asset ending on or prior to the Closing Date, and (ii) insurance claims or rights to payment arising with respect to Assets for which title has yet to pass to Buyer or the Ultimate Purchaser, as the case may be, to the extent necessary to remediate or pay for any liability borne by Sellers relating to or arising from such Asset, provided, however, that to the extent the Buyer or any Ultimate Purchaser pays for any tax liability, it shall be entitled to the pro rata portion of such return and any such tax refund shall be an Asset;

(e)    All rights and interests in connection with, and assets of, any employee benefit plan;

(f)    All of the patronage equity of the Sellers, or any Seller, in and to Buyer related to "Qualified Sales" during fiscal year 2014 to the extent distributed, as expected, in March, 2015, and any Membership Certificates to the extent not offset and recouped pursuant to the Sellers' post-petition debtor-in-possession financing.

(g)    All leased Equipment not part of an Assumed Contract;

(h)    All consigned goods;

(i)    the Inventory, Equipment, and other assets related to the Store located at the 8700 Hickman Real Property; and

(j)    Any other property listed on Exhibit F-1.

Section 1.48    "Files and Records" will mean, to the extent in Sellers' possession (or otherwise within or under their control) and currently existing, (a) all real estate files, documents, instruments, papers, books and records of Sellers relating to the Stores, the Leases and the Leased Premises and (b) electronic files for each Store showing for each item of Inventory the item description, and UPC code and such other information as Buyer may reasonably request relating to such item of Inventory.  Files and Records shall not include any materials that are protected by privilege, the work-product doctrine, or any other relevant immunity or protection.  To the extent any confidential, privileged or personally identifiable customer information is inadvertently included within such Files and Records, such are to remain private and confidential.

Section 1.49    "Hazardous Materials" will mean any hazardous or toxic substance, material or waste which is regulated by local authorities, state and/or the federal government, including, but not limited to, any hazardous material, substance or waste which is defined as (a) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state laws; (b) a hazardous substance under Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317); (c) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et. seq.); (d) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (e) a hazardous or toxic waste, substance or material in any statute, regulation, rule or law enacted by the applicable state and/or the federal government.  To the extent not otherwise included, phenolic foam shall be considered a Hazardous Material.

Section 1.50    "Improvements" will have the meaning assigned in Section 2.1 of this Agreement.

Section 1.51    "Inventory" will mean all inventories of goods and merchandise located at or within the Stores and owned by Sellers on the Inventory Count Date and held for resale to retail customers, but excluding the Excluded Inventory.

Section 1.52   "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Sellers in connection with the Closing as contemplated by Section 3.4 of this Agreement, in the form attached hereto as Exhibit G to this Agreement.

Section 1.53   "Inventory Count" will have the meaning assigned in Section 3.4 of this Agreement.

Section 1.54   "Inventory Count Date" will mean, with respect to each Store, the day immediately preceding the Closing Date.

Section 1.55   "Inventory Price" will mean the purchase price for the Inventory determined pursuant to Section 3.4 of this Agreement.

Section 1.56   "Inventory Service" will mean such inventory service as shall be mutually agreed upon by Buyer and Sellers.

Section 1.57   "Landlords" will mean the lessors under the Leases.

Section 1.58   "Leased Premises" will have the meaning assigned in paragraph B of the Recitals to this Agreement, and will include the elements thereof as described in Section 2.1 of this Agreement.

Section 1.59   "Leases" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

Section 1.60   "Liquidated Deposit" will have the meaning assigned in Section 15.1 of this Agreement.

Section 1.61   "Monetary Liens" will mean (i) any of the following which arise by, through or under Sellers:  (A) mortgages on any of Sellers' Leased Premises or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Sellers and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Sellers' interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Sellers' interest under any of the Leases, on any other Assets.

Section 1.62   "NorthMarq" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.63   "Original APA" will have the meaning assigned in paragraph J of the Recitals to this Agreement

Section 1.64   "Outside Date" means March 31, 2015, or an alternate date mutually agreed to by the parties in writing.

Section 1.65   "Owned Real Property" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.66    "Permits" will mean all third party and governmental consents, permits and licenses, including, without limitation, liquor, beer and similar licenses, required with respect to the consummation of any part of this Agreement and/or the use, ownership, operation (including the sale at retail of liquor, beer and other items where a permit or license is required) or maintenance of any of the Stores or other Assets.

Section 1.67    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit D to this Agreement, (ii) subject to the provisions of Section 4.2 of this Agreement, all other matters set forth as exceptions in any Title Policies, other than Monetary Liens and (iii) without limiting (i) and/or (ii), all secured interests and/or liens (perfected or unperfected) of any kind of the Buyer in and to the Assets..

Section 1.68    "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

Section 1.69    "Prepaid Expenses" will mean Sellers' prepaid rent and prepaid expenses related to the Assets and the Stores, including, without limitation, (i) all rent, taxes and common area maintenance and similar charges under the Leases; (ii) water charges, sewer rents and vault charges, if any; and (iii) utilities, including, telephone, steam, electricity and gas, on the basis of the most recently issued bills therefor, subject to post-closing adjustment when the next bills are available, or if current meter readings are available, on the basis of such readings.

Section 1.70    "Purchase Price" will mean collectively the Base Purchase Price and the Inventory Price.

Section 1.71    "Real Property" will mean the Leased Premises, the Owned Real Property, and the Improvements together.

Section 1.72    "Remaining Contracts" will have the meaning assigned in Section 2.3(c) of this Agreement.

Section 1.73    "Sale Order" will mean an order or orders of the Bankruptcy Court pursuant to 11 U.S.C. §§ 363 and 365 substantially in the form of Exhibit J to this Agreement approving the sale to Buyer and/or any applicable Ultimate Purchaser of the Assets free and clear of all liens, claims, encumbrances and interests and the assumption and assignment of all Leases to the Buyer and/or Ultimate Purchaser, as applicable.

Section 1.74    "Sellers' Inventory Representative" will mean such person or persons designated in writing by Sellers to act in such capacity.

Section 1.75    "Sellers' Brokers" will have that meaning as set forth in Section 16.3 hereof.

Section 1.76    "Sellers' Escrowed Items" will have the meaning assigned in Section 13.2 of this Agreement.

Section 1.77    "Small Wares" will mean all small wares used in connection with the Stores, such as knives, sharpeners, pots and pans.

Section 1.78    "Store Employees" will have the meaning assigned in Section 7.9 of this Agreement.

Section 1.79    "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including, if applicable, any associated liquor store, fuel center, c-store, car wash, or other specialty area operated by Sellers or any third-party lessee at the Leased Premises, but shall exclude the store associated with the 8700 Hickman Real Property, unless, and to the extent applicable, Buyer is the Back-Up Purchaser of the 8700 Hickman Real Property pursuant to Article 3.8 of this Agreement.

Section 1.80    "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 (Leases) to this Agreement (if any), including amendments.  If no sublease is listed on Exhibit A-2 (Leases) to this Agreement with respect to a Store, then each reference in this Agreement and the conveyance instrument to any Sublease at such Store will be disregarded.

Section 1.81    "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease.  If no Sublease is listed on Exhibit A-2 (Leases) to this Agreement with respect to a Store, then each reference in this Agreement and any conveyance instrument to any Subtenant at such Store will be disregarded.

Section 1.82    "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Stores and owned by Sellers on the Inventory Count Date.

Section 1.83    "Supplies Price" will mean, as to any given Store, $3,000.

Section 1.84    "Title Insurer" will mean such nationally recognized title insurance company, as mutually agreed upon by Sellers and Buyer.

Section 1.85    "Title Policies" will have the meaning assigned in Section 4.3 of this Agreement.

Section 1.86    "Title Reports" will mean, collectively, any title reports and/or title insurance commitments with respect to the Stores that Sellers have made available to Buyer for review.

Section 1.87    "Ultimate Purchaser" will have the meaning assigned in paragraph F of the Recitals to this Agreement.

Section 1.88    "Violations" will mean all material violations or notices of material violations of law or governmental ordinances, orders or requirements that exist or are noted in or issued by any housing and building, fire, labor, health, air resources, environmental, highways or any other Federal, state, county or municipal department, agency, authority or bureau having jurisdiction as to conditions affecting any of the Assets.

Section 1.89    "Warranties and Guaranties" will mean all assignable third party warranties, guaranties or similar rights owned by Sellers or inuring to Sellers' benefit in connection with, and only to the extent of, the Assets.

# ARTICLE 2

## PROPERTY INCLUDED IN SALE; ASSUMED LIABILITIES

Section 2.1    Assets to be Purchased.  On the terms and subject to the conditions set forth in this Agreement, Sellers agree to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Sellers, the Assets, which, excluding Excluded Personal Property, are comprised of the following:

(a)    Sellers' interest in the Stores, Leases, and Leased Premises, subject to any agreed modifications between the applicable landlord(s) and the Buyer or Ultimate Purchaser, as applicable, if any, together with the Designation Rights;

(b)    Sellers' interest in the Store buildings now existing on the Leased Premises (the "**Buildings**"), and all fixtures and all equipment located in the Buildings, including, but not limited to Sellers' interest in (i) all heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, flooring and leasehold improvements (collectively, the "**Improvements**"), and (ii) the Equipment;

(c)    The Euclid Real Property and the EP True Real Property (subject to the Buyer's rights to remove the EP True Real Property from the purchased Assets pursuant to Article 3 of this Agreement);

(d)    The Inventory;

(e)    Sellers' interest in the Subleases (if any);

(f)    Any assignable Permits;

(g)    Any assignable Warranties and Guaranties;

(h)    The Assumed Contracts;

(i)    The Files and Records (note that Sellers make no representation or warranty as to the accuracy or correctness of such Files and Records);

(j)    All stock owned by the Sellers in Buyer;

(k)    All intellectual property owned by the Sellers;

(l)    The Prepaid Expenses, subject, however, to proration as provided in Section 3.3(c);

(m)    Sellers' fuel centers and any fuel or other Inventory associated therewith;

(n)     All claims, demands, causes of actions and other rights which the Sellers have or may have against AWG or any of its affiliates, including, but not limited to, claims under chapter 5 of the Bankruptcy Code;

(o)     Subject to all applicable federal, state, municipal, and regulatory laws governing the transfer of personal medical information, all non-privileged files, documents, instruments, papers, books, computer files and records and all other non-privileged records of Sellers in any media relating to the patients, doctors, pharmaceuticals, controlled substances, or prescriptions of, administered by or filled at the Stores and/or relating to any applicable federal, state, municipal, and regulatory laws or orders concerning any of the foregoing (collectively, the "**Pharmacy Records**").  Pharmacy Records shall be provided to Buyer in an electronic format, mutually agreeable to Buyer and Sellers, and in accordance with all applicable state board of pharmacy regulations; provided, however, in the event Buyer requests conversion of such electronic format to another format for any reason whatsoever, the cost of such conversion shall be at Buyer's sole cost and expense; and

(p)     Sellers' pharmacies and all pharmaceuticals associated with the Sellers' pharmacies.

Section 2.2     Cure Costs.

(a)     To the extent that any Assumed Contract or Assumed Lease is subject to a cure (pursuant to section 365 of the Bankruptcy Code and described in the Sale Order or any Order of the Bankruptcy Court relating to such cure liability), Sellers shall be responsible for any such cure (in the aggregate, the "**Cure Costs**"); provided, however, with respect to any Contract which Buyer designates to be an Assumed Contract by exercising its Designation Rights subsequent to the Closing Date, the Buyer or Ultimate Purchaser, as applicable, shall be responsible for any incremental Cure Costs incurred during the Designation Period and subsequent to the Closing Date.

(b)     Subject to paragraph (a) above, with respect to each Assumed Contract and Assumed Lease, Sellers shall pay, as soon as practicable following the Closing Date, all Cure Costs that are required to be paid with respect to such Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code and described in the Sale Order or any Order of the Bankruptcy Court relating to such cure liability; provided, however, that Cure Costs that are subject of a *bona fide* dispute shall be paid within five Business Days of the effectiveness of a settlement or Final Order of the Bankruptcy Court resolving such disputes, as the case may be.

Section 2.3     Designation Rights.  Buyer shall have the right to direct the Sellers to assume and assign or to reject, at Buyer's sole option, any Contracts and Sellers shall file and prosecute a motion or motions to effectuate such assumptions and assignments or rejections ("**Designation Rights**"), subject to the following:

(a)     Buyer shall be entitled to exercise Designation Rights from the date of the entry of the Sale Order until the date which is ten (10) Business Days after the Closing Date (the "**Designation Period**").

(b)     [Reserved]

(c)     [Reserved]

(d)     Buyer may notify Sellers in writing of its decision to assume and assign or reject any Contracts during the Designation Period (a "**Designation Notice**"). If Buyer has not submitted to Sellers a Designation Notice with respect to a particular Contract as of the expiration of the Designation Period, then Sellers shall reject such Contracts. Buyer may revoke a Designation Notice at any time prior to the entry of an order approving the requested assumption or rejection.

(e)     [Reserved]

(f)     Buyer's election to reject a particular Contract shall not affect the Purchase Price.

Section 2.4    Buyer's Use of Permits.  To the extent permitted by applicable laws and regulations of the governing jurisdiction, Buyer shall be authorized to use Sellers' Permits with respect to the Store for a reasonable period of time pending Buyer's obtaining Permits in its own name. Such use of Sellers' Permits shall terminate as to a particular Permit upon the earlier to occur of (a) a date which is seven (7) days after Closing unless Buyer has submitted its own Permit application to the applicable regulatory body before Closing; (b) a date which is seven (7) days after Buyer is notified that its Permit application has been denied by the applicable regulatory body unless such denial allows resubmission and such resubmission has occurred within such seven (7) day period; and (c) issuance of the like Permit in the name of Buyer. In the event Buyer or an Ultimate Purchaser uses Sellers' Permits under this Section 2.4 and if proceeds from Ultimate Purchaser's operation of the Stores under those Permits are delivered to Sellers by a third-party, then (i) Sellers will hold such proceeds in trust for the benefit of such Ultimate Purchaser; and (ii) Sellers will promptly remit such proceeds to Buyer by wire transfer, but in no event later than three business days. Sellers hereby agree to use their commercially reasonable efforts at no cost or expense to Sellers to assist Buyer in obtaining all Permits required for Buyer's ownership and operation (including maintenance and repairs) of the Stores. The liquor, pharmacy and all other licenses held for use in relation to the Stores and owned by the Sellers shall, if requested by Buyer and provided Buyer has made application in Buyer's name and in substantial compliance with all applicable rules and regulations therefor, be transferred to Buyer at Closing to the extent (but only to the extent) (i) such licenses are transferable in accordance with applicable law, and (ii) such licenses relate exclusively to the Stores. With respect to any liquor (or similar) license or liquor or other alcoholic beverage inventory conveyed hereunder, the parties shall comply with all applicable laws, including the creation of any necessary escrow and the disbursement or release of any funds held in such escrow. The Closing is not conditioned on obtaining any liquor license, pharmacy license or other Permit; provided, however, if (y) a state liquor control authority refuses to consent to the transfer or issuance of a liquor license to Buyer, the affected liquor inventory shall be deemed Excluded Personal Property and Sellers shall have the right to access the Stores to remove the affected liquor inventory for their own use, and (z) a state pharmacy board or other state of federal authority refuses to consent to the transfer or issuance of a pharmacy or other license relating to pharmacies or the dispensing of drugs, the affected pharmacy inventory shall be deemed Excluded Personal Property and Sellers shall have the right to access the Stores to remove the affected pharmacy inventory for their own use. Anything in this Agreement to the

contrary notwithstanding, if a pharmacy license, liquor license or other license or permit required for the operation of a particular Store is not issued to Buyer prior to the Closing, Sellers shall, if legally permissible, grant Buyer the right to use Sellers' pharmacy license (by, among other things, executing an authorization in the form attached hereto as <u>Exhibit N</u> and executing a power of attorney in form sufficient to allow Buyer to operate under Sellers' DEA number), liquor license or other license or permit required for the operation of such Stores until the earlier of (1) the date of issuance to Buyer, as applicable, of a pharmacy license by the state pharmacy control authority and/or DEA, liquor license or other such license or permit, and (2) the ninetieth (90th) day following the Closing; <u>provided</u>, <u>however</u>, that during such period Buyer will provide insurance coverage satisfactory to Sellers for the operation of such business at such Stores naming Sellers as additional insureds on such policies for the term of such use.  Buyer shall also indemnify, defend and hold harmless Sellers from and against all losses resulting from Buyer's use of Sellers' Permits at such Store during the term of such use.

Section 2.5    Buyer hereby agrees and acknowledges that Sellers' obligations under this Agreement, in their entirety, are:

(a)    subject to approval by the Bankruptcy Court, and

(b)    conditioned upon the entry of the Sale Order approving the sale of the Assets to Buyer and the Ultimate Purchaser, as applicable, free and clear of all liens, claims, encumbrances and interests and the assumption and assignment of the Leases to the Buyer pursuant to the terms and conditions of this Agreement.  Sellers agree and acknowledge that (i) this Agreement is non-severable with respect to the Assets related to the Stores, and is to be considered as a whole, and (ii) Sellers shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in <u>Section 15.1</u> below.  If the Sale Order is not entered by the Bankruptcy Court on or before March 31, 2015, or another date mutually agreed to by the parties in writing, Buyer shall be entitled to return of the Deposit.

# ARTICLE 3

### PURCHASE PRICE

Section 3.1    <u>Amount</u>.  The purchase price to be paid by Buyer to Sellers for the Assets (other than the Inventory and Supplies) is $3,500,000.00 (the "**Base Purchase Price**"). The purchase price to be paid by Buyer to Sellers for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory.

(a)    The purchase price for the EP True Real Property (the "**EP True Real Property Purchase Price**") shall be severable from the Base Purchase Price to the extent that NorthMarq does not consent to the purchase of the EP True Real Property free and clear of its Liens and security interests.  In such case, the Base Purchase Price shall be reduced by **$1,000,000** to account for the subtraction of the EP True Real Property Purchase Price and the EP True Real Property shall be removed from the Assets to be acquired pursuant to this Agreement; <u>provided</u>, <u>however</u>, that Buyer shall be granted reasonable access, at no cost to Buyer, to the EP True Real Property for no less than four (4) weeks after the Closing in order to liquidate and/or remove the Inventory and Equipment associated with the Store located on the EP True Real Property.

Section 3.2    Deposit.

(a)      Buyer shall deliver to Escrow Agent, no later than two (2) Business Days after Sellers' filing of a motion to approve the sale contemplated by this Agreement in a form acceptable to Buyer, an earnest money deposit with respect to all Stores in the amount equal to 10% of the Base Purchase Price (the "**Deposit**").  Buyer shall make the Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Deposit will be fully refundable if the Sale Order is not entered by the Bankruptcy Court on or before March 31, 2015, or another date mutually agreed to by the parties in writing, or Buyer is entitled to terminate this Agreement, and does terminate this Agreement, in accordance with the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or the Bid Procedures, in the event that the Buyer is not the successful bidder, the Buyer's bid shall not be a back-up bid and the Buyer's Deposit shall be immediately refunded.

(b)      Application of Deposit.  If the Sale Order is timely entered and this transaction closes, the Deposit will be credited against the Base Purchase Price at Closing. Whenever used herein, the Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Deposit will be deemed earned by Buyer or the Ultimate Purchaser.

Section 3.3    Payment.  The Purchase Price will be paid in the following manner:

(a)      Base Purchase Price.  On the Closing Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Deposit and with any adjustments with respect to the Base Purchase Price) contemplated by any Closing Statement.  On the Closing Date, upon satisfaction or waiver of all conditions set forth in Article 9, Buyer will, subject to the conditions of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed portion of the Base Purchase Price (as so adjusted) with respect to the Stores to Sellers (by wire transfer to an account designated in writing by Sellers).

(b)      Inventory Price and Supplies Price.  The Inventory Price for each Store shall be determined in the manner set forth in Section 3.4 of this Agreement.  Within forty-eight (48) hours after the Inventory Count Date for each Store, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Inventory Price and Supplies Price for the Stores and (b) Buyer will instruct Escrow Agent to transfer and deliver such amount with respect to the Stores to Sellers, by wire transfer to an account designated in writing by Sellers.  The provisions of this Section 3.3(b) shall survive the Closing.

(c)      Proration of Certain Transaction Costs.  All relevant rent, taxes (including real and personal property taxes), utilities and other payments regarding the Assets, including the Prepaid Expenses, will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price and Supplies Price payable at Closing to the extent thereof and then against the Inventory Price. Buyer will thereafter be responsible for payment of all such prorated obligations.  The parties

SLC-7413198-1

shall calculate all prorations and resulting credits, as the case may be, for real estate taxes pursuant to the common standards of practice for commercial real estate transactions within the State of Iowa. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this <u>Section 3.3(c)</u> shall survive the Closing.

(d)    <u>Sales Tax</u>. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Sellers' request, Buyer agrees to provide Sellers with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Sellers or any governmental authority to document that sale of the Inventory is exempt from sales tax. This <u>Section 3.3(d)</u> shall survive the Closing.

Section 3.4    <u>Inventory</u>.

(a)    <u>Count of Store Inventory</u>. Sellers shall close each Store at a time agreed to by Sellers and Buyer on the Inventory Count Date. The parties will then conduct a physical count of the Inventory at each of the Stores (the "**Inventory Count**") with the assistance of the Inventory Service. Sellers and Buyer, or the Ultimate Purchaser, as applicable, will each have representatives present at each Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

(b)    <u>Valuation of Inventory</u>. The Inventory will be valued by taking Sellers' regular retail shelf price for the applicable item (which shall reflect all normal, temporary, or special price reductions, advertised prices, promotions or discounts, but excluding coupon discounts or customer loyalty card discounts) and multiplying such price by the valuation percentage for each merchandise category indicated on <u>Exhibit G</u>.

(c)    <u>Inventory Certificates; Inventory Closing Statement</u>. Upon completion of the valuation of the Inventory for each Store, which shall be completed prior to the completion of Closing, the Buyer, Sellers and the Ultimate Purchaser, as applicable, shall execute an Inventory Certificate, which shall contain the Inventory Price and Supplies Price for the Inventory at such Store, and shall have incorporated therein a complete listing of the Inventory for such Store. Following execution of the Inventory Certificates, if requested by Buyer, Sellers, Escrow Agent, or Ultimate Purchaser, as applicable, Ultimate Purchaser or Buyer and Sellers shall execute an inventory closing statement, which shall contain the Inventory Price and Supplies Price for the Inventory at such Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

(d)    <u>Cooperation and Resolution of Disputes</u>. Buyer, Sellers and each of their respective representatives agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall

be separately listed and settled by Buyer and Sellers with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

(e)      Inventory Services and Fees.  Sellers will engage the Inventory Service, but the fees of the Inventory Service will be billed one-half to Ultimate Purchaser and one-half to Sellers, with such amount reflected on the Closing Statement.  Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.  This Section 3.4(e) shall survive the Closing.

(f)      Inventory Relating to Permits.  Buyer agrees to use its best efforts to obtain any governmental Permits required to purchase the Inventory for resale at Buyer's sole cost and expense.  If by Closing Buyer or Ultimate Purchaser, as applicable, shall not have obtained any required Permit contemplated by Section 8.1(h) of this Agreement and Ultimate Purchaser is not using Sellers' Permits as provided in Section 2.2, notwithstanding its commercially reasonable best efforts to do so, (tobacco, liquor, beer, wine, pharmaceuticals, fuel or other Inventory that under applicable law may not be transferred without such Permit), such items will not be sold and transferred at Closing and shall not constitute Inventory hereunder.  At Sellers' election, Sellers will either remove such Inventory from the applicable Store in the same manner as other Excluded Property and with reasonable promptness after Closing or request Buyer dispose of such Inventory, in which case, Buyer or Ultimate Purchaser shall bear the expense of disposal.  Notwithstanding the foregoing, if applicable law or regulation restricts Sellers from removing from the Store (or transporting from the Store to a convenient location in which Sellers will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals, fuel or other Inventory that constitutes Excluded Personal Property, then (i) Sellers will have the right to segregate such items at a secured location in the Store selected by Sellers and reasonably acceptable to Buyer and Ultimate Purchaser, and to maintain and protect such items at such secured location for so long as Sellers reasonably require in order to obtain all Permits necessary to remove or transport such items (or to sell or convey such items to a third party entitled to do so), (ii) Sellers will have reasonable access to such secured location to maintain and protect such items and when appropriate remove such items from the Store, and (iii) Sellers will have the right but not the obligation to require Buyer or Ultimate Purchaser, as applicable to purchase such items at the Inventory Price allocable to such items, at such time as Buyer has obtained such Permits as are required for Sellers to do so.

Section 3.5      Allocation of Base Purchase Price Among Assets at each Store. Prior to Closing, the parties shall mutually agree as to the specific allocation of the Base Purchase Price to the Assets in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder and such allocation shall be further confirmed by the parties in writing at Closing (the "**Closing Allocation**").  Each of the parties agrees to report each purchase and sale transaction hereunder for state and federal tax purposes in a manner consistent with the Closing Allocation, including the filing of a Form 8594 with the Internal Revenue Service reflecting such allocation in accordance with Treasury Regulation Sections 1.1060-1 and 1.1060-1T.  Neither Buyer nor Sellers shall take any position (whether in audits, tax returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.  If any state or federal taxing authority challenges such allocation, Buyer and Sellers shall cooperate in good faith in responding to such challenge.  Sellers shall give prompt written notice to Buyer of any such challenge.  Notwithstanding the allocation of the Base

Purchase Price set forth in the Closing Allocation, nothing in the foregoing shall be determinative of values ascribed to the Assets or the allocation of the value of the Assets in any plan of reorganization or liquidation that may be proposed or any structured dismissal order agreement entered into and the Sellers reserve the right on their behalf and on behalf of the Sellers' estates, to the extent not prohibited by applicable law and accounting rules, for purposes of any plan of reorganization or liquidation or structured dismissal, to ascribe values to and allocate the value of the Assets.

Section 3.6    <u>Bid Protections and Break-Up Fee</u>.  See <u>Exhibit L</u> attached hereto and incorporated herein by this reference.

Section 3.7    <u>Credit Bid Rights</u>.    Buyer shall be allowed to credit against the Base Purchase Price any amounts outstanding with respect to the Obligations at the time of the Closing.

Section 3.8    <u>Buyer's Agreement to act as Back-Up Purchaser for 8700 Hickman Real Property</u>.  In the event that the separate sale of the 8700 Hickman Real Property to the 8700 Hickmann Purchaser should fail to close by March 2, 2015, Buyer agrees to act as a back-up purchaser (the "**Back-Up Purchaser**") solely with respect to the 8700 Hickman Real Property (which purchase shall include any Improvements associated with the store located at the 8700 Hickman Real Property, but exclude any Inventory or Equipment) for a purchase price of **$1 million** and under the same terms and conditions of this Agreement (the "**Back-Up Purchase**").    In the event of a Back-Up Purchase, the Seller shall liquidate the Inventory and Equipment associated with the store at the 8700 Hickman Real Property on or before the Closing Date or by such date as mutually agreed by the Seller and Buyer in writing..

# ARTICLE 4

### BUYER'S DUE DILIGENCE

Section 4.1    <u>Right of Inspection</u>. Buyer acknowledges that prior to the Effective Date, it has had the opportunity to examine and investigate the Assets and the Leased Premises to the extent permitted by Sellers.  Furthermore, Buyer shall have the right at all reasonable times, after giving Sellers advance written notice and at Buyer's sole cost and expense, of going to the Store with its agents and engineers as needed to investigate and inspect the Assets to determine whether or not the same are in acceptable physical condition as determined by Buyer in its reasonable discretion, and to conduct a physical inventory of the Equipment located at the Store.  In no event shall Sellers be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection.  Notwithstanding anything contained herein to the contrary, Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Sellers.

Section 4.2    <u>Indemnification</u>. Buyer and Ultimate Purchasers, as applicable, hereby indemnify and agree to hold harmless Sellers from and against any and all damage to the Real Property and the Assets (including the cost of restoring the Real Property and the Assets to their pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's investigation under this Agreement.  Such indemnification will survive the

expiration or termination of this Agreement and/or the consummation of the Transaction.  The indemnity provided by an Ultimate Purchaser by this <u>Section 4.2</u> shall be limited solely to those Stores acquired by such Ultimate Purchaser.

Section 4.3    <u>Title</u>.  Buyer confirms and acknowledges that Sellers have represented that they have made all title information in its possession available to Buyer, and Buyer (at Buyer's sole expense) may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "**Title Policies**") at Closing.

Section 4.4    <u>Surveys</u>.  Sellers represent that Sellers have made available to Buyer for review, copies of all surveys relating to the Stores and/or Leased Premises which are in their possession or under its control.

Section 4.5    <u>Environmental Reports</u>.  Sellers represent that they have made, or will make, available to Buyer for review copies of all environmental reports in the possession of (or within or under the control of) Sellers or any Affiliate thereof relating to any of the Stores.

# ARTICLE 5

**REPRESENTATIONS AND WARRANTIES OF SELLERS RELATING TO THE ASSETS**

Section 5.1    <u>Representations and Warranties of Sellers Relating to the Assets</u>. In addition to any representations and warranties contained elsewhere in this Agreement, Sellers hereby make the following representations and warranties (subject, however, to any exceptions noted on <u>Exhibit K</u> to this Agreement, which Exhibit will specifically refer to the applicable representation for each item listed) to and for the benefit of Buyer and the Ultimate Purchaser and their respective successors and assigns, in connection with the Assets, each of which warranties and representations (a) is being relied upon by Buyer and the Ultimate Purchaser, and (b) is true in all respects as of the date hereof (or such other date as may be indicated).

Section 5.2    <u>Leases and Sublease Agreements</u>.  On or prior to the Effective Date, or as soon as reasonably practical thereafter, Sellers have delivered/will deliver to Buyer or made available to Buyer for review, in hard copy, in electronic format or otherwise:  (i) copies of each of the Leases (including amendments with respect thereto) and Subleases as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Sellers:

(a)    copies of the site plans for the Stores;

(b)    copies of the fixture plans for the Stores; and

(c)    a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Sellers' current records.

Section 5.3    <u>Ownership</u>.  At Closing, subject to <u>Bankruptcy</u> Court Approval, Sellers will own and convey the Assets free and clear of all liens, claims and encumbrances other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code and the Sale Order.

Section 5.4    Lease Defaults.  Except for proceedings pending in the Bankruptcy Court in the Bankruptcy Cases, there is no action, suit or proceeding pending between Sellers and any Landlord with respect to any Lease or between Sellers and any sublessee with respect to any Sublease.   In addition, other than defaults that may have arisen on account of the commencement of the Bankruptcy Cases, to Sellers' knowledge, after due inquiry, there is not any material default on the part of any party to any Lease or Sublease or any event that with notice or lapse of time would constitute such a default.

Section 5.5    Warranties and Guaranties.   To Sellers' knowledge, after due inquiry, Exhibit P to this Agreement includes a true and correct summary of all Warranties and Guaranties concerning any of the Assets.

Section 5.6    Taxes.  To Sellers' knowledge, after due inquiry, all sales, excise, payroll, personal property, license, transaction, privilege, rental and real property taxes arising after the Filing Date due and payable in connection with Sellers' ownership or operation of the Assets prior to the Closing have been, or at the Closing will be paid in the ordinary course of business, except to the extent escrowed by consent of Sellers and Buyer, or credited to the Buyer or Ultimate Purchaser, as applicable and as the case may be, at Closing.

Section 5.7    Insurance.  To Sellers' knowledge, after due inquiry, Sellers have not received any notice or request from any insurance company or Board of Fire Underwriters or governmental agency, department, bureau or other entity requiring or demanding the performance of any work or alteration with respect to the Assets.  To Sellers' knowledge, the Assets are insured by Sellers or for Sellers' benefit, and will be so insured until possession is given to Buyer or the Ultimate Purchaser, in amounts and against risks deemed adequate by Sellers, subject to any deductibles and/or levels of self-insurance consistent with the ordinary course of business of Sellers.

# ARTICLE 6

## BUYER'S REPRESENTATIONS AND WARRANTIES

Section 6.1    Buyer represents and warrants to Sellers as follows:

(a)    Organization and Authority.  AWG is a corporation duly organized, validly existing and in good standing under the laws of the State of Kansas and has the power and authority to consummate the transactions contemplated hereunder.  This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

(b)    Permits.  No Permits are or will be required in connection with the execution, delivery or performance by Buyer or any Ultimate Purchaser of this Agreement or any closing document to which Buyer or any Ultimate Purchaser, as applicable, is or is to become a party or the transactions herein or therein contemplated.

(c)    Binding Effect.  This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in

accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(d)    Litigation. There is no action, suit or proceeding pending or, to the knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

(e)    Bankruptcy. There are no bankruptcy, reorganization, insolvency, or arrangement proceedings pending against, being contemplated by, or to the knowledge of Buyer, threatened against, Buyer.

(f)    No Contravention. Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or, by which it, or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing or transaction documents contemplated herein to which Buyer is or is to become a party.

(g)    Availability of Funds. As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

## ARTICLE 7

### COVENANTS OF SELLERS

Sellers hereby covenant for the benefit of Buyer as follows:

Section 7.1    Conduct of Business.  Sellers will (a) subject to any restrictions imposed by the Bankruptcy Code or any order issued by the Bankruptcy Court, conduct their businesses in the ordinary course through Closing; (b) except as otherwise agreed to by Buyer and Sellers, maintain adequate levels of Inventory, and keep on all utilities and Equipment at the Stores and any related facilities until the Closing; (c) use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, including but not limited to retaining and utilizing until the Closing all service contracts relating to equipment maintenance, cleaning, pest control and waste removal; (d) not give any raises to employees working in the Stores, except pursuant to regular annual reviews and consistent with raises in prior years and except for additional compensation to provide incentives to such employees to remain employed at the Stores at least until Closing and excepting any severance or retention packages or

compensation (as approved by the Bankruptcy Court) for employees terminated in the ordinary course of business; and (e) not without prior written consent of Buyer (i) engage in any extraordinary transactions with respects to the Assets; (ii) cease or (except as otherwise contemplated in this paragraph) curtail operations at any of the Stores and, except with respect to any particular Stores in which Store operations were suspended prior to the Effective Date, will continue operation of the Stores, (iii) sell, dispose of, abandon or remove from any Store any of the Assets; (iv) materially change their pricing strategy with respect to Inventory, including abandonment or termination of any "sale" or discount programs, in a manner inconsistent with present practice except as otherwise contemplated by this paragraph; or (v) display signs indicating that Sellers are moving their operations or closing their business, or conduct any going out of business or liquidation sales relating to the Inventory (as contrasted to the Excluded Inventory) or agree to do so except in the ordinary course of business; *provided, however*, it is expressly acknowledged and understood that, following the Effective Date, Sellers will take certain actions to wind up their operations (including related marketing, promotions and advertising with regard to the sale of Excluded Inventory) at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Inventory Counts, Closings and the turnover of possession to Buyer or Ultimate Purchaser.

Section 7.2    Removal of Excluded Assets.    Unless Sellers elect to abandon all or a portion of the Excluded Personal Property, Sellers will use commercially reasonable efforts to remove all non-abandoned Excluded Personal Property, except vendor leased equipment, from the Stores on or before the Closing Date but in any event no later than forty-eight (48) hours after the Closing Date; provided, however, Buyer will reasonably cooperate with Sellers' requests for access to thereafter complete such removal (such removal to be conducted in such a manner as not to materially interfere with Buyer's operation of the Store and Sellers to be responsible for all damage or injury caused by such removal).  Sellers shall notify Buyer in writing on or within five (5) Business Days prior to the Closing Date as to which items of Excluded Personal Property they intend to abandon. This Section 7.2 shall survive Closing.

Section 7.3    Estoppel Certificates.    Sellers will use reasonable commercial efforts to cooperate with Buyer in obtaining from each of the Landlords an estoppel certificate substantially in the form of Exhibit Q to this Agreement or in such substantively similar form as may be provided for under the particular Assumed Lease or Sublease ("**Estoppel Certificate**"). Notwithstanding anything herein to contrary, obtaining any particular Estoppel Certificate shall not be a condition precedent to Closing

Section 7.4    Title Documents.    Sellers will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.  The cost of any Title Policies shall be the obligation of Buyer and/or Ultimate Purchaser, as applicable.

Section 7.5    Maintenance of Assumed Contracts.    From the date Buyer advises Sellers in writing of the identity of a Contract that Buyer intends to make an Assumed Contract, through and including the Closing Date, Sellers shall perform any and all obligations imposed upon it under such Assumed Contract.

Section 7.6    Location of Equipment.    Sellers agree that the Equipment located in the Stores shall remain in each respective Store through the Closing Date.  No Equipment will be moved by or at the direction of Sellers between and among the Stores or any other store or

property owned, operated or closed by Sellers or any of their Affiliates, unless otherwise agreed to by Buyer in writing.

Section 7.7    <u>Access to Premises and Properties</u>.  Sellers agree that Buyer and/or the Ultimate Purchaser may access the Stores up to five (5) days prior to Closing for purposes of preparing for installation of new point of sale equipment, including, without limitation, laying computer cables therefore; provided that such access does not materially interrupt business at the Stores.

Section 7.8    <u>Acquisition of Title to Leased Equipment</u>.  On or before the delivery to Buyer of the Equipment that is currently leased, Sellers shall cooperate with and assist Buyer and the Ultimate Purchasers with respect to Buyer's and the Ultimate Purchasers' efforts, should any of them so choose, to obtain, at such Ultimate Purchasers' expense, good, marketable and unencumbered title to such Equipment or their own lease of such Equipment from the lessor.

Section 7.9    <u>Employee Information; Interviews</u>.  On the Effective Date, or as reasonably practicable thereafter, Sellers will release to Buyer a list of each of Sellers' employees employed at each Store, indicating rate of pay, number of employees enrolled in Sellers' health and welfare benefit plan, position title and hire or re-hire date as shown in Sellers' books and records (provided no representation is made as to the accuracy or completeness of such information), and will permit Buyer or the Ultimate Purchaser, at reasonable times during normal business hours after forty-eight (48) hours prior notice and with minimum impact on Sellers' business, to arrange for personal interviews with Store managers and other Store employees ("**Store Employees**"), at times and places mutually agreeable to Sellers and Buyer and/or the Ultimate Purchaser, and to arrange for those relevant employees of Sellers, who are interested, to interview with Buyer or the Ultimate Purchaser.  For the avoidance of doubt, nothing in this <u>Section 7.9</u> shall obligate Sellers to provide Buyer or Ultimate Purchaser information otherwise protected by the Health Insurance Portability and Accountability Act of 1996.  Notwithstanding and in limitation of the foregoing, any and all contact and interviews by and between Buyer (or Ultimate Purchaser) and Store Employees may only occur within the Designation Period, unless otherwise agreed to by the parties in writing.

Section 7.10    <u>No Obligation of Buyer as to Employees</u>.  Sellers will have the sole and absolute responsibility for any financial or other commitments to their employees including, without limitation, any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, without limitation, any withdrawal liability) or any local, state or federal law, rule or regulation (including, without limitation, the Worker Adjustment and Retraining Notification Act).  Neither Buyer or Ultimate Purchaser shall have any contractual or other obligation with respect to hiring, offering to hire or employing any of Sellers' employees.  In no event shall Buyer or Ultimate Purchaser be obligated to commit to any particular usage of employees or to any particular benefits or wage rates.  Nothing contained herein shall be deemed an admission that Sellers has any financial obligation to employees or that obligations, if any, are entitled to a particular treatment or priority under the Bankruptcy Code.  Sellers' failure to pay an obligation, if any, under this <u>Section 7.10</u> shall not be a default under this Agreement.

Section 7.11    <u>Termination.</u>

(a)     Sellers will transfer or terminate all of their employees working at each Store effective as of the Closing Date.  Sellers will have no obligation to terminate any employee to the extent such termination violates the Family Medical Leave Act with such employee remaining an employee of Sellers; however, neither Buyer nor any Ultimate Purchaser shall have an obligation to hire any such current or former employees of Sellers.

(b)     Following the Effective Date with respect to a Store or Stores and prior to the Closing Date, except as provided for or required by a collective bargaining agreement, Sellers will not and will cause their Affiliates to not transfer, without written consent of Buyer, any Store Employees of such Store or Stores prior to Buyer or the Ultimate Purchaser having completed interviewing such Store Employees, and having provided Sellers a list of Store Employees that Buyer or the Ultimate Purchaser have chosen not to hire on the Closing Date, which Buyer covenants to do as soon as reasonably practicable.

(c)     Furthermore, Sellers shall not enter into any agreements or other arrangements with Store Employees that will preclude or create a disincentive to Store Employees from being employed by Buyer or the Ultimate Purchaser.

Nothing herein expressed or implied is intended to confer upon any Store Employee or his or her legal representatives any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement, including without limitation, any rights of employment for a specified time period.  Buyer and the Ultimate Purchaser shall not have any liability with respect to claims of Store Employees arising from Sellers' conduct prior to or as of the Closing.  Sellers shall have no liability with respect to claims of Store Employees hired by Buyer or the Ultimate Purchaser arising from Buyer's conduct after the Closing. Sellers will proceed diligently and use commercially reasonable efforts to obtain the entry of the Sale Order as to the Stores in a form acceptable to Buyer.

Section 7.12   Wages, Severance and Other Obligations.   Prior to the Closing, Sellers will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Stores, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Sellers in connection with Sellers' winding up of their operations at the Stores.  As between Sellers, Buyer, and the Ultimate Purchaser, Sellers shall be liable to Store Employees for all wages, severance benefits, accrued vacations, unpaid sick, holiday pay and bonuses, and other obligations of any kind whatsoever, that accrue through and including the Closing and shall hold Buyer and the Ultimate Purchaser harmless from any and all such liabilities to such Store Employees.  Sellers will pay to Store Employees when due all earned and accrued vacation and bonuses relating to periods prior to the Closing Date.  The Ultimate Purchaser shall be liable to any Store Employees whom it hires for all wages and benefits that accrue after the Closing.  Sellers agree they shall not increase salaries to Store Employees, except in the ordinary course of business consistent with their policies and past practices, or establish new bonus programs for Store Employees after the execution of this Agreement, except for additional compensation to provide incentives to such employees to remain employed at the Stores at least until Closing.

## ARTICLE 8

### COVENANTS OF BUYER

Section 8.1    Buyer hereby covenants for the benefit of Sellers as follows:

(a)    <u>Title Documents</u>.  Buyer or the Ultimate Purchaser, as applicable will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with Closing and the issuance of the Title Policies.

(b)    <u>Consents</u>.  Buyer or the Ultimate Purchaser, as applicable will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer and Ultimate Purchaser, as applicable, are or are to become a party and to attain the fulfillment of the conditions set forth herein, including without limitation all Permits necessary for Sellers to sell and Buyer and Ultimate Purchaser, as applicable, to buy the Assets.

(c)    <u>Cooperation</u>.  Buyer will, or will cause the Ultimate Purchaser to, (a) furnish to Sellers such necessary information and reasonable assistance as Sellers may reasonably request in connection with their preparation of any filing, registration or declaration that is necessary under any law or regulation, information necessary to establish adequate assurance of future performance as contemplated by Section 365 of the Bankruptcy Code, for the consummation of the transactions contemplated hereby, (b) keep Sellers apprised of the status of any communications with, and any inquiries or requests for additional information from, any governmental authority, and will comply promptly with any such inquiry or request, (c) use its best efforts to obtain any consent, approval, order or authorization of any governmental authority necessary in connection with the transactions contemplated hereby or to resolve any objections that may be asserted by any governmental authority with respect to such transactions, including by executing agreements and submitting to judicial or administrative orders to hold separate or divest assets constituting a part of the Assets, and (d) in the event any claim, action, suit, investigation or other proceeding by any Person is commenced that questions the validity or legality of any of the transactions contemplated hereby or seeks damages in connection therewith, cooperate with Sellers and use all reasonable efforts to defend against such claim, action, suit, investigation or other proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, use all reasonable efforts to have such injunction or other order lifted.

(d)    <u>Sellers' Employees</u>.  To the extent that Buyer continues to operate each Store, subject to <u>Section 7.10</u>, Buyer will permit all persons employed by Sellers at each Store as of the date of this Agreement to apply for employment with Buyer.

(e)    <u>Additional Actions</u>.  Buyer will use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with Sellers in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. Buyer shall promptly upon request by any other party, (a) correct any manifest defect or error that may be discovered in this Agreement or any other agreement, instrument or document relating to the transactions contemplated by this Agreement or in the execution, acknowledgment, or recordation of this Agreement or any such other agreement, instrument or document, (b) execute and deliver to the other party such further instruments of transfer, assignment and conveyance and take such other action as the other party may reasonably require to more effectively carry out and consummate the transactions contemplated, but only to the extent contemplated, by this Agreement and any other agreement, instrument or document

relating to the transactions contemplated by this Agreement, (c) perform all respective acts or refrain from performing all respective omissions contemplated herein during the period from the signing of this Agreement through the Closing Date or such later date as may be specifically set forth herein, and (d) proceed diligently and use reasonable commercial efforts to cause the satisfaction of all conditions precedent contained herein as expeditiously as possible.  Buyer agrees to use its best efforts to coordinate the timing of the Closing and other Closing mechanics with Sellers so as to permit the transfer of the Assets and other assets to the Buyer.

(f)    <u>Adequate Assurances</u>.  Buyer or Ultimate Purchaser, as applicable, agrees to provide Adequate Assurance Information to Sellers, the Bankruptcy Court, Landlords and Subtenants as may be requested.  In addition, Buyer shall provide and shall cause each Ultimate Purchaser to provide to Sellers a declaration in the form of <u>Exhibit H</u> hereto (or otherwise reasonably satisfactory to Sellers).

(g)    <u>Personally Identifiable Information</u>.  To the extent that Sellers disclose to Buyer prior to Closing any policies of Sellers in effect on the Filing Date prohibiting the transfer of personally identifiable information about individuals, Buyer shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all such policies and otherwise comply with the requirements of Section 363(b)(l)(A) of the Bankruptcy Code.

(h)    <u>Required Permits</u>.  Buyer or the Ultimate Purchaser, as applicable shall make all filings necessary to obtain the transfer of, or replacement permit for, each Permit prior to the Closing.

(i)    <u>Sellers' Access to Files and Records</u>. Following the Closing, Sellers shall have a right of reasonable access to the Files and Records sold to and actually received by Buyer so that Sellers may fully administer their bankruptcy estates.

(j)    <u>HIPAA Privacy Standards</u>. After the Closing, Buyer shall make the Pharmacy Records available for access and amendment to individuals in accordance with the Health Insurance Portability and Accountability Act privacy standards (the "**HIPAA Privacy Standards**") and other applicable laws.  To the extent Buyer is able to do so based on Sellers' documentation, Buyer shall respond to individuals' requests for accountings of disclosures of protected health information for periods prior to the Closing in accordance with all requirements of the HIPAA Privacy Standards.  In addition, Buyer shall maintain the Pharmacy Records and all protected health information transferred by Sellers in accordance with the Health Insurance Portability and Accountability Act security standards governing electronic protected health information.  Sellers acknowledge and agree that, notwithstanding the foregoing, Buyer shall not assume any legal obligations of Sellers under the HIPAA Privacy Standards relating to uses and disclosures of protected health information prior to the Closing, except for any obligations of the Sellers resulting from Buyer's unauthorized intentional and/or negligent disclosure of protected health information to third parties after the Closing.  All inquiries and responses by Buyer relating to patient rights under HIPAA Privacy Standards relating to uses or disclosures of health information made prior to the Closing shall be forwarded to Sellers.

# ARTICLE 9

## CONDITIONS PRECEDENT

Section 9.1    The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to each Store, including each of the following (any of which may be waived by Buyer or the Ultimate Purchaser in Buyer's, or the Ultimate Purchaser's, sole discretion, unless otherwise stated herein):

(a)    Covenants.  Sellers will have performed all of their covenants contained in this Agreement, and all of Sellers' representations and warranties contained in this Agreement, will be true and accurate in all material respects on the Effective Date and as of the Closing Date, as applicable and as the case may be, and Sellers will have executed and delivered a certificate to that effect as contemplated by Section 13.2(h) of this Agreement.

(b)    No Governmental Proceedings or Litigation.  No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to each Store will be in effect.

(c)    Entry of Sale Order.  The Sale Order with respect to the Stores shall have been entered by the Bankruptcy Court on or before January 26, 2015 or an alternate date mutually agreed to by the parties in writing, in the form attached hereto as Exhibit J or with such modifications thereto as are reasonably satisfactory to Buyer and Sellers and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

(d)    [Reserved]

(e)    Lift of Stays.  The stays imposed by Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

Section 9.2    Conditions Not Met.  If any of the foregoing conditions have not been satisfied or waived on or before the Closing Date, then Buyer shall have the right to terminate this Agreement and receive a refund of the Deposit; *provided, however*, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Sellers, then Buyer's and Sellers' respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with Article 15 of this Agreement.

# ARTICLE 10

### CONDITIONS PRECEDENT TO SELLERS' OBLIGATIONS

The obligations of Sellers under this Agreement as to the Stores are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to the Stores, including each of the following (any of which may be waived by Sellers in their sole discretion, unless otherwise stated herein):

Section 10.1    Covenants.  Buyer will have performed all of its covenants contained in this Agreement, and all of Buyer's representations and warranties contained in this Agreement, will be true and accurate in all material respects on the Effective Date and as of such

Closing Date and Buyer will have executed and delivered a certificate to that effect as contemplated by <u>Section 13.3(h)</u> of this Agreement.

Section 10.2   <u>No Governmental Proceedings or Litigation</u>.  No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to any of the Stores will be in effect.

Section 10.3   <u>Entry of Sale Order</u>.  The Sale Order with respect to the Stores shall have been entered by the Bankruptcy Court in a form attached hereto as <u>Exhibit J</u> or with such modifications thereto as are reasonably satisfactory to Buyer and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

Section 10.4   <u>Lift of Stays</u>.  The stays imposed by Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

Section 10.5   <u>Payment</u>.  Buyer or Ultimate Purchaser, as applicable, shall have paid the Purchase Price in accordance with <u>Article 3</u> hereof, and as otherwise contemplated by this Agreement, subject to the prorations and adjustments provided for herein.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Sellers shall have the right to terminate this Agreement pursuant to <u>Section 14.1</u> of this Agreement; *provided, however*, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Sellers, then Buyer's and Sellers' respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>Article 15</u> of this Agreement.

# ARTICLE 11

### LOSS BY FIRE OR OTHER CASUALTY; CONDEMNATION

Section 11.1   <u>Loss, Casualty and Condemnation</u>.  In the event that, prior to a Closing, the relevant Assets or any material part thereof related to any Store, are destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the relevant Real Property, Buyer or the Ultimate Purchaser will have the right, within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Assets affected by such loss, and thereafter none of the parties will have any further rights or obligations hereunder as to such Assets; <u>provided</u>, <u>however</u>, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, except as otherwise provided herein, that Buyer will be entitled to the return from the Escrow Agent of the portion of the Deposit attributable to such Store or Stores.  If Buyer does not exercise its right of termination with respect to the Assets affected by such casualty or proceeding and the Assets are sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Sellers will assign to Buyer or the Ultimate Purchaser any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over

and deliver to Buyer or the Ultimate Purchaser any such proceeds or compensation received by it.

# ARTICLE 12

## TURN OVER OF POSSESSION AND UTILITIES

Section 12.1    Possession.  Sellers will turn over exclusive physical possession of each Store and the Assets associated therewith, (including, to the extent in Sellers' possession, control or custody), including all keys, combinations to safes, security codes and passwords, to Buyer or the Ultimate Purchaser, as Buyer may direct, at the conclusion of the Inventory Count provided that the Inventory Count commences no earlier than the close of business on the day immediately preceding the Closing Date; otherwise at the commencement of Closing Date. After conclusion of the Inventory Count, or upon Closing, whichever is earlier, Buyer or the Ultimate Purchaser may commence preparation for opening of such Store as a Buyer's or Ultimate Purchaser's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and continuing electrical and wiring work required in order to install Buyer's or the Ultimate Purchaser's point of sale and other equipment, signage, etc.

Section 12.2    Utilities.  Buyer shall be authorized to use Sellers' utility accounts with respect to each Store pending Buyer's obtaining utility accounts in its own name, provided that if Buyer has not obtained utility accounts in its own name on or before seven (7) days after the Closing Date, Sellers shall be entitled to take any action to shut off any such utilities, and shall be entitled to seek a return of any bond securing any such utilities.  Nothing in this subsection shall affect or alter the proration of costs as provided for in Section 3.3 of this Agreement.  Notwithstanding the foregoing, the Buyer or Ultimate Purchaser shall use all commercially reasonable efforts to establish utility accounts in its own name(s), respectively, to be effective as of the Closing Date.

# ARTICLE 13

## CLOSING

Section 13.1    Closing Process.  The parties agree to set a Closing Date for the Stores mutually acceptable to the parties as soon as practicable following the satisfaction or waiver of all conditions to the Closing on such Closing Date other than deliveries and transfers to occur on the Closing Date, provided that the Closing must occur on or before March 31, 2015, or an alternate date mutually agreed to by the parties in writing, but in any event at least forty-five (45) days after entry of the Sale Order, or another date mutually agreed to by the parties in writing, and the full Purchase Price must be paid by Buyer to Sellers in accordance with the terms of this Agreement, but not later than said date.  The Closing will be conducted by use of an escrow administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and the Ultimate Purchaser and Sellers based on satisfaction of the terms and conditions of this Agreement.  Upon the Closing, title to the Stores and related Assets shall be transferred by Sellers to Buyer.

Section 13.2    Sellers' Escrowed Items.  On or before the Closing Date, Sellers will, subject to the conditions contained in Article 10 of this Agreement, deliver the following ("**Sellers' Escrowed Items**") to Escrow Agent:

(a)    (i)    Two counterparts of a lease assignment or assignments, transferring the Leases to Buyer or the Ultimate Purchaser, as Buyer shall direct executed by Sellers in such form as is attached hereto as Exhibit I ("**Lease Assignment**");

(ii)    Assignments and assumptions of any Subleases relating to the Stores, substantially in the form of Sublease Assignment set forth in Exhibit E attached hereto and incorporated herein by this reference (the "**Sublease**"), executed by Sellers to Buyer or the Ultimate Purchaser as Buyer shall direct;

(iii)    An assignment and assumption of Warranties and Guaranties executed by Sellers to Buyer or the Ultimate Purchaser as Buyer shall direct, in the form set forth in Exhibit P attached hereto and incorporated herein by this reference (the "**Warranties and Guaranties Assignment**").

(iv)    An assignment and assumption of Assumed Contracts executed by Sellers to Buyer or the Ultimate Purchaser as Buyer shall direct, in the form set forth in Exhibit Q attached hereto and incorporated herein by this reference (the "**Assumed Contracts Assignment**").

(v)    The Bill of Sale, executed by Sellers in favor of Buyer or Ultimate Purchaser, as Buyer shall direct;

(vi)    Two counterparts of the Closing Statement, executed by Sellers;

(vii)    Non-Foreign Tax Certification (FIRPTA);

(viii)    Owner's Affidavit as required by the Title Insurer with regard to the Owned Real Property; and

(ix)    A Special Warranty Deed in the form set forth in Exhibit T attached hereto and incorporated herein by this reference

(b)    Such other instruments as are reasonably required by any applicable Title Insurer.

(i)    A certificate from an officer of Sellers certifying that all representations and warranties of Sellers contained in this Agreement are true and correct as of the Closing Date;

(ii)    To the extent not previously provided to Buyer or Ultimate Purchaser, original Leases and Subleases or, in the event Sellers do not possess originals of the same, copies thereof; and

(iii)    Any other documents, instruments or agreements called for hereunder for delivery by Sellers with respect to the Stores that have not previously been delivered.

Buyer may waive compliance by Sellers as to any of the foregoing items.  At Buyer's direction, Sellers will prepare the conveyance instruments and other documents required hereby for conveyance directly to the Ultimate Purchaser.

Section 13.3    Buyer's Escrowed Items.  On or before the Closing Date Buyer will deliver the following ("**Buyer's Escrowed Items**") to Escrow Agent:

(a)    Two counterparts of the Lease Assignment(s), executed by Buyer or the Ultimate Purchaser, as applicable;

(b)    Any Sublease Agreement Assignments;

(c)    Two counterparts of a closing statement, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(d)    The Assumed Contracts Assignment, if any, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(e)    Two counterparts of the Closing Statement, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(f)    Such other instruments as are reasonably required by any applicable title company;

(g)    Any other documents, instruments or agreements called for hereunder for delivery by Buyer or Ultimate Purchaser or required to facilitate the transactions outlined herein;

(h)    A certificate from an officer of the applicable Ultimate Purchaser, certifying that all representations and warranties of Buyer  contained in this Agreement as to the Applicable Store are true and correct as of the Closing Date, in such form as is attached hereto as Exhibit O; and

(i)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to this Agreement.

Sellers may waive compliance by Buyer as to any of the foregoing items.

Section 13.4    Delivery and Escrowed Items.  At the Closing, with respect to each Store, Sellers will direct Escrow Agent to deliver Sellers' Escrowed Items to Buyer and Buyer will direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Sellers.

Section 13.5    Closing Costs.  At Closing, Buyer shall pay all fees and costs of Buyer's counsel related to the transactions outlined herein, one-half of the fees and costs of the Escrow Agent, one-half of the fees and costs of the Inventory Service, all costs associated with Buyer's investigations of the Assets, all premiums associated with any Title Policies, and all costs related to obtaining any required Permits.  For the avoidance of doubt, the closing costs to be paid by Buyer shall be not offset, deducted or otherwise reduce the Purchase Price.  At Closing, Sellers shall pay all fees and costs of Sellers' counsel related to the transactions outlined herein, one-half of the fees and costs of the Escrow Agent, one-half of the fees and costs of the Inventory Service and any commissions payable to Sellers' Brokers, if any.

SLC-7413198-1

# ARTICLE 14

**TERMINATION**

Section 14.1    <u>Termination</u>.    This Agreement may be terminated, and the transactions contemplated hereby abandoned, only as follows:

(a)    by mutual written consent of Sellers and Buyer, in which case the applicable portion of the Deposit shall be disbursed as provided in such written consent;

(b)    [reserved]

(c)    at the election of Sellers, if and to the extent permitted under <u>Section 15.1</u> of this Agreement, in which case the applicable portion of the Deposit shall be disbursed as provided in such <u>Section 15.1</u>;

(d)    at the election of Buyer if and to the extent permitted under <u>Section 15.2</u> of this Agreement, in which case the applicable portion of the Deposit shall be disbursed as provided in such <u>Section 15.2</u>;

(e)    at the election of Sellers, if any of the conditions set forth in <u>Article 10</u> of this Agreement has not been satisfied or waived by Sellers on or before the Outside Date, in which case Sellers shall direct Escrow Agent to return the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Sellers, then Buyer's and Sellers' respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>Section 15.1</u> of this Agreement;

(f)    at the election of Buyer upon occurrence of any of the following: (a) Sellers' failure to obtain entry of the Sale Order on or before January 26, 2015 or the alternate date as otherwise agreed to by the parties in writing; or (b) entry of an order approving a sale or plan that contemplates the sale of the Assets to any Person that is not the Buyer (except as specifically permitted and subject to the terms and conditions in Section 3 hereof), in which, in the case of (a) or (b), Sellers shall direct Escrow Agent to return the Deposit to the Buyer;

(g)    except as provided in <u>Section 11.1</u>, at the election of Sellers as to all Stores if the Bankruptcy Court denies Bankruptcy Court Approval in which case Sellers shall direct Escrow Agent to return the entire portion of the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Sellers' respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>Section 15.1</u> of this Agreement;

(h)    by Buyer if the Bankruptcy Court enters an order approving any transaction inconsistent with the terms of this Agreement (an "**Alternate Transaction**") (other than the sale of the Assets to Buyer) or if Sellers (i) seek or support Bankruptcy Court approval of an Alternative Transaction (other than to or by Buyer) or a Chapter 11 plan contemplating the sale or retention of the Assets in a manner substantially inconsistent with the terms of this Agreement or (ii) execute and deliver an agreement or understanding of any kind with respect to any proposed Alternate Transaction; or

(i)      Notwithstanding anything to the contrary contained in this Agreement, each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyer for the Assets related to the Stores, and is to be considered as a whole, and (ii) Sellers shall not be permitted to terminate this Agreement with respect to any particular Store or Stores.

## ARTICLE 15

### DEFAULTS AND REMEDIES

Section 15.1    Buyer's Default.    If the Closing is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated due to Buyer's breach of this Agreement, then Sellers shall be entitled, as their sole and exclusive remedy for such breach, (A) to terminate this Agreement and (B) to receive the Deposit (collectively, the "**Liquidated Deposit**") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Sellers in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Sellers' right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Liquidated Deposit as full liquidated damages is Sellers' sole and exclusive remedy in the event of breach of this Agreement by Buyer with respect to the Terminated Stores, and Sellers hereby waive and release any right to (and Sellers hereby covenant that they shall not) sue Buyer with respect to this Agreement or any Asset contemplated to be purchased hereunder: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.

Section 15.2    Default by Sellers.  If the sale is not consummated due to Sellers' breach of this Agreement, or if this Agreement is terminated due to Sellers' breach of this Agreement, then Buyer and Ultimate Purchaser shall be entitled, as their sole and exclusive remedy for such breach, to receive the return of the Deposit and, as to Buyer only, immediate payment of the Break-Up Fee, which return and payment shall operate to terminate this Agreement and release Sellers from any and all liability under this Agreement.  Buyer and Ultimate Purchaser expressly waive and release (i) any right to seek specific performance of Sellers' obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages.

Section 15.3    Notice of Default; Opportunity to Cure.  Neither Sellers nor Buyer shall be deemed to be in default hereunder with respect to a curable default until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within five (5) Business Days after receipt of such notice; *provided, however*, that this Section 15.3 (i) shall not be applicable to a party's failure to make any deliveries required of such party on the Closing Date and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

Section 15.4    Limitation of Claims.  Notwithstanding anything contained herein to the contrary, any claim, demand or cause of action against Sellers or Buyer (or any Ultimate Purchaser) related to any alleged breach of this Agreement or a breach of a surviving representation, warranty or covenant hereunder must be brought, if at all, within one hundred eighty (180) days after the Closing Date, after which period all such claims, demands or causes of action shall be forever barred and are hereby prospectively waived and released.

## ARTICLE 16

**MISCELLANEOUS**

Section 16.1  <u>Notices</u>.  All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this <u>Section 16.1</u> and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; or (ii) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Sellers or Buyer at their respective addresses stated below:

|               |                                          |
|---------------|------------------------------------------|
| If to Sellers: | Dahl's Foods, Inc.                      |
|               | Attn: Craig Moore                        |
|               | 4343 Merle Hay Road                      |
|               | Des Moines, IA 50310                     |
|               | Telephone:  (515) 278-1657               |
|               | Fax:  (515) 278-0012                     |
|               | craig.moore@dahlsfoods.com               |
|               |                                          |
| With a copy to: | Jeffrey D. Goetz                       |
|               | Bradshaw, Fowler, Proctor & Fairgrave, P.C. |
|               | 801 Grand Avenue                         |
|               | Suite 3700                               |
|               | Des Moines, IA 50309-8004                |
|               | Telephone: (515) 243-4191                |
|               | Facsimile:  (515) 246-5808               |
|               | goetz.jeffrey@bradshawlaw.com            |
|               |                                          |
|               | Roger Strong                             |
|               | Crowe & Dunlevy                          |
|               | 324 North Robinson Avenue                |
|               | Suite 100                                |
|               | Oklahoma City, OK 73102                  |
|               | Telephone: (405) 235-7700                |
|               | Facsimile:  405.272.5255                 |
|               | roger.stong@crowedunlevy.com             |
|               |                                          |
| If to Buyer:  | Associated Wholesale Grocers, Inc.       |
|               | Attn: David Smith                        |
|               | 5000 Kansas Avenue                       |
|               | Kansas City, Kansas 66106                |
|               | Telephone:  913-288-1521                 |
|               | Facsimile:  913-288-1573                 |
|               | desmith@awginc.com                       |
|               |                                          |
| With a copy to: | General Counsel                        |
|               | Associated Wholesale Grocers, Inc.       |
|               | 5000 Kansas Avenue                       |

Kansas City, Kansas 66106
Telephone:  913-288-1511
Facsimile:  913-288-1573
cpuhl@awginc.com

or such other address as any party may from time to time specify by notice to the other.

Section 16.2   Notice of Certain Inquiries.   If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

Section 16.3   Brokers and Finders.   The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Sellers to The Food Partners ("**Sellers' Brokers**").   Sellers agree to pay all fees and commissions claimed by Sellers' Brokers pursuant to that certain agreement between Sellers and Sellers' Brokers.   Except for Sellers' Brokers, neither Sellers nor Buyer have dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.   Sellers and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Sellers' or Buyer's own acts, said indemnifications by Sellers and Buyer to survive the Closing or earlier termination of this Agreement.

Section 16.4   Transition Services Agreements.   After, and conditioned upon, the occurrence of the Closing, Buyer hereby agrees to engage the services of such officers and/or other representatives of the Seller (to be determined by the mutual agreement of the Parties) as consultants for certain transition advisory services pursuant to agreements to be executed between the engaged individuals as applicable.   In exchange for such services during the pendency of such agreement, the engaged individuals and the Buyer shall negotiate a reasonable compensation to be established in writing prior to commencement of the services.   Although not yet determined, any such officers or representatives of the Seller hereby reserve the right to enter into long-term employment agreements.

Section 16.5   Successors and Assigns.   This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

Section 16.6   Assignment.   Neither Sellers nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required, except that Buyer may assign its rights and obligations under this Agreement with respect to one or more designated Stores to the Ultimate Purchaser of such Stores provided that such Ultimate Purchaser assumes in writing all of the duties and obligations of Buyer hereunder with respect to such designated Stores; provided, however, any assignment by Buyer of its obligations to the Ultimate Purchaser will not relieve Buyer of its obligations hereunder, with

Sellers acknowledging and agreeing, however, that Buyer shall have no post-closing obligation to them in connection with any Assets (including, without limitation, any Lease) that is assigned or transferred to and assumed by an Ultimate Purchaser.  Buyer, shall have no obligation to provide adequate assurance of future performance pursuant to Section 365(f) of the Bankruptcy Code in connection with any Assumed Leases or Assumed Contracts which are to be assigned by Sellers to Ultimate Purchasers.   Buyer shall cause Sellers to be an intended third party beneficiary with respect to any and all agreements between Buyer and an Ultimate Purchaser pursuant to which any Ultimate Purchaser is assuming obligations of Buyer hereunder; provided that in the event of a default by an Ultimate Purchaser, Sellers shall have no rights or remedies other than the right to retain the applicable portion of any Deposit pursuant to <u>Section 16.1</u> hereof.

Section 16.7   <u>Amendments</u>.   Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Sellers and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

Section 16.8   <u>Governing Law</u>.  The application and effect of this Agreement as to any particular Store or Stores as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Iowa and the applicable provisions of the Bankruptcy Code.

Section 16.9   <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto, and  constitutes the entire agreement of the parties with respect to the matters contained herein.

Section 16.10  <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.

Section 16.11  <u>No Recordation</u>.   This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

Section 16.12  <u>Survival of Representations and Warranties</u>.   All of the representations, warranties and covenants contained in this Agreement or in any certificate delivered pursuant hereto shall be true as of the Closing Date, and shall not survive the Closing Date other than those representations, warranties or covenants which by their express terms are intended to survive or be performed after the Closing Date.

Section 16.13  <u>Further Assurances</u>.  Both before and after the Closing Date each party will cooperate in good faith with the other and will take all appropriate action and execute any documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder, provided they create no obligations inconsistent with the terms of this Agreement, and to provide the other party with such information and copies of such documents as such other party may reasonably request and that may be provided without, in the providing party's reasonable discretion, adverse effect or risk to the providing party other than any adverse effect or risk that is immaterial.

Section 16.14 <u>Multiple Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 16.15 <u>Invalidity</u>.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument and they shall be construed as if the invalid, illegal or unenforceable provision had never been present.

Section 16.16 <u>No Consequential or Punitive Damages</u>.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

Section 16.17 <u>Titles</u>.  The titles, captions or headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE 17

### WAIVER OF JURY TRIAL

Section 17.1   With respect to any matter properly before the Bankruptcy Court, Buyer and Sellers each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable.  Accordingly, Buyer and Sellers each knowingly, voluntarily and intentionally waives any right to such a trial by jury that any of them may have in the Bankruptcy Court with respect to any action relating to this Agreement or the transactions contemplated herein.

## ARTICLE 18

### CONSENT TO JURISDICTION

Section 18.1   THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Section 18.2   Buyer and Sellers further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in <u>Section 16.1</u> of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Sellers irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

## ARTICLE 19

### DISCLAIMERS AND WAIVERS

Section 19.1   **EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT HEREOF (THE "CONTRACT WARRANTIES"), SELLERS MAKE NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLERS OR THEIR AFFILIATES TO BUYER OR ULTIMATE PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.   BUYER AND ULTIMATE PURCHASER ACKNOWLEDGE AND AGREE THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLERS OR ANY AFFILIATE TO BUYER OR ULTIMATE PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, OR IN ELECTRONIC FORMAT) ARE PROVIDED TO BUYER OR ULTIMATE PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER OR ULTIMATE PURCHASER SHALL BE AT THE SOLE RISK OF BUYER OR ULTIMATE PURCHASER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER AND ULTIMATE PURCHASER ACKNOWLEDGE AND AGREE THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLERS OR ANY AFFILIATE TO BUYER OR ULTIMATE PURCHASER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER OR ULTIMATE PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLERS OR ANY AFFILIATE TO BUYER OR ULTIMATE PURCHASER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLERS, ANY AFFILIATE OF SELLERS NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLERS OR ANY AFFILIATE TO BUYER OR ULTIMATE PURCHASER SHALL HAVE ANY LIABILITY TO BUYER OR ULTIMATE PURCHASER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.**

Section 19.2   **EXCEPT FOR THE CONTRACT WARRANTIES, BUYER OR ULTIMATE PURCHASER UNDERSTAND AND AGREE THAT SELLERS ARE NOT MAKING AND HAVE NOT AT ANY TIME MADE ANY WARRANTIES OR**

REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLERS OR ANY AFFILIATE TO BUYER OR ULTIMATE PURCHASER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. BUYER OR ULTIMATE PURCHASER ACKNOWLEDGE AND AGREE THAT UPON CLOSING SELLERS SHALL SELL AND CONVEY TO BUYER AND BUYER OR ULTIMATE PURCHASER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS".  BUYER AND ULTIMATE PURCHASER HAVE NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLERS NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLERS OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLERS OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING OR IN ELECTRONIC FORMAT.

Section 19.3    No Assumption of Liabilities.  This Agreement constitutes a sale of certain assets of Sellers only and is not a sale of any stock in any entity comprising Sellers.

(a)    By entering into this Agreement or performing any act or agreement hereunder, except as expressly set forth herein, Buyer does not assume any obligations or liabilities of Sellers or the Ultimate Purchaser and shall not be responsible for the payment of any liabilities of or obligations of Sellers or the Ultimate Purchaser whatsoever, including, without limitation, the following:

(i)    Claims by Sellers' employees, former employees or others under any contract, agreement or the like or any state, Federal, local or other laws, statutes, executive order, regulations, ordinances, codes or the like including, but not limited to, claims in connection with employee wages, vacation pay, severance pay, holiday pay, sick leave pay, detrimental reliance claims, implied contract claims, WARN notice claims, worker's compensation claims, ERISA claims, COBRA claims, Civil Rights Laws claims, claims under the Fair Labor Standards Act or Labor Management Relations Act, Americans With Disabilities Act, Family Medical Leave Act, employment discrimination claims of all types, claims regarding health and welfare benefits or premiums, sexual harassment claims, disability claims, Family and Medical Leave Act claims, pension fund

liability (whether for current or unfunded accrued liabilities), claims or other problems arising under OSHA, claims in connection with environmental problems, claims arising out of Sellers' agreements with third parties or any other obligations of any kind or character arising out of Sellers' acts, omissions or agreements;

(ii)     Demands, causes of action, obligations or liabilities (including damages, costs and reasonable attorneys' fees) from any claim of any third party arising out of Sellers' or the Ultimate Purchaser's acts, omissions or agreements.

(b)     There is no agency relationship between Sellers and Buyer or Buyer and the Ultimate Purchaser; Buyer is not a successor or assign or alter ego to Sellers or the Ultimate Purchaser. Sellers and Buyer and Buyer and the Ultimate Purchaser are not involved in a joint venture, Buyer is not required to continue operations at any of Sellers' former facilities. If in its sole discretion, Buyer or the Ultimate Purchaser hires former employees, managers or supervisors of Sellers, these individuals shall be employed as new employees of Buyer or the Ultimate Purchaser. All individuals considered for employment by Buyer or the Ultimate Purchaser, if any, will be hired on the basis of qualifications, as determined by Buyer or the Ultimate Purchaser. Buyer or the Ultimate Purchaser does not assume and is not responsible for any liability Sellers may have to retired persons or former employees. Sellers represent to Buyer and the Ultimate Purchaser that they have, or will before the Closing Date, satisfied their liabilities and/or obligations accruing prior to the Closing Date to all other persons who are affected by the closing of Sellers' business operations; provided, however, if such obligations are of a nature such that they cannot be satisfied prior to the Closing Date, Sellers shall diligently cause the satisfaction of such obligations as soon as practicable after the Closing Date.

Section 19.4   Third Party Beneficiaries.   To the extent specifically set forth herein, the Ultimate Purchaser with respect to the Store(s) such Ultimate Purchaser is acquiring shall be an intended third party beneficiary hereunder. In all other respects, only the parties hereto and their permitted successors and assigns shall have any rights and/or obligations hereunder.

# ARTICLE 20

## EXHIBITS

Section 20.1   Each of the exhibits and schedules hereto are deemed incorporated by reference herein as a material part of this Agreement. Such exhibits and schedules described herein may be attached by the parties after execution by the parties of this Agreement; and, thereafter, updated from time to time until Closing by mutual agreement.

[Remainder of Page Intentionally Left Blank.  Signature Page Follows.]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLERS:**

**FOODS, INC. D/B/A DAHL'S FOODS**
an Iowa corporation, Debtor-in-Possession


By:_____
Name:_____
Title:_____


**DAHL'S FOOD MART, INC.,**
an Iowa corporation, Debtor-in-Possession

By:_____
Name:_____
Title:_____


-and-

**DAHL'S HOLDINGS I, LLC,**
an Iowa limited liability company, Debtor-in-Possession


By:_____
Name:_____
Title:_____


**BUYER:**


**ASSOCIATED WHOLESALE GROCERS, INC.**, a Kansas corporation


By:_____
Name:_____
Title:_____

# **LIST OF EXHIBITS**

| | | |
|---|---|---|
| Exhibit A-1 | - | List of Owned Stores |
| Exhibit A-2 | - | List of Leased Stores; Description of Leases |
| Exhibit A-3 | - | Legal Description of EP True Real Property |
| Exhibit A-4 | - | Legal Description of 8700 Hickman Real Property |
| Exhibit A-5 | - | Legal Description of Euclid Real Property |
| Exhibit B | - | [Reserved] |
| Exhibit C | - | Form of Bill of Sale |
| Exhibit D | - | Permitted Encumbrances |
| Exhibit E | - | Form of Sublease Assignment |
| Exhibit F | - | Excluded Personal Property |
| Exhibit F-1 | - | Other Excluded Personal Property |
| Exhibit G | - | Form of Inventory Certificate |
| Exhibit H | - | Form of Declaration |
| Exhibit I | - | Form of Lease Assignment |
| Exhibit J | - | Form of Sale Order |
| Exhibit K | - | Exceptions to Sellers' Representations and Warranties |
| Exhibit L | - | Bid Protections and Break-Up Fee |
| Exhibit M | - | List of Contracts |
| Exhibit N | - | Form of Authorization for use of pharmacy license |
| Exhibit O | - | Form of Buyer Certificate |
| Exhibit P | - | List of All Warranties and Guaranties |
| Exhibit Q | - | Form of Landlord Estoppel Certificate |
| Exhibit R | - | Form of Warranties and Guaranties Assignment |
| Exhibit S | - | Form of Assumed Contracts Assignment |
| Exhibit T | - | Form of Special Warranty Deed |

**EXHIBIT "A-1"**
**TO**
**ASSET PURCHASE AGREEMENT**

**List of Owned Stores**

|  | **Address** | **County** |
|---|---|---|
| 1. | 8700 Hickman Road<br>Clive, Iowa  50325 | Polk |
| 2. | 1320 E. Euclid Avenue<br>Des Moines, Iowa  50316 | Polk |
| 3. | 5003 EP True Pkwy<br>West Des Moines, Iowa  50265 | Polk |

EXHIBIT "A-2"
TO
ASSET PURCHASE AGREEMENT

**List of Leased Stores; Description of Leases**

|  | **Address** | **County** |
|---|---|---|
| 1. | 1819 Beaver Avenue<br>Des Moines, Iowa  50310 | Polk |
| 2. | 3425 Ingersoll Avenue<br>Des Moines, Iowa  50312 | Polk |
| 3. | 4121 Fleur Drive<br>Des Moines, Iowa  50321 | Polk |
| 4. | 4343 Merle Hay Drive<br>Des Moines, Iowa  50310 | Polk |
| 5. | 5440 NW 86th Street<br>Johnston, Iowa  50131 | Polk |
| 6. | 15500 W. Hickman Road<br>Clive, Iowa  50325 | Dallas |
| 7. | 3400 E. 33rd Street<br>Des Moines, Iowa  50317 | Polk |

SLC-7413198-1

**Additional Description of Leases and Subleases**

**4343 Merle Hay Road, Des Moines, Iowa**

1.    Lease dated December 19, 1973
-    Daniels Investment Company, a partnership comprised of Selma S. Daniels and Ronald L. Daniels (Landlord)
-    Foods, Inc. (Tenant)

Memorandum of Lease and Designation of Lease Term, dated December 19, 1973
-    Daniels Investment Company, a partnership comprised of Selma S. Daniels and Ronald L. Daniels (Landlord)
-    Foods, Inc. (Tenant)

Amendment to Lease dated May 8 (illegible), 1985, recorded June 21, 1985, as Instrument No. 056197 of the Polk County, Iowa

Subordination, Non-Disturbance and Attornment Agreement dated July 24, 2007
-    Foods, Inc. (Tenant)
-    Galileo CMBS T1 IG LLC (Landlord)
-    Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2004-MKBQ, Commercial Mortgage Pass-Through Certificates, Series 2004-MKB1

Tenant Estoppel dated October 29, 2010, to Centro GA CMBS T1 IG LLC and UBS Real Estate Securities, Inc.

**3400t 33rd Street, Des Moines, Iowa**

1.    Shopping Center Lease dated June 24, 2009
-    Grayslake Eastwood, LLC, and Eastwood Investors, LLC (Landlord)
-    Foods, Inc. (Tenant)

**1819 Beaver Avenue, Des Moines, Iowa**

1.    Sublease dated June 15, 2011
-    Associated Wholesale Grocers, Inc. (Sublandlord)
-    Foods, Inc. (Subtenant)

2.    ATM Lease Agreement dated April 18, 2002
-    Foods, Inc., an Iowa corporation (Landlord)
-    Wells Fargo Bank Iowa, N.A., a national banking association (Tenant)

**Ingersoll Avenue, Des Moines, Iowa**

1.      Sublease dated June 15, 2011
        -       Associated Wholesale Grocers, Inc. (Sublandlord)
        -       Foods, Inc. (Subtenant)

2.      ATM Lease Agreement dated April 18, 2002
        -       Foods, Inc. (Landlord)
        -       Wells Fargo Bank Iowa, N.A. (Tenant)

        First Amendment to ATM Lease Agreement dated March 2, 2009
        -       Foods, Inc. (Landlord)
        -       Wells Fargo Bank (Tenant)

3.      Build-to-Suit Lease Agreement dated August 16, 2010
        -       Foods, Inc. d/b/a Dahl's, an Iowa corporation (Landlord)
        -       Metabank, a federally chartered savings bank (Tenant)

4.      Lease Agreement dated November 13, 2009
        -       Foods, Inc. (Landlord)
        -       Mercy Clinics, Inc. (Tenant)

**4121 Fleur Drive, Des Moines, Iowa**

1.      Sublease dated June 15, 2011
        -       Associated Wholesale Grocers, Inc. (Sublandlord)
        -       Foods, Inc. (Subtenant)

2.      ATM Lease Agreement dated April 18, 2002
        -       Foods, Inc., an Iowa corporation (Landlord)
        -       Wells Fargo Bank Iowa, N.A., a national banking association (Tenant)

**5440 NW 86th Street, Johnston, Iowa**

1.      Sublease dated June 15, 2011
        -       Associated Wholesale Grocers, Inc. (Sublandlord)
        -       Foods, Inc. (Subtenant)

2.      ATM Lease Agreement dated April 18, 2002
        -       Foods, Inc. (Landlord)
        -       Wells Fargo Bank Iowa, N.A. (Tenant)

**15500 W. Hickman Road, Clive, Iowa**

1.      Sublease dated September 23, 2011
        -       Associated Wholesale Grocers, Inc. (Sublandlord)
        -       Foods, Inc. (Subtenant)
        -

    2.  Lease Agreement dated May 14, 2007
       -  Foods, Inc. (Landlord)
       -  Mercy Clinics, Inc. (Tenant)

**5003 EP True Parkway, West Des Moines, Iowa**

1.  Lease Agreement dated December 2, 2008
    -    Dahl's Holdings I, LLC (Landlord)
    -    Foods, Inc. (Tenant)

    Subordination Agreement dated December 2, 2008
    -    Foods, Inc., for the benefit of West Coast Life Insurance Company

    Tenant Estoppel Certificate dated December 4, 2008
    -    Foods, Inc. (Tenant)

**EXHIBIT "A-3"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Legal Description of EP True Real Property</u>**

Lot 2 in Southwoods Plat 1, except for that part conveyed to the City of West Des
Moines, Iowa, recorded in Book 10719 at Page 672, an Official Plat, now
included in and forming a part of the City of West Des Moines, Iowa.

**EXHIBIT "A-4"**
**TO**
**ASSET PURCHASE AGREEMENT**

<u>**Legal Description of 8700 Hickman Real Property**</u>

All that property described in Boundary Survey filed December 28, 2001 in the Office of the Polk County Recorder in Book 9077, Page 771 more particularly described as follows: Lot 1 in Barry's Place, an Official Plat, now included in and forming a part of the City of Clive, Polk County, Iowa EXCEPT that part deeded to the City of Clive, Iowa by Warranty Deed filed May 23, 2007 and recorded in Book 12204 Page 706.

EXHIBIT "A-5"
TO
ASSET PURCHASE AGREEMENT

**Legal Description of Euclid Real Property**

The West 75 feet of the South 180 feet (except the South 2.5 feet thereof) of Lot 2; Lot 3 (except the North 25 feet thereof and except that part of said Lot 3 lying Southerly of a line described as: Beginning at a point 177.8 feet Westerly from the East line of said Lot 3 and on the South line thereof; thence Easterly to a point which is both 2.5 feet Northerly from the South line of said Lot 3 and 91.8 feet Westerly from the East line of said Lot 3; thence Easterly to a point which is 2.5 feet Northerly from the SE corner of said Lot 3 and on the East line thereof); The South 100 feet of Lot 4 (except the West 25 feet thereof); and Lot 5 (except the West 25 feet thereof); all in EUCLID PLACE, an Official Plat, now included in and forming a part of the City of Des Moines, Polk County, Iowa.

# EXHIBIT "B"
# TO
# ASSET PURCHASE AGREEMENT

[Reserved]

EXHIBIT "C"
TO
ASSET PURCHASE AGREEMENT

**Form of Bill of Sale**

**BILL OF SALE**

_____, a _____ and _____, a _____ ("**Sellers**"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated effective _____, 2014, among **ASSOCIATED WHOLESALE GROCERS, INC.**, a Kansas corporation ("**Buyer**") and Sellers (the "**Agreement**"), do hereby grant, bargain, transfer, sell, assign and convey unto [Buyer or _____, a _____ ("**Ultimate Purchaser**") as Buyer shall determine] all of Sellers' right, title and interest in the Assets described in the Agreement (other than the Leases, Owned Real Property, and any sublease(s) or permit(s), which are subject to separate instruments of conveyance and assignment), relating to Sellers' store locations as more particularly described on attached Schedule A.

This Bill of Sale is delivered by Sellers to [Buyer/Ultimate Purchaser] as required under the Agreement, and is made subject to the terms and conditions of the Agreement.   All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

**IN WITNESS WHEREOF**, Sellers has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 2015.

"**SELLERS**"

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

Exhibit "A"
to
Bill of Sale

Store Locations

**EXHIBIT "D"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Permitted Encumbrances</u>**

1. Taxes and assessments of any taxing authority that levies taxes or assessments on real property due and payable, but non-delinquent, as of Closing Date and subsequent to the Closing Date reflecting the Sellers' possession of any real property that comprises a part of the Assets.

2. Rights of Landlords under the Leases, including the rights of any Landlord's mortgagee.

3. Rights of subtenants under the Subleases.

4. All matters set forth as exceptions in any Title Policies or the site plans, other than Monetary Liens.

5. Boundary line disputes, overlaps, encroachments, and any matters which would be disclosed by an accurate survey and inspection of the Leased Premises, including but not limited to all matters shown or set forth on any survey or site plan, other than matters objected to by Buyer pursuant to <u>Section 4.2</u> if Buyer obtains a current survey of the affected Real Property or if shown on a prior survey of the affected Real Property.

EXHIBIT "E"
TO
ASSET PURCHASE AGREEMENT

**Form of Sublease Assignment**

## ASSIGNMENT AND ASSUMPTION OF SUBLEASE AGREEMENT

This Assignment and Assumption of Sublease Agreement ("**Assignment**") is made and entered into as of this _____ day of _____, 2014 ("**Effective Date**"), by and among _____, a _____ and _____, a _____ (collectively, "**Assignor**"), with an address of _____, and _____, a _____ ("**Assignee**"), with an address of _____, with reference to the following:

## RECITALS:

A.       Assignor is the current tenant under that certain sublease described on Exhibit A attached hereto and incorporated herein by reference, as amended (collectively, as amended, modified or supplemented, the "**Sublease**").

B.       The Sublease affects certain premises more particularly described therein (the premises which is the subject of the Sublease is hereinafter called the "**Premises**"; the real estate of which the Premises is a part is hereinafter called the "**Property**").

C.       Assignor, _____ ("_____") and _____, a _____ ("_____"; ("_____"), entered into that certain Asset Purchase Agreement dated _____, 2014 ("**APA**").  All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

D.       The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain subleased real property as specified in the APA.

E.       AWG has designated Assignee, as Buyer's designee, to acquire the interests of Assignor in and to the Sublease, the Premises, and the Property.

F.       An order, In re: _____, et al., has been entered by the United States Bankruptcy Court for the Southern District Of Iowa, Case No. _____ on _____, 2014 (the "**Order**") approving the transactions contemplated by the APA.

G.       In connection with the transactions contemplated by the APA and the Order, the applicable Assignor desires to sell, assign, transfer, convey and deliver to Assignee, and Assignee desires to accept an assignment from the applicable Assignor, all of the applicable Assignor's right, title and interest in and to the Sublease, the Premises and the Property upon and subject to the terms and conditions hereinafter set forth.

SLC-7413198-1

**NOW THEREFORE**, in consideration of the premises and of the mutual covenants and agreements set forth herein, in the APA and in the Order, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

1.     <u>Assignment</u>.  Assignor hereby sells, assigns, sets over, transfers and delivers to Assignee, its successors and assigns, (i) all of Assignor's right, title and interest in and to the Sublease, the Premises, the Property, and (ii) other than Excluded Personal Property (as defined in the APA), all incidental and appurtenant rights in connection with the Sublease, the Premises and the Property.  Assignor hereby agrees that it will remain, and will be, responsible for all liabilities and obligations of the tenant that have accrued under the Sublease prior to the Effective Date, and Assignor hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignee from and against all liabilities and obligations of the tenant that have accrued under the Sublease prior to the Effective Date.

2.     <u>Assumption</u>.  Assignee hereby accepts the assignment pursuant to <u>Section 1</u>, above, and assumes each and every obligation of Assignor which is to be performed from and after the Effective Date as tenant under the Sublease and holder of any of the rights and interests transferred in <u>Section 1</u>, above.  Assignee further agrees to pay, perform and observe all of such obligations arising on and after the Effective Date and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the tenant that accrue under the Sublease on or after the Effective Date.

3.     <u>Terms of APA</u>.  This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.     <u>Binding Effect</u>.  This Assignment shall inure to the benefit of Assignee and its successors and assigns, and shall be binding upon Assignor, Assignee and each of their respective successors and assigns.

5.     <u>Governing Law</u>.  This Assignment shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the laws of the state in which the Property is located.

6.     <u>Amendment</u>.  This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

7.     <u>Headings</u>.  The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

8.     <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the day and year first written above.

**ASSIGNOR**:

_____

a _____


By:      _____
Name:   _____
Title:   _____

**ASSIGNEE**:

_____,

a _____


By:      _____
Name:   _____
Title:   _____


**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
<u>Assignment and Assumption of Sublease Agreement</u>

[Sublease Description]

**EXHIBIT "F"**
**TO**
**ASSET PURCHASE AGREEMENT**

<u>**Excluded Personal Property**</u>

1.      Product that has an expired "sell by" date, is out of date or (other than with respect to pharmaceutical and dairy) is within fourteen (14) days of a "sell by" or "pull" date; with respect to pharmaceutical inventory (including diabetic supplies) and over-the-counter medicines, within forty-five (45) days of the manufacturer's expiration date, if any; and with respect to dairy, is within ten (10) days of a sell by or pull date.

2.      Product that is damaged, opened, bloated, spoiled, or in partial packages, or which is otherwise not saleable at full retail.

3.      Inventory on consignment, including any magazines, videos and DVDs, for which the consignor has timely and properly perfected its rights pursuant to the Uniform Commerical Code and/or applicable law.

4.      Firearms, ammunition and similar items, if any.

5.      Seasonal merchandise (which term shall not include merchandise that Sellers customarily carry all year) that is out-of-season or that is carry-over seasonal merchandise.

6.      Direct store delivery soft drinks to the extent rejected by Buyer because of dissatisfaction with the retail/shelf price once determined, and Sellers shall be provided a reasonable opportunity to return to the vendor any such items not taken.

7.      Any Inventory that is not in compliance with Sellers' representations and warranties as it relates to excess inventory.

8.      Hazardous chemicals other than bleach, lighter fluid, cleaning products and other consumer products customarily sold at retail grocery supermarkets, in quantities that do not violate applicable law.

9.      Any "will call" merchandise, but not limited to, photo finishing that has been held for pick-up for over six (6) weeks.

**EXHIBIT "F-1"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Other Excluded Personal Property</u>**

1.      None.

**EXHIBIT "G"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Inventory Certificate**

**INVENTORY CERTIFICATE**

Seller: _____, a _____
Buyer: _____
Store #: _____
Store Address:

| | Inventory Taken @ Retail | Valuation Percentage | Inventory @ Cost |
|---|---|---|---|
| Grocery (Food and Non-Food) Taken @ Retail | $ | x  65.00% | $ |
| Frozen Food Taken @ Retail | $ | x  55.00% | $ |
| Dairy Taken @ Retail | $ | x  60.00% | $ |
| Tobacco Taken @ Retail | $ | x  80.00% | $ |
| Alcohol Taken @ Retail | $ | x  75.00% | $ |
| Meats Taken @ Retail | $ | x 55.00% | $ |
| Produce Taken @ Retail | $ | x  50.00% | $ |
| Seafood Taken @ Retail | $ | x  50.00% | $ |
| Floral Taken @ Retail | $ | x  40.00% | $ |
| Health and Beauty Care Taken @ Retail | $ | x  50.00% | $ |
| General Merchandise Taken @ Retail | $ | x  40.00% | $ |
| Greeting Cards Taken @ Retail | $ | x  25.00% | $ |
| Deli Taken @ Retail | $ | x  45.00% | $ |
| Bakery Taken @ Retail | $ | x  35.00% | $ |
| Fuel @ Cost | $ | x | $ |
| Pharmacy @ Cost | $ | x | $ |
| Total Inventory | $ | | $ |

_____  ____/____/____
   Seller's Authorized Agent      Date

_____  ____/____/____
   Buyer's Authorized Agent Date

**EXHIBIT "H"**
**TO**
**ASSET PURCHASE AGREEMENT**

<u>**Form of Declaration**</u>

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| | ) Case No.  14-02689-11 |
| Foods, Inc., | ) Case No.  14-02690-11 |
| Dahl's Food Mart, Inc., | ) Case No.  14-02691-11 |
| Dahl's Holdings I, LLC, | ) Chapter 11 |
| | ) |
| | ) |
| Debtors. | ) |

<u>**DECLARATION OF [AFFIANT]**</u>

I, **[Affiant]**, state and declare as follows:

I am a _____ of _____ (the "**Purchaser**").  I am duly authorized to make this Declaration on behalf of the Purchaser.  I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of the Purchaser.  If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

I submit this Declaration in connection with the Purchaser's offer to purchase certain assets (the "**Bid**") from _____ (the "**Debtor**").  The assets subject to the Bid constitute the stores identified on the attached <u>Exhibit A</u> (including their inventory, equipment, and related assets), which presently are operated by the Debtor (collectively, the "**Stores**").

The Purchaser is not an affiliate of the Debtor.  The Purchaser has at all times dealt at arm's length and in good faith with the Debtor, has no connection with any insider of the Debtor, and has not received any material non-public information regarding the Stores from the Debtor or their advisors except through the due diligence process established by the Debtor and its advisors in this Chapter 11 case.

The Purchaser is not a party to any agreement among potential bidders for the Debtor's assets to conspire to chill bidding for such assets and does not intend to enter into any such agreement.

The Bid identifies certain executory contracts and unexpired leases to be assumed by the Debtor and assigned to the Purchaser (collectively, the "**Assigned Contracts**").  With respect to each of the Assigned Contracts, the Purchaser intends to perform and has the financial capability to perform its obligations under such Assigned Contract arising from and after the date on which such Assigned Contract is assigned to the Purchaser.

Attached as Exhibit B are true and correct copies of the following:  (a) the Purchaser's balance sheet as of the end of the most recent fiscal quarter for which financial results are available; (b) the Purchaser's income statement for the four quarters ending on the date of such balance sheet.  **[If the Purchaser is a newly-organized entity with no operational history, substitute this sentence:  Attached as Exhibit B hereto are true and correct copies of the following:  (a) the balance sheet as of the end of the most recent fiscal quarter for which financial results are available of the affiliate of Purchaser that will guarantee the Purchaser's obligations under the Assigned Contracts; (b) such affiliate's income statement for the four quarters ending on the date of such balance sheet.]**  The financial statements in Exhibit B have been prepared in accordance with generally accepted accounting principles and fairly and accurately represent the financial condition and operating results of the Purchaser for the time periods specified.

All of the business records of the Purchaser to which I have referred in this Declaration or in the preparation of this Declaration were made at or near the time of the event recorded, by or from information transmitted by a person with knowledge of the matters recorded in such records, and were made and kept in the course of the Purchaser's regularly conducted business activities.  It is the regular practice of the Purchaser to make such records.

The Purchaser consents to the Debtor's providing a copy of this Declaration, including exhibits, to any non-Debtor party to an Assigned Contract.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on _____, 2014, at **[City, State]**.

_____

**[Affiant]**

Exhibit "A"
to
Form of Declaration

<u>Stores</u>

<u>Store No.</u>                    <u>Location</u>

Exhibit "B"
to
Form of Declaration

Entity Information

SLC-7413198-1

EXHIBIT "I"
TO
ASSET PURCHASE AGREEMENT

**Form of Lease Assignment**

**ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT**

This Assignment and Assumption of Lease Agreement ("**Assignment**") is made and entered into as of this _____ day of _____, 2014 ("**Effective Date**"), by and among _____, a _____ and _____, a _____ (collectively, "**Assignor**"), with an address of _____, and _____, a _____ ("**Assignee**"), with an address of _____, with reference to the following:

**RECITALS:**

H.      Assignor is the current tenant under that certain lease described on <u>Exhibit A</u> attached hereto and incorporated herein by reference, as amended (collectively, as amended, modified or supplemented, the "**Lease**").

I.      The Lease affects certain premises more particularly described therein (the premises which is the subject of the Lease is hereinafter called the "**Premises**"; the real estate of which the Premises is a part is hereinafter called the "**Property**").

J.      Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("**AWG**") and _____, a _____ ("_____"; collectively with AWG, "**Buyer**"), entered into that certain Asset Purchase Agreement dated _____, 2014 ("**APA**").  All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

K.      The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain leased real property as specified in the APA.

L.      AWG has designated Assignee, as Buyer's designee, to acquire the interests of Assignor in and to the Lease, the Premises, and the Property.

M.      An order, In re: _____, <u>et al.</u>, has been entered by the United States Bankruptcy Court for the Southern District Of Iowa, Case No. _____ on _____, 2014 (the "**Order**") approving the transactions contemplated by the APA.

N.      In connection with the transactions contemplated by the APA and the Order, the applicable Assignor desires to sell, assign, transfer, convey and deliver to Assignee, and Assignee desires to accept an assignment from the applicable Assignor, all of the applicable

SLC-7413198-1

Assignor's right, title and interest in and to the Lease, the Premises and the Property upon and subject to the terms and conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the premises and of the mutual covenants and agreements set forth herein, in the APA and in the Order, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

9.      <u>Assignment</u>.   Assignor hereby sells, assigns, sets over, transfers and delivers to Assignee, its successors and assigns, (i) all of Assignor's right, title and interest in and to the Lease, the Premises, the Property, and (ii) other than Excluded Personal Property (as defined in the APA), all incidental and appurtenant rights in connection with the Lease, the Premises and the Property.   Assignor hereby agrees that it will remain, and will be, responsible for all liabilities and obligations of the tenant that have accrued under the Lease prior to the Effective Date, and Assignor hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignee from and against all liabilities and obligations of the tenant that have accrued under the Lease prior to the Effective Date.

10.      <u>Assumption</u>.   Assignee hereby accepts the assignment pursuant to <u>Section 1</u>, above, and assumes each and every obligation of Assignor which is to be performed from and after the Effective Date as tenant under the Lease and holder of any of the rights and interests transferred in <u>Section 1</u>, above.   Assignee further agrees to pay, perform and observe all of such obligations arising on and after the Effective Date and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the tenant that accrue under the Lease on or after the Effective Date.

11.      <u>Terms of APA</u>.   This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

12.      <u>Binding Effect</u>.   This Assignment shall inure to the benefit of Assignee and its successors and assigns, and shall be binding upon Assignor, Assignee and each of their respective successors and assigns.

13.      <u>Governing Law</u>.   This Assignment shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the laws of the state in which the Property is located.

14.      <u>Amendment</u>.   This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

15.      <u>Headings</u>.   The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

16.      <u>Counterparts</u>.   This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the day and year first written above.

**ASSIGNOR**:

_____

a _____

By: _____
Name: _____
Title: _____

**ASSIGNEE**:

_____,

a _____

By: _____
Name: _____
Title: _____

**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
Assignment and Assumption of Lease Agreement


[Lease Description]

**EXHIBIT "J"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Form of Sale Order</u>**

**EXHIBIT "K"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Exceptions to Sellers' Representations and Warranties**

None.

**EXHIBIT "L"
TO
ASSET PURCHASE AGREEMENT**

**Bid Protections and Break-Up Fee**

The following additional terms are hereby made an integral and non-severable part of the Asset Purchase Agreement:

1. Exclusivity; Solicitation.

(a) Buyer and Sellers acknowledge that under the Bankruptcy Code the sale of Assets is subject to approval of the Bankruptcy Court. Buyer and Sellers acknowledge that to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or best price possible for the Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Assets to potential bidders, entertaining higher or better offers from possible bidders and, if necessary, conducting an Auction.

(b) Sellers represent that, other than the transactions contemplated by this Agreement, Sellers are not a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any material part of its business or the Assets.

(c) In consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Buyer in connection with the preparation, negotiation, and execution of this Agreement and additional Transaction Documents and Financing Documents, Sellers acknowledge and agree that (i) the Buyer shall be the stalking horse bidder at the Auction, (ii) no Person other than the Buyer shall be the stalking horse bidder at the Auction and Sellers shall not participate in any negotiations for the purpose of naming any Person other than the Buyer as the stalking horse bidder in the Auction, and (iii) Sellers shall actively oppose any effort by any other Person to be the stalking horse bidder; provided that consistent with its fiduciary duties to elicit the highest and best offer for the Assets and to conduct the Auction, Sellers may solicit, encourage and negotiate higher or better offers for the Assets under the terms of the Bidding Procedures Order, and provided further that Sellers may (A) in response to an acquisition proposal for some or all of the Assets that was not solicited after the date hereof, participate in negotiations or discussions with, request clarifications from, or furnish information to, any qualified person which makes such acquisition proposal, and (B) continue discussions and negotiations and continue to provide information to any qualified person, group or other entity with which Sellers has been conducting such discussions or negotiations. The Sellers shall file a notice with the Bankruptcy Court designating Buyer as the Stalking Horse Bidder and confirming its agreement to provide these bid protections and a break-up fee of **$215,000** (the "Break-Up Fee"), with an initial overbid requirement of **$400,000**, with each overbid thereafter being in increments of **$50,000** (the "Bid Protections") pursuant to the Bidding Procedures.

(d) Other Bids.  Buyer acknowledges that both before and after entry of the Bidding Procedures Order on the Bankruptcy Court's docket, Sellers may solicit bids ("Bids") from

qualified bidders for the sale of all or substantially all of the Assets, on terms and conditions substantially the same in all respects to this Agreement (or improved terms) and in accordance with the procedures set forth in the Bidding Procedures Order.

    2.  <u>Bankruptcy Conditions</u>.

     (a) The Sale Order shall approve and authorize the assumption and assignment of the Assumed Contracts and the Assumed Contracts shall have been actually assumed and assigned to Buyer such that the Assumed Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims (including, without limitation, cure claims under section 365 of the Bankruptcy Code, except as otherwise specifically provided in the Sale Order) existing as of the Closing or by reason of the Closing.

     (b) The Sale Order shall approve and authorize the Designation Rights with respect to the Remaining Contracts.

     (c) Nothing in this Agreement shall preclude Buyer or Sellers from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders. No notice of such waiver of this or any other condition to Closing need be given except to Buyer, any official committee appointed in the Chapter 11 Case, any senior secured lender holding a Lien on the Assets, and the Bankruptcy Administrator, it being the intention of the parties hereto that Buyer shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of Law if the Closing occurs in the absence of Final Orders.

    3.  <u>Break-Up Fee</u>.

     (a) Upon the first to occur of (i) the date Sellers consummate an Alternative Transaction or (ii) on the date Sellers file a Chapter 11 plan or plans contemplating the sale or retention of the Assets by Sellers in a manner substantially inconsistent with the terms of this Agreement, Sellers shall immediately pay (in cash) to Buyer the Break-Up Fee, which shall be a super-priority administrative expense claim senior to all other administrative expense claims against Sellers under section 364(c)(1) of the Bankruptcy Code, and such Break-Up Fee shall be paid to Buyer at Closing of any Alternative Transaction as a cost and expense of sale prior to the determination of net proceeds available to secured creditors.

     (b) Each of the parties' obligations to make payments pursuant to this <u>Section 3</u> shall survive termination of this Agreement, other than in an instance in which this Agreement is terminated as a result of the Buyer's breach of this Agreement).

**EXHIBIT "M"**
**TO**
**ASSET PURCHASE AGREEMENT**

## List of Contracts

[To be determined]

**EXHIBIT "N"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Form of Authorization for use of pharmacy license</u>**

**AUTHORIZATION AND LIMITED POWER OF ATTORNEY
FOR USE OF DEA REGISTRATION NUMBER**
Store Location: _____

THIS AUTHORIZATION AND LIMITED POWER OF ATTORNEY FOR USE OF DEA REGISTRATION NUMBER ("**DEA Agreement**") is made as of the ___ day of _____, 2015 by and between **FOODS, INC. D/B/A DAHL'S FOODS**, an Iowa corporation ("**Seller**") and _____, a _____ ("**Buyer**").

**RECITALS:**

A.    Seller and Associated Wholesale Grocers, Inc., a Kansas corporation ("**AWG**"), are parties to an Asset Purchase Agreement, dated _____, 2014 (the "**APA**"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the APA.

B.    The APA provides for, among other things, the execution by Seller of a power of attorney sufficient to allow AWG to operate under Seller's DEA number for a limited period of time.

C.    In accordance with the terms of the APA, AWG has assigned certain of its rights under the APA to Buyer, including the right to receive rights under this DEA Agreement directly from Seller.

AGREEMENT

NOW, THEREFORE, for and in consideration of the agreements and covenants contained in the APA, and the agreements and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Seller hereby grants to Buyer the authority to use the Drug Enforcement Administration Registration issued to Seller, DEA #_____ (the "**Seller Registration**") relating to Seller's former pharmacy location at _____ (the "**Pharmacy**"), subject to the terms and conditions described herein.

2.    In connection with the use by Buyer of the Seller Registration, Seller does hereby nominate, constitute, and appoint Buyer, for the limited purpose of continuing business operations at the Pharmacy during transition of the Pharmacy business to Buyer's full ownership and responsibility, as the true and lawful attorney-in-fact for Seller in its name, place, and stead and hereby gives and grants unto Buyer authority to operate and otherwise conduct the Pharmacy business pursuant to the Seller Registration.  Seller hereby ratifies and confirms all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof.

3.    Buyer has filed an application requesting issuance of Drug Enforcement Administration Registration related to the Pharmacy ("**Buyer Registration**") and Buyer hereby covenants that it shall actively and in good faith pursue issuance of such Buyer Registration.

Buyer also covenants that it shall comply with all legal and regulatory requirements applicable to the Seller Registration, and shall indemnify and hold harmless Seller for any failure by Buyer to comply with such requirements.

4.      This DEA Agreement shall automatically terminate effective as of the date Buyer receives Buyer's DEA Registration.

5.      This DEA Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one and the same instrument, and shall be effective upon execution and delivery of one or more of such counterparts by each of the parties hereto.

**IN WITNESS WHEREOF**, each party hereto has caused this DEA Agreement to be executed and delivered as of the day and year first above written.

**SELLER**:

**FOODS, INC. d/b/a Dahl's Foods**,
an Iowa corporation

By:_____
Name:_____
Title:_____

**BUYER**:

_____

By:_____
Name:_____
Title:_____

**EXHIBIT "O"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Form of Buyer Certificate</u>**

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Form of Buyer's Certificate

## CERTIFICATE OF WARRANTIES

_____ ("**Buyer**") hereby certifies, represents and warrants to FOODS, INC. D/B/A DAHL'S FOODS, INC., DAHL'S FOOD MART, INC., and DAHL'S HOLDINGS I, LLC, ("**Sellers**"), that the representations and warranties made by Buyer in that certain Asset Purchase Agreement dated _____ ___, 2014, with respect to the purchase by Buyer of _____ ("**Agreement**") were true and correct as of the date of the Agreement and continue to be true and correct in accordance with their terms as of the date hereof.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate effective as of the ____ day of _____, 2015.

_____

_____, a(n)

By:_____

Name:_____

**EXHIBIT "P"**
**TO**
**ASSET PURCHASE AGREEMENT**

**List of All Warranties and Guarantees**

None

**EXHIBIT "Q"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Landlord Estoppel Certificate**

Date: _____, 2015

_____

_____

_____

RE:      _____, _____, Iowa (the "**Premises**")

Gentlemen:

      The undersigned landlord or lessor ("**Landlord**") is requested to execute this Estoppel Certificate as an inducement for the addressees above to enter into an Assignment and Assumption of Lease regarding the referenced Premises (the "**Assignment**"). This is to confirm that _____, a _____ ("**Assignor**") may assign its interests under the Lease to _____, a _____ ("**Assignee**"). The undersigned acknowledges that Assignee's willingness to enter into the Assignment is based, in part, on the reliance by Assignee on the truth and accuracy of the statements made herein and Landlord understands and agrees that Assignor and Assignee will and shall be entitled to rely upon this Estoppel Certificate for such purposes. As of the date of this Estoppel Certificate, Landlord hereby represents, warrants and certifies to Assignor and Assignee as follows:

      1.    <u>Lease and Tenant</u>. Landlord is the present landlord or lessor and Assignor is the present tenant under that certain lease, as modified or amended, as more particularly described on attached <u>Exhibit A</u>, a memorandum of which is recorded in Book _____ at Page _____ of _____ County, Iowa public records (the "**Lease**"). The Lease is in full force and effect and has not, except as specifically stated in <u>Exhibit A</u>, been modified or amended in any manner whatsoever, and constitutes the entire agreement between the parties with respect to the Premises. Any capitalized terms which are not otherwise defined herein shall have the meaning set forth in the Lease.

      2.    <u>Premises</u>. The Premises described in the Lease contains approximately _____ square feet, and is located in and upon the land legally described on <u>Exhibit B</u> (the "**Land**"). The Land is currently owned by and held in the name of Landlord.

3.     Term.  The Term of the Lease commenced on _____, and expires on _____.  Tenant has the right to extend the term of the Lease for _____ (____) option periods, each for _____ (____) years, by giving Landlord written notice of the exercise of any option to extend at least _____ (_____) days prior to the expiration of the current term or option period.

4.     Rent.  Tenant is currently obligated to pay base rent under the Lease is $_____ per year, payable in monthly installments of $_____.     [If applicable: Tenant's proportionate share of common area maintenance fees is $_____ per month.]  (If applicable: Tenant's proportionate share of insurance premiums is $_____ per month.]  [If applicable: Tenant pays all real estate taxes directly, and the real estate taxes for the tax year July 2013-June 2014 were $_____.  OR Tenant's proportionate share of real estate taxes for tax year July 2013 –June 2014 was $_____.]  [If applicable:  Tenant is additionally obligated to pay percentage rent as follows: _____.]

As of the date of this Estoppel Certificate, Monthly Rent and all other amounts due and payable by Assignor to Landlord under the Lease are paid in full through _____, and no other amounts are due and payable to Landlord under the Lease, except as follows: _____ _____ _____.  The next occurring rent payment is due on _____, _____.

5.     Deposit.  If applicable, Landlord currently holds a security deposit in the amount of $_____, as security for the payment and performance of Assignor's obligations under the Lease.

6.     Default by Assignor.  Landlord has no actual knowledge of: (a) any default by Assignor under any of the terms, covenants or conditions of the Lease on the part of Assignor to be observed or performed, (b) any event which has occurred and which with the passage of time or the giving of notice, or both, would constitute a default by Assignor under the Lease or would permit termination, modification or acceleration under the Lease, and (c) any construction-related obligation under the Lease that required either the performance or payment of money which Assignor failed to fulfill, EXCEPT AS FOLLOWS:_____.

7.     Default by Landlord.  Landlord has: (a) performed all obligations required to be performed by Landlord under the Lease, (b) committed no default, which remains uncured under any of the terms, covenants or conditions of the Lease on the part of Landlord to be observed or performed, and (c) no knowledge of any event which has occurred and which with the passage of time or the giving of notice, or both, would constitute a default by Landlord under the Lease, EXCEPT AS FOLLOWS:_____.

8.     Right of First Refusal.  Assignor does not have an option or right of first refusal to purchase the Premises or the Land, except as follows: _____.

9.     No Assignment.  Landlord has not assigned, whether outright or by collateral assignment, all or any portion of its rights under the Lease, except as follows (please include the

name,    address    and,    if    known,    contact    person    for    any    such    assignee):
_____.

     1.    <u>Notices</u>.  Tenant should send rent payments and any other monetary obligations under the Lease to the following party at the following address (which is the current address used to send rent payments):

_____

_____

_____

All notices from Tenant to Landlord should be sent to the following address:

_____

_____

_____

     11.    <u>No Action</u>.  Landlord has not commenced, and has no actual knowledge that Assignor has commenced, any action or has given or received any notice for the purpose of terminating the Lease.

     12.    <u>No Condemnation Notice</u>.  Landlord has not received any notice of any condemnation proceeding or eminent domain proceeding affecting the premises subject to the Lease or the shopping center in which such premises are located.

     13.    <u>Consent</u>.  To the extent that Landlord's consent is required under the Lease, Landlord hereby consents to the assignment of Assignor's interest in the Lease by Assignor to Assignee, and agrees that the execution of the Assignment by Assignor and Assignee will not constitute a default under the Lease.

     14.    <u>Miscellaneous</u>.  This Estoppel Certificate shall be binding upon Landlord and inure to the benefit of the Assignor and Assignee hereto and their respective heirs, representatives, successors, and assigns.  This Estoppel Certificate is made and entered into under, and shall be construed according to the laws of the State in which the Premises is located. This Estoppel Certificate may not be amended except by a written instrument signed by the Landlord, Assignor and Assignee.

**[Signatures on following page]**

**"LANDLORD"**

_____

By: _____
Name: _____
Its: _____

STATE OF _____        )
                                 )    ss.
COUNTY OF _____         )

On this _____ day of _____, 2015, before me appeared _____, to me personally known, who being by me duly sworn, did say that he/she is the _____ of _____, a _____ corporation, and that said instrument was signed on behalf of said corporation by authority of its Board of Directors, and said officer acknowledged said instrument to be the free act and deed of said corporation.

In Witness Whereof, I have hereunto set my hand and affixed my official seal on the day and year last written above.

_____
Notary Public

My commission expires:


_____

Exhibit A
to
Landlord Estoppel Certificate


Description of Lease and Amendments


_____ STORE #_____

_____,_____, _____

Lease dated as of _____, between _____
_____, as landlord and _____, as tenant;

As evidenced by Memorandum of Lease (Short Form Lease) dated _____
recorded in Book _____, page _, of the public records of _____,
County, _____;

As amended by First Amendment to lease dated _____; and

SLC-7413198-1

Exhibit B
to
Landlord Estoppel Certificate


Legal Description of Land

**EXHIBIT "R"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Warranties and Guaranties Assignment**

**ASSIGNMENT AND ASSUMPTION OF WARRANTIES AND GUARANTIES**

**THIS ASSIGNMENT AND ASSUMPTION OF WARRANTIES AND GUARANTIES** ("**Assignment**") is made this _____ day of _____, 2015 by and among _____ _____, a _____ and _____, a _____, (collectively, "**Assignor**") and _____, a _____ ("**Assignee**").

**R E C I T A L S :**

A.    Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("**AWG**") and _____, a _____ ("_____"; collectively with AWG, "**Buyer**") are parties to that certain Asset Purchase Agreement dated _____, 2014 ("**APA**"). All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

B.    The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain Assets as specified in the APA.

C.    AWG has designated Assignee to acquire the Warranties and Guaranties as identified on attached Exhibit B and associated with the Stores identified on attached Exhibit A.

D.    An order, In re: _____, et al., has been entered by the United States Bankruptcy Court for the Southern District Of Iowa, Case No. _____ on _____, 2014 (the "**Order**") approving the transactions contemplated by the APA.

E.    In furtherance of the transfer and assignment of the Assets, Assignor and Assignee desire to enter into this Assignment to evidence the assignment and assumption of certain Warranties and Guaranties.

**NOW, THEREFORE**, for and in consideration of the foregoing recitals, which are incorporated herein, the mutual covenants contained herein and in the APA, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, Assignor and Assignee agree as follows:

1.    Assignment.  Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's respective right, title, and interest in all Warranties and Guaranties as the same relate solely to the Stores identified on attached Exhibit A, including without limitation those particular Warranties and Guaranties, if any, identified on attached Exhibit B, and all of their respective duties,

obligations and liabilities under such Warranties and Guaranties arising or accruing from and after the date hereof, but not before, it being understood that Assignor will remain fully obligated for the payment and performance of any duties, obligations or liabilities accruing prior to the date hereof. Assignor agrees to indemnify and hold Assignee harmless from all such obligations and liabilities accruing prior to the date hereof.

2.  Assumption.  Assignee expressly assumes all of the right, title, interest, duties, obligations and liabilities of Assignor under all Warranties and Guaranties as the same relate solely to the Stores identified on attached Exhibit A, including without limitation those particular Warranties and Guaranties, if any, identified on attached Exhibit B, and all of their respective duties, obligations and liabilities under such Warranties and Guaranties arising or accruing from and after the date hereof, but not before.  Assignee agrees to indemnify and hold Assignor harmless from all such obligations and liabilities accruing from and after the date hereof.

3.  Terms of APA.  This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.  Further Assurances.  Each party agrees to execute and deliver such other assignments, affidavits, instruments or certifications as any other party reasonably may request as necessary or appropriate to effectuate the assignments contemplated in this Assignment.

5.  Governing Law.  This instrument shall be governed by and construed in accordance with the internal laws of the State of Iowa.

6.  Binding Effect.  This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

7.  Amendment.  This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

8.  Headings.  The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

9.  Counterparts.  This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the day and year first written above.

**ASSIGNOR:**

a _____

By: _____
Name: _____
Title: _____

**ASSIGNEE**:

a _____

By: _____
Name: _____
Title: _____

**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
<u>Assignment and Assumption of Warranties and Guaranties</u>

[Schedule of Stores]

| _____ _____ Store No. | Address | City | State |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Exhibit B
to
Assignment and Assumption of Warranties and Guaranties


[Schedule of Warranties and Guaranties]

EXHIBIT "S"
TO
ASSET PURCHASE AGREEMENT

**Form of Assumed Contracts Assignment**

**ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS**

THIS ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS ("**Assignment**") is made this ___ day of _____, 2015 by and among _____, a _____ and _____, a _____, (collectively, "**Assignor**") and _____, a _____ ("**Assignee**").

**R E C I T A L S :**

A.    Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("**AWG**") and _____, a _____ ("_____"; collectively with AWG, "**Buyer**") are parties to that certain Asset Purchase Agreement dated _____, 2014 ("**APA**"). All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

B.    The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain Assets as specified in the APA.

C.    AWG has designated Assignee to acquire the Assumed Contracts as identified on attached <u>Exhibit B</u> and associated with the Stores identified on attached <u>Exhibit A</u>.

D.    An order, In re: _____, <u>et al.</u>, has been entered by the United States Bankruptcy Court for the Southern District Of Iowa, Case No. _____ on _____, 2014 (the "**Order**") approving the transactions contemplated by the APA.

C.    In furtherance of the transfer and assignment of the Assets, Assignor and Assignee desire to enter into this Assignment to evidence the assignment and assumption of certain Assumed Contracts.

**NOW, THEREFORE**, for and in consideration of the foregoing recitals, which are incorporated herein, the mutual covenants contained herein and in the APA, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, Assignor and Assignee agree as follows:

1.    <u>Assignment</u>.    Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's respective right, title, and interest in all Assumed Contracts as the same relate solely to the Stores identified on attached <u>Exhibit A</u> and as identified on attached <u>Exhibit B</u>, and all of their respective duties, obligations and liabilities under such Assumed Contracts arising or accruing from

and after the date hereof, but not before, it being understood that Assignor will remain fully obligated for the payment and performance of any duties, obligations or liabilities accruing prior to the date hereof.   Assignor agrees to indemnify and hold Assignee harmless from all such obligations and liabilities accruing prior to the date hereof.   Assignor hereby warrants to Assignee that the Assumed Contracts are valid, in full force and effect and that neither Assignor nor any other party to the Assumed Contracts are in default.

2.   <u>Assumption</u>.   Assignee expressly assumes all of the right, title, interest, duties, obligations and liabilities of Assignor under all Assumed Contracts as the same relate solely to the Stores identified on attached <u>Exhibit A</u> and are identified on attached <u>Exhibit B</u>, and all of their respective duties, obligations and liabilities under such Assumed Contracts arising or accruing from and after the date hereof, but not before.   Assignee agrees to indemnify and hold Assignor harmless from all such obligations and liabilities accruing from and after the date hereof.

3.   <u>Terms of APA</u>.   This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.   <u>Further Assurances</u>.   Each party agrees to execute and deliver such other assignments, affidavits, instruments or certifications as any other party reasonably may request as necessary or appropriate to effectuate the assignments contemplated in this Assignment.

5.   <u>Governing Law</u>.   This instrument shall be governed by and construed in accordance with the internal laws of the State of Iowa.

6.   <u>Binding Effect</u>.   This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

7.   <u>Amendment</u>.   This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

8.   <u>Headings</u>.   The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

9.   <u>Counterparts</u>.   This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the day and year first written above.

**ASSIGNOR:**

a _____

By: _____
Name: _____
Title: _____

**ASSIGNEE**:

a _____

By: _____
Name: _____
Title: _____

**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
Assignment and Assumption of Assumed Contracts


[Schedule of Stores]

| _____ _____ Store No. | Address | City | State |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Exhibit B
to
Assignment and Assumption of Assumed Contracts


[Schedule of Assumed Contracts]

**EXHIBIT "T"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Form of Special Warranty Deed</u>**

**SPECIAL WARRANTY DEED**
**THE IOWA STATE BAR ASSOCIATION**
**Official Form No. 105**
**Recorder's Cover Sheet**

**Preparer Information:** (name, address and phone number)

**Taxpayer Information:** (name and complete address)

**Return Document To:** (name and complete address)

**Grantors:**

**Grantees:**

**Legal Description:** See Page 2

**Document or instrument number of previously recorded documents:** N/A

SLC-7413198-1

## SPECIAL WARRANTY DEED

For the consideration of Ten Dollars ($10.00) and other valuable consideration, _____, an Iowa _____ ("**Grantor**"), whose address is 4343 Merle Hay Road, Des Moines, Iowa, does hereby grant and convey to _____, a _____ ("**Grantee**") the following described real estate in _____ County, Iowa:

[INSERT]

Grantor does hereby covenant with Grantee and successors in interest, that Grantor holds the real estate by title in fee simple; that it has good and lawful authority to sell and convey the real estate; that the real estate is free and clear of all liens and encumbrances except as may be stated on **Exhibit A**; and Grantor covenants to warrant and defend the real estate against the lawful claims of all persons claiming by, through or under it except as may be above stated.

Words and phrases herein, including acknowledgment hereof, shall be construed as in the singular or plural number, and as masculine or feminine gender, according to the context.

Dated:_____, 2015

_____

By:_____
Name:_____
Title:_____

STATE OF IOWA, COUNTY OF POLK

This instrument was acknowledged before me on _____, 2015, by _____, _____.

_____
Notary Public in and for the State of Iowa

**EXHIBIT A**

## AMENDED ASSET PURCHASE AGREEMENT

THIS **AMENDED** **ASSET PURCHASE AGREEMENT** is made effective as of November 9, 2014January ___, 2015 (the "**Effective Date**"), by and among **FOODS, INC. D/B/A DAHL'S FOODS**, an Iowa corporation ("**Dahl's**"), **DAHL'S FOOD MART, INC.**, an Iowa corporation ("**DFMI**"), **DAHL'S HOLDINGS I, LLC**, an Iowa limited liability company, ("**Holdings**" and, together with **Dahl's** and **DFMI**, the "**Sellers**" as debtors-in-possession), and **ASSOCIATED WHOLESALE GROCERS, INC.**, a Kansas corporation ("**AWG**" or "**Buyer**").

## R E C I T A L S :

**The following Recitals are a material part of this Agreement and are being relied upon by Buyer and Sellers in connection with the transaction contemplated hereby:**

A.      Sellers own the supermarket stores (the "**Stores**"), listed on <u>Exhibit A-1</u> to this Agreement.

B.      Sellers lease the real property associated with those Stores listed on <u>Exhibit A-2</u>, under the respective lease(s), including amendments thereto, (the "**Leases**") described on <u>Exhibit A-2</u> to this Agreement.

C.      Sellers hold fee simple interest in the real property associated with the following Stores: (i) the real property associated with the Store located at 5003 EP True Parkway, West Des Moines, Iowa, which is owned by Holdings and leased to Dahl's, legally described on <u>Exhibit A-3</u> (the "**EP True Real Property**"), which is subject to a mortgage granted to NorthMarq Capital (Protective Life/West Coast Life Insurance Company) ("**NorthMarq**"), (ii) a fee simple interest in the real property associated with the Store located at 8700 Hickman Road, Clive, Iowa, legally described on <u>Exhibit A-4</u> (the "**8700 Hickman Real Property**"), and (iii) a fee simple interest in the real property associated with the Store located at 1320 E. Euclid Avenue, Des Moines, Iowa, legally described on <u>Exhibit A-5</u> (the "**Euclid Real Property**" and together with the EP True Real Property and the 8700 Hickman Real Property, the "**Owned Real Property**").

D.      The Sellers occupy the respective leased premises as described in each Lease (the "**Leased Premises**") as well as the respective owned premises associated with the Owned Real Property.

E.      Sellers' leasehold interest in the Leased Premises pursuant to each Lease and Sellers' interests in the Owned Real Property, together with those additional items described in <u>Article 2</u> of this Agreement relating to the Purchased Leased Premises, hereinafter collectively are referred to as the "**Assets**."

F.      Sellers desire to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

G.  Until the Stores are sold, Sellers intend to continue to own and/or operate such Stores as retail grocery stores.

H.  In entering into this Agreement, the Parties acknowledge Buyer intends to act as a facilitator to establish a conduit mechanism for the sale of the Assets, including the sale of the Stores to one or more of Buyer's Affiliates or retail members or customers, or other third-parties (each, an "**Ultimate Purchaser**"), all within the terms and conditions set forth herein.

I.  Sellers filed voluntary petitions (the "**Petitions**") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Iowa (the "**Bankruptcy Court**") on November 9, 2014 (the "**Filing Date**") and have operated their businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  Such cases are being administered under case nos. 14-02689-11, 14-02690-11, and 14-02691-11 (the "**Bankruptcy Cases**").

J.  The Sellers and the Buyer had previously entered into that certain Asset Purchase Agreement made effective as of November 9, 2014 by and among Foods, Inc. d/b/a Dahl's Foods, Dahl's Food Mart, Inc., Dahl's Holdings I, LLC, and Associated Wholesale Grocers, Inc. (the "**Original APA**").

K.  On November 9, 2014, the Debtors filed the Debtors' Motion for Order (1) Approving Auction and Bidding Procedures; (2) Approving Cost and Cost and Expense Reimbursement; (3) Prescribing Manner of Notice; and (4) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances, Subject to Higher or Better Offers [Docket No. 19].

L.  On December 3, 2014, the Court entered an Order approving, among other things, the Bid Procedures governing the submission of competing bids for the Debtors' assets and approving the assumption of the Original APA. [Docket No. 157].

M.  Pursuant to Article 3.1(b) of the Original APA, the Sellers and Buyer agreed that, only with respect to the 8700 Hickman Real Property and under certain circumstances, the sale of the 8700 Hickman Real Property could be servered from the assets to be sold under the Original APA, with a corresponding reduction in the Base Purchase Price in the amount of $1,300,000.

N.  At the request of the Seller and in order to facilitate the sale of the 8700 Hickman Real Property in a separate transaction to Equity Ventures Commercial Development, L.C. (the "**8700 Hickmann Buyer**"), the Buyer has agreed to amend the Original APA to sever the sale of the 8700 Hickman Real Property including the Inventory, Equipment, and other assets related to the Store located at the 8700 Hickman Real Property from the transaction contemplated by this Agreement and to make minor clarifications of the Original APA.

**IN CONSIDERATION OF THE FOREGOING AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

# ARTICLE 1

### DEFINED TERMS

Capitalized terms as used in this Agreement will have the following meanings when used herein.

Section 1.1    "8700 Hickman Real Property" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.2    "8700 Hickmann Buyer" will have the meaning assigned in paragraph N of the Recitals to this Agreement.

Section 1.3    Section 1.2 "Adequate Assurance Information" will mean financial and other information as may be reasonably requested by Sellers to demonstrate to the Bankruptcy Court that Landlords and Subtenants under the respective Assumed Leases and counterparties to the Assumed Contracts are adequately assured of the applicable Buyer's or the respective Ultimate Purchaser's future performance under the Assumed Leases or Assumed Contracts, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's or the Ultimate Purchaser's obligations under the Leases or Contracts by an Affiliate of such Buyer or Ultimate Purchaser, as applicable, with sufficient assets to provide adequate assurance of future performance.

Section 1.4    Section 1.3 "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

Section 1.5    Section 1.4 "Agreement" will mean this Amended Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

Section 1.6    Section 1.5 "Allocation Schedule" will mean the allocation of the Base Purchase Price and Deposit among the Stores as provided on Exhibit B to this Agreement.[Reserved].

Section 1.7    Section 1.6 "Alternate Transaction" will have the meaning set forth in Section 14.1(h).

Section 1.8    Section 1.7 "Assets" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

Section 1.9    Section 1.8 "Assumed Contracts" will mean any agreements to which Sellers are a party that relate to a Store or Stores and are assignable to Buyer and/or the Ultimate Purchaser and that Buyer or the Ultimate Purchaser elects to assume by written notice given prior to the expiration of the Designation Period; provided, however, that the Assumed Contracts shall include the Supply Agreement by and between Dahl's and AWG.

Section 1.10    Section 1.9 "Assumed Leases" will mean all of the Leases identified on Exhibit A-2 to this Agreement andto which Assumed Leases shall include any SubleasesAWG is a counterparty. For the avoidance of doubt, any Leases to which AWG is not a counterparty are Contracts which may be assumed or rejected pursuant the Buyer's Designation Rights during the Designation Period.

Section 1.11 ~~Section 1.10~~ "Auction" will mean the auction established pursuant to the Bid Procedures.

Section 1.12 "Back-Up Purchase" will have the meaning assigned in Article 3.8 to this Agreement.

Section 1.13 "Back-Up Purchaser" will have the meaning assigned in Article 3.8 to this Agreement.

Section 1.14 ~~Section 1.11~~ "Bankruptcy Code" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

Section 1.15 ~~Section 1.12~~ "Bankruptcy Court" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

Section 1.16 ~~Section 1.13~~ "Bankruptcy Court Approval" will mean the entry of the Sale Order with respect to the Stores by the Bankruptcy Court.

Section 1.17 ~~Section 1.14~~ "Bankruptcy Cases" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

Section 1.18 ~~Section 1.15~~ "Base Purchase Price" will mean the amount set forth in Section 3.1 of this Agreement.

Section 1.19 ~~Section 1.16~~ "Bid Procedures" shall mean those certain bid procedures pursuant to order of the Bankruptcy Court entered subsequent to the Effective Date hereof, as amended or modified thereafter.

Section 1.20 ~~Section 1.17~~ "Bid Protections" will have the meaning assigned in Exhibit L of this Agreement.

Section 1.21 ~~Section 1.18~~ "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit C to this Agreement, pursuant to which Sellers will sell and convey to Buyer or Ultimate Purchaser, as applicable, at each Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the Stores being transferred at such Closing.

Section 1.22 ~~Section 1.19~~ "Break-Up Fee" will have the meaning ascribed thereto in Exhibit L to this Agreement.

Section 1.23 ~~Section 1.20~~ "Buildings" will have the meaning assigned in Section 2.1 of this Agreement.

Section 1.24 ~~Section 1.21~~ "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Des Moines, Iowa.

Section 1.25 ~~Section 1.22~~ "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

Section 1.40 ~~Section 1.37~~ "EP True Real Property" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.41 ~~Section 1.38~~ "Environmental Laws" will mean any federal, state or local laws, statutes, ordinances, regulations or policies relating to the environment, health and safety, any Hazardous Materials (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof) or to industrial hygiene or the environmental conditions applicable to the Assets, including, without limitation, soil, subsurface and ground water conditions.

Section 1.42 ~~Section 1.39~~ "Equipment" will mean (other than those items that are Excluded Personal Property) all trade fixtures, equipment, Supplies, machinery, telephone and computer lines, control devices, totes, Small Wares, supplies that are not included within the definition of Supplies, outdoor signage and sign faces complete with all additions, accessories and attachments thereto owned or to be owned by Sellers on or before the Closing Date and/or located at the Leased Premises and, in any such case, utilized in connection with Sellers' business, whether located at the Leased Premises, its corporate offices or otherwise.

Section 1.43 ~~Section 1.40~~ "Escrow Agent" will be the escrow and closing agent chosen by mutual written agreement of Buyer and Sellers.

Section 1.44 ~~Section 1.41~~ "Estoppel Certificate" will have the meaning assigned in Section 7.3 of this Agreement.

Section 1.45 ~~Section 1.42~~ "Euclid Real Property" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.46 ~~Section 1.43~~ "Excluded Inventory" will mean those items of Inventory described on Exhibit F to this Agreement and any items of Inventory associated with the 8700 Hickman Real Property

Section 1.47 ~~Section 1.44~~ "Excluded Personal Property" will mean:

(a)     All cash, cash equivalents, money orders, undeposited, uncollected and returned checks, food stamps, coupons, accounts receivable, bank deposits, operating accounts, refunds, credits, rebates and long-term investments of the Sellers;

(b)     All claims, demands, causes of actions and other rights which the Sellers have or may have against third parties (except any such claims, demands, causes of actions and other rights that the Sellers may have against AWG or any of its affiliates), including, but not limited to, claims under chapter 5 of the Bankruptcy Code and claims against current or former officers, directors, and/or managing members of the Sellers;

(c)     The unexpired leases and contracts that the Buyer does not assume;

(d)     Rights to (i) any tax refunds or credits for tax periods (or portions thereof) with respect to any Asset ending on or prior to the Closing Date, and (ii) insurance claims or rights to payment arising with respect to Assets for which title has yet to pass to Buyer or the Ultimate Purchaser, as the case may be, to the extent necessary to remediate or pay for any

liability borne by Sellers relating to or arising from such Asset, provided, however, that to the extent the Buyer or any Ultimate Purchaser pays for any tax liability, it shall be entitled to the pro rata portion of such return and any such tax refund shall be an Asset;

(e)     All rights and interests in connection with, and assets of, any employee benefit plan;

(f)     All of the patronage equity of the Sellers, or any Seller, in and to Buyer related to "Qualified Sales" during fiscal year 2014 to the extent distributed, as expected, in March, 2015, and any Membership Certificates to the extent not offset and recouped pursuant to the Sellers' post-petition debtor-in-possession financing.

(g)     All leased Equipment not part of an Assumed Contract;

(h)     All consigned goods;

(i)     the Inventory, Equipment, and other assets related to the Store located at the 8700 Hickman Real Property; and

(j)     (i) Any other property listed on Exhibit F-1.

Section 1.48   Section 1.45 "Files and Records" will mean, to the extent in Sellers' possession (or otherwise within or under their control) and currently existing, (a) all real estate files, documents, instruments, papers, books and records of Sellers relating to the Stores, the Leases and the Leased Premises and (b) electronic files for each Store showing for each item of Inventory the item description, and UPC code and such other information as Buyer may reasonably request relating to such item of Inventory.  Files and Records shall not include any materials that are protected by privilege, the work-product doctrine, or any other relevant immunity or protection.  To the extent any confidential, privileged or personally identifiable customer information is inadvertently included within such Files and Records, such are to remain private and confidential.

Section 1.49   Section 1.46 "Hazardous Materials" will mean any hazardous or toxic substance, material or waste which is regulated by local authorities, state and/or the federal government, including, but not limited to, any hazardous material, substance or waste which is defined as (a) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state laws; (b) a hazardous substance under Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317); (c) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et. seq.); (d) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (e) a hazardous or toxic waste, substance or material in any statute, regulation, rule or law enacted by the applicable state and/or the federal government.  To the extent not otherwise included, phenolic foam shall be considered a Hazardous Material.

Section 1.50   Section 1.47 "Improvements" will have the meaning assigned in Section 2.1 of this Agreement.

Section 1.51 ~~Section 1.48~~ "Inventory" will mean all inventories of goods and merchandise located at or within the Stores and owned by Sellers on the Inventory Count Date and held for resale to retail customers, but excluding the Excluded Inventory.

Section 1.52 ~~Section 1.49~~ "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Sellers in connection with the Closing as contemplated by Section 3.4 of this Agreement, in the form attached hereto as Exhibit G to this Agreement.

Section 1.53 ~~Section 1.50~~ "Inventory Count" will have the meaning assigned in Section 3.4 of this Agreement.

Section 1.54 ~~Section 1.51~~ "Inventory Count Date" will mean, with respect to each Store, the day immediately preceding the Closing Date.

Section 1.55 ~~Section 1.52~~ "Inventory Price" will mean the purchase price for the Inventory determined pursuant to Section 3.4 of this Agreement.

Section 1.56 ~~Section 1.53~~ "Inventory Service" will mean such inventory service as shall be mutually agreed upon by Buyer and Sellers.

Section 1.57 ~~Section 1.54~~ "Landlords" will mean the lessors under the Leases.

Section 1.58 ~~Section 1.55~~ "Leased Premises" will have the meaning assigned in paragraph B of the Recitals to this Agreement, and will include the elements thereof as described in Section 2.1 of this Agreement.

Section 1.59 ~~Section 1.56~~ "Leases" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

Section 1.60 ~~Section 1.57~~ "Liquidated Deposit" will have the meaning assigned in Section 15.1 of this Agreement.

Section 1.61 ~~Section 1.58~~ "Monetary Liens" will mean (i) any of the following which arise by, through or under Sellers:  (A) mortgages on any of Sellers' Leased Premises or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Sellers and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Sellers' interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Sellers' interest under any of the Leases, on any other Assets.

Section 1.62 ~~Section 1.59~~ "NorthMarq" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

Section 1.63 "Original APA" will have the meaning assigned in paragraph J of the Recitals to this Agreement

Section 1.64 ~~Section 1.60~~ "Outside Date" means March 31, 2015, or an alternate date mutually agreed to by the parties in writing.

Section 1.76 ~~Section 1.72~~ "Sellers' Escrowed Items" will have the meaning assigned in Section 13.2 of this Agreement.

Section 1.77 ~~Section 1.73~~ "Small Wares" will mean all small wares used in connection with the Stores, such as knives, sharpeners, pots and pans.

Section 1.78 ~~Section 1.74~~ "Store Employees" will have the meaning assigned in Section 7.9 of this Agreement.

Section 1.79 ~~Section 1.75~~ "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including, if applicable, any associated liquor store, fuel center, c-store, car wash, or other specialty area operated by Sellers or any third-party lessee at the Leased Premises, but shall exclude the store associated with the 8700 Hickman Real Property, unless, and to the extent applicable, Buyer is the Back-Up Purchaser of the 8700 Hickman Real Property pursuant to Article 3.8 of this Agreement.

Section 1.80 ~~Section 1.76~~ "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 (Leases) to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 (Leases) to this Agreement with respect to a Store, then each reference in this Agreement and the conveyance instrument to any Sublease at such Store will be disregarded.

Section 1.81 ~~Section 1.77~~ "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease. If no Sublease is listed on Exhibit A-2 (Leases) to this Agreement with respect to a Store, then each reference in this Agreement and any conveyance instrument to any Subtenant at such Store will be disregarded.

Section 1.82 ~~Section 1.78~~ "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Stores and owned by Sellers on the Inventory Count Date.

Section 1.83 ~~Section 1.79~~ "Supplies Price" will mean, as to any given Store, $3,000.

Section 1.84 ~~Section 1.80~~ "Title Insurer" will mean such nationally recognized title insurance company, as mutually agreed upon by Sellers and Buyer.

Section 1.85 ~~Section 1.81~~ "Title Policies" will have the meaning assigned in Section 4.3 of this Agreement.

Section 1.86 ~~Section 1.82~~ "Title Reports" will mean, collectively, any title reports and/or title insurance commitments with respect to the Stores that Sellers have made available to Buyer for review.

Section 1.87 ~~Section 1.83~~ "Ultimate Purchaser" will have the meaning assigned in paragraph F of the Recitals to this Agreement.

Section 1.88 ~~Section 1.84~~ "Violations" will mean all material violations or notices of material violations of law or governmental ordinances, orders or requirements that exist or are noted in or issued by any housing and building, fire, labor, health, air resources, environmental, highways or any other Federal, state, county or municipal department, agency, authority or bureau having jurisdiction as to conditions affecting any of the Assets.

Section 1.89 ~~Section 1.85~~ "Warranties and Guaranties" will mean all assignable third party warranties, guaranties or similar rights owned by Sellers or inuring to Sellers' benefit in connection with, and only to the extent of, the Assets.

## ARTICLE 2

### PROPERTY INCLUDED IN SALE; ASSUMED LIABILITIES

Section 2.1    Assets to be Purchased.  On the terms and subject to the conditions set forth in this Agreement, Sellers agree to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Sellers, the Assets, which, excluding Excluded Personal Property, are comprised of the following:

(a)    Sellers' interest in the Stores, Leases, and Leased Premises, subject to any agreed modifications between the applicable landlord(s) and the Buyer or Ultimate Purchaser, as applicable, if any, together with the Designation Rights;

(b)    Sellers' interest in the Store buildings now existing on the Leased Premises (the "**Buildings**"), and all fixtures and all equipment located in the Buildings, including, but not limited to Sellers' interest in (i) all heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, flooring and leasehold improvements (collectively, the "**Improvements**"), and (ii) the Equipment;

(c)    The ~~8700 Hickman Real Property, the~~ Euclid Real Property~~,~~ and the EP True Real Property (subject to the Buyer's rights to remove the EP True Real Property ~~and the 8700 Hickman Real Property~~ from the purchased Assets pursuant to Article 3 of this Agreement);

(d)    The Inventory;

(e)    Sellers' interest in the Subleases (if any);

(f)    Any assignable Permits;

(g)    Any assignable Warranties and Guaranties;

(h)    The Assumed Contracts;

(i)    The Files and Records (note that Sellers make no representation or warranty as to the accuracy or correctness of such Files and Records);

(j)    All stock owned by the Sellers in Buyer;

escrow.  The Closing is not conditioned on obtaining any liquor license, pharmacy license or other Permit; provided, however, if (y) a state liquor control authority refuses to consent to the transfer or issuance of a liquor license to Buyer, the affected liquor inventory shall be deemed Excluded Personal Property and Sellers shall have the right to access the Stores to remove the affected liquor inventory for their own use, and (z) a state pharmacy board or other state of federal authority refuses to consent to the transfer or issuance of a pharmacy or other license relating to pharmacies or the dispensing of drugs, the affected pharmacy inventory shall be deemed Excluded Personal Property and Sellers shall have the right to access the Stores to remove the affected pharmacy inventory for their own use.  Anything in this Agreement to the contrary notwithstanding, if a pharmacy license, liquor license or other license or permit required for the operation of a particular Store is not issued to Buyer prior to the Closing, Sellers shall, if legally permissible, grant Buyer the right to use Sellers' pharmacy license (by, among other things, executing an authorization in the form attached hereto as Exhibit N and executing a power of attorney in form sufficient to allow Buyer to operate under Sellers' DEA number), liquor license or other license or permit required for the operation of such Stores until the earlier of (1) the date of issuance to Buyer, as applicable, of a pharmacy license by the state pharmacy control authority and/or DEA, liquor license or other such license or permit, and (2) the ninetieth (90th) day following the Closing; provided, however, that during such period Buyer will provide insurance coverage satisfactory to Sellers for the operation of such business at such Stores naming Sellers as additional insureds on such policies for the term of such use.  Buyer shall also indemnify, defend and hold harmless Sellers from and against all losses resulting from Buyer's use of Sellers' Permits at such Store during the term of such use.

Section 2.5     Buyer hereby agrees and acknowledges that Sellers' obligations under this Agreement, in their entirety, are:

(a)     subject to approval by the Bankruptcy Court, and

(b)     conditioned upon the entry of the Sale Order approving the sale of the Assets to Buyer and the Ultimate Purchaser, as applicable, free and clear of all liens, claims, encumbrances and interests and the assumption and assignment of the Leases to the Buyer pursuant to the terms and conditions of this Agreement.  Sellers agree and acknowledge that (i) this Agreement is non-severable with respect to the Assets related to the Stores, and is to be considered as a whole, and (ii) Sellers shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in Section 15.1 below.  If the Sale Order is not entered by the Bankruptcy Court on or before March 31, 2015, or another date mutually agreed to by the parties in writing, Buyer shall be entitled to return of the Deposit.

# ARTICLE 3

### PURCHASE PRICE

Section 3.1     Amount.  The purchase price to be paid by Buyer to Sellers for the Assets (other than the Inventory and Supplies) is $4,800,000.003,500,000.00 (the "**Base Purchase Price**"). The purchase price to be paid by Buyer to Sellers for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory.

(a)    The purchase price for the EP True Real Property (the "**EP True Real Property Purchase Price**") shall be severable from the Base Purchase Price to the extent that NorthMarq does not consent to the purchase of the EP True Real Property free and clear of its Liens and security interests.   In such case, the Base Purchase Price shall be reduced by **$1,000,000** to account for the subtraction of the EP True Real Property Purchase Price and the EP True Real Property shall be removed from the Assets to be acquired pursuant to this Agreement; provided, however, that Buyer shall be granted reasonable access, at no cost to Buyer, to the EP True Real Property for no less than four (4) weeks after the Closing in order to liquidate and/or remove the Inventory and Equipment associated with the Store located on the EP True Real Property.

(b)    ~~Only with respect to the 8700 Hickman Real Property, Buyer has agreed that Seller may sever the sale of the 8700 Hickman Real Property from the Assets to be sold pursuant to this Agreement, subject to the strict requirement that the Sellers receive Bankruptcy Court approval of a sale transaction for the 8700 Hickman Real Property which must specifically, in any order approving such sale, (i) provide to the Sellers a net purchase price for the 8700 Hickman Real Property of **no less than $2.5 million**; (ii) require such sale to close no later than forty-five (45) days before the Closing Date; and (iii) grant the Buyer reasonable access, at no cost to Buyer, to the 8700 Hickman Real Property for no less than four (4) weeks prior to the closing of such transaction in order to liquidate and/or remove the Inventory and Equipment associated with the Store located on the 8700 Hickman Real Property.  Upon the occurrence of the conditions precedent in the prior sentence, including the actual occurrence of the closing of such transaction with respect to the 8700 Hickman Real Property no later than forty-five (45) days before the Closing Date, the 8700 Hickman Real Property shall be removed from the Assets to be acquired pursuant to this Agreement and the Base Purchase Price shall be reduced by **$1,300,000**. For the avoidance of doubt, the sale of the 8700 Hickman Real Property is severable solely under the terms and conditions of this paragraph and such sale shall not make the remainder of the Assets divisible in any manner other than as specifically set forth in this Agreement.   In the event that such transaction with respect to the 8700 Hickman Real Property closes as contemplated above, the Inventory, Equipment, and other assets related to the Store located at the 8700 Hickman Real Property shall become Excluded Personal Property.~~

Section 3.2    Deposit.

(a)    Buyer shall deliver to Escrow Agent, no later than two (2) Business Days after Sellers' filing of a motion to approve the sale contemplated by this Agreement in a form acceptable to Buyer, an earnest money deposit with respect to all Stores in the amount equal to 10% of the Base Purchase Price (the "**Deposit**").  Buyer shall make the Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Deposit will be fully refundable if the Sale Order is not entered by the Bankruptcy Court on or before March 31, 2015, or another date mutually agreed to by the parties in writing, or Buyer is entitled to terminate this Agreement, and does terminate this Agreement, in accordance with the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or the Bid Procedures, in the event that the Buyer is not the successful bidder, the Buyer's bid shall not be a back-up bid and the Buyer's Deposit shall be immediately refunded.

Section 3.8    Buyer's Agreement to act as Back-Up Purchaser for 8700 Hickman Real Property.  In the event that the separate sale of the 8700 Hickman Real Property to the 8700 Hickmann Purchaser should fail to close by March 2, 2015, Buyer agrees to act as a back-up purchaser (the "**Back-Up Purchaser**") solely with respect to the 8700 Hickman Real Property (which purchase shall include any Improvements associated with the store located at the 8700 Hickman Real Property, but exclude any Inventory or Equipment) for a purchase price of **$1 million** and under the same terms and conditions of this Agreement (the "**Back-Up Purchase**").  In the event of a Back-Up Purchase, the Seller shall liquidate the Inventory and Equipment associated with the store at the 8700 Hickman Real Property on or before the Closing Date or by such date as mutually agreed by the Seller and Buyer in writing..

# ARTICLE 4

### BUYER'S DUE DILIGENCE

Section 4.1    Right of Inspection. Buyer acknowledges that prior to the Effective Date, it has had the opportunity to examine and investigate the Assets and the Leased Premises to the extent permitted by Sellers.  Furthermore, Buyer shall have the right at all reasonable times, after giving Sellers advance written notice and at Buyer's sole cost and expense, of going to the Store with its agents and engineers as needed to investigate and inspect the Assets to determine whether or not the same are in acceptable physical condition as determined by Buyer in its reasonable discretion, and to conduct a physical inventory of the Equipment located at the Store. In no event shall Sellers be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection.  Notwithstanding anything contained herein to the contrary, Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Sellers.

Section 4.2    Indemnification. Buyer and Ultimate Purchasers, as applicable, hereby indemnify and agree to hold harmless Sellers from and against any and all damage to the Real Property and the Assets (including the cost of restoring the Real Property and the Assets to their pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's investigation under this Agreement.  Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the Transaction.  The indemnity provided by an Ultimate Purchaser by this Section 4.2 shall be limited solely to those Stores acquired by such Ultimate Purchaser.

Section 4.3    Title. Buyer confirms and acknowledges that Sellers have represented that they have made all title information in its possession available to Buyer, and Buyer (at Buyer's sole expense) may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "**Title Policies**") at Closing.

Section 4.4    Surveys.  Sellers represent that Sellers have made available to Buyer for review, copies of all surveys relating to the Stores and/or Leased Premises which are in their possession or under its control.