# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In Re: | Case No.:    14-02689-als-11 |
| **FOODS, INC. dba DAHL'S FOODS** | Chapter 11 |
| Debtor and Debtor-in-Possession. | Hon.  Anita L. Shodeen |
| P.O. Box 1218<br>Johnston, IA  50131<br>EIN: 42-0803702 | **DEBTOR FOODS, INC. SECOND AMENDED COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DATED AUGUST 17, 2015** |
| _____ | No Hearing Set |

Jeffrey D. Goetz, Esq., IS# 9999366
Krystal R. Mikkileneni, Esq., IS# 9997703
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel for Debtor
And Debtor-in-Possession and Plan Proponent

Richard S. Lauter, Esq.
Devon J. Eggert, Esq.
Freeborn & Peters, LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
312/360-6000
312/360-6520 FAX
rlauter@freeborn.com

Counsel for the Official Committee of
Unsecured Creditors and Co-Plan Proponent

## Article I.   INTRODUCTION

Foods, Inc. dba Dahl's Foods ("Dahl's")[1], is the Debtor in this Chapter 11 Bankruptcy Case.  On November 9, 2014 (the "Petition Date"), Dahl's filed its Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"), 11 U.S.C. § 101 et seq., in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court" or "Court").

This is Dahl's (the "Debtor" or the "Debtor-in-Possession") Second Amended Combined Plan and Disclosure Statement Dated August 17, 2015 (for ease of reference, the Combined Plan and Disclosure Statement will be referred to as the "Plan").  This Plan is proposed by both the Debtor and the Official Committee of Unsecured Creditors ("Official Committee") appointed in the Bankruptcy Case (the "Plan Proponent" and "Plan Co-Proponent" respectively, and collectively the "Plan Proponents")

This Plan is filed under the Code and proposes to pay Creditors of the Debtor primarily from the liquidation and sale of assets of the Bankruptcy Estate.  This Plan provides for Five (5) Classes of Claims: one Class of priority non-tax Claims; One (1) Class of Secured Claims, within which there are Five (5) sub-Classes;  One (1) Class of Priority Non-Tax Claims; Two (2) Classes of General Unsecured Claims; and One (1) Class of Equity Interest holders.  Unsecured Creditors holding Allowed Priority Tax Claims and Allowed Administrative Expense Claims, and Unsecured Creditors holding Allowed Claims in Classes Three and Four  will receive payments from Cash on hand on the Effective Date, and from the net proceeds, if any, from avoidance of any preferential payments and/or fraudulent transfers, continued liquidation of the Debtor's non-real estate and non-operational assets, and/or Claims against the Debtor's Directors & Officers and Insurance Policies.  <u>Based on the Debtor's best and current information as of the filing of this Plan, the Debtor anticipates that Creditors with Allowed Claims in Class Three may eventually receive as much as a 100% Dividend under this Plan.</u>

All Creditors holding Classified Claims and holders of Equity Interests should refer to Article III, Section D of this Plan for information regarding the precise treatment of their Claims.

This Plan also provides detailed information regarding the terms for payment of the Debtor's Creditors and other information designed to assist Creditors and holders of Equity Interests  in determining whether to accept the Plan.  ***Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)***

### A.   Purpose of This Document

This Plan describes:

- The Debtor and significant events during the Bankruptcy Case.
- Historical information regarding the Debtor and the events leading to its bankruptcy

---

[1] All capitalized terms in this Combined Plan and Disclosure Statement are defined in Appendix 1 attached hereto and incorporated by reference herein.

filing.

- How the Plan proposes to treat Claims or Equity Interests of the type you hold (i.e., what you will receive on your Claim or Equity Interest if the Plan is confirmed).
- Who can vote on or object to the Plan.
- What factors the Bankruptcy Court will consider when deciding whether to confirm the Plan.
- Why the Debtor believes the Plan is feasible, and how the treatment of your Claim or Equity Interest under the Plan compares to what you would receive on your Claim or Equity Interest in a hypothetical Chapter 7 liquidation.
- The effect of confirmation of the Plan.

### B.        Deadlines for Voting and Objecting; Date of Plan  Confirmation Hearing

The Court has not yet confirmed the Plan and the Debtor has asked to Court to "conditionally approve" the Disclosure Statement pursuant to Bankruptcy Code Sections 105(d) and 1125(f).  These sections describe the procedures under which the Plan will or will not be confirmed.

1.        Time and Place of the Hearing to Confirm the Plan

The hearing at which the Court will consider confirmation of the Plan and/or final approval of the Disclosure Statement will be set by a separate Order and Notice of Hearing and Deadlines accompanying this Plan.

2.        Deadline for Voting to Accept or Reject the Plan

If you are entitled to vote to accept or reject the Plan, you will vote on the enclosed Ballot and return the Ballot in the enclosed envelope to Jeffrey D. Goetz, Esq., Bradshaw Fowler, Proctor & Fairgrave, P.C., 801 Grand Avenue, Suite 3700, Des Moines, IA 50309. See Article VII below for a discussion of voting eligibility requirements.

The Ballot will advise you by what date and time your Ballot must be received by, or your Ballot may not be counted.

3.        Deadline for Objecting to the Adequacy of Disclosure and Confirmation of the Plan

Objections to final approval of the Disclosure Statement and confirmation of the Plan must be filed with the Court and served upon the Debtor's General Reorganization Counsel, counsel for the Official Committee, and the Office of the United States Trustee and all other Creditors and/or interested parties who have filed notices of appearances and requests for special notice, by the deadline provided for in the Court's Order and Notice of Deadlines and Hearing accompanying this Plan.

4.      Identity of Person to Contact for More Information

If you want additional information about the Plan, you should contact the Chief Executive and Restructuring Officer of the Debtor, Dean Longnecker.

## Article II.      BACKGROUND

### A.      Description and History of the Debtor's Business

Dahl's was founded in 1931 by W.T. Dahl, with the opening of his first grocery store in Des Moines, and was formally organized as a corporate entity in 1958 by five key Dahl's employees.

At the time of the filing of the Bankruptcy Case, Dahl's owned and/or operated 10 full-line grocery stores in and around the Des Moines area.  Three of the stores were owned by Dahl's and the other seven were leased.

Since the 1970s, Dahl's has been "employee-owned", pursuant to an Employee Stock Ownership Plan (the "ESOP") with 97% of the ownership of the Debtor held by the ESOP.  The remaining 3% is owned by certain past members of management, and other former employees.

Individual grocery store square footage ranged from 28,820 to 70,000, with average square footage of 55,188.  For the 52 weeks ended June 28, 2014, Dahl's generated sales of approximately $136.8 million.  Prior to cessation of business operations, Dahl's employed over 950 people.

Dahl's corporate offices were located on the second floor of the Merle Hay store.  Craig Moore was hired in January 2014 as Chief Restructuring Officer and named Chief Executive Officer in April of 2014 to stabilize the business and lead turnaround efforts.  Upon cessation of business operations, Dean Longnecker was appointed as both Chief Executive Officer and Chief Restructuring Officer.

In June of 2011, Dahl's signed a supply agreement with Associated Wholesale Grocers, Inc. ("AWG").  Dahl's also leased or subleased five of its stores from AWG (Fleur Drive, Ingersoll, Beaver, Johnston, and West Hickman).

Property Summary:

| Store Number | Store Name | Total Square Footage | Owned or Leased |
|---|---|---|---|
| 4 | Hickman | 42,192 | Owned |
| 5 | Euclid | 43,500 | Owned |
| 17 | EP True | 55,980 | Owned |
| 3 | Fleur Drive | 53,468 | Leased |
| 7 | Ingersoll | 70,000 | Leased |
| 8 | Beaver | 28,820 | Leased |

| 15 | Merle Hay | 55,000 | Leased |
| 18 | Johnston | 67,264 | Leased |
| 19 | West Hickman | 66,656 | Leased |
| 20 | East 33rd | 65,000 | Leased |

**B.      Current and Former Managers, Officers, Directors and Shareholders of the Debtor**

A listing of current and former officers, directors and shareholders, and their respective equity ownership interest in the Debtor, is attached hereto as Exhibit "A" and is incorporated by reference herein.

**C.      Events Leading to the Debtor's Chapter 11 Filing**

Since 2011, Dahl's has been a member of AWG, which is a Kansas corporation doing business in a cooperative manner.  AWG supplies its members a full line of groceries and supermarket products.  Prior to cessation of its business operations, Dahl's was primarily supplied by AWG, purchasing approximately 85% of its grocery and supermarket products from AWG which amounted to approximately 65% of its total purchases of goods for sale in its stores.

In order to finance its operations, Dahl's entered into a series of transactions with AWG, including without limitation, a borrowing relationship, a supply agreement under which it purchased products from AWG for sale in the stores, and certain lease transactions whereby Dahl's leased space from AWG for the operation of its stores.  The Debtor maintained an open account by which AWG provided additional revolving credit to the Debtor for its weekly purchase of groceries.

Over time, the Debtor experienced increased competition in the markets in which it did business.  That competition eroded sales.  The Debtor was slow to recognize the competitive threat and to make the operational changes necessary to remain viable.  During this period, the Debtor over-leveraged its assets as its revenues declined and became undercapitalized.  To deal with the increased debt obligations, the Debtor embarked on asset sales and store closings of unprofitable stores to reduce debt, in an effort to continue its businesses as going-concerns.  It also entered into its relationship with AWG to lower its costs and obtain additional merchandising and financial support from its key supplier.

In 2013, the Debtor retained The Food Partners to assist the Debtor in strategic decision making, and to assist in the marketing and sale of certain of the Debtor's assets.  Additionally, the Debtor hired a new CEO, Craig Moore, to assist in the operational turn-around.  While operations improved, the turn-around took more time than originally anticipated.  Moreover, the asset sales were slower to materialize and took longer to close than planned, resulting in additional operational losses.  Despite these efforts, the Debtor's Cash position has continued to erode, and the filing of the Petition became necessary to preserve the value of the Debtor's businesses.

### D.    Significant Events During the Bankruptcy Case

On November 9, 2014 (the "Petition Date"), Foods, Inc., Dahl's Food Mart, Inc., and Dahl's Holdings I, LLC filed separate Voluntary Chapter 11Petitions.  Dahl's Food Mart, Inc. and Dahl's Holdings I, LLC are wholly-owned subsidiaries of Foods, Inc. The three Bankruptcy Cases were consolidated on November 26, 2014 with the lead Bankruptcy Case as Foods, Inc.'s Bankruptcy Case, Case No. 14-02689-als11.  Filed contemporaneously with this Plan is the Debtor's motions to have the Dahl's Food Mart, Inc. and Dahl's Holdings I, LLC Bankruptcy Cases dismissed, on the basis that both entities no longer have any assets to administer an in the case of Dahl's Food Mart, Inc., there are no Creditors owed any money.

A summary of the events that have occurred since the Petition Date are detailed and itemized in a copy of the Bankruptcy Court's Docket.  Access to all documents and pleadings referenced on the Bankruptcy Court Docket are available from the Clerk of the Bankruptcy Court, online through Public Access to the Court's Electronic Records ("PACER") (if you have a PACER account,) or at no charge by requesting a copy of any document or pleading from the Debtor's General Reorganization Counsel.

### E.    Post-Petition Sale of Assets of the Bankruptcy Estate

The Debtor filed a Motion with the Court seeking to sell substantially all of its real estate and operational assets at a "Stalking Horse" Auction, pursuant to Bidding Procedures Motion and an Asset Purchase Agreement.  On December 3, 2014, the Court entered its Order approving the Debtor's Bidding Procedures (Docket Item 157), which provided for the Auction to be commenced by no later than January 19, 2015 and completed by January 21, 2015.

The Debtor conducted the Auction of substantially all of its real estate and operational assets on January 19, 2015.  The Debtor filed an emergency motion for modification of the Court's order approving the bid procedures on January 21, 2015 in order to extend the deadline for completion of the auction.  The Court entered an Order on January 22, 2015 extending the deadline to January 23, 2015.  A second round of the auction was conducted on January 23, 2015 for the sale of the Debtor's pharmacy prescriptions and pharmaceutical inventory.  The Court approved the sales of the Debtor's assets.

The Debtor's store at 5003 EP True Parkway, West Des Moines, Iowa (the "EP True Store") and the equipment in the EP True Store were sold to Kum & Go, L.C.  The Debtor's store at 8700 Hickman Road, Clive, Iowa (the "8700 Hickman Store") was sold to Equity Ventures Commercial Development, L.C.  The Debtor's pharmacy prescriptions and pharmacy inventory at the 8700 Hickman Store, EP True Store, and 3400 East 33rd Street, Des Moines, Iowa (the "East 33rd Street Store") were sold to Hy-Vee, Inc.  The Debtor's remaining assets were sold to AWG, pursuant to the Second Amended Asset Purchase Agreement between AWG and the Debtors (the "AWG APA").

### F.    Projected Recovery of Avoidable Transfers

The Debtor's Plan contemplates that the Trustee of the Dahl's Liquidating Trust, and the

professionals retained to assist the Trustee of the Dahl's Liquidating Trust (the "Liquidating Trust" or the "Trust") will conduct an analysis of all potentially avoidable preference payments and other fraudulent transfers. Depending on the outcome and results of any disputes involving any remaining assets of the Debtor, and the Trust's success in pursuit of the preference Claims and actions, there may be a dividend paid on account of the Allowed Claims of General Unsecured Creditors in Classes 3 and 4. If you received a payment or other transfer within 90 days of the Petition Date or other transfer avoidable under the Code, the Trust may seek to avoid such transfer.

### G.    Claims Objections

Pursuant to the Court's Notice to all Creditors (Docket Item 60) filed on November 14, 2014, the Bar Date for timely filing Proofs of Claim in the Bankruptcy Case was set for March 4, 2015.

Except to the extent that a Claim is already allowed pursuant to a final non-appealable order, the Debtor and/or the Trust reserve the right to object to Claims within Sixty (60) days of the Effective Date of the Plan, which date may be extended by further order of the Court. Therefore, even if your Claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your Claim is later filed and upheld.

The Debtor and/or the Trust will review all Claims and, where possible, attempt to settle or resolve disputed, contingent and/or unliquidated Claims as appropriate.

### H.    Current and Historical Financial Statements and Reports

Attached hereto as Exhibit "C" and incorporated by reference herein is the Debtor's audited consolidated financial statements as of September 28, 2013. Since the Petition Date, the Debtor has been preparing and filing Monthly Operating Reports. Attached hereto as Exhibit "D" is the Debtor's most recently filed Monthly Operating Report for the month ending June 30, 2015.

## Article III.    THE PLAN OF REORGANIZATION AND TREATMENT OF UNCLASSIFIED AND CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.    What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places Claims and Equity Interests in various Classes and describes the treatment each Class will receive. The Plan also states whether each Class of Claims or Equity Interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.    What is the Effective Date of the Plan?

The Effective Date of this Plan shall be fourteen (14) days after the Confirmation Order becoming a final, non-appealable order, unless extended by an Order of the Bankruptcy Court.

If a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first Business Day after that date on which no stay of the Confirmation Order is in effect, unless the Confirmation Order has been vacated.

## C.     Explanation of and Treatment of Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such Claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  Accordingly, the Plan Proponents have not placed the following Claims in any Class:

### 1.     Administrative Expenses

Administrative expenses are costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code § 507(a)(2).  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the Petition Date for which a Code § 503(b)(9) Claim has been filed and allowed.  The Code requires that each Administrative Expense Claim be paid on the Effective Date of the Plan, unless the holder of the Claim agrees to different and/or less favorable treatment.

On December 4, 2014, the Debtor filed with the Court a Motion Pursuant to Bankruptcy Code Sections 503 and 105(a) for Approval of Procedures for the Treatment of Claims Asserted Under Bankruptcy Code Section 503(b)(9) (Docket Item 166).  The Court granted the Debtor's Motion on December 8, 2014 (Docket Item 172).  Pursuant to the 503(b)(9) procedures, the Debtor filed its Bankruptcy Code Section 503(b)(9) Report with the Court on January 28, 2015 (Docket Items 293 & 294).  Following good faith settlement negotiations with Creditors holding 503(b)(9) Claims, the Debtor filed an Amended Bankruptcy Code Section 503(b)(9) Report on February 11, 2015 (Docket Item 333) and a Second Amended Bankruptcy Code Section 503(b)(9) Report on February 26, 2015 (Docket Item 349).  The Debtor's Second Amended 503(b)(9) Report was approved by the Court on March 20, 2015 (Docket Item 392).  Attached hereto as Exhibit "H" is a listing of all allowed 503(b)(9) Claims.

Further, following a hearing on motions for administrative expenses and objections thereto, the Court entered an Order granting such motions for administrative expenses on March 20, 2015 (Docket Item 393).

All Allowed Administrative Expense Claims will be paid Pro Rata.  If there are insufficient funds on hand to pay the Allowed Administrative Expense Claims in full, the balance owed shall be paid by the Trust as additional funds are collected and received by the Trust.  The Debtor believes there will be sufficient Cash on hand to pay all Allowed Administrative Expense Claims in full on the Effective Date

The following chart lists the Debtor's estimated administrative expenses and their treatment under this Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Allowed Bankruptcy Code Sec. 503(b)(9) Claims | $1,077,493.00 | Paid in full on or before the Effective Date of the Plan, or according to such different and/or less favorable terms by agreement. |
| Post-Petition Ordinary Course of Business Claims | $255,000.00 | Paid in full on or before the Effective Date of the Plan, or according to such different and/or less favorable terms by agreement. |
| Allowed Executory Contract and Unexpired Lease Assumption Cure Claim | $71,432.00 | Paid in full on or before the Effective Date of the Plan, or according to such different and/or less favorable terms by agreement. |
| Professional Fees, as approved by the Court (estimated) | $140,000.00 | Allowed Professional Fees will be paid 100% of what is allowed by the Court on the Effective Date of the Plan or the entry of a Final Order approving such Claim,  Any amounts subsequently approved by the Court shall be paid within 14 days of the Court's approval. |
| Office of the U.S. Trustee Fees | $1,625.00 | Paid in full on the Effective Date of the Plan |
| TOTAL | $1,545,550.00 | |

2.       Priority Tax Claims

Priority Tax Claims are secured real estate property taxes and unsecured sales and use taxes described by Code § 507(a)(8). Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees to different and/or less favorable treatment, it must receive the present value of such Claim, in regular installments paid over a period not exceeding five (5) years from the order of relief.

There are no known § 507(a)(8) Priority Tax Claims.

**D.**       **Explanation and Treatment of Classified Claims and Equity Interests**

1.       Classes of Secured Claims (Class 1)

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as Secured Claims under Code § 506. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a Class 3 General Unsecured Claim.

8

2.      Classes of Priority Non-Tax Unsecured Claims (Class 2)

Certain Priority Non-Tax Claims that are referred to in Code §§ 507(a)(1), (4), (5), (6), and (7) are required to be placed in Classes.  The Code requires that each holder of such an Allowed Claim receive Cash on the Effective Date of the Plan equal to the allowed amount of such Claim.  However, a Class of holders of such Claims may vote to accept different and/or less favorable treatment.

The Debtor does not believe there are any Class 2 Non-Tax Priority Claims.

3.      Classes of General Unsecured Claims (Classes 3 and 4)

General Unsecured Claims are not secured by property of the estate and are not entitled to priority under Code § 507(a).

4.      Class of Equity Interest Holders (Class 5)

Holders of Equity Interests are parties who hold an ownership interest (i.e., equity interest) in the Debtor.  In a corporation or a limited liability company, entities or individuals holding preferred or common stock are equity interest holders.  A list of the equity interest holders, otherwise referred to as the shareholders, are included in Exhibit "E".

Unless all holders of Allowed Claims in Classes 1, 2, 3 and 4 are paid in full, holders of Allowed Class 5 Equity Interests will not receive any payment or dividend on account of their respective Equity Interests.

5.      Overview - Treatment of Classified Claims and Interests under Plan

Classified Claims and Equity Interests are treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1a – Allowed Secured Claim of AWG | Unimpaired | Class 1a has been paid in full during the pendency of the case, from the liquidation of its collateral.  The Class 1a Claim holder shall not receive any further payment or dividend under the Plan. |
| Class 1b – Allowed Secured Mechanics Lien Claim of Allied Construction Services, Inc. – EP True Store | Unimpaired | Class 1b has been paid in full during the pendency of the case, from the liquidation of its collateral.  The Class 1b Claim holder shall not receive any further payment in dividend under the Plan. |
| Class 1c – Allowed Secured Mechanics Lien Claim of Allied Construction Services, Inc. – | Impaired | The Class 1c Claim shall be paid in full on the Effective Date of the Plan. |

9

| Merle Hay Store | | |
|---|---|---|
| Class 1d – Allowed Secured Mechanics Lien Claim of Control Installations of Iowa, Inc. – Beaver Ave. Store | Unimpaired | Class 1b has been paid in full during the pendency of the case, from the liquidation of its collateral.  The Class 1b Claim holder shall not receive any further payment in dividend under the Plan. |
| Class 1e – Allowed Secured Equipment Lease Claim of GE Capital Commercial, Inc. | Unimpaired | Class 1e has been paid in full during the pendency of the case, from the liquidation of its collateral.  The Class 1e Claim holder shall not receive any further payment in dividend under the Plan. |
| Class 2 – Allowed Non-Tax Priority Unsecured Claims | Unimpaired | Paid in full on or before the Effective Date of the Plan, or according to such different and/or less favorable terms by agreement.  The Debtor does not believe there are any Class 2 Claims. |
| Class 3 – Allowed General Unsecured Claims | Impaired | Allowed Class 3 Claims will be paid a Pro Rata dividend, from the net proceeds of the assets of the Liquidating Trust (defined below), which includes, without limitation, Cash on hand, any recoveries made on avoidance of preference payments and fraudulent transfers and Directors & Officers and Insurance Policies, and from the sale, liquidation or other disposition of the remaining non-real estate and non-operational assets of the Reorganized Debtor on the Effective Date, depending on the results and resolution of any disputes. Pursuit of said recoveries and resolution of any disputes with Creditors and the sale, liquidation or other disposition of the non-real estate and non-operational assets shall be administered by the Trustee of the Liquidating Trust.[2] The Debtor estimates there are approximately $4,633,631 in Allowed Class 3 Claims. |
| Class 4 – Subordinated General Unsecured ESOP Contribution Claims | Impaired | Allowed Class 4 Claims will be paid a Pro Rata dividend, if any and only to the extent Allowed Class 3 Claims are paid in full, from the net proceeds of the assets of the Liquidating Trust which includes, without limitation, Cash on hand, any recoveries made on avoidance of preference payments and fraudulent transfers and Directors & Officers and Insurance Policies, and from the sale, liquidation or other disposition of the remaining non-real estate and non-operational assets of the Reorganized Debtor on the Effective Date, depending on the results and resolution of any disputes. Pursuit of said recoveries |

---

[2] A copy of the Dahl's Liquidating Trust Agreement is attached to this Plan as Exhibit "F" and is incorporated by reference herein.

| | | and resolution of any disputes with Creditors and the sale, liquidation or other disposition of the non-real estate and non-operational assets shall be administered by the Trustee of the Liquidating Trust.  The Debtor estimates that the Class 4 Claim is approximately $1,058,987.00. |
|---|---|---|
| Class 5 – Equity Interest Holders | Impaired | All Class 5 Interests shall be cancelled on the Effective Date of the Plan. Allowed Class 5 Equity Interests will be paid a Pro Rata dividend, if any, and only to the extent Allowed Class 3 and Class 4 Claims are paid in full, from the net proceeds of the assets of the Liquidating Trust which includes, without limitation, Cash on hand, Directors & Officers and Insurance Policies, and from the sale, liquidation or other disposition of the remaining non-real estate and non-operational assets of the Reorganized Debtor on the Effective Date, depending on the results and resolution of any disputes. Pursuit of said recoveries and resolution of any disputes with Creditors and the sale, liquidation or other disposition of the non-real estate and non-operational assets shall be administered by the Trustee of the Liquidating Trust. |

### E.    Treatment of U.S. Trustee Fees

All fees required to be paid by the Debtor or the Reorganized Debtor pursuant to 28 U.S.C. § 1930(a)(6) (the "U.S. Trustee Fees") will accrue and be timely paid until entry of a Final Decree and the case is closed, dismissed, or converted to another chapter of the Code.  Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date

## Article IV.    ALLOWANCE AND DISALLOWANCE OF CLAIMS

### A.    Disputed Claims

A disputed Claim is a Claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of Claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of Claim has been filed, and the Debtor has scheduled such Claim as disputed, contingent, or unliquidated.

No distribution will be made on account of a disputed Claim unless such Claim is allowed by a final non-appealable order.

### B.    Settlement of Disputed Claims

After the Effective Date, the Trustee will have the power and authority to settle and compromise a disputed Claim with court approval and compliance with Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure.

### Article V.    PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### A.    Assumed Executory Contracts and Unexpired Leases

Filed contemporaneously with this Plan is the Debtor's Third and Final Motion For Entry of Order Authorizing The Debtor To Assume and Assign Certain Executory Contracts and Unexpired Leases.  Assumption means that the Debtor has elected to continue to perform the obligations under such executory contracts and/or unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. Assumption and assignment includes assumption and assignment of the executory contract or unexpired lease to another party who has agreed to fulfill the obligations under such contract or lease.

If you object to the assumption or assumption and assignment of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Motion within the deadline for objecting to Motion, unless the Court sets a different time.

#### B.    Rejected Executory Contracts and Unexpired Leases

Filed contemporaneously with this Plan is the Debtor's Motion for Entry of Order Approving Rejection of Certain Executory Contracts and Unexpired Leases and Setting a Bar Date for Lease Rejection Damages Claims.  Any Claim based on the rejection of a contract or lease will be barred if the proof of Claim is not timely filed, unless the Court orders otherwise.

To the extent not assumed by separate order of the Bankruptcy Court prior to the Confirmation Hearing, all executory contracts and unexpired leases of the Debtor shall be rejected effective upon the Effective Date. Any rejection damages claim arising from the automatic rejection of any executory contract or unexpired lease on the Effective Date must be filed on or before thirty (30) days after the Effective Date.

### Article VI.    MEANS OF IMPLEMENTING THE PLAN

#### A.    In General

Substantially all of the Debtor's real estate and operational assets have been sold, transferred or otherwise liquidated during the pendency of this case and prior to the filing of this Plan, either in the ordinary course of business or pursuant to orders of this Court.

Upon confirmation of the Plan, the Reorganized Debtor will make payment in full to all unclassified claims and payments in full to Classes 1C and 2.  The Reorganized Debtor will make an initial distribution on all Allowed Class 3 Claims in an amount to be determined prior to Confirmation by the Debtor in consultation with the Official Committee.

The net proceeds from the sale of substantially all of the Debtor's real estate and operational assets that were not distributed in the ordinary course of business or in accordance with orders of the Court will be held in a trust account pending confirmation of this Plan, and disbursed by the Debtor pursuant to the Plan and Confirmation Order on the Effective Date of the Plan.  Any Cash, non-real estate and non-operational assets of the Debtor held by the Debtor or Reorganized Debtor on the Effective Date, including, without limitation, any rights, titles, Claims, Causes of Action under Chapter 5 of the Code, or otherwise (the "Litigation Claims), and all Assets of the Debtor on the Effective Date (collectively, the "Liquidating Trust Assets"), will be irrevocably transferred to the Trustee of the Liquidating Trust on the Effective Date, which will sell, liquidate and/or otherwise dispose of said assets after the Effective Date for the benefit of Creditors, and distributed pursuant to the Plan and the Liquidating Trust Agreement. The deeding of any real property, if any, to the Liquidating Trustee shall be exempt from document stamps pursuant to Code Section 1146(a).

B.    Non-Real Estate and Non-Operational Assets

As of the filing of this Plan, the Debtor's non-real estate and non-operational assets include, but are not limited to the following:

1)    Two (2) tranches of AWG Patronage Certificates, the first with a face value of $417,277, maturing on November 31, 2018 and the second with a face value of $554,101 maturing on November 31, 2019. The Debtor has received authority from AWG to solicit other AWG Coop Members for offers to purchase the Debtor's AWG Patronage Certificates at a discount.  The Debtor  anticipates accepting the highest and best offer from either AWG or one of its AWG Coop Members.

2)    Potential refund from deposit on account of a large-deductible, self-insured workers' compensation insurance policy.  The Debtor estimates this asset may realize approximately $100,000 upon satisfaction of all pending claims.

3)    The Debtor believes it may have a Claim in a pending class-action lawsuit against Visa and Mastercard regarding interchange fees.  The Debtor has not fully investigated whether it has such a Claim, or if it does, how large of a Claim it might be able to assert.  The Debtor is aware that there are "Claims traders" who are offering to buy such Claims at discount.

4)    The Debtor continues to collect accounts receivables from various vendors and insurance companies on account of vendor refunds and its previous pharmacy operations.  It has not been determined whether all refund Claims from vendors and/or insurance Claims for pharmacy receivables will be collected by the time the Plan is confirmed.

5)    The Debtor is pursuing Iowa State Sales and Use Tax refund Claims for the period between July 1, 2012 through and including March 31, 2015.

**B.    Source of Payments**

Payments and distributions under the Plan will be funded by the following: Cash on hand, proceeds from the sale of substantially all of the Debtor's non-real estate and non-operational assets, and recoveries, if any, from pursuit of Litigation Claims.

**C.    Cessation of the Debtor's Business Operations**

Upon the closing of each sale of the Debtor's real estate and operational assets, the Debtor effectively and actually did cease all business operations.  Upon cessation of all business operations, the Debtor has focused, and shall continue to focus all of its energy and efforts in seeking confirmation of this Plan and distribution of the proceeds from the sale, transfer or other liquidation of its remaining non-real estate and non-operational assets.

**D.    Post-Effective Date Operations of the Debtor**

After the Effective Date of the Plan, the Reorganized Debtor shall cooperate and provide all requisite information, data and other books and records to the Liquidating Trust so that it can properly and effectively pursue and discharge its obligations under this Plan.  The Debtor's representatives shall be compensated for such services on an hourly basis, but only to the extent such services are requested by the Liquidating Trustee and the Liquidating Trustee determines, in his sole discretion, that the amount of fees incurred for such services are reasonable.

**E.    Retention of Liens**

All valid, binding and perfected liens, Claims, encumbrances and interests of all Claim holders in the real estate and operational assets of the Debtor and non-real estate and non-operational assets, shall attach to the proceeds , pursuant to Bankruptcy Code Section 363, in the same priority as held pre-petition.

**F.    Post-Confirmation Compensation of Professional Persons**

Compensation for services rendered and for reimbursement of expenses by a Professional Person after the Confirmation Date need not be approved by the Bankruptcy Court.  Professional Persons may invoice the Liquidating Trust directly, and the Liquidating Trustee may pay such invoices without further Order of the Bankruptcy Court; provided, however, that in the event of a dispute between the Liquidating Trustee and the Professional Person regarding such compensation or reimbursement, the Liquidating Trustee or Professional Person may submit an application to the Bankruptcy Court for review of the request for compensation and reimbursement, and the Bankruptcy Court retains jurisdiction to hear and approve such application and compel payment thereon.  Such post-Confirmation Date compensation for services rendered and reimbursement of expenses shall be considered an ordinary operating expense, and the Liquidating Trust shall be liable for such expense in accordance with the terms of the Liquidating Trust.

### G.      All Post-Petition Section 1129(a)(4) Payments Subject to Bankruptcy Court Review

As required by Bankruptcy Code Section 1129(a)(4), all payments made, or to be made by the Debtor, the Reorganized Debtor or the Trust for post-petition services, or for costs and expenses in, or in connection with the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, prior to the Confirmation Date, are subject to approval of the Bankruptcy Court as reasonable.  To the extent that any such payment is not subject to the procedures and provisions of Code Sections 326-330, pursuant to this Plan, or otherwise, then such Bankruptcy Court approval shall be deemed to have been given through entry of the Confirmation Order unless, within 15 days of such payment or request for such payment, the Bankruptcy Court, the Official Committee, the United States Trustee, the party making the payment, or the party receiving the payment challenges or seeks approval of the reasonableness of such payment; no other parties or entities shall have standing to make such a challenge or application for approval.  Nothing in this provision shall affect the duties, obligations and responsibilities of any entity under Code Sections 326-330 and is subject to the provisions of Article III(C)(1).

### H.      Default

1.      Events of Default

The following shall be events of default under this Plan:

a.      The failure of the Debtor to make any payment required under the Plan when due; provided, however, that, except as otherwise provided in this Plan, no default shall be deemed to have occurred if such missed payment is made within ten (10) days of its due date.

b.      Provided no agreement exists to extend or modify the terms of any agreement between the Debtor and third-party vendors or Creditors, failure of the Debtor to pay when due all debts and expenses in the ordinary course of its financial affairs.

c.      A material breach of any provision of this Plan.

2.      Cure of Prior Defaults

As of the Effective Date, any defaults by the Debtor under any non-bankruptcy agreement shall be deemed cured, and notice of default or sale recorded by any Creditor prior to the Effective Date shall be deemed null, void, and to have no further force or effect.

3.      Consequences of Default

Except as otherwise provided by this Plan or by an order of the Bankruptcy Court issued upon application by a party in interest, if an event of default under this Plan occurs and is not cured within ten (10) days after service of written notice of default on: (i) the Debtor or

Reorganized Debtor and on counsel for the Debtor or Reorganized Debtor prior to the Effective Date; and (ii) the Liquidating Trustee and counsel for the Liquidating Trustee after the Effective Date, any holder of an Allowed Claim, subject to the provisions of this Plan, may immediately seek appropriate relief from the Bankruptcy Court.

Notwithstanding the foregoing, the Reorganized Debtor or another party in interest may seek an order of the Bankruptcy Court staying any Creditor from pursuing its default rights and remedies based on appropriate grounds.  Except as otherwise specified in this Plan, such grounds may include, among others: (1) that no uncured default has occurred; and (2) that the Creditor is adequately protected and the Reorganized Debtor or the Liquidating Trustee is likely to be able to cure any default within a reasonable period of time taking into account the Reorganized Debtor's right to seek modification of this Plan in accordance with applicable bankruptcy law. The Reorganized Debtor shall bear the burden of proof with respect thereto.

Notices pursuant to this Article shall be served as follows:

Counsel for the Reorganized Debtor:
Jeffrey D. Goetz, Esq.
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

Reorganized Debtor:
Foods, Inc.
Mr. Dean Longnecker
P.O. Box 1218
Johnston, IA  50131

Liquidating Trustee:
Barry A. Chatz, Esq.
Arnstein & Lehr LLP
120 South Riverside Plaza, Suite 1200
Chicago, IL 60606

## I.    Post-Confirmation Management

The Post-confirmation managers of the Debtor, and their compensation, will be as follows:

| Name | Insider | Position | Hourly Compensation |
|------|---------|----------|---------------------|
| Dean Longnecker | Yes | Chief Executive Officer & Chief Restructuring Officer | $350.00 |
| Craig Moore | Yes | Consultant | $350.00 |

### J.    Risk Factors

The assumptions made in this Plan are based upon the best information available to the Debtor at this time.  The Debtor reserves the right to revise the data, projections, and assumptions contained herein as more accurate information becomes available.  In addition, the listing of a particular Claim for a specific amount in this Plan is not an admission by the Debtor as to either liability or amount, and the Debtor, and after the Effective Date, the Trustee, reserves the right to object to any and all Claims in accordance with the Plan.

Finally, with regard to the Liquidating Trust's pursuit of recovery of Litigation Claims, there is a risk that such actions are unsuccessful, or result in negligible or less than anticipated recoveries.

The Debtor believes, however, that with cooperation between and among the various creditors, interested parties and other constituencies in the case, such risks will be mitigated and minimized, and that the Plan will be fully implemented.

### K.    Tax Consequences of Plan

The Debtor will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan.  **EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS/HER/ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

ANY PERSON CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN IS STRONGLY URGED TO CONSULT WITH HIS/HER/ITS OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS TO DETERMINE HOW THE PLAN MAY AFFECT HIS/HER/ITS FEDERAL, STATE, LOCAL AND FOREIGN TAX LIABILITY.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor.  The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the tax code embodies many complicated rules which make it difficult to completely and accurately state all of the tax implications of any action or transaction.

The following are the tax consequences that the Plan will have on the Debtor's tax liability:

The Debtor is unaware of any adverse tax consequences of the Plan as to the Debtor.  The Debtor expects to minimize its tax liability and, to the extent permitted by the Tax Code, will seek to expense from current income the amounts paid under the Plan.  Notwithstanding the foregoing, the feasibility of the Plan does not depend on the deductibility of amounts paid.

The Debtor is unaware of any adverse tax consequences of the Plan to Creditors.  It is not necessary or practical to present a detailed explanation of the federal income tax aspects of the Plan or the related bankruptcy tax matters involved in this Chapter 11 case.  The tax

consequences resulting from the Plan to each individual Creditor should not vary significantly from the past tax consequences realized by each individual Creditor.  To the extent that the tax consequences do vary for individual Creditors, each one is urged to seek advice from his/her/its own counsel or tax advisor with respect to the federal income tax consequences resulting from confirmation of the Plan.

The Liquidating Trust will withhold all amounts required by law to be withheld from payments to holders of Allowed Claims.  In addition, such holders may be required to provide certain tax information to the Liquidating Trust as a condition of receiving distributions under the Plan.  The Liquidating Trust will comply with all applicable reporting requirements of the Internal Revenue Code of 1986, as amended.

## L.   The Dahl's Liquidating Trust

The Official Committee appointed in the Bankruptcy Case shall cease to continue after the Effective Date. All rights to pursue actions to recover money from Litigation Claims, sale, disposition or other liquidation of any remaining non-real estate and non-operational assets shall be vested with the Liquidating Trustee on the Effective Date of the Plan, pursuant to the terms of the Liquidating Trust Agreement.

The Liquidating Trustee will be compensated at his regular hourly rate in the amount of $495.00 for services as Liquidating Trustee and the reduced rate of $295.00 for any necessary disbursement services. The terms, conditions and provisions of the Liquidating Trust Agreement will be prepared and finalized within Ten (10) days of the hearing on Plan Confirmation, pursuant to agreement by the Debtor, the Liquidating Trustee and the Committee.  A copy of the Dahl's Liquidating Trust Agreement, in a form substantially as attached hereto as Exhibit F, is incorporated by reference herein.

The Liquidating Trust Agreement provides for an oversight committee (the "Oversight Committee").  As set forth in more detail in the Liquidating Trust Agreement, the Oversight Committee shall generally oversee the actions of the Liquidating Trustee in administering the Liquidating Trust.

On at least an annual basis after the Effective Date, the Liquidating Trust shall make distributions of Liquidating Trust Assets to Creditors, pursuant to the terms of the Plan and the Liquidating Trust Agreement. Compensation to the Professional Persons employed by the Liquidating Trustee for services rendered for, among other things, pursuit of the Litigation Claims shall be paid not less than annually as set forth in the Liquidating Trust Agreement from the Liquidating Trust Assets.

The Bankruptcy Estate will treat the transfer of its assets to the Liquidating Trust as a transfer to the Creditors for all purposes under Internal Revenue Code Sections 61(a)(12), 483, 1001, 1012 and 1274, to the extent that the Creditors are the beneficiaries of the Liquidating Trust.  Pursuant to the terms of the Liquidating Trust Agreement, the Liquidating Trustee will file returns for the Liquidating Trust as a Grantor Trust, pursuant to Section 1.671-1(a) of the Income Tax Regulations.  Additionally, the Liquidating Trust will not receive or retain Cash or

Cash equivalents in excess of what is a reasonable amount necessary to meet Claims and contingent liabilities or to maintain the value of the assets during liquidation.

Upon the Effective Date, the Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators or other Professionals as it may deem necessary and in accordance with the Liquidating Trust Agreement. The Professionals retained by the Liquidating Trustee are not required to be "disinterested" as that term is defined in the Code and may include, without limitation, counsel and financial advisors of any party in the Case. The Liquidating Trustee's retention of any such Professionals is deemed not to pose any conflict of interest, and no conflict will exist by virtue of the filing of applications by Professional Persons for allowance of Administrative Claims in accordance with the Plan.

### M.    Termination of the Dahl's Employee Stock Ownership Plan and Trust

The Debtor currently sponsors the Dahl's Employee  Stock Ownership Plan and Trust (the "ESOP"),  The ESOP was originally adopted on September 26, 1975 and was last amended and restated on January 22, 2013.  The custodian of the assets of the ESOP is The Principal. Prior to the Petition Date, the Debtor, as employer, matched contributions made by employees who contributed to the Dahl's 401(k) Plan 100%, up to 4% of the employees earnings.  The ESOP also allowed for discretionary contributions from the employer

The Debtor has ceased contributions to the ESOP and will terminate the ESOP through the ESOP's Third Party Administrator, The Principal, who will assist the ESOP participants in "rolling over" and/or distributing their vested account balances, if any.

As the Debtor's Plan provides for liquidation of substantially all of the Debtor's assets, and the Debtor has ceased all business operations,, the Debtor shall terminate the ESOP as of the Effective Date.  Any Allowed Claim against the Debtor arising from such termination shall be subordinate to the Claims of Allowed Class 3 Claims pursuant to section 510(b) of the Bankruptcy Code and shall be classified as a Class 4 Claim and treated accordingly.

Since the Petition Date, the Debtor has not engaged any actuary or other accounting professional to determine the amount of the Debtor's unfunded liability, either as of the Petition Date, or the Effective Date.  As of the filing of this Plan, the Department of Labor has filed a proof of Claim.  The Claims Bar Date for Governmental Units, including the ESOP, shall be sixty (60) days after the Effective Date. Notice of the Bar Date for Administrative Expense Claims shall be included in the Confirmation Order mailed to all Creditors and interested parties in the case.

### N.    Termination of the Dahl's 401(k) Plan

The Debtor currently sponsors the Dahl's 401(k) Plan (the "401(k)"),  The 401(k) was originally adopted on October 1, 2002 and was last amended and restated on January 1, 2012. The custodian of the assets of the 401(k) is The Principal.  Prior to the Petition Date, the Debtor, as employer, did not match contributions made by employees who contributed to the 401(k).

Upon cessation of the Debtor's business operations, and final payroll, no further employee contributions have been made to the 401(k).   The Debtor, through the Third Party Administrator, The Principal, has given all 401(k) Plan Participants the requisite notices and shall assist 401(k) Plan Participants in "rolling over" and/or distributing their vested account balances, and otherwise complete the formal termination of the 401(k).

### O.     Unclaimed Funds

Any distribution by check to any holder of an Allowed Claim, if unclaimed or uncashed by the payee thereof within 90 days after issuance and delivery by first class mail, shall become property of the Liquidating Trust, and all liabilities and obligations of the Liquidating Trust to such payee and any holder of such check shall thereupon cease.

### P.     Bar Date for Administrative Expense Claims

To enable the Debtor to efficiently respond to the multiple Bankruptcy Code Section 503(b)(9) motions filed by the Creditors in this case, the Debtor formulated procedures for the 503(b)(9) motions.  The Debtor filed a Motion for Approval of Procedures for the Treatment of Claims Asserted Under Bankruptcy Code Section 503(b)(9) on December 4, 2014 (Docket Item 166), which was granted by Docket Text Order on December 8, 2014 (Docket Item 172).  All 503(b)(9) Claims were handled according to such procedures.

Except as set forth in Bankruptcy Code § 503(b)(1)(D) and the § 503(b)(9) procedures, all Administrative Expense Claim holders shall file motions for allowance of their Administrative Expense Claims not later than thirty (30) days after the Effective Date of the Plan or such Administrative Expense Claims shall be disallowed and forever barred.  Notice of the Bar Date for Administrative Expense Claims shall be included in the Confirmation Order mailed to all Creditors and interested parties in the case.

### Q.     Injunction.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, EXCEPT AS OTHERWISE SET FORTH IN THE PLAN, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTOR OR REORGANIZED DEBTOR ARE, WITH RESPECT TO OR ON ACCOUNT OF ANY SUCH LIENS, CLAIMS OR INTERESTS, PERMANENTLY ENJOINED FROM:  (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTOR OR REORGANIZED DEBTOR, THE OFFICIAL COMMITTEE, OR THE LIQUIDATING TRUST OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS (EXCLUDING THE DEBTOR'S INSIDERS); (II) ENFORCING AGAINST, LEVYING UPON OR ATTACHING

(INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT) THE DEBTOR OR REORGANIZED DEBTOR, THE OFFICIAL COMMITTEE, OR THE LIQUIDATING TRUST OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS (EXCLUDING THE DEBTOR'S INSIDERS); (III) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, CLAIM OR ORDER AGAINST THE DEBTOR OR REORGANIZED DEBTOR, THE OFFICIAL COMMITTEE, OR THE LIQUIDATING TRUST OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS (EXCLUDING THE DEBTOR'S INSIDERS); (IV) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIENS, CLAIMS OR INTERESTS OF ANY KIND AGAINST OR IN THE DEBTOR OR REORGANIZED DEBTOR, THE OFFICIAL COMMITTEE, OR THE LIQUIDATING TRUST OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS (EXCLUDING THE DEBTOR'S INSIDERS); (V) OTHER THAN AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, ASSERTING ANY RIGHT OF SETOFF, SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR OR REORGANIZED DEBTOR, THE OFFICIAL COMMITTEE, OR THE LIQUIDATING TRUST OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS (EXCLUDING THE DEBTOR'S INSIDERS); AND (VI) TAKING ANY ACTIONS IN ANY PLACE AND IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN.  FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS SECTION SHALL BE INTENDED TO, OR BE DEEMED TO, RELEASE, ENJOIN, DISCHARGE OR OTHERWISE IMPACT ANY CLAIMS, CAUSES OF ACTION, OR RIGHTS OF ANY PARTY AGAINST THE INSIDERS OF THE DEBTOR.

All injunctions or stays provided for in the Bankruptcy Case under section 105 or 362 of the Code, or otherwise, and in existence on the Effective Date, will remain in full force and effect through the imposition of the injunction set forth in the Plan.

### R.     Exculpation and Limitation of Liability.

Neither the Official Committee, the Debtor, the Reorganized Debtor, the Liquidating Trust, nor any of their respective members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity (excluding the Debtor's insiders), will have or incur any liability to, or be subject to any right of action by, any Person or entity, for any act or omission in connection with, relating to or arising out of, the Bankruptcy Case or the pursuit of confirmation of the Plan, except to the extent arising out of fraud, willful misconduct

or gross negligence, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.  For the avoidance of doubt, nothing in this section shall be intended to, or be deemed to, release, enjoin, discharge or otherwise impact any Claims, Causes of Action, or rights of any party against the insiders of the Debtor.

## Article VII.   CONFIRMATION REQUIREMENTS AND PROCEDURES

### A.   Overview of Requirements

To be confirmable, the Plan must meet the requirements listed in Code §§ 1129(a) or (b). These include the requirements that: the Plan must be proposed in good faith; at least one impaired Class of Claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each Creditor and Equity Interest holder at least as much as the Creditor or Equity Interest holder would receive in a Chapter 7 liquidation case, unless the Creditor or Equity Interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in Code § 1129, and they are not the only requirements for confirmation.

### B.   Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A Creditor or Equity Interest holder has a right to vote for or against the Plan only if that Creditor or Equity Interest holder has a Claim or Equity Interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

### C.   What Is an Allowed Claim or an Allowed Equity Interest?

Only a Creditor or Equity Interest holder with an Allowed Claim or an Allowed Equity Interest (for voting purposes) has the right to vote on the Plan.  Generally, a Claim or Equity Interest is allowed if either (1) the Debtor has scheduled the Claim on the Debtor's schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (2) the Creditor has filed a proof of Claim or equity interest, unless an objection has been filed to such proof of Claim or equity interest.  When a Claim or equity interest is not allowed, the Creditor or equity interest holder holding the Claim or equity interest cannot vote unless the Court overrules the objection or allows the Claim or equity interest for voting purposes under Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of Claim in this case was March 4, 2015. The deadline for filing objections to Claims will be sixty (60) days after the Effective Date, which may be extended by order of the Bankruptcy Court.

**D.      What Is an Impaired Claim or Impaired Equity Interest?**

As noted above, the holder of an Allowed Claim or equity interest has the right to vote only if it is in a Class that is impaired under the Plan.  As provided in Code § 1124, a Class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

**E.      Who is Not Entitled to Vote?**

The following types of Creditors and Equity Interest holders are not entitled to vote:

1.  Holders of Claims and Equity Interests that have been disallowed by an order of the Court.
2.  Holders of other Claims or Equity Interests that are not "Allowed Claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
3.  Holders of Claims or Equity Interests in unimpaired Classes.
4.  Holders of Allowed Claims entitled to priority pursuant to Code §§ 507(a)(2) and (8).
5.  Holders of Claims or Equity Interests in Classes that do not receive or retain any value under the Plan.
6.  Holders of administrative expenses.

Even if you are not entitled to vote on the Plan, you have a right to object to the confirmation of the Plan.

**F.      Who Can Vote in More Than One Class?**

A Creditor whose Claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim or who otherwise holds Claims in multiple Classes, is entitled to accept or reject a Plan in each capacity, and should cast one Ballot for each Claim.

**G.      Votes Necessary to Confirm the Plan**

Since impaired Classes exist under this Plan, the Court cannot confirm the Plan unless (1) at least one impaired Class of Creditors has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting Classes, as discussed below in section G.2.

1.      Votes Necessary for a Class to Accept the Plan

A Class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan.

A Class of Equity Interests accepts the Plan if the holders of at least two-thirds in amount of the allowed Equity Interests in the Class, who vote, cast their votes to accept the Plan.

2.      Treatment of Non-accepting Classes

Even if one or more impaired Classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner prescribed by Code § 1129(b).  A Plan that binds non-accepting Classes is commonly referred to as a "cram down" Plan.  The Code allows the Plan to bind non-accepting Classes of Claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of Code § 1129(a)(8), does not "discriminate unfairly," and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan.

You should consult your own attorney if a "cramdown" confirmation will affect your Claim or equity interest, as the variations on this general rule are numerous and complex.

**H.      Liquidation Analysis**

To confirm the Plan, the Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claim and/or Equity Interest holder would receive through any Chapter 7 liquidation.  This is often referred to as the "Best Interests Test".

In a Chapter 7 case, the Debtor's assets are usually sold or otherwise liquidated by a Chapter 7 trustee. Secured Creditors are paid first from the sales proceeds of properties on which the Secured Creditors have liens. Administrative Expense Claims are paid next.  Costs of liquidation under chapter 7 of the Code would include the compensation of a Chapter 7 trustee, as well as that of counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is completed. Next, Unsecured Creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured Creditors with the same priority share in proportion to the amount of their Allowed Unsecured Claims. Finally, Interest holders receive the balance that remains after all Creditors are paid, if any.  The following is a hypothetical liquidation analysis demonstrating the amount holders would receive under a Chapter 7 liquidation.

| **Assets** | | | | |
|---|---|---|---|---|
| Cash | | | $5,025,368 | (1) |
| Prepaid Expense Recapture | | | $25,000 | (2) |
| AWG Patronage Refund Certificates | | | $981,481 | (3) |
| Other Assets - Accounts Recievable | | | $100,000 | (4) |
| Estimated Refund from Workman Comp Insurance Deposit | | | $250,000 | (5) |
| Total Assets | | | $6,381,849 | |
| **Liabilities** | | | | |
| Allowed Exectory Contract and Unexpired Lease Assumption Cure Claims | | | $88,126 | (6) |

24

| | | |
|---|---|---|
| Allowed Section 503(b)(9) Claims | $1,079,729 | (7) |
| Estimated Professional Fees | $140,000 | (8) |
| Post-Petition Ordinary Course ExpenseS | $280,000 | (9) |
| UST Fees | $10,000 | (10) |
| General Unsecured Claims - Class 3 | $4,715,602 | (11) |
| Total Liabilities | $6,313,457 | |
| **Liquidation Analysis** | | |
| | | |
| Gross Assets Available | $6,381,849 | |
| Estimated Professional Fees | ($140,000) | |
| Post Petition Ordinary Course Expense | ($280,000) | |
| Allowed Exectory Contract and Unexpired Lease Assumption Cure Claims | ($88,126) | |
| UST Fees | ($10,000) | |
| Allowed Section 503b9 Claims | (1,079,729) | |
| Net Proceeds Available for General Unsecured Claims | $4,783,994 | |
| | | |
| General Unsecured Claims - Class 3 | $4,715,602 | |
| | | |
| Estimated Recovery for General Unsecured Claims | 101% | |
| | | |

| **Footnotes:** | |
|---|---|
| (1) | Actual Cash |
| (2) | Management Estimate |
| (3) | Based on bid for partronage certificates by AWG and projected Patronage Rebates for 2015 earned before closing |
| (4) | Management Estimate based on remaining AR outstanding |
| (5) | Management Estimate |
| (6) | Actual |
| (7) | Actual |
| (8) | Mangement Estimate |
| (9) | Mangement Estimate |
| (10) | Mangement Estimate |
| (11) | Actual |

For the Court to be able to confirm this Plan, the Court must find that all Creditors and Interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under any Chapter 7 liquidation. Since the Plan here provides for the liquidation of all of the Debtor's assets, like in a hypothetical Chapter 7, the primary reason this Plan is in the best interests of all Creditors is because the Debtor believes it will be able to distribute more money faster to more Classes of Creditors than the delay inevitable with the administration of a Chapter 7 case. Further, the Debtor anticipates a 100% dividend to all Allowed Class 3 Claims under the Plan.

In a hypothetical Chapter 7 case, the case would be administered by a Chapter 7 Trustee who in all likelihood would not be able to make any distributions for an extended period of time,

due to the existing rules and regulations imposed on Chapter 7 Trustees by the Office of the United States Trustee, and the Bankruptcy Code and Rules.

Moreover, the Debtor believes that a significant distinction between the Plan and converting the Case to chapter 7 is the substantial chapter 7 administrative costs that will result from such conversion. Pursuant to section 326 of the Bankruptcy Code, the statutory chapter 7 trustee fee (the "Chapter 7 Trustee Fee") can equal 25% of the first $5,000 disbursed, 10% on any amount disbursed in excess of $5,000 but not in excess of $50,000, 5% on any amount disbursed in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000. Any such Chapter 7 Trustee Fee will directly reduce any recovery for Creditors.

A Chapter 7 trustee will likely also retain professionals for purposes similar to those retained by the Liquidating Trust. The Chapter 7 trustee and his or her professionals, however, may be unfamiliar with the Debtor's operations and the Bankruptcy Case. Accordingly, the Chapter 7 trustee and his or her professionals may be required to devote considerable time reviewing the Debtor's books and records and the events of the case occurring prior to the conversion to Chapter 7. Given this reality, the Debtor estimates that the fees of a Chapter 7 trustee's professionals will exceed the fees of the Liquidating Trust's professionals.

The rates of those professionals retained by the chapter 7 trustee, on the one hand, and the Liquidating Trust, on the other hand, may vary. For instance, one group of professionals may have higher rates than a group of other professionals. Assuming that both groups of professionals are equally efficient in their approach and effectiveness in the results obtained, this factor may increase the cost of administration.[3] Based on these facts, the Debtor maintains that this requirement is met here.

**I.      No Need to Show Ability to Make Future Plan Payments and Operate Without Further Reorganization**

Pursuant to Code §1129(a)(11), the Debtor must show that it will have enough Cash over the life of the Plan to make the required Plan payments, unless the Debtor's Plan proposes to liquidate its assets. Since the Debtor's Plan herein proposes such liquidation of its assets, and does not propose future business operations, there is no need to provide projections of future income and expenses, or other similar financial information.

**Article VIII.   EFFECT OF CONFIRMATION OF PLAN**

**A.      Discharge**

---

[3]      Given that the Professional groups have not been – and, in fact, cannot be – identified at this time, it remains impossible to fully evaluate this issue for purposes of voting on the Plan.

Pursuant to Code §1141(d)(3), since the Debtor is seeking to liquidate all of its assets and will not engage in business after consummation of the Plan, the Debtor will not be seeking a discharge of debts under Code §1141(d)(1).

### B.      Binding Effect

The provisions of the Plan, the Liquidating Trust Agreement, the Confirmation Order, and any associated findings of fact or conclusions of law shall bind the Debtor, any entity acquiring property under the Plan, and any Creditor of the Debtor, whether or not the Claim of such Creditor is impaired under the Plan and whether or not such Creditor has accepted the Plan.

### C.      Vesting of Property

Confirmation of the Plan vests all of the property of the Debtor's Chapter 11 estate, including the Liquidating Trust Assets, in the Debtor for the benefit of its Creditors, subject only to such liens, encumbrances, and security interests as are provided for in this Plan. On the Effective Date, all of the Liquidating Trust Assets shall vest with the Liquidating Trust for the benefit of Classes 3, 4, and 5, who will then become the beneficiaries of the Liquidating Trust.

### D.      Assets Free and Clear of Liens

As of the Confirmation Date, the assets of the Debtor dealt with under the Plan shall be free and clear from any and all Claims and Interests or the holders of Claims and Interests, except as specifically provided otherwise in the Plan, the Liquidating Trust Agreement or the Confirmation Order.  On the Effective Date, the Liquidating Trust shall be entitled to control its financial affairs without further order of the Bankruptcy Court and to use, acquire and distribute any of its property free of any restrictions of the Bankruptcy Code or the Bankruptcy Court, except as specifically provided otherwise in the Plan, the Liquidating Trust or Confirmation Order.  The terms of the Plan shall supersede the terms of all prior orders entered by the Bankruptcy Court in the Bankruptcy Case and the terms of all prior stipulations and other agreements entered into by the Debtor with other parties in interest, except as specifically recognized in the Plan, the Liquidating Trust Agreement, or the Confirmation Order.

### E.      Modification of the Plan

The Debtor, as a Plan Proponent, may modify the Plan at any time before confirmation of the Plan, with the written consent of the Official Committee.  However, the Court may require a new Disclosure Statement and/or re-voting on the Plan.  The Debtor may also seek to modify the Plan at any time after confirmation, with the written consent of the Official Committee and only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### F.      Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal

Rules of Bankruptcy Procedure, the Reorganized Debtor, the Trustee, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a Final Decree to close the case. Alternatively, the Court may enter such a Final Decree on its own motion.

## Article IX.   GENERAL PROVISIONS

### A.   Definitions and Rules of Construction

The definitions and rules of construction stated in Code §§ 101 and 102 apply when terms defined or construed in the Code are used in this Plan and not otherwise defined herein.

### B.   Captions and Headings

The article and section headings used in the Plan are for convenience and reference only, and they do not constitute a part of the Plan or in any manner affect the terms, provisions, or interpretations of the Plan.

### C.   Corporate Governance

Pursuant to Code § 1123(a)(6),  the Articles of Organization and Bylaws of the corporate Debtor shall be amended, to the extent necessary and appropriate, to prohibit the issuance of nonvoting equity securities, and providing, as to the classes of securities possessing voting power, an appropriate distribution of such power among such classes.

### D.   Severability

Should any term or provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of the Plan; provided, however, that this provision shall not be applied or interpreted so as to defeat the primary purpose of this Plan, which is liquidation of the Debtor's assets and distribution of the proceeds thereof to payment of obligations to its Creditors and Interest holders, according to the treatment afforded to their Claims or Interests under the Plan.

### E.   Governing Law

Except to the extent that the Code or other provisions of federal law are applicable, the rights and obligations arising under the Plan in any documents, agreements, and instruments executed in connection with the Plan (except to the extent such documents, agreements and instruments designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Iowa.

### F.   Successors and Assigns

The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

### G.    Plan Is Self-Executing

The terms and provisions of this Plan are self-executing on the Effective Date.

### H.    Post-Confirmation Jurisdiction

The Bankruptcy Court shall retain jurisdiction over the Bankruptcy Case, and over the Dahl's Liquidating Trust, subsequent to the Confirmation Date to the fullest extent permitted under Section 1334 of Title 28 of the United States Code, including, without limitation, for the following purposes:

1.    To determine any requests for subordination pursuant to the Plan and Bankruptcy Code §510, whether as part of an objection to Claim or otherwise;

2.    To determine any motion for the sale of the Debtor's property, or to compel re-conveyance of a lien against or interest in such property upon payment, in full, of a Claim secured under the Plan;

3.    To determine any and all proceedings related to allowance of Claims or objections to the allowance of Claims, including objections to the Classification of any Claim and determination of any deficiency Claim following any event of default under this Plan, and including, on an appropriate motion pursuant to Federal Rule of Bankruptcy Procedure 3008, reconsidering Claims that have been allowed or disallowed prior to the Confirmation Date;

4.    To determine any and all applications of Professional Persons and any other fees and expenses authorized to be paid or reimbursed in accordance with the Code or the Plan;

5.    To determine any and all pending applications for the assumption or rejection of executory contracts, or for the assumption and assignment of unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

6.    To hear and determine any and all actions initiated by the Trustee to collect, realize upon, reduce to judgment or otherwise liquidate any Litigation Claim, to the extent that such Litigation Claim was property of the estate prior to the Effective Date;

7.    To determine any and all applications, motions, adversary proceedings and contested or litigated matters whether pending before the Bankruptcy Court on the Confirmation Date or filed or instituted after the Confirmation Date, including, without limitation, proceedings under the Bankruptcy Code or other applicable law seeking to avoid and recover any transfer of an interest of the Debtor in property or of obligations incurred by the Debtor, or to exercise any rights pursuant to Bankruptcy Code Sections 506, 544-551, and 553;

8.      To modify the Plan, or to remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court (including the Confirmation Order), the Plan, or the Disclosure Statement in such manner as may be necessary to carry out the purposes and effects of the Plan;

9.      To determine disputes regarding title of the property of the estate claimed to be property of the estate or of the Debtor whether as Debtor or Debtor-in-Possession, but not as to title to real property acquired after the Effective Date;

10.      To ensure that the distributions to holders of Claims are accomplished in accordance with the provisions of the Plan and the Liquidating Trust Agreement;

11.      To liquidate or estimate any undetermined Claim or Interest;

12.      To enter such orders as may be necessary to consummate and effectuate the operative provisions of the Plan, including actions to enjoin enforcement of Claims inconsistent with the terms of the Plan;

13.      To hear and determine disputes concerning any event of default or alleged event of default under this Plan, as well as disputes concerning remedies upon any event of default, including but not limited to determination of the commercial reasonableness of the disposition of any collateral that is the subject of any liens granted under this Plan;

14.      To hear any other matter not inconsistent with Chapter 11 of the Bankruptcy Code;

15.      To enter a Final Decree closing the Bankruptcy Case;

16      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated; and

17.      To determine such other matters as may arise in connection with the Plan, the Disclosure Statement, or the Confirmation Order.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction, over any matter arising out of the Bankruptcy Case, this post-confirmation jurisdiction section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## I.      Wavier of Bankruptcy Rule 3020(e) Stay of Confirmation Order

The 14-day stay of the Confirmation Order provided for in Bankruptcy Rule 3020(e) will be waived, and the Confirmation Order will be effective upon entry on the Court's Docket.

DATED:  August 17, 2015                                    Respectfully submitted

By: */s/ Dean Longnecker*
    Dean Longnecker, Chief Executive
    Officer & Chief Restructuring Officer
    Foods, Inc.

Jointly Prepared By:
Jeffrey D. Goetz, Esq., IS# 9999366
Krystal R. Mikkilineni, IS#9997703
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
Mikkilineni.krystal@bradshawlaw.com

General Reorganization Counsel for Foods, Inc.,
Debtor and Debtor-in-Possession and Plan Proponent


Richard S. Lauter, Esq.
Devon J. Eggert, Esq.
Elizabeth L. Janczak, Esq.
Freeborn & Peters LLP
311 S. Wacker Dr. Ste. 3000
Chicago, IL 60606
312/360-6641
312/360-6520 FAX
rlauter@freeborn.com
deggert@freeborn.com
ejanczak@freeborn.com

Counsel for the Official Committee of
Unsecured Creditors and Co-Plan Proponent

# APPENDIX 1 - DEFINITIONS

As used in this Plan, the following terms shall have the respective meanings specified below:

1.  **Administrative Expense Claim:**  Any cost or Administrative Expense of the Bankruptcy Case that is entitled to priority in accordance with Bankruptcy Code §§ 503(b) and 507(a)(2), including, without limitation: any actual and necessary expenses of preserving the Debtor's estate and of operating the Debtor's business from and after the Petition Date through and including the Confirmation Date; all allowances of compensation and reimbursement of costs and expenses to Professional Persons, as approved by a Final Order of the Bankruptcy Court; and any fees or charges assessed against the Debtor's estate under Chapter 123 of Title 28 of the United States Code.

2.  **Allowed Claim:**  Any Claim against the Debtor that meets either of the following two requirements: (1) proof of such Claim was filed on or before the Bar Date, or, if no Proof of Claim is filed, the Claim has been or hereafter is listed by the Debtor in its schedules and statements as liquidated in amount and not disputed or contingent as to liability, and, in either case, no objection to the allowance of such Claim has been filed; or (2) a Claim as to which any objection has been filed and such Claim has been allowed in whole or in part by a Final Order of the Bankruptcy Court.

3.  **Allowed Unsecured Claim:**  Any Allowed Claim that is not an Administrative Expense Claim or an Allowed Secured Claim.

.   **Ballot:**  The form for acceptance or rejection of the Plan distributed to those Creditors entitled to vote on the Plan, as such form may be approved by the Bankruptcy Court and shall otherwise comply with the requirements of Bankruptcy Rule 3018(c).  Any Ballot which is executed by the holder of an Allowed Claim but which does not indicate an acceptance or rejection of the Plan shall be deemed to be an acceptance of the Plan.

5.  **Bankruptcy Case:**  The pending Bankruptcy Case filed by Foods, Inc., on the Petition Date, in the U.S. Bankruptcy Court for the Southern District of Iowa and assigned the case number 14-02689-als11.

6.  **Bankruptcy Code:**  The United States Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended.

7.  **Bankruptcy Court:**  The unit of the United States District Court for the Southern District of Iowa, constituted pursuant to 28 U.S.C. § 151, having jurisdiction over the Bankruptcy Case to the extent of any reference made pursuant to 28 U.S.C. ' 157(a), or in the event such court ceases to exercise jurisdiction over the Bankruptcy Case, such court or adjunct thereof that has jurisdiction over the Bankruptcy Case.

8.  **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Bankruptcy Case.

9.    **Business Day:**  Any day that is not a Saturday, Sunday or legal holiday as identified in Federal Rule of Bankruptcy Procedure 9006(a).

10    **Cash:**  Cash and cash equivalents, including, but not limited to, bank deposits, checks, wire transfers, money orders, certificates of deposit and other similar, readily marketable securities or instruments, together with any interest earned or accrued thereon.

11.    **Causes of Action:**  All causes of action of any kind held by the Debtor whether or not such causes of action are the subject of presently pending lawsuits, adversary proceedings or appeals, including, without limitation:  (i) causes of action belonging to the Debtor as of the Petition Date; (ii) causes of action belonging to the Debtor that arose after the Petition Date; and (iii) rights exercisable by the Debtor as Debtor-In-Possession pursuant to Bankruptcy Code §§ 506, 510, 544, 545, 547, 548, 549, 550 or 553.

12.    **Claim:**  Any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

13.    **Claims Objection Bar Date:**  The date established by the Bankruptcy Court pursuant to an order entered in this Bankruptcy Case or in the Confirmation Order by which written objections to a Proof of Claim must be filed.

14.    **Class:**  A category or group of Creditors which are substantially similar to the Claims of the other Creditors in such Class, as designated by the Plan pursuant to Bankruptcy Code §§ 1122 and 1123.

15.    **Confirmation Date:**  (i) If no appeal of the Confirmation Order is filed, the first Business Day after the expiration of time for an appeal of the Confirmation Order; or (ii) if an appeal of the Confirmation Order has been filed, the first Business Day after the expiration of time for an appeal of the Confirmation Order, provided that no stay of the Confirmation Order pending appeal has been granted; or (iii) if an appeal of the Confirmation Order has been filed and a stay of the Confirmation Order has been granted, the first Business Day after the expiration or termination of such stay.

16.    **Confirmation Hearing:**  The duly noticed hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to Bankruptcy Code § 1128, scheduled on such date fixed by the Bankruptcy Court in the order approving the Disclosure Statement, any scheduling order or otherwise.  The Confirmation Hearing may be adjourned by the Bankruptcy Court from time to time without further notice other than the announcement of the adjourned date at the Confirmation Hearing.

17. **Confirmation Order:** The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

18. **Creditor:** Any Person who has a Claim against the Debtor that arose on or before the Petition Date, or a Claim against the Debtor of any kind specified in § 502(g), (h) or (i) of the Bankruptcy Code.

19. **Debtor:** Foods, Inc. fdba Dahl's Foods.

20. **Debtor in Possession:** The Debtor, as Debtor in Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

21. **Disclosure Statement:** The Disclosure Statement respecting the Plan filed by the Debtor in the Bankruptcy Case and approved, conditionally or otherwise, by order of the Bankruptcy Court, as containing adequate information in accordance with Bankruptcy Code § 1125, as such Disclosure Statement may be modified, amended or supplemented from time to time thereafter.

22. **Effective Date:** The first Business Day that is fourteen (14) days after the Confirmation Date.

23. **Equity Interests:** Shareholders holding an ownership interest in the Debtor.

24. **Final Decree:** An order or a judgment of a court which has not been reversed, stayed, modified or amended, and as to which (i) the time to appeal or to seek review by certiorari or rehearing has expired and no appeal, review, certiorari or rehearing petition has been filed; or (ii) any appeal, review, certiorari or rehearing proceeding that has been filed has been finally determined or dismissed, and the time to further appeal or to seek further review by certiorari or rehearing has expired and no further appeal, review, certiorari or rehearing petition has been filed.

25. **Litigation Claims**: Any rights, titles, Claims, Causes of Action under Chapter 5 of the Code, or otherwise held by the Debtor, its estate or Reorganized Debtor on the Effective Date.

26. **Liquidating Trust:** That certain liquidating trust established for the collection of funds from the liquidation of Debtor's assets for payment of claims.

27. **Liquidating Trust Agreement:** the Dahl's Liquidating Trust Agreement to be executed as soon as reasonably practicable after the Confirmation Date among the Debtor, the Official Committee and the Liquidating Trustee, which shall govern the obligations of the Liquidating Trustee with respect to oversight of the distribution of the net proceeds of the Liquidating Trust Assets, as further set forth in the Liquidating Trust Agreement and the Plan.

28.   **Liquidating Trust Assets**:   Those assets to be transferred to and vested in the Liquidating Trust under this Plan and the Confirmation Order, plus all proceeds, earnings and replacements arising from or relating to these assets and all assets acquired by the Liquidating Trust at any time.

The Liquidating Trust Assets shall include, without limitation:  (i) all Cash held by the Debtor, including any Cash received by the Debtor through the Sale Order or other disposition of property of the estate (less any Cash paid or to be paid on account of unpaid Allowed Professional Fee Claims and other allowed administrative expenses); (ii) any remaining personal property owned by the Debtor as of the Effective Date; (iii) any remaining real estate owned by the Debtor as of the Effective Date; (iv) all Litigation Claims; and (v) any other property of the Debtor's estate.

29.   **Liquidating Trustee:**  Barry A. Chatz, Esq., Arnstein & Lehr LLP, 120 South Riverside Plaza, Suite 1200, Chicago, IL 60606

30.   **Person:**  An individual, corporation, partnership, limited liability company, or other legal or governmental entity.

31.   **Petition Date:**  November 9, 2014, the date the Debtor filed its Voluntary Chapter 11 Petition for relief, commencing the Bankruptcy Case.

32.   **Plan:**  The Debtor's First Amended Plan of Reorganization dated August 7, 2015, and any exhibits and schedules attached thereto and any documents incorporated by reference, either in its present form or as it may be altered, amended or modified from time to time to the extent permitted herein or by the Bankruptcy Code.

33.   **Priority Non-Tax Claim:**  Any Claim entitled to priority and payment under § 507 of the Bankruptcy Code other than Administrative Expense Claims and Priority Tax Claims.

34.   **Priority Tax Claim:**  Any Claim entitled to priority and payment under § 507(a)(8) of the Bankruptcy Code.  All Secured Priority Tax Claims shall be deemed Unclassified Claims and not be classified and/or treated as Secured Claims under this Plan.

35.   **Professional Person:**  Any attorney, accountant, or other professional:  (i) engaged by the Debtor or any committee and approved by order of the Bankruptcy Court in the Bankruptcy Case; or (ii) engaged by the Reorganized Debtor after the Effective Date.

36.   **Proof of Claims Bar Date:**  March 4, 2015, as established by Bankruptcy Court order entered on November 12, 2014 (Docket Item 44).

37.   **Pro Rata:**  Proportionately, so that the ratio of the amount of a particular Claim to the total amount of Allowed Claims of the Class in which a particular Claim is included is the same as the ratio of the amount of consideration distributed on account of such

particular Claim to the consideration distributed on account of the Allowed Claims of the Class as a whole in which the particular Claim is included.

38.      **Reorganized Debtor:**  Foods, Inc. fdba Dahl's Foods, on and after the Confirmation Date.

39.      **Secured Claim:**  A Claim to the extent such Claim is secured as defined in Bankruptcy Code § 506.  An "Allowed Secured Claim" is thus both an Allowed Claim and Secured Claim as defined herein.

40.      **Secured Creditor:**  Any Creditor that is the holder of a Secured Claim, to the extent of such Claim.

41.      **Unsecured Claim:**  Any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim or a Secured Claim, and all Claims of Secured Creditors to the extent such Claims are valued as unsecured pursuant to § 506(a) of the Bankruptcy Code.

42.      **Unsecured Creditor:**  Any Creditor holding an Unsecured Claim.

The words "herein" and "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section, subsection or clause contained in this Plan, unless the context requires otherwise.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender include the masculine, feminine and the neuter.  The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning, interpretation and/or construction of the Plan.

A term used in this Plan and not defined herein but that is defined in the Bankruptcy Code has the meaning assigned to the term in the Bankruptcy Code.  A term used in this Plan and not defined herein or in the Bankruptcy Code, but which is defined in the Bankruptcy Rules, has the meaning assigned to the term in the Bankruptcy Rules.

**EXHIBIT A**

Current and Former Managers, Officers, Directors and Shareholders of the Debtor

| Name | Number of Shares | Officer | Director | Former |
|---|---|---|---|---|
| Craig Moore | | CEO | Director | |
| Gary Dean Longnecker | | CFO | Director | |
| Tim Davis | Less than 5% | Vice President | Director | |
| Kenny Kane | Less than 5% | | Director | |
| David Wilson | Less than 5% | | Director | |
| David Wilkerson | | | Director | |
| David Sinwell | | | | Former CEO/Director |
| Mark Brase | | | | Former President/Director |
| Richard Rissman | | | | Former Director |
| Michael Hoffman | | | | Former Director |
| Marilyn Aldridge | | | | Former Director |

**EXHIBIT B**

Copy of Court's Docket Not Attached But Available
Upon Request from Debtor's General Reorganization Counsel At No Cost

**EXHIBIT C**

Audited consolidated financial statements as of September 28, 2013.

# Foods, Inc. and Subsidiary

Consolidated Financial Report
September 28, 2013

## Contents

| | |
|---|---|
| Independent Auditor's Report | 1-2 |

Financial Statements

| | |
|---|---|
| Consolidated Balance Sheets | 3-4 |
| Consolidated Statements of Operations | 5 |
| Consolidated Statements of Stockholders' Equity | 6 |
| Consolidated Statements of Cash Flows | 7-8 |
| Consolidated Notes to Financial Statements | 9-15 |



Independent Auditor's Report

To the Board of Directors
Foods, Inc. and Subsidiary
Des Moines, Iowa

**Report on the Financial Statements**

We have audited the accompanying consolidated financial statements of Foods, Inc. and subsidiary which comprise the consolidated balance sheets as of September 28, 2013 and September 29, 2012, and the related consolidated statements of operations, stockholder's equity and cash flows for the years then ended and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

Member of the RSM International network of independent accounting, tax and consulting firms.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Foods, Inc. and subsidiary as of September 28, 2013 and September 29, 2012, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matter Regarding Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company is in default with the lender on its line of credit, is experiencing operating losses and has a working capital deficit that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

*McGladrey LLP*

Des Moines, Iowa
March 19, 2014

**Foods, Inc. and Subsidiary**

**Consolidated Balance Sheets**
**September 28, 2013 and September 29, 2012**

| Assets | 2013 | 2012 |
|---|---|---|
| Current Assets | | |
| Cash: | | |
| Unrestricted | $    635,135 | $    763,491 |
| Restricted | 33,793 | 33,793 |
| Trade accounts receivable | 1,599,552 | 1,727,010 |
| Merchandise inventories | 15,445,137 | 16,926,214 |
| Prepaid expenses | 1,061,591 | 1,054,749 |
| Land held for sale | - | 750,000 |
| **Total current assets** | 18,775,208 | 21,255,257 |
| | | |
| Property and Equipment | | |
| Land and land improvements | 8,637,846 | 8,702,280 |
| Buildings | 59,943,740 | 60,016,673 |
| Leasehold interest in land and buildings | 1,849,442 | 1,849,442 |
| Leasehold improvements | 5,229,060 | 5,229,060 |
| Fixtures and equipment | 37,194,812 | 37,293,575 |
| Construction in progress | 57,022 | 255,389 |
| | 112,911,922 | 113,346,419 |
| Less accumulated depreciation | 63,951,532 | 60,642,027 |
| | 48,960,390 | 52,704,392 |
| | | |
| Other Assets | | |
| Goodwill | - | 725,000 |
| Investments | 2,107,455 | 1,483,178 |
| Other | 124,528 | 154,699 |
| | 2,231,983 | 2,362,877 |
| | $  69,967,581 | $  76,322,526 |

See Notes to Consolidated Financial Statements.

3

| Liabilities and Stockholders' Equity | 2013 | 2012 |
|---|---|---|
| Current Liabilities | | |
| Line of credit | $  5,089,375 | $  2,914,826 |
| Current maturities of long-term debt | 1,463,041 | 795,626 |
| Current maturities of financing obligation resulting from sale-leaseback | 1,056,301 | 989,582 |
| Accounts payable | 9,751,775 | 6,674,316 |
| Accrued expenses | 4,890,674 | 4,954,817 |
| **Total current liabilities** | 22,251,166 | 16,329,167 |
| Financing Obligation Arising from Sale-Leaseback Transaction | 33,402,131 | 34,458,432 |
| Long-Term Debt | | |
| Less current maturities | 4,972,461 | 6,262,828 |
| Stockholders' Equity | | |
| Common stock, no par value, stated value $0.01 per share; authorized 50,000,000 shares; issued and outstanding 2013 5,094,878 shares; 2012 5,688,488 shares | 50,949 | 56,885 |
| Retained earnings | 10,362,999 | 21,353,442 |
| ESOP note receivable | (1,072,125) | (2,138,228) |
| | 9,341,823 | 19,272,099 |
| | $  69,967,581 | $  76,322,526 |

**Foods, Inc. and Subsidiary**

**Consolidated Statements of Operations**
**Years Ended September 28, 2013 and September 29, 2012**

|  | 2013 | 2012 |
|---|---|---|
| Net sales | $ 183,223,284 | $ 197,079,127 |
| Cost of goods sold | 134,467,057 | 143,953,461 |
| **Gross profit** | 48,756,227 | 53,125,666 |
| Other operating revenue | 1,276,417 | 1,463,940 |
| **Gross income from operations** | 50,032,644 | 54,589,606 |
| Selling, general and administrative expenses: |  |  |
| Operating expenses | 50,752,703 | 47,964,494 |
| General and administrative expenses | 2,804,292 | 2,272,238 |
| Impairment loss on property and equipment | 574,384 | 1,458,777 |
| Impairment loss of goodwill | 725,000 | - |
|  | 54,856,379 | 51,695,509 |
| **Operating income (loss)** | (4,823,735) | 2,894,097 |
| Other expense: |  |  |
| Loss on disposal of property and equipment | (211,965) | (25,581) |
| Interest expense | (2,906,246) | (2,955,023) |
| **(Loss) before income taxes** | (7,941,946) | (86,507) |
| Income tax benefit | - | 226,775 |
| **Net income (loss)** | $ (7,941,946) | $ 140,268 |

See Notes to Consolidated Financial Statements.

**Foods, Inc. and Subsidiary**

**Consolidated Statements of Stockholders' Equity**
**Years Ended September 28, 2013 and September 29, 2012**

|  | Common Stock | Retained Earnings | ESOP Note Receivable | Total |
|---|---|---|---|---|
| Balance, September 24, 2011 | $  57,030 | $  22,402,440 | $  (664,347) | $ 21,795,123 |
| Net income | - | 140,268 | - | 140,268 |
| Purchase and retirement of 14,450 shares of common stock | (145) | (73,774) | - | (73,919) |
| Distributions | - | (1,115,492) | - | (1,115,492) |
| Net advances on ESOP note receivable | - | - | (1,473,881) | (1,473,881) |
| Balance, September 29, 2012 | 56,885 | 21,353,442 | (2,138,228) | 19,272,099 |
| Net (loss) | - | (7,941,946) | - | (7,941,946) |
| Purchase and retirement of 593,610 shares of common stock | (5,936) | (3,048,497) | 3,010,228 | (44,205) |
| Net advances on ESOP note receivable | - | - | (1,944,125) | (1,944,125) |
| **Balance, September 28, 2013** | $  **50,949** | $  **10,362,999** | $  **(1,072,125)** | $  **9,341,823** |

See Notes to Consolidated Financial Statements.

**Foods, Inc. and Subsidiary**

**Consolidated Statements of Cash Flows**
**Years Ended September 28, 2013 and September 29, 2012**

|  | 2013 | 2012 |
|---|---|---|
| Cash Flows from Operating Activities |  |  |
| Net income (loss) | $ (7,941,946) | $ 140,268 |
| Adjustments to reconcile net income (loss) to net cash |  |  |
| provided by operating activities: |  |  |
| Depreciation | 3,613,321 | 3,775,021 |
| Amortization | 30,171 | 65,885 |
| Loss on disposal of property and equipment | 211,965 | 25,581 |
| Equity from allocation of investment | (624,277) | (885,594) |
| Deferred taxes | - | (226,775) |
| Forgiveness of ESOP note receivable | 756,130 | - |
| Impairment loss of goodwill | 725,000 | - |
| Impairment loss on property and equipment | 574,384 | 1,458,777 |
| Changes in working capital components: |  |  |
| Trade accounts receivable | 127,458 | (720,179) |
| Merchandise inventories | 1,481,077 | 296,162 |
| Prepaid expenses | (6,842) | (100,094) |
| Accounts payable and accrued expenses | 3,013,316 | (1,133,300) |
| **Net cash provided by operating activities** | 1,959,757 | 2,695,752 |
|  |  |  |
| Cash Flows from Investing Activities |  |  |
| Proceeds from sale of land held for sale | 750,000 | - |
| Purchase of property and equipment | (724,774) | (671,190) |
| Proceeds from sale of property and equipment | 69,106 | - |
| **Net cash provided by (used in) investing activities** | 94,332 | (671,190) |
|  |  |  |
| Cash Flows from Financing Activities |  |  |
| (Advances) on ESOP note receivable | (2,700,255) | (2,551,539) |
| Borrowings on line of credit | 25,294,972 | 71,923,629 |
| Principal payments on line of credit | (23,120,423) | (69,259,704) |
| Principal payments on notes payable | (622,952) | (919,365) |
| Payments on financing obligations | (989,582) | (964,724) |
| Distributions | - | (65,870) |
| Purchase and retirement of common stock | (44,205) | (73,919) |
| **Net cash (used in) financing activities** | (2,182,445) | (1,911,492) |
|  |  |  |
| **Net increase (decrease) in cash** | (128,356) | 113,070 |
|  |  |  |
| Cash |  |  |
| Beginning | 763,491 | 650,421 |
|  |  |  |
| Ending | $ 635,135 | $ 763,491 |

(Continued)

**Foods, Inc. and Subsidiary**

**Consolidated Statements of Cash Flows (Continued)**
**Years Ended September 28, 2013 and September 29, 2012**

|  | 2013 | 2012 |
|---|---|---|
| Supplemental Disclosure of Cash Flow Information |  |  |
| Cash payments for interest | $ 2,914,537 | $ 2,944,880 |
|  |  |  |
| Supplemental Disclosure of Noncash Activities |  |  |
| Accrued distributions | $ - | $ 37,834 |
| Allocation of equity in investment converted from trade receivables | - | 358,550 |
| Accrued distribution for payment of ESOP note receivable | - | 1,077,658 |
| Redemption of shares to reduce ESOP note receivable | 3,010,228 | - |
| Forgiveness of ESOP note receivable | 756,130 | - |

See Notes to Consolidated Financial Statements.

**Foods, Inc. and Subsidiary**

**Notes to Consolidated Financial Statements**

**Note 1.     Nature of Business and Significant Accounting Policies**

**Nature of business:** Foods, Inc. and Subsidiary (the Company) operates 13 retail supermarkets under the name Dahl's in Iowa. The Company's wholly owned subsidiary, Dahl's Holdings I, LLC (Dahl's Holdings) holds various real estate investments and other investments.

**A summary of the Company's significant accounting policies follows:**

**Fiscal year:** The Company's fiscal year ends on the last Saturday in September. The years ending September 28, 2013 and September 29, 2012 contained 52 and 53 weeks, respectively.

**Consolidation policy:** The consolidated financial statements include the accounts of Foods, Inc. and its wholly owned subsidiary, Dahl's Holdings. All material intercompany balances and transactions are eliminated in consolidation.

**Accounting estimates and assumptions:** The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Trade accounts receivable:** Trade accounts receivable consists primarily of patronage refunds and pharmacy insurance reimbursements. The Company receives a patronage refund measured by the quantity of the goods purchased from a wholesaler. Management determines the allowance for doubtful accounts by identifying troubled accounts and by using historical experience applied to an aging of accounts. Trade accounts receivable are written off when deemed uncollectible. Recoveries of trade accounts receivable previously written off are recorded when received. The Company had no allowance for doubtful accounts as of September 28, 2013 and September 29, 2012.

**Merchandise inventories:** Merchandise inventories are stated generally at the lower of cost or market. The cost of the majority of merchandise is determined by the retail inventory method (RIM). RIM is an averaging method widely used in the retail industry because of its practicality.

Under RIM, inventory valuations are at cost and the resulting gross margins are calculated by applying a cost-to-retail ratio to sales. Inherent in the RIM calculations are certain management judgments and estimates, which could affect the ending inventory valuation at cost and the resulting gross margins.

**Land held for sale:** The Company had land held for sale located in Des Moines, Iowa that was sold in 2013. Land held for sale was carried at the lower of cost or fair value less estimated cost to sell.

**Property and equipment:** Property and equipment are stated at cost. Land improvements and other property and equipment are depreciated primarily by the straight-line method over their estimated useful lives. Leasehold interest in land and buildings, leasehold improvements and assets under financing obligations, are depreciated primarily by the straight-line method over the lesser of the term of the lease or their respective estimated useful lives.

The Company reviews its property and equipment for impairment whenever events indicate that the carrying amount of the asset may not be recoverable. An impairment loss is recorded when the sum of the future cash flows is less than the carrying amount of the asset and is measured as the amount by which the carrying amount of the asset exceeds its fair value. Fair value is based on management's estimate of the amount that could be realized from the sale of the assets in a current transaction between willing parties. The estimate is derived from offers, actual sale or disposition of assets subsequent to year end, and other indications of asset value.

**Foods, Inc. and Subsidiary**

**Notes to Consolidated Financial Statements**

**Note 1.        Nature of Business and Significant Accounting Policies (Continued)**

During the year ended September 29, 2012, it was determined that the value of the land and land held for sale was impaired and the Company recognized an impairment loss of $1,458,777. During the year ended September 28, 2013, it was determined that the value of three stores asset groups was impaired and the Company recognized an impairment loss of $574,384. The land, land held for sale and stores are measured at fair value on a nonrecurring basis as they are subject to fair value adjustments when there is evidence of impairment. Fair value was determined by use of third party appraisals, estimated sale prices less cost to dispose and based on industry specialist information obtained by the management for certain equipment at the stores. The valuation technique is classified as Level 3 under the fair value hierarchy.

**Goodwill:** Goodwill represents the excess of purchase price over the underlying net assets of business acquired. Goodwill is not amortized but is subject to annual impairment tests. The Company assesses goodwill for such impairment by comparing the carrying value of each reporting unit to its fair value using the present value of expected future cash flows. If this first step of the goodwill impairment test identifies a potential impairment, the Company performs a second step for that reporting unit to determine the amount of impairment loss, if any. The Company determines the fair value of its reporting units utilizing discounted cash flows and implied fair value. The discounted cash flows incorporates assumptions that it believes marketplace participants would utilize. When available and as appropriate, comparative market multiples and other factors to corroborate the discounted cash flow results are used. The implied fair value is determined by assigning a fair value of the assets and liabilities of the reporting unit. The tests performed for the year ended September 28, 2013 indicated that the carrying value exceeded the fair value and resulted in a $725,000 impairment loss. The impairment loss was driven by increased competition as well as decreasing margins which has resulted in a decline in the future projected cash flows from the store locations.

**Investments:** The Company accounts for its investment in a wholesaler cooperative at cost including allocated equity. Under the cost method, the Company's allocation of equity and income from the cooperative are recorded as a reduction to cost of goods sold in the Company's income statement when earned. The allocation has been received 40% in the form of stock in the cooperative and 60% in the form of cash which is issued and paid, respectively, after the cooperative's December 31 year end. Income from investment in the cooperative totaled approximately $1,645,400 and $1,600,800 during the years ended September 28, 2013 and September 29, 2012, respectively, of which approximately $715,600 and $715,200 is included in accounts receivable at September 28, 2013 and September 29, 2012, respectively. As the cooperative is a December 31 year end the receivable balance as of the Company's year end is the estimated receivable for the 9 months during 2013 ending September 30, 2013.

**Financing obligation arising from sale-leaseback transaction:** Sale-leaseback transactions are recorded under the financing method when continuing involvement is determined to exist. Under the financing method, the book value of the properties and related accumulated depreciation remain on the balance sheet and no sale is recognized. The sales price of the properties is recorded as a financing obligation, and a portion of each lease payment is recorded as interest expense. The financing obligation is amortized over the lease terms, using the effective interest method.

**Revenue recognition:** Revenue is recognized at the point of sale.

**Contingencies:** In the normal course of business, the Company is involved in various legal proceedings. In the opinion of management, there are no proceedings that would have a material adverse effect on the Company's financial statement.

**Subsequent events:** Management has evaluated subsequent events through March 19, 2014 the date financial statements are available to be issued.

Foods, Inc. and Subsidiary

**Notes to Consolidated Financial Statements**

---

### Note 2.    Going Concern and Uncertainty

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. At September 28, 2013 and through the date of this report, the Company is in default with the lender on its line of credit, is experiencing operating losses and has a working capital deficit. The Company's plans to remedy these items include:

- Evaluating the performance of its individual stores and developing a plan to eliminate non-performing or under-performing stores.
- Sell assets in connection with the closed stores as well as other non-operating assets that are currently owned to create liquidity to reduce the outstanding balance on the line of credit and invest in improvements at the remaining stores.
- Working with current providers to restructure operating agreements to control costs and improve profitability.
- Reducing operating expenses including labor related cost.

However, there is no assurance that the Company will be able to complete these plans or achieve profitable operations. The Company's line of credit matures on March 19, 2014 and therefore the lender will have the right to call the loan on this date. The financial statements do not include any adjustments that might result should the Company be unable to continue as a going concern.

### Note 3.    Employee Benefit Plans

The Company has a 401(k) retirement plan for the benefit of its employees. The Plan is qualified by the IRS. Matching contributions are made at the discretion of the Board of Directors. There were no contributions to the 401(k) retirement plan by the Company for the years ended September 28, 2013 and September 29, 2012.

The Company also sponsors the Dahl's Employee Stock Ownership Plan and Trust (ESOP). This ESOP provides retirement benefits for most of the Company's full-time employees who have completed one year of service and have attained the age of 21. The Plan was unfrozen effective on September 25, 2011 and contributions to the plan are at the discretion of the Company. Compensation expense for the ESOP was approximately $1,411,000 and $549,000 for the years ended September 28, 2013 and September 29, 2012, respectively.

Shares of the Company held by the ESOP at September 28, 2013 and September 29, 2012 totaled 4,916,890 and 5,510,000, respectively, both of which include 10,000 shares of nonvoting stock. Shares are allocated to the individual participants based on each participant's compensation as a proportionate share of the compensation paid to all participants for the Plan year.

In accordance with the Internal Revenue Code, the participants in the ESOP have the right to require the employer to repurchase employee securities upon the later of termination of service or attaining the age of 62. Based off of the most recent valuation dated September 29, 2012, the Company's total contingent obligation to repurchase the 4,916,890 shares held by the ESOP was approximately $20,742,000.

Foods, Inc. and Subsidiary

**Notes to Consolidated Financial Statements**

**Note 4.        Income Tax Matters**

The Company, with the consent of its stockholders, has elected to be treated as an S Corporation. This status will tax the Company under sections of federal and state income tax laws which provide that, in lieu of corporate income taxes, the stockholders will separately account for the Company's income, deductions, losses and credits. Although S Corporations are not generally subject to income taxes, the Company was subject to built-in gains tax upon the recognition of certain income or gains related to sale or disposal of assets subsequent to the date of the S election for a period of ten years. The Company had recorded its net deferred tax liability to an amount that represents the potential estimated income taxes that might be payable if certain assets are sold. The deferred tax liability of $226,775 as of September 24, 2011 was eliminated during the year ended September 29, 2012 due to the expiration of the ten year recognition period.

The Company follows the accounting guidance on accounting for uncertainty in income taxes. Management evaluated the Company's tax positions and concluded that the Company had taken no uncertain tax positions that require adjustment to the financial statements to comply with the provisions of this guidance. With few exceptions, the Company is no longer subject to income tax examination by the U.S. federal, state or local tax authorities for years before 2010.

**Note 5.        Line of Credit, Long-Term Debt, and Pledged Assets**

The Company has an unsecured line of credit with a total of $6,000,000 available through March 19, 2014. Borrowings are limited to a percentage of accounts receivable and inventories as defined in the credit agreement ($6,000,000 at September 28, 2013). In addition, the Company can issue letters of credit, which reduces the amount available on the line of credit. For the years ending September 28, 2013 and September 29, 2012, the Company's outstanding letters of credit totaled approximately $950,000 and $1,050,000, respectively. There were no amounts drawn on the letters of credit outstanding at September 28, 2013 or September 29, 2012. These agreements call for monthly interest payments at LIBOR plus 2% (2.19% at September 28, 2013). (A)

Foods, Inc. and Subsidiary

**Notes to Consolidated Financial Statements**

**Note 5.    Line of Credit, Long-Term Debt, and Pledged Assets (Continued)**

Long-term debt, excluding the line of credit, consists of the following at September 28, 2013 and September 29, 2012:

| | **2013** | 2012 |
|---|---|---|
| Note payable, supplier, due in weekly payments of $2,065 including interest at prime rate plus 1% (4.25% at September 28, 2013) through March 2018 when all remaining principal is due.  (A) | $    438,141 | $    494,535 |
| Note payable, insurance company, due in monthly payments of $35,167, including interest at 6.75% through January 2034 when all remaining principal is due.  (B) | 4,643,740 | 4,756,716 |
| Note payable, bank, due in monthly payments of $8,485, including interest at 6%. Interest and payment amounts will be adjusted at December 2017 and December 2021 to the effective prime rate at that date plus 0.5%. All remaining principal is due December 2025. The note is collateralized by a mortgage. | 875,301 | 923,037 |
| Note payable, bank, due in monthly payments of $13,682 including interest at 4.5% through February 2015 when all remaining principal is due. Note was paid in full during 2013.  (A) | - | 384,166 |
| Note payable, due in monthly payments of $5,551 including interest at 6% through December 2019 when all remaining principal is due. The note is collateralized by a mortgage. | 478,320 | 500,000 |
| | 6,435,502 | 7,058,454 |
| Less current maturities | 1,463,041 | 795,626 |
| | $  4,972,461 | $  6,262,828 |

(A)    These notes are collateralized by various mortgages and have various covenants such as limitations on capital expenditures, current ratio, debt service coverage, and tangible net worth. As of September 28, 2013 the Company was in violation of various covenants related to these agreements. Subsequent to year end, the Company received a default letter due to the violations on the line of credit.

(B)    This note is collateralized by a mortgage and assignments of rents and leases. The lender has optional acceleration rights to require the remaining unpaid principal balance to be paid at any time on or after January 1, 2019. This note is subject to various covenants, including a requirement to fund property tax and insurance escrows.

Foods, Inc. and Subsidiary

**Notes to Consolidated Financial Statements**

---

#### Note 5.  Line of Credit, Long-Term Debt, and Pledged Assets (Continued)

The line of credit and leaseback payments discussed in Note 6 are guaranteed by a supplier as part of a supply agreement in place through the full release of the suppliers' obligations under the leaseback transactions. As of September 28, 2013, the Company was in violation of certain financial and non-financial covenants within this supply agreement and subsequent to year end received and is operating under an unsigned forbearance agreement with the guarantor.

Due to default provisions contained in the loan agreements, certain loans have been classified as current on the balance sheet and within the schedule below. Subsequent to year end, the Company also has not made the required payments on the $478,320 note payable and therefore this note could be callable.

Approximate aggregate maturities of long-term debt excluding the line of credit, for each of the five fiscal years following September 28, 2013 are as follows:

Year Ending September:

| | | |
|---|---|---:|
| 2014 | $ | 1,463,000 |
| 2015 | | 160,000 |
| 2016 | | 170,000 |
| 2017 | | 182,000 |
| 2018 | | 194,000 |
| Thereafter | | 4,267,000 |
| **Total** | $ | 6,436,000 |

#### Note 6.  Sale-Leaseback Transaction

During 2011, the Company sold land, buildings and related improvements, for approximately $36,643,000 and concurrently entered into an agreement to lease the properties back at payments ranging from $16,603 to $93,844 per month through September 2031. Consideration received were cash payments of approximately $7,339,000 and the extinguishment of the existing mortgages on the properties of approximately $29,304,000. Because the Company has an option to repurchase the properties through the end of the lease terms, the transaction has been accounted for as a financing obligation, whereby consideration received from the purchaser is added to the finance obligation and payments made under the leaseback are treated as interest expense (at effective rates ranging from 6.17% to 7.29%) and a reduction of the finance obligation. Interest and principal on the financing obligation is payable monthly with final payments due on dates ranging between June 2031 to September 2031.

The land and buildings involved in this transaction included in property and equipment as of September 28, 2013 and September 29, 2012 are as follows:

| | **2013** | | 2012 | |
|---|---:|---|---:|---|
| Land | **$ 1,917,885** | $ | 1,917,885 | |
| Buildings | **36,460,971** | | 36,460,971 | |
| | **38,378,856** | | 38,378,856 | |
| Less accumulated depreciation | **13,743,725** | | 12,337,817 | |
| | **$ 24,635,131** | $ | 26,041,039 | |

Depreciation on the buildings will continue through the end of the lease terms.

**Foods, Inc. and Subsidiary**

**Notes to Consolidated Financial Statements**

**Note 6.     Sale-Leaseback Transaction (Continued)**

The total approximate future minimum payments required on the leaseback as of September 28, 2013, are due as follows:

Year Ending September:

| | | |
|---|---|---:|
| 2014 | $ | 1,056,000 |
| 2015 | | 1,128,000 |
| 2016 | | 1,204,000 |
| 2017 | | 1,285,000 |
| 2018 | | 1,371,000 |
| Thereafter | | 28,414,000 |
| **Total** | $ | 34,458,000 |

Interest expense relating to this financing agreement was $2,293,499 and $2,318,358 for the years ended September 28, 2013 and September 29, 2012, respectively.

**Note 7.     Operating Leases**

The Company leases some of its store property and equipment under various agreements which expire through June 2020 with options to renew thereafter. The leases also require the payment of property taxes and normal maintenance.

The total approximate future minimum rental commitments as of September 28, 2013 are as follows:

Year Ending September:

| | | |
|---|---|---:|
| 2014 | $ | 1,738,000 |
| 2015 | | 1,439,000 |
| 2016 | | 920,000 |
| 2017 | | 367,000 |
| 2018 | | 347,000 |
| Thereafter | | 555,000 |
| **Total** | $ | 5,366,000 |

The rent expense for the years ended September 28, 2013 and September 29, 2012 totaled approximately $2,067,000 and $2,066,000, respectively.

# EXHIBIT D

June, 2015 Monthly Operating Report

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

### CHAPTER 11 MONTHLY OPERATING REPORT

Case No.  14-02689 _____          Report Month/Year __15-Jun__

Debtor  Foods Inc _____

This report is due 21 days after the end of the month.  Debtor must attach each of the required forms or documents unless the U.S. Trustee has waived the requirement.  The report must be filed with the Court.  A signed hard copy must be provided to the U.S. Trustee.

The debtor has provided the following with this monthly operating report:

| | | Yes | No |
|---|---|---|---|
| UST-2A | **Comparative Balance Sheet** | X | ☐ |
| UST-2B | **Comparative Income Statement** | X | ☐ |
| UST-2C | **Cash Receipts and Disbursements Statement** | X | ☐ |
| | *Continuation Sheet for Each Account* | X | ☐ |
| | *Detailed List of Receipts and Disbursements for Each Account* | X | ☐ |
| | *Bank Statement for Each Account* | ☐ | X |
| | *Bank Reconciliation for Each Account* | X | ☐ |
| UST-2D | **Supplemental Information** | X | ☐ |

*I declare under penalty of perjury that this Monthly Operating Report, and any attachments thereto are true, accurate and correct to the best of my knowledge and belief.*

Date: __7/31/15__

Name: _Dean Longnecker_
Signature: _Dean Longnecker_
Title: _CFO_

**CHAPTER 11 MONTHLY OPERATING REPORT - COMPARATIVE BALANCE SHEET**

| | | |
|---|---|---|
| Case No. | 14-02689 | Report Month/Year _____ 6/27/2015 |
| Debtor | Foods Inc | |

| | Current Month | Petition Date |
|---|---|---|
| *ASSETS* | | |
| Current Assets: | | |
| Cash | $ See Attached | $ _____ |
| Accounts Receivable | _____ | _____ |
| Receivable from Officers, Employees, Affiliates | _____ | _____ |
| Inventory | _____ | _____ |
| Other Current Assets :(List) | _____ | _____ |
| | _____ | _____ |
| Total Current Assets | _____ | _____ |
| | | |
| Fixed Assets: | | |
| Land | _____ | _____ |
| Building | _____ | _____ |
| Equipment, Furniture and Fixtures | _____ | _____ |
| Total Fixed Assets | _____ | _____ |
| Less: Accumulated Depreciation | ( _____ | _____ ) |
| Net Fixed Assets | _____ | _____ |
| | | |
| Other Assets (List): | _____ | _____ |
| | _____ | _____ |
| **TOTAL ASSETS** | $ _____ | $ _____ |
| | | |
| *LIABILITIES* | | |
| Post-petition Trade Accounts Payable | $ _____ | $ _____ |
| Post-petition Accrued Profesional Fees | _____ | _____ |
| Post-petition Taxes Payable | _____ | _____ |
| Post-petition Notes Payable | _____ | _____ |
| Other Post-petition Payables (List): _____ | _____ | _____ |
| | _____ | _____ |
| Total Post Petition Liabilities | _____ | _____ |
| | | |
| Pre Petition Liabilities: | | |
| Secured Debt | _____ | _____ |
| Priority Debt | _____ | _____ |
| Unsecured Debt | _____ | _____ |
| Total Pre Petition Liabilities | _____ | _____ |
| **TOTAL LIABILITIES** | _____ | _____ |
| | | |
| *OWNERS' EQUITY* | | |
| Owner's/Stockholder's Equity | _____ | _____ |
| Retained Earnings - Prepetition | _____ | _____ |
| Retained Earnings - Post-petition | _____ | _____ |
| **TOTAL OWNERS' EQUITY** | _____ | _____ |
| **TOTAL LIABILITIES AND OWNERS' EQUITY** | $ _____ | $ _____ |

*Explain any significant changes on Form UST-2D, Supplemental Information*

Totals for FOODS, INC.
BALANCE SHEET
For the 1 Period Ended 06/27/15

Run: 07/28/15   08:26:37

| Desc | CURRENT PERIOD |
|---|---|
| CURRENT ASSETS | |
| CASH | |
| ERROR SUSPENSE | 0.00 |
| BANK ADJUSTMENTS | 0.00 |
| BANK ACCOUNT - ADP | 0.00 |
| BANK ACCOUNT - WELLS FARGO | 0.00 |
| BANK ACCOUNT - WF MAIN ACCT | 2,247,312.81 |
| BANK ACCOUNT - WELLS FLEX FSA | 78.06 |
| BANK ACCOUNT - DAHLS FOOD MAR | 0.00 |
| ESCROW DEPOSITS | 0.00 |
| VENDOR DRAFT ACCOUNT | 0.00 |
| CGFFI CERTIFICIES ACCT | 0.00 |
| BANK ACCOUNT AP & PR | 0.00 |
| CASH FUND - STORES | 0.00 |
| CHANGE-FUEL | 0.00 |
| PR BANK ACCOUNT | 0.00 |
| BANK ACCOUNT WF CC Deposits | (447.10) |
| BANK ACCOUNT - WF RESERVE | 0.00 |
| BANK ACCOUNT - WF GENERAL ACCT | 2,372,414.13 |
| TOTAL CASH | $4,619,357.90 |
| RECEIVABLES | |
| SCMP INVENTORY | 0.00 |
| ACCOUNT RECEIVABLE - SCANDOWN | 0.00 |
| ACCOUNTS RECEIVABLE - AWG | 600,000.00 |
| LOAN CHANGER REC | 0.00 |
| LOTTERY RECEIVABLE | 0.00 |
| PULL TABS REC | 0.00 |
| MISC ACCTS REC | 0.00 |
| ACCRUED INTEREST RECEIVABLE | 966,267.00 |
| DISCOVER CARD | 0.00 |
| ACCTS REC DAHLS FOOD MART INC | 242,170.81 |
| MISC ACCT REC -ETHANOL CREDIT | (99,686.21) |
| ACCTS REC 3RD PARTY PHARMACY | 0.00 |
| RETURNED CHECKS | 0.00 |
| TOTAL RECEIVABLES | $1,708,751.60 |

Totals for FOODS, INC.
BALANCE SHEET
For the 1 Period Ended 06/27/15

Run: 07/28/15    08:26:37

| | CURRENT PERIOD |
|---|---|
| INVENTORIES | |
| MDSE INVENTORY | 0.00 |
| GROCERY INVENTORY | 0.00 |
| DAIRY INVENTORY | 0.00 |
| WINE/LIQUOR INVENTORY | 0.00 |
| MEAT MDSE INVENTORY | 0.00 |
| FISH MDSE INVENTORY | 0.00 |
| PRO MDSE INVENTORY | 0.00 |
| FLORAL INVENTORY | 0.00 |
| FROZ MDSE INVENTORY | 0.00 |
| BAK MDSE INVENTORY | 0.00 |
| DELI INVENTORY | 0.00 |
| LUNCHEONETTE INVENTORY | 0.00 |
| NON-FOODS INVENTORY | 0.00 |
| PHARMACY INVENTORY | 0.00 |
| FOODS INVENTORY | 0.00 |
| INSTORE INVENTORY | 0.00 |
| FUEL INVENTORY | 0.00 |
| BAKERY PRODUCTION INV | 0.00 |
| TOTAL INVENTORIES | $0.00 |
| | |
| PREPAIDS | |
| PREPAID SUPPLIES / EXPENSES | 0.00 |
| MISC. PREPAID EXPENSE | 0.00 |
| PREPAID LICENSES | 0.00 |
| PREPAID INSURANCE | 0.00 |
| TOTAL PREPAIDS | $0.00 |
| TOTAL CURRENT ASSETS | $6,328,109.50 |

Totals for FOODS, INC.
BALANCE SHEET
For the 1 Period Ended 06/27/15

Run: 07/28/15    08:26:37

|  | CURRENT PERIOD |
|---|---|
| FIXED ASSETS | |
| ---------- | ---------- |
| LAND | $0.00 |
| LAND URBANDALE | $0.00 |
| LAND IMPROVEMENTS | 0.00 |
| ACCUMULATED AMORTIZATION | 0.00 |
| BOOKVALUE LAND IMPROVEMENTS | $0.00 |
| BUILDING | 0.00 |
| ACCUMULATED AMORTIZATION | 0.00 |
| BOOKVALUE BUILDING | $0.00 |
| BUILDING IMPROVEMENT | $0.00 |
| ACCUMULATED AMORTIZATION | 0.00 |
| BOOKVALUE BUILDING IMPROV | $0.00 |
| LEASEHOLD IMPROVEMENTS | $0.00 |
| ACCUMULATED AMORTIZATION | 0.00 |
| BOOKVALUE LEASEHOLD | $0.00 |
| EQUIPMENT & FIXTURES | $0.00 |
| ACCUMULATED DEPRECIATION | 0.00 |
| BOOK VALUE EQUIPMENT | $0.00 |
| BOOK VALUE VEHICLES | $0.00 |
| TOTAL FIXED ASSETS | $0.00 |
| OTHER ASSETS | |
| ---------- | ---------- |
| CONSTR IN PROGRESS | 0.00 |
| DEFERRED FINANCING COST | 0.00 |
| AMORT - DEFERRED FIN COST | 0.00 |
| AWG PATRONAGE RECEIVABLE | 0.00 |
| TOTAL OTHER ASSETS | $0.00 |
| TOTAL ASSETS | $6,328,109.50 |

Totals for FOODS, INC.
BALANCE SHEET
For the 1 Period Ended 06/27/15

Run: 07/28/15   08:26:37

| | CURRENT PERIOD |
|---|---|
| CURRENT LIABILITIES | |
| ACCOUNTS PAYABLE - TRADE | 5,283,718.11 |
| ACCOUNTS PAYABLE - PRIOR | 0.00 |
| GIFT CARDS | 0.00 |
| SUPPLIER DEPOSITS | 0.00 |
| BLACKHAWK GIFT CARDS | 0.00 |
| LOTTERY PAYABLE | 0.00 |
| LOTTERY PAYABLE - DES MOINES | 0.00 |
| DELTA DENTAL PAYABLE | 0.00 |
| DISABILITY INSURANCE PAYABLE | 0.00 |
| AFLAC INSURANCE PAYABLE | 0.00 |
| TICKETS FOR RESALE | 0.00 |
| TICKETS FOR RESALE - IA EVENT | 0.00 |
| BANK CARD MONEY PAYABLE | 425,281.21 |
| A/P CENTRALLY BILLED | 14,132.08 |
| A/P TRADE POST PETITION | (15,251.96) |
| WESTERN UNION TRANSFER | 0.00 |
| WUPOS ACCRUED | 736,262.84 |
| CUSTOMER UTILITY PYMTS - WAT/ | 0.00 |
| CUSTOMER UTILITY PYMTS - US W | 0.00 |
| OTHER F LICENSE PAYABLE | 0.00 |
| MONEY ORDERS PAYABLE | 0.00 |
| MGFL FEE PAYABLE | 0.00 |
| MVTA PAYABLE | 0.00 |
| TOTAL ACCOUNTS PAYABLE | $6,444,142.28 |
| ACCRUED EXPENSES | |
| ACCRUED INSURANCE | 0.00 |
| LOAN PAYABLE CURRENT PORTION | 0.00 |
| ACCRUED PAYROLL TAXES | 0.00 |
| ACCRUED VACATION PAY | 0.00 |
| ACCRUED SICK LEAVE | 0.00 |
| ACCRUED PROMOTIONAL EXPENSE | 0.00 |
| ACCRUED DISTRIBUTION | 0.00 |
| HEALTH SAVINGS ACCOUNT (HSA) | 0.00 |
| ACCRUED FLEX SPENDING | (462.92) |
| ACCRUED 401K | 0.00 |
| ACCRUED 401K MATCH ESOP | 0.00 |
| ACCRUED SALES TAX - IA | 0.00 |
| ACCRUED INT EXPENSE PAYABLE | 0.00 |
| ACCRUED PROPERTY TAX | 0.00 |
| ACCRUED RESERVE - FUTURE LOSS | 0.00 |
| TOTAL ACCRUED EXPENSES | ($462.92) |
| TOTAL CURRENT LIABILITIES | $6,443,679.36 |

Totals for FOODS, INC.
BALANCE SHEET
For the 1 Period Ended 06/27/15

Run: 07/28/15  08:26:37

| Desc | CURRENT PERIOD |
|---|---|
| NOTES PAYABLE | |
| LONG TERM LEASE OBLIGATION | 0.00 |
| WF LOAN - LINE OF CREDIT | 0.00 |
| WF LOAN - TERM 2 | 0.00 |
| WF LOAN - CONSTRUCTION | 0.00 |
| TERM LOAN PROTECTIVE LIFE | 0.00 |
| TERM LOAN IOWA SAVINGS BANK | 0.00 |
| NOTE PAYABLE - MR DAHL | 0.00 |
| TOTAL NOTES PAYABLE | $0.00 |
| TOTAL LIABILITIES | $6,443,679.36 |
| EQUITY | |
| CAPITAL STOCK | $50,948.78 |
| PAID IN SURPLUS | $7,723,404.03 |
| CURRENT YEAR PROFIT (LOSS) | 1,598,393.52 |
| RETAINED EARNINGS | (9,488,316.19) |
| TOTAL EQUITY AND NET WORTH | ($115,569.86) |
| TOTAL LIABILITIES AND EQUITY | $6,328,109.50 |

=================

UNAUDITED FINANCIAL STATEMENT, FOR MANAGEMENT USE ONLY

**CHAPTER 11 MONTHLY OPERATING REPORT - COMPARATIVE INCOME STATEMENT**

Case No. _14-02689_              Report Month/Year _5/31/15 thru 6/27/15_
Debtor   _Foods Inc_

|  | Current Month | Total Post-Petition |
|---|---|---|
| **GROSS SALES/REVENUE** | $ See Attached | $ ____ |
| Less:  Discounts, Returns and Allowances | ____ | ____ |
| Net Sales/Revenue | ____ | ____ |
| | | |
| Cost of Sales: | | |
| Beginning Inventory            $ ____ | | |
| Add:  Purchases                    ____ | | |
| Less:  Ending Inventory         ( ____ ) | | |
| Cost of Goods Sold | ____ | ____ |
| | | |
| **GROSS PROFIT** | $ ____ | $ ____ |
| | | |
| Operating Expenses: | | |
| Officers' Salaries | ____ | ____ |
| Other Salaries | ____ | ____ |
| Employee Benefits/Payroll Taxes | ____ | ____ |
| Insurance | ____ | ____ |
| Rent and Lease Payments | ____ | ____ |
| Other (list):  ____ | ____ | ____ |
| | ____ | ____ |
| Total Operating Expenses | ____ | ____ |
| | | |
| **OPERATING INCOME (LOSS)** | $ ____ | $ ____ |
| | | |
| Add:  Other Income | ____ | ____ |
| Less:  Interest Expense | ____ | ____ |
| Less:  Professional Fees and Other Reorganization Expenses | ____ | ____ |
| Other Adjustments to Income (explain) | ____ | ____ |
| Gain (Loss) on Sale of Assets | ____ | ____ |
| | | |
| **NET INCOME (LOSS) BEFORE TAXES** | $ ____ | $ ____ |
| | | |
| Income Tax Expense (Benefit) | ____ | ____ |
| | | |
| **NET INCOME (LOSS)** | $ ____ | $ ____ |

United States Trustee-Southern District of Iowa

UST-2B
January 2011

PAGE   1

Totals for FOODS, INC.
FINANCIAL STATEMENTS
For the 1 Period 05/31/15 to 06/27/15

Run: 07/28/15   08:27:11

| Desc | CURRENT PERIOD | % | CURRENT Q-T-D | % | CURRENT Y-T-D | % | LAST Y-T-D | % |
|---|---|---|---|---|---|---|---|---|
| **TOTAL SALES & GROSS PROFIT** | | | | | | | | |
| TOTAL SALES | 0.00 | 0.00 | 103,981.71 | | 59,667,658.36 | | 123,975,433.80 | |
| TOTAL COST OF GOODS SOLD | 0.00 | 0.00 | 24,120.33 | | 45,886,559.41 | | 94,475,535.99 | |
| GROSS PROFIT | 0.00 | 0.00 | 79,861.38 | 76.48 | 13,781,098.95 | 22.99 | 29,499,897.81 | 23.78 |
| NET GROSS PROFIT | 0.00 | 0.00 | 79,861.38 | 76.48 | 13,781,098.95 | 22.99 | 29,499,897.81 | 23.78 |
| AVG SALE PER CUSTOMER | 0.00 | | 0.00 | | 276.98 | | 3,395.68 | |
| CUSTOMER COUNT | 0.00 | | 0.00 | | 216,459.00 | | 36,527.00 | |
| **OTHER INCOME** | | | | | | | | |
| HUNTING & FISHING LICENS | 0.00 | 0.00 | 3.00 | 0.00 | 9,769.40 | 0.02 | 1,999.99 | 0.00 |
| MONEY ORDER FEE INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,852.17 | 0.01 |
| LOTTERY INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 2,993.75 | 0.00 | 7,376.90 | 0.01 |
| BLACKHAWK GIFT CARD INCO | 0.00 | 0.00 | 0.00 | 0.00 | 1,871.69 | 0.00 | 33,044.88 | 0.03 |
| BC FEE INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 21,365.10 | 0.02 |
| CHECK CASHING INCOME | 0.00 | 0.00 | 30.00 | 0.03 | 10,492.41 | 0.02 | 122,746.50 | 0.10 |
| COPY CHANGER INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 68,433.96 | 0.11 | 4,913.92 | 0.00 |
| COPY MACHINE INCOME | 0.00 | 0.00 | 0.35 | 0.00 | 2,758.02 | 0.00 | 5,696.83 | 0.00 |
| CASH REGISTER COMM. INCOME | 0.00 | 0.00 | 113.18 | 0.11 | 3,409.14 | 0.01 | 159.19 | 0.00 |
| OVER/SHORT | 0.00 | 0.00 | (63.68) | (0.06) | 219.53 | 0.00 | 32,083.21 | 0.03 |
| CLEANING INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,621.01 | 0.00 |
| DISCOUNTS INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 10,920.83 | 0.02 | 10,329.69 | 0.01 |
| INTEREST INCOME-MISC | 0.00 | 0.00 | 0.00 | 0.00 | 7.00 | 0.00 | 47,336.78 | 0.04 |
| MEMBER INCOME | 0.00 | 0.00 | 545.96 | 0.52 | 0.00 | 0.00 | 10,329.69 | 0.01 |
| MISCELLANEOUS INCOME | 0.00 | 0.00 | 13.86 | 0.01 | 32,083.21 | 0.05 | 214,061.06 | 0.17 |
| WIRE INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 4,621.01 | 0.01 | 9,220.97 | 0.01 |
| FEE INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 10,329.69 | 0.02 | 120,265.79 | 0.14 |
| VENDING COMMISSION | 0.00 | 0.00 | (1,308.81) | (1.26) | 47,336.78 | 0.08 | 36,504.82 | 0.06 |
| POSTAGE COMMISSION | 0.00 | 0.00 | 0.00 | 0.00 | 214,061.06 | 0.36 | 8,394.20 | 0.01 |
| POSTAGE SALES | 0.00 | 0.00 | 0.00 | 0.00 | 9,220.97 | 0.02 | 10,463.33 | 0.02 |
| DVD RENTAL INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 120,265.79 | 0.20 | 297.14 | 0.00 |
| DVD RENTAL INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 36,504.82 | 0.06 | 4,043.30 | 0.01 |
| NSF/WA EVENT COMM. INCOME | 0.00 | 0.00 | 0.02 | 0.00 | 8,394.20 | 0.01 | 29.49 | 0.00 |
| B911 COMMISSION | 0.00 | 0.00 | 0.02 | 0.00 | 10,463.33 | 0.02 | 8.50 | 0.00 |
| UTILITY COLLECTION INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 297.14 | 0.00 | 0.00 | 0.00 |
| BAD CHECK FEE INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 4,043.30 | 0.01 | 8,579.98 | 0.01 |
| VACUUM INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 29.49 | 0.00 | 789.75 | 0.00 |
| WESTERN UNION INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 8.50 | 0.00 | 0.00 | 0.00 |
| INCOME REBATE AWG | 0.00 | 0.00 | 600.00 | 0.57 | 502,661.66 | 0.84 | 1,034,817.99 | 0.83 |
| RENTAL INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 33,856.71 | 0.06 | 63,168.39 | 0.05 |
| BOTTLE REDEEM/DEPOSIT | 0.00 | 0.00 | (786.88) | (0.75) | (50,529.92) | (0.08) | (25,739.54) | (0.02) |
| BOTTLE DEPOSITS | 0.00 | 0.00 | 369.05 | 0.35 | 16,558.67 | 0.03 | (6,564.04) | (0.01) |
| **TOTAL OTHER INCOME** | 0.00 | 0.00 | (483.95) | (0.46) | 833,516.41 | 1.39 | 1,892,914.45 | 1.53 |
| **TOTAL INCOME** | 0.00 | 0.00 | 79,377.43 | 76.01 | 14,614,615.36 | 24.38 | 31,392,812.26 | 25.31 |

Totals for FOODS, INC.
FINANCIAL STATEMENTS
For the 1 Period 05/31/15 to 06/27/15

Run: 07/28/15   08:27:11

| DESC | CURRENT PERIOD | % | CURRENT Q-T-D | % | CURRENT Y-T-D | % | LAST Y-T-D | % |
|---|---|---|---|---|---|---|---|---|
| DL SALARIES | | | | | | | | |
| SALARIES | 0.00 | 0.00 | 16,763.92 | 16.05 | 7,662,662.18 | 12.78 | 15,523,448.35 | 12.52 |
| TOTAL PRODUCTIVE WAGES | 0.00 | 0.00 | 16,763.92 | 16.05 | 7,662,662.18 | 12.78 | 15,523,448.35 | 12.52 |
| NON-PRODUCTIVE WAGES | | | | | | | | |
| VACATION SALARIES | 0.00 | 0.00 | 0.00 | 0.00 | 132,397.57 | 0.22 | 0.00 | 0.00 |
| SICK TIME PAID | 0.00 | 0.00 | 0.00 | 0.00 | 19,450.76 | 0.03 | 0.00 | 0.00 |
| TOTAL NON-PRODUCTIVE WAG | 0.00 | 0.00 | 0.00 | 0.00 | 151,848.33 | 0.25 | 0.00 | 0.00 |
| PAYROLL TAXES AND EE BENEFITS | | | | | | | | |
| EMPLOYEE MEDICAL INSURAN | 0.00 | 0.00 | 0.00 | | 629,458.79 | 1.05 | 1,349,184.98 | 1.09 |
| CONTRIB - LT DISABILI | 0.00 | 0.00 | 0.00 | | (250,061.74) | (0.42) | (663,890.78) | (0.54) |
| EMPLOYER CONTRIBUTIO | 0.00 | 0.00 | 0.00 | | 2,983.27 | 0.00 | 498,246.09 | 0.40 |
| INSURANCE EXPENSE | 0.00 | 0.00 | 0.00 | | 102,118.66 | 0.17 | 261,051.37 | 0.21 |
| CONTRIB - RX (POSTTAX) | 0.00 | 0.00 | 0.00 | | (5,150.70) | (0.01) | (15,430.62) | (0.01) |
| INS EXP EMPLOYEES (CLINI | 0.00 | 0.00 | 0.00 | | 64.32 | 0.00 | 37.28 | 0.00 |
| SOCIAL SECURITY EXPENSE | 0.00 | 0.00 | 0.00 | | 568,715.09 | 0.95 | 1,136,431.35 | 0.92 |
| FEDERAL UNEMPLOYMENT EXP | 0.00 | 0.00 | 0.00 | | 21,374.74 | 0.04 | 37,825.88 | 0.03 |
| STATE UNEMPLOYMENT EXPEN | 0.00 | 0.00 | 0.00 | | 29,134.43 | 0.05 | 74,043.08 | 0.06 |
| TOTAL TAXES AND BENEFITS | 0.00 | 0.00 | 0.00 | 0.00 | 1,098,636.86 | 1.83 | 2,677,498.63 | 2.16 |
| SUPPLIES | | | | | | | | |
| SUNDRY SUPPLIES | 0.00 | 0.00 | 9,485.24 | 9.08 | 56,709.97 | 0.09 | 83,333.90 | 0.07 |
| STORE SUPPLIES | 0.00 | 0.00 | 117.01 | 0.11 | 350,073.48 | 0.58 | 1,150,277.82 | 0.93 |
| TOTAL SUPPLIES | 0.00 | 0.00 | 9,602.25 | 9.20 | 406,783.45 | 0.68 | 1,233,611.72 | 0.99 |

Totals for FOODS, INC.
FINANCIAL STATEMENTS
For the 1 Period 05/31/15 to 06/27/15

Run: 07/28/15    08:27:11

| Desc | CURRENT PERIOD | % | CURRENT Q-T-D | % | CURRENT Y-T-D | % | LAST Y-T-D | % |
|---|---|---|---|---|---|---|---|---|
| **ADVERTISING** | | | | | | | | |
| LOYALTY PROGRAM EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 46.00 | 0.00 | 7,199.43 | 0.01 |
| PROMOTION EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 206,921.58 | 0.35 | 580,951.64 | 0.47 |
| ADVERTISING EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 314,748.65 | 0.52 | 212,243.03 | 0.17 |
| NEWSPAPER EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 366,375.70 | 0.30 |
| LOCAL STORE ADVERTISING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ADVERTISING - GIFT CERTI | 0.00 | 0.00 | 0.00 | 0.00 | 1,251.50 | 0.00 | 6,342.50 | 0.00 |
| TOTAL ADVERTISING | 0.00 | 0.00 | 0.00 | 0.00 | 522,967.73 | 0.87 | 1,173,133.35 | 0.95 |
| **OCCUPANCY EXPENSES** | | | | | | | | |
| RENT EXPENSE - BUILDING | 0.00 | 0.00 | 0.00 | 0.00 | 285,516.65 | 0.48 | 388,799.97 | 0.31 |
| RENT EXPENSE - EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 351,304.40 | 0.59 | 1,022,668.85 | 0.82 |
| PROPERTY TAXES EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 1,024,948.15 | 1.71 | 1,921,167.45 | 1.55 |
| GAS EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 164,357.10 | 0.27 | 16,538.59 | 0.01 |
| ELECTRIC EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 456,448.82 | 0.76 | 2,404,517.39 | 1.94 |
| WATER EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 84,002.14 | 0.14 | 16,497.24 | 0.01 |
| TELEPHONE EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 78,764.44 | 0.13 | 0 | 0.00 |
| COMMUNICATIONS EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 46,902.30 | 0.08 | 71,006.43 | 0.06 |
| GARBAGE DISPOSAL | 0.00 | 0.00 | 0.00 | 0.00 | (7,526.88) | (0.01) | (19,203.48) | (0.02) |
| RECYCLABLE CARDBOARD | 0.00 | 0.00 | 0.00 | 0.00 | (733.91) | 0.00 | (2,557.60) | 0.00 |
| TRASH REMOVAL | 0.00 | 0.00 | 0.00 | 0.00 | 148,923.71 | 0.25 | 646,326.06 | 0.52 |
| MAINTENANCE EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 67,627.50 | 0.11 | 0.00 | 0.00 |
| SNOW REMOVAL | 0.00 | 0.00 | 0.00 | 0.00 | 8,115.36 | 0.01 | 80.25 | 0.00 |
| GROUND MAINTENANCE | 0.00 | 0.00 | 0.00 | 0.00 | 110,807.60 | 0.18 | 162,660.44 | 0.13 |
| EQUIPMENT REPAIR | 0.00 | 0.00 | 0.00 | 0.00 | 630,826.37 | 1.05 | 1,367,072.01 | 0.94 |
| LEASEHOLD COST EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 93,924.00 | 0.16 | 140,882.78 | 0.11 |
| BUILDING REPAIR EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 46,849.32 | 0.08 | 104,275.16 | 0.08 |
| LOSS/GAIN - SALE OF PROP | 0.00 | 0.00 | 0.00 | 0.00 | (3,500.00) | (0.01) | 717,021.58 | 0.58 |
| TOTAL OCCUPANCY | 0.00 | 0.00 | 0.00 | 0.00 | 3,587,557.07 | 5.98 | 8,757,753.12 | 7.06 |

Totals for FOODS, INC.
FINANCIAL STATEMENTS
For the 1 Period 05/31/15 to 06/27/15

Run: 07/28/15  08:27:11

## ADMINISTRATIVE EXPENSES

| Desc | CURRENT PERIOD | % | CURRENT Q-T-D | % | CURRENT Y-T-D | % | LAST Y-T-D | % |
|------|---------------:|---:|--------------:|---:|--------------:|---:|-----------:|---:|
| GIFT CARD ADMIN FEE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (11,675.60) | (0.01) |
| WAREHOUSE FEES | 0.00 | 0.00 | 0.00 | 0.00 | (7,081.37) | (0.01) | (19,362.79) | (0.02) |
| MEDIA VENDOR SUPPORT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (167,758.65) | (0.14) |
| CUSTOMER CONVENIENT FEAT | 0.00 | 0.00 | 0.00 | 0.00 | (6,440.00) | (0.01) | 445,584.26 | 0.36 |
| HOST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 61,165.48 | 0.05 |
| FUEL EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 23,652.26 | 0.04 | 51,167.49 | 0.05 |
| VEHICLE RENTAL EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 14,496.30 | 0.02 | 342,905.36 | 0.98 |
| INTEREST EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 1,048,638.96 | 1.75 | 384,532.61 | 1.08 |
| GENERAL OFFICE EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 193,186.95 | 1.32 | 23,394.64 | 1.31 |
| SUBSCRIPTION & DUES | 0.00 | 0.00 | 0.00 | 0.00 | 2,783.53 | 0.02 | 14,834.03 | 0.02 |
| DONATIONS | 0.00 | 0.00 | 0.00 | 0.00 | 3,852.47 | 0.01 | 652,046.94 | 0.53 |
| LEGAL & PROFESSIONAL FEE | 26,259.00 | 0.00 | 423,274.86 | 405.34 | 1,459,512.85 | 2.43 | 652,046.94 | 0.53 |
| DUES & FEES | 0.00 | 0.00 | 0.00 | 0.00 | 151,097.50 | 0.25 | 0.00 | 0.00 |
| DUES & ENTERTAINMENT | 0.00 | 0.00 | 0.00 | 0.00 | (150.42) | 0.00 | 3,277.60 | 0.01 |
| MEALS & ENTERTAINMENT | 0.00 | 0.00 | 0.00 | 0.00 | 15,694.11 | 0.03 | 21,201.73 | 0.02 |
| POST OFFICE EXPENSE | 95,581.43 | 0.00 | 398,878.13 | 381.97 | 2,659,279.80 | 4.44 | 531,065.06 | 0.43 |
| INVENTORY EXPENSE | 0.00 | 0.00 | (2,492.00) | (2.39) | (43,012.63) | (0.07) | 0.00 | 0.00 |
| FEES | 0.00 | 0.00 | 0.00 | 0.00 | 512,413.80 | 0.85 | 16,653.86 | 0.01 |
| MERCHANT BANK CARD FEES | 0.00 | 0.00 | (93,028.36) | (89.09) | 0.00 | 0.00 | 750,196.08 | 0.60 |
| EFT FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.53 | 0.00 |
| NSF FEES | 0.00 | 0.00 | 0.00 | 0.00 | 1,062.54 | 0.00 | 0.00 | 0.00 |
| WORKERS COMP PREMIUM | 0.00 | 0.00 | 0.00 | 0.00 | 551.00 | 0.00 | 143,162.90 | 0.12 |
| INS-PROPERTY INS PREMIUM | 0.00 | 0.00 | 0.00 | 0.00 | 372,728.50 | 0.62 | 107,171.15 | 0.09 |
| DEFENSE EXPENSE | 0.00 | 0.00 | 0.00 | 0.00 | 60,984.27 | 0.10 | 10,500.03 | 0.09 |
| OFFICE EXPENSE - CAP LEASE | 0.00 | 0.00 | 0.00 | 0.00 | 7,000.02 | 0.01 | 0.00 | 0.00 |
| EXPENSE - GENERAL O | 0.00 | 0.00 | 0.00 | 0.00 | 63,873.28 | 0.11 | 26,767.78 | 0.02 |
| CHECKS EXPENSES | 0.00 | 0.00 | 449.73 | 0.43 | 358.00 | 0.00 | 888.71 | 0.00 |
| CHECK COLLECTION EXP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,346.47 | 0.01 |
| OVER/SHORT | 0.00 | 0.00 | (81,019.35) | (77.59) | 24,616.08 | 0.04 | 17,751.47 | 0.01 |
| LOTTERY OVER & SHORT | 0.00 | 0.00 | 12.87 | 0.01 | 359.37 | 0.00 | 5.02 | 0.00 |
| CASH LONG & SHORT | 0.00 | 0.00 | 0.00 | 0.00 | 43.18 | 0.00 | 5,446.58 | 0.00 |
| TAX | 0.00 | 0.00 | 0.00 | 0.00 | 981.64 | 0.07 | 368,858.82 | 0.30 |
| MANAGEMENT CONTRIBUTION | 0.00 | 0.00 | 0.00 | 0.00 | 298,604.00 | 0.46 | 824,827.68 | 0.67 |
| DEPRECIATION EXP EQUIPME | 0.00 | 0.00 | 0.00 | 0.00 | 696,328.00 | 1.16 | 1,169,387.39 | 1.02 |
| DEPR EXPENSE BUILDING | 0.00 | 0.00 | 0.00 | 0.00 | 88,328.00 | 0.01 | 52,880.15 | 0.04 |
| DEPR EXPENSE LAND IMPROV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 178,236.09 | 0.14 |
| **TOTAL ADMINISTRATIVE EXP** | 121,840.43 | 0.00 | 646,075.88 | 618.69 | 7,665,445.16 | 12.79 | 7,658,788.51 | 6.17 |
| **TOTAL EXPENSES** | 121,840.43 | 0.00 | 672,442.05 | 643.94 | 21,095,900.78 | 35.19 | 37,024,233.68 | 29.85 |
| PROFIT/LOSS BEFORE EXTRA | (121,840.43) | 0.00 | (593,064.62) | (567.93) | (6,481,285.42) | (10.81) | (5,631,421.47) | (4.54) |
| EBITDA BEFORE EXTRAORDIN | (121,840.43) | 0.00 | (593,064.62) | (567.93) | (4,369,578.46) | (7.29) | (1,393,479.92) | (1.12) |
| EXTRAORDINARY GAIN/LOSS | 0.00 | 0.00 | (582,777.15) | (558.08) | (8,079,577.74) | (13.48) | (5,684,301.57) | (4.58) |
| PROFIT OR LOSS | (121,840.43) | 0.00 | (10,287.47) | (9.85) | 1,598,393.52 | 2.67 | 52,880.15 | 0.04 |
| EBITDA | | | 3,710,100.48 | | 6.19 | | (1,446,360.07) | (1.17) |

<div style="border:1px solid">

**CHAPTER 11 MONTHLY OPERATING REPORT -**
**CASH RECEIPTS AND DISBURSEMENTS STATEMENT**

Case No.  14-02689                                    Report Month/Year                    15-Jun

Debtor    Foods In
</div>

| **SUMMARY** | | Current Month | | Total Post-Petition |
|---|---|---|---|---|
| **Beginning cash balance, per Debtor's books (all acccounts)** | $ | 4,636,089 | $ | |
| **Total cash receipts** (from continuation sheets) | | 102,345 | | |
| **Total cash disbursements** (from continuation sheets) | | 135,782 | | |
| **Net cash flow** (Total cash receipts less total cash disbursements) | $ | (33,437) | | |
| **Ending cash balance, per Debtor's books (all accounts)** | $ | 4,602,652 | $ | |

United States Trustee-Southern District of Iowa

UST-2C
January 2011

# CHAPTER 11 MONTHLY OPERATING REPORT -
## CASH RECEIPTS AND DISBURSEMENTS STATEMENT-Continuation Sheet

Case No.  14-02689

Debtor  Foods Inc

Report Month/Year  06/27/2015

---

Prepare this CONTINUATION SHEET for each bank account and attach supporting documents as indicated on the checklist below.

**Depository (bank) name:**  UMB

**Account number:**  ███ 331

| | | |
|---|---|---:|
| **Beginning cash balance, per Debtor's books** | | $ 2,273,001 |
| Add: | Transfers in from other estate bank accounts | 0 |
| | **Cash receipts deposited** to this account | 80,643 |
| Subtract: | Transfers out to other estate bank accounts | 0 |
| | **Cash disbursements** from this account | 106,189 |
| Adjustments, if any (explain) | | |
| **Net cash flow** | | $ (25,547) |
| (receipts and transfers in less disbursements and transfers out) | | |
| **Ending cash balance, per Debtor's books** | | $ 2,247,454 |
| (beginning balance plus net cash flow) | | |

| Does this CONTINUATION SHEET include the following supporting documents? | Yes | No |
|---|:---:|:---:|
| • Detailed list of receipts and disbursements | ☑ | ☐ |
| • Bank statement | ☐ | ☑ |
| • Bank reconcilation | ☑ | ☐ |

# Bank Reconciliation



FMS
*Helping retailers succeed.*

**(1) Dhal's Foods General acct UMB**

Bank Acct # ████████331

GL Acct # 1-1-500-1-1002

Report Run Date 7/27/2015

Period Ending 06/27/2015

A1

| | | | |
|---|---:|---:|---|
| **Balance per Bank** | $2,291,363.40 | | |
| Deposits in Transit | $0.00 | | |
| Outstanding | | $0.00 | |
| Cleared After Period End | | $0.00 | |
| Disbursements Outstanding | ($43,909.08) | | |
| Outstanding | | ($31,118.58) | |
| Cleared After Period End | | ($12,790.50) | |
| **Adjusted Bank Balance** | $2,247,454.32 | | |
| Unverified Bank Items | $0.00 | | |
| Unverified Bank Credits | | $0.00 | |
| Unverified Bank Debits | | $0.00 | |
| Adjusted After Period End | | $0.00 | |
| **Reconciled Bank Balance** | $2,247,454.32 | | |

| | | | |
|---|---:|---:|---|
| **Beginning Ledger Balance** | $2,250,660.13 | | |
| GL Credit Adjustments | | | |
| Transaction Type | Amount | Volume | |
| 455MISC-Misc Admin | ($165.00) | 5 | |
| 698-Bank Fee | ($3,068.84) | 1 | |
| GL Debit Adjustments | | | |
| Transaction Type | Amount | Volume | |
| 165PH-Pharmacy A/R | $28.03 | 3 | |
| Total Adjustment | ($3,205.81) | | |
| **Adjusted Ledger Balance** | $2,247,454.32 | | |

In Balance

## Bank Reconciliation

**Balance per Bank**      **$2,291,363.40**

| Serial | Transaction Type | Tran Date | Amount | GI Header | Description |
|---|---|---|---|---|---|
| 0 | 0-BANK_BALANCE | 06/27/2015 | $2,291,363.40 | | BANK BALANCE |
| Other | | | | | |
| | | | *$2,291,363.40* | | |

**Disbursements Outstanding**    **($43,909.08)**

| Serial | Transaction Type | Tran Date | Amount | GI Header | Description |
|---|---|---|---|---|---|
| 301323 | CHK-Check | 01/02/2015 | ($227.70) | 0001002016 | LEANIN` TREE INC. |
| 301399 | CHK-Check | 01/09/2015 | ($261.20) | 0001002107 | LEANIN` TREE INC. |
| 301478 | CHK-Check | 01/16/2015 | ($217.25) | 0001002213 | LEANIN` TREE INC. |
| 301550 | CHK-Check | 01/23/2015 | ($202.25) | 0001002317 | LEANIN` TREE INC. |
| 301635 | CHK-Check | 01/30/2015 | ($273.27) | 0001002436 | LEANIN` TREE INC. |
| 301711 | CHK-Check | 02/06/2015 | ($319.45) | 0001002483 | LEANIN` TREE INC. |
| 301797 | CHK-Check | 02/13/2015 | ($319.45) | 0001002533 | LEANIN` TREE INC. |
| 301828 | CHK-Check | 02/17/2015 | ($24.29) | 0001002578 | EMINA JUSIC |
| 301865 | CHK-Check | 02/20/2015 | ($271.94) | 0001002643 | LEANIN` TREE INC. |
| 301940 | CHK-Check | 02/27/2015 | ($295.97) | 0001002693 | LEANIN` TREE INC. |
| 302029 | CHK-Check | 03/06/2015 | ($385.81) | 0001002774 | LEANIN` TREE INC. |
| 302107 | CHK-Check | 03/13/2015 | ($413.12) | 0001002843 | LEANIN` TREE INC. |
| 302111 | CHK-Check | 03/13/2015 | ($188.00) | 0001002843 | MCS TRUCKING LLC |
| 302188 | CHK-Check | 03/20/2015 | ($553.83) | 0001002907 | LEANIN` TREE INC. |
| 302219 | CHK-Check | 03/23/2015 | ($5,000.00) | 0001002908 | DAVE WILKINSON |
| 302273 | CHK-Check | 03/27/2015 | ($410.90) | 0001002981 | LEANIN` TREE INC. |
| 302309 | CHK-Check | 03/31/2015 | ($534.88) | 0001003025 | ANKENY CHAMBER OF COMMERCE |
| 302335 | CHK-Check | 03/31/2015 | ($10,000.00) | 0001003025 | GLOBAL SPECTRUM |
| 302342 | CHK-Check | 03/31/2015 | ($541.02) | 0001003025 | LEANIN` TREE INC. |
| 302382 | CHK-Check | 03/31/2015 | ($398.25) | 0001003026 | GLOBAL SPECTRUM |
| 302473 | CHK-Check | 05/15/2015 | ($5,280.00) | 0001003037 | Knapp Investments |
| 302494 | CHK-Check | 06/26/2015 | ($5,000.00) | 0001003041 | DAVE WILKINSON |
| Outstanding | | | *($31,118.58)* | | |

| Serial | Transaction Type | Tran Date | Amount | GI Header | Description |
|---|---|---|---|---|---|
| 302489 | CHK-Check | 06/19/2015 | ($951.00) | 0001003040 | ADVANTAGE TAPE ADVERTISING INC |
| 302497 | CHK-Check | 06/26/2015 | ($6,250.00) | 0001003041 | PROFESSIONAL FIDUCIARY SERVICE |
| 302488 | CHK-Check | 06/19/2015 | ($40.00) | 0001003040 | ADP |
| 302496 | CHK-Check | 06/26/2015 | ($3,375.14) | 0001003041 | MERCK SHARP & DOHME CORP |
| 302495 | CHK-Check | 06/26/2015 | ($124.80) | 0001003041 | GENEVA FOODS  LLC |
| 302493 | CHK-Check | 06/19/2015 | ($174.56) | 0001003040 | TYCO INTEGRATED SECURITY |
| 302491 | CHK-Check | 06/19/2015 | ($1,875.00) | 0001003040 | LAWSON ENTERPRISES |
| Cleared After Period-End | | | *($12,790.50)* | | |

# GL Adjustments From Reconciliation



| (1) Dhal's Foods General acct UMB | Report Run Date 7/27/2015 |
|---|---|
| Bank Acct # ████331 | Period Ending 06/27/2015 |
| GL Acct # 1-1-500-1-1002 | Weeks Included 4 |

A3

| Post Date | Amount | Bank Description |
|---|---|---|
| **Serial Number   500** | | |
| *165PH-Pharmacy A/R* | | |
| 06/08/2015 | $9.73 | 1603352TP STATION CP  TPSDEPOSIT DAHLS PHARMACY PREAUTHORIZED ACH CREDIT |
| 06/22/2015 | $9.64 | 1603352TP STATION CP  TPSDEPOSIT DAHLS PHARMACY PREAUTHORIZED ACH CREDIT |
| 06/24/2015 | $8.66 | 1607906TP STATION CP  TPSDEPOSIT DAHLS PHARMACY PREAUTHORIZED ACH CREDIT |
| | **$28.03** | *Total Ledger Adjustment* |
| **Serial Number   0** | | |
| *455MISC-Misc Admin* | | |
| 06/02/2015 | ($20.00) | 1603364PHARMACYFIRST/TP TPSDEBIT  DAHLSPHARMACY PREAUTHORIZED ACH DEBIT |
| 06/02/2015 | ($101.00) | 1603388PHARMACYFIRST/TP TPSDEBIT  DAHLSPHARMACY PREAUTHORIZED ACH DEBIT |
| 06/02/2015 | ($1.00) | 1603390PHARMACYFIRST/TP TPSDEBIT  DAHLSPHARMACY PREAUTHORIZED ACH DEBIT |
| 06/02/2015 | ($29.00) | 1603340PHARMACYFIRST/TP TPSDEBIT  DAHLSPHARMACY PREAUTHORIZED ACH DEBIT |
| 06/02/2015 | ($14.00) | 1607906PHARMACYFIRST/TP TPSDEBIT  DAHLSPHARMACY PREAUTHORIZED ACH DEBIT |
| | **($165.00)** | *Total Ledger Adjustment* |
| **Serial Number   0** | | |
| *698-Bank Fee* | | |
| 06/02/2015 | ($3,068.84) | ANALYSIS SERVICE CHARGE(S) MISCELLANEOUSFEES |
| | **($3,068.84)** | *Total Ledger Adjustment* |
| | **($3,205.81)** | **Total Adjustment to Cash** |

## CHAPTER 11 MONTHLY OPERATING REPORT -
### CASH RECEIPTS AND DISBURSEMENTS STATEMENT-Continuation Sheet

Case No.  14-02689
Debtor        Foods Inc                                    Report Month/Year    06/27/2015

Prepare this CONTINUATION SHEET for each bank account and attach supporting documents as indicated on the checklist below.

Depository (bank) name:    UMB - FLEX
Account number:                          434

| | |
|---|---|
| **Beginning cash balance, per Debtor's books** | $        541 |
| Add:    Transfers in from other estate bank accounts | 0 |
| **Cash receipts deposited** to this account | 0 |
| Subtract:  Transfers out to other estate bank accounts | 0 |
| **Cash disbursements** from this account | 463 |
| Adjustments, if any (explain) | |
| **Net cash flow** | $        (463) |
| (receipts and transfers in less disbursements and transfers out) | |
| **Ending cash balance, per Debtor's books** | $         78 |
| (beginning balance plus net cash flow) | |

| Does this CONTINUATION SHEET include the following supporting documents? | Yes | No |
|---|:---:|:---:|
| • Detailed list of receipts and disbursements | ☑ | ☐ |
| • Bank statement | ☐ | ☑ |
| • Bank reconcilation | ☑ | ☐ |

# Bank Reconciliation



FMS
Helping retailers succeed.

**(1) Dhal's Foods Flex acct UMB**

Bank Acct # ████434
GL Acct # 1-1-500-1-1003

Report Run Date 7/27/2015

Period Ending 06/27/2015

A1

| | | |
|---|---|---|
| **Balance per Bank** | $78.06 | |
| Deposits in Transit | $0.00 | |
|   Outstanding | | $0.00 |
|   Cleared After Period End | | $0.00 |
| Disbursements Outstanding | $0.00 | |
|   Outstanding | | $0.00 |
|   Cleared After Period End | | $0.00 |
| **Adjusted Bank Balance** | $78.06 | |
| Unverified Bank Items | $0.00 | |
|   Unverified Bank Credits | | $0.00 |
|   Unverified Bank Debits | | $0.00 |
|   Adjusted After Period End | | $0.00 |
| **Reconciled Bank Balance** | $78.06 | |

| | | |
|---|---|---|
| **Beginning Ledger Balance** | $540.98 | |
| GL Credit Adjustments | | |
| Transaction Type | Amount | Volume |
| 455FX-FLEX | ($462.92) | 13 |
|   Total Adjustment | ($462.92) | |
| **Adjusted Ledger Balance** | $78.06 | |

**In Balance**

# Bank Reconciliation

**Balance per Bank**

| Serial | Transaction Type | Tran_Date | $78.06 Amount | GI Header | Description |
|--------|------------------|-----------|--------|-----------|-------------|
| 0 | 0-BANK_BALANCE | 06/27/2015 | $78.06 | | BANK BALANCE |
| Other | | | | | |

$78.06

# GL Adjustments From Reconciliation



**FMS**
Helping retailers succeed.

| | | |
|---|---|---|
| **(1) Dhal's Foods Flex acct UMB** | | |
| Bank Acct # ████████434 | | *Report Run Date 7/27/2015* |
| GL Acct # 1-1-500-1-1003 | | Period Ending 06/27/2015 |
| | | Weeks Included 4 |

A3

| Post Date | Amount | Bank Description |
|---|---|---|
| **Serial Number   500** | | |
| *455FX-FLEX* | | |
| 06/01/2015 | ($40.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/08/2015 | ($40.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/08/2015 | ($60.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/08/2015 | ($119.09) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/10/2015 | ($58.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/11/2015 | ($20.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/15/2015 | ($14.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/15/2015 | ($21.83) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/16/2015 | ($20.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/18/2015 | ($10.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/22/2015 | ($20.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/22/2015 | ($20.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| 06/24/2015 | ($20.00) | MED-I-BANKMBI  SETL  MED-I-BANK PREAUTHORIZED ACH DEBIT |
| | ($462.92) | *Total Ledger Adjustment* |
| | ($462.92) | **Total Adjustment to Cash** |

# CHAPTER 11 MONTHLY OPERATING REPORT -
## CASH RECEIPTS AND DISBURSEMENTS STATEMENT-Continuation Sheet

Case No.  14-02689
Debtor         Foods Inc                         Report Month/Year   06/27/2015

Prepare this CONTINUATION SHEET for each bank account and attach supporting documents as indicated on the checklist below.

**Depository (bank) name:**   Wells Fargo
**Account number:**           ███████876

| | | |
|---|---|---:|
| **Beginning cash balance, per Debtor's books** | | $   2,379,340 |
| Add: | Transfers in from other estate bank accounts | 2,644 |
| | **Cash receipts deposited** to this account | 19,058 |
| Subtract: | Transfers out to other estate bank accounts | 0 |
| | **Cash disbursements** from this account | 28,627 |
| Adjustments, if any (explain) | | 0 |
| **Net cash flow** (receipts and transfers in less disbursements and transfers out) | | $   (6,925) |
| **Ending cash balance, per Debtor's books** (beginning balance plus net cash flow) | | $   2,372,414 |

| Does this CONTINUATION SHEET include the following supporting documents? | Yes | No |
|---|:---:|:---:|
| • Detailed list of receipts and disbursements | ☑ | ☐ |
| • Bank statement | ☐ | ☑ |
| • Bank reconcilation | ☑ | ☐ |

# Bank Reconciliation



**(1) Dhal's Foods Gen2 Wells Fargo**

Bank Acct # ▮▮▮▮▮376

GL Acct # 1-1-500-1-1016

*Report Run Date 7/27/2015*

*Period Ending 06/27/2015*

A1

| | | | |
|---|---|---|---|
| **Balance per Bank** | $2,372,414.13 | | |
| Deposits in Transit | $0.00 | | |
| Outstanding | | $0.00 | |
| Cleared After Period End | | $0.00 | |
| Disbursements Outstanding | $0.00 | | |
| Outstanding | | $0.00 | |
| Cleared After Period End | | $0.00 | |
| **Adjusted Bank Balance** | $2,372,414.13 | | |
| Unverified Bank Items | $0.00 | | |
| Unverified Bank Credits | | $0.00 | |
| Unverified Bank Debits | | $0.00 | |
| Adjusted After Period End | | $0.00 | |
| **Reconciled Bank Balance** | $2,372,414.13 | | |

| | | |
|---|---|---|
| **Beginning Ledger Balance** | $2,371,739.00 | |
| **GL Credit Adjustments** | | |
| Transaction Type | Amount | Volume |
| 698-Bank Fee | ($1,968.40) | 1 |
| **GL Debit Adjustments** | | |
| Transaction Type | Amount | Volume |
| TRNUEC-Transfer (Self-Rec Not Pos | $2,643.53 | 8 |
| Total Adjustment | $675.13 | |
| **Adjusted Ledger Balance** | $2,372,414.13 | |

**In Balance**

## Bank Reconciliation

**Balance per Bank**                                    $2,372,414.13

| Serial | Transaction Type | Tran_Date | Amount | GI Header | Description |
|--------|------------------|-----------|--------|-----------|-------------|
| 0 | 0-BANK_BALANCE | 06/27/2015 | $2,372,414.13 | | BANK BALANCE |
| Other | | | | | |

$2,372,414.13

# GL Adjustments From Reconciliation



**(1) Dhal's Foods Gen2 Wells Fargo**

Bank Acct # ███ 876
GL Acct # 1-1-500-1-1016

Report Run Date 7/27/2015

Period Ending 06/27/2015
Weeks Included 4

A3

| Post Date | Amount | Bank Description |
|---|---|---|
| **Serial Number   0** | | |
| **698**-Bank Fee | | |
| 06/11/2015 | ($1,968.40) | OTHER REFERENCE:IA000012105475CLIENT ANALYSIS SRVC CHRG 150610 SVC CHGE 0515 000 |
| | ($1,968.40) | *Total Ledger Adjustment* |
| **Serial Number   0** | | |
| **TRNUEC**-Transfer (Self-Rec Not Posted) | | |
| 06/01/2015 | $472.76 | OTHER REFERENCE:IA060100000069ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/03/2015 | $290.02 | OTHER REFERENCE:IA060300000010ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/04/2015 | $453.88 | OTHER REFERENCE:IA060400000029ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/05/2015 | $374.73 | OTHER REFERENCE:IA060500000008ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/08/2015 | $353.50 | OTHER REFERENCE:IA060800000008ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/10/2015 | $152.38 | OTHER REFERENCE:IA061000000008ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/11/2015 | $427.91 | OTHER REFERENCE:IA061100000012ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| 06/12/2015 | $118.35 | OTHER REFERENCE:IA061200000010ZBA FUNDING ACCOUNT TRANSFER FROM 4120550884 |
| | $2,643.53 | *Total Ledger Adjustment* |
| | **$675.13** | **Total Adjustment to Cash** |

## CHAPTER 11 MONTHLY OPERATING REPORT - SUPPLEMENTAL INFORMATION

| Case No. | 14-02689 | Report Month/Year | 4 Weeks Ended 6/27/15 |
|---|---|---|---|
| Debtor | Foods Inc | | |

### Reconciliation of Unpaid Post-Petition Taxes

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Type of tax | Unpaid post-petition taxes from prior reporting month | Post-petition taxes accrued this month (new obligations) | Post-petition tax payments made this reporting month | Unpaid post-petition taxes at end of reporting month (col. 1+2-3) |
| **Federal** | | | | |
| Employee income tax withheld | | | | |
| Employee FICA taxes withheld | | NONE | | |
| Employer FICA taxes | | | | |
| Unemployment taxes | | | | |
| Other:_____ | | | | |
| **State** | | | | |
| Sales, use & excise taxes | | | | |
| Unemployment taxes | | | | |
| Other:_____ | | | | |
| **Local** | | | | |
| Personal property taxes | | | | |
| Real property taxes | | | | |
| Other:_____ | | | | |
| | | | **Total unpaid post-petition taxes** | |

### Payments to Attorneys and Other Professionals (requires court approval)

| Professional's name | Type of services | Amount paid this month | Date of court approval | Balance unpaid at end of month, net of retainer |
|---|---|---|---|---|
| Crow & Dunlevy | Legal | 5,984 | | |
| Dickinson Law | Legal | 7,775 | | |
| The Food Partners | Investment Banking | 12,500 | | |

### Payments to Principals of Debtor and Other Insiders (includes officers, directors, shareholders, partners, members, relatives, etc.)

| Payee's name | Position with or relationship to Debtor | Amount paid this month | Purpose of payment (e.g., wages or salary, expense reimbursement, loan repayment, |
|---|---|---|---|
| Craig Moore | CEO | 787 | Consulting |
| Dean Longnecker | CFO | 49,700 | Consulting |
| Tim Davis | VP | | Salary |

### Insurance Coverage Summary

| Type of insurance | Insurance carrier | Amount of coverage | Policy expiration date | Premium paid through date |
|---|---|---|---|---|
| Workers' compensation | United Heartland | Statutory | 9/15/2015 | $210,028 |
| General liability | EMC | $1,000,000 | 9/15/2015 | $62,544 |
| Property (fire, theft, etc.) | EMC | $91,954,679 | 9/15/2015 | $20,800 |
| Vehicle | EMC | $1,000,000 | 9/15/2015 | $5,208 |
| Umbrella | EMC & Liberty Mutual | $20,000,000 | 9/15/2015 | $8,384 |
| Other | Various | Various | 9/15/2015 | $7,664 |
| *If any policies were renewed or replaced during reporting period, attach new certificate of insurance.* | | | | |

## CHAPTER 11 MONTHLY OPERATING REPORT - SUPPLEMENTAL INFORMATION

Case No._____ 14-02689
Debtor_____ Foods Inc

Report Month/Year _____ 6/27/2015

**Accounts Receivable Aging Summary** (attach detailed aging report)

|  | 30 days or less | 31 to 60 days | 61 to 90 days | Over 90 days | Total at month end |
|---|---|---|---|---|---|
| Pre-petition receivables |  |  |  |  |  |
| Post-petition receivables |  |  |  |  |  |
| Total |  |  |  |  |  |

Represents Third Party Pharmacy Receivable From Third Party Station

**Post-Petition Accounts Payable Aging Summary** (attach detailed aging report)

|  | 30 days or less | 31 to 60 days | 61 to 90 days | Over 90 days | Total at month end |
|---|---|---|---|---|---|
| Trade Payables |  |  |  |  |  |
| Other Payables |  |  |  |  |  |
| Total |  |  |  |  |  |

**Personnel Changes**

|  | Full-time | Part-time |
|---|---|---|
| Number of employees at beginning of month |  |  |
| Number of employees at end of month |  |  |

**Other Information**

|  | Yes | No |
|---|---|---|
| **Payment of Pre-Petition Debts**<br>Did Debtor pay any unsecured pre-petition debts during the reporting month?  *If yes, attach a detailed explanation including the payee, amount paid, and date of court approval.* | ❑ | x |
| **Sale of Assets**<br><br>Did Debtor, or another party on behalf of Debtor, sell, transfer, or otherwise dispose of any assets outside of the ordinary course of Debtor's business during the reporting month?  *If yes, attach a report of sale or settlement statement, or detailed explanation including description of asset sold, purchaser, sale price, net proceeds received, and date of court approval.* | ❑ | x |
| **Post-Petition Financing**<br>Did Debtor borrow any money outside of the ordinary course of business during the reporting month?  *If yes, attach a detailed explanation including the name of the lender, the amount borrowed, and the date of court approval.* | ❑ | x |

**Narrative**
*Provide a brief description of any significant business and legal actions taken by the debtor, its creditors, or the court during the reporting period; any unusual or non-recurring accounting transactions that are reported in the financial statements; any significant changes in the financial condition of the debtor; and any progress made toward confirmation of a plan during the month.*

United States Trustee-Southern District of Iowa

**EXHIBIT E**

Equity Interest Holders, including ESOP

| Stockholders | Shares |
|---|---:|
| David W. Sinnwell | 65,000 |
| Mark A. Brase | 36,500 |
| Timothy G. Davis | 700 |
| Kenneth Kane | 500 |
| John P. Herold | 1,000 |
| Michael R. Hixson | 1,000 |
| David S. Wilson | 3,338 |
| Joseph A. McDonald | 1,000 |
| Loyd Nickel | 750 |
| Donald W. Mark | 21,000 |
| Douglas L. Schreck | 1,500 |
| Michael J. Hoffman | 3,000 |
| Jason Polich | 200 |
| Richard S. Rissman | 9,000 |
| Marilyn J. Aldrich | 13,500 |
| Trustees | 5,500,000 |
| Lillian Alice Crusan | 6,500 |
| Larry Keleher | 600 |
| Robert R. Keleher | 600 |
| Katherine M. Frame | 23 |
| NON VOTING STOCK | 10,000 |
|  |  |
| TOTAL SHARES | 5,677,988 |

**EXHIBIT F**

Dahl's Liquidating Trust Agreement

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Lead Case No.:   14-02689-als-11 |
| | ) | Affiliated Cases: 14-02690-als-11 |
| **FOODS, INC. dba DAHL'S FOODS** | ) | 14-02691-als-11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Chapter 11 (Jointly Administered) |
| | ) | |
| 4343 Merle Hay Road | ) | Hon.  Anita L. Shodeen |
| Des Moines, IA  50310 | ) | |
| | ) | |
| EIN: 42-0803702 | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| AND AFFILIATED CASES | ) | |
| ———————————————— | ) | |

## FOODS, INC. LIQUIDATING TRUST AGREEMENT

## PREAMBLE

This Agreement (the "*Liquidating Trust Agreement*") is made this ___ day of _____, 2015, by and between Foods, Inc. d/b/a Dahl's Foods (the "*Debtor*"), the Official Committee of Unsecured Creditors of Dahl's Foods (the "*Committee*"), and Barry A. Chatz, not individually, but solely as trustee of this Liquidating Trust (the "*Liquidating Trustee*" or "*Trustee*") and, together with the Debtor and the Committee, the "*Parties*") in accordance with the First Amended Combined Plan of Reorganization and Disclosure Statement dated _____, 2015 (the "*Plan*"), confirmed by the Bankruptcy Court (as defined *infra*) by the Order Confirming the Plan, dated _____ (the "*Confirmation Order*").[2]

## R E C I T A L S :

A.      On November 9, 2014, the Debtor and its affiliated debtor entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Iowa (the "*Bankruptcy Court*") and commenced their chapter 11 cases (the "*Cases*");

B.      On November 18, 2014, the Office of the United States Trustee for the Southern District of Iowa (the "*U.S. Trustee*") appointed the Committee.

---

[2]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

C.    The Plan and the Confirmation Order provide, among other things, that the Trustee shall be empowered to make distributions, pursuant to the Plan, the Confirmation Order and this Liquidating Trust Agreement, to holders of Allowed Class 3 Claims, Allowed Class 4 Claims and Allowed Class 5 Equity Interests (referred herein as "*Allowed Class 5 Claims*") and together with Allowed Class 3 Claims and Allowed Class 4 Claims, the "*Beneficiaries*");

D.    The Liquidating Trust is created pursuant to, and to effectuate, the Plan and the Confirmation Order;

E.    The Liquidating Trust is created on behalf of, and for the sole benefit of, the Beneficiaries;

F.    The powers, authority, responsibilities and duties of the Trustee shall be governed by this Liquidating Trust Agreement, the Plan, applicable orders issued by the Bankruptcy Court (including the Confirmation Order), and general fiduciary obligations of trustees under Iowa law;

G.    Pursuant to the terms and conditions of the Plan, the Confirmation Order and this Liquidating Trust Agreement, the Liquidating Trustee shall administer the Liquidating Trust Assets;

H.    This Liquidating Trust Agreement is intended to supplement and complement the Plan and the Confirmation Order; provided, however, that if any of the terms and/or provisions of this Liquidating Trust Agreement conflict with the terms and/or provisions of the Plan or the Confirmation Order, the Plan and the Confirmation Order shall govern; and

I.    The Liquidating Trust is intended to qualify as a "liquidating trust" under the Internal Revenue Code of 1986 and the regulations promulgated thereunder, specifically Treas. Reg. § 301.7701-4(d), and as such is a "grantor trust" for federal income tax purposes with the Beneficiaries treated as the grantors and owners of the Liquidating Trust Assets.  In particular:

(i)    The Liquidating Trust is organized for the primary purpose of liquidating the Liquidating Trust Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  The Liquidating Trust shall not be deemed a successor of the Debtor;

(ii)    The Liquidating Trust provides that the Beneficiaries of the Liquidating Trust will be treated as the grantors of the Liquidating Trust and deemed owners of the Liquidating Trust Assets.    This Liquidating Trust Agreement requires the Trustee to file returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.6714(a);

(iii)    This Liquidating Trust Agreement provides for consistent valuations of the transferred property by the Liquidating Trustee and the Beneficiaries, and those valuations shall be used for federal income tax purposes;

45

(iv)   All of the Liquidating Trust's income is to be treated as subject to tax on a current basis to the Beneficiaries who will be responsible for payment of any tax due;

(v)   This Liquidating Trust contains a fixed or determinable termination date that is not more than thirty (30) years from the date of creation of the Liquidating Trust and that is reasonably based on all the facts and circumstances;

(vi)   The investment powers of the Trustee, other than those reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating purpose of the Liquidating Trust, are limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills; and

(vii)   The Liquidating Trustee is required to make a distribution at least once per twelve-month period to the Beneficiaries in the order of priorities set forth in this Liquidating Trust Agreement based on the Liquidating Trust's net income, except that the Liquidating Trustee may retain an amount of net income reasonably necessary to maintain the value of the Liquidating Trust Assets or to satisfy claims and contingent liabilities (including Disputed Claims).

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan and the Confirmation Order, the Parties agree as follows:

# ARTICLE I
# ESTABLISHMENT OF THE LIQUIDATING TRUST

1.1   <u>Transfer of Assets to the Liquidating Trust</u>

1.1.1   Pursuant to the Plan, the Debtor and the Trustee hereby establish the Liquidating Trust on behalf of the Beneficiaries, to be treated as the grantors and deemed owners of the Liquidating Trust Assets, and, pursuant to the Confirmation Order, the Debtor agreed to transfer, assign and deliver to the Liquidating Trust, on behalf of the Beneficiaries, all of their right, title and interest in the Liquidating Trust Assets, notwithstanding any prohibition of assignability under applicable non-bankruptcy law.  The Liquidating Trust agrees to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Beneficiaries, subject to the terms of the Plan, the Confirmation Order and this Liquidating Trust Agreement.

1.1.2   All rights in connection with the vesting and transfer of the Liquidating Trust Assets, including the Litigation Claims, and any attorney-client privileges, work-product protection or other privilege or immunity attaching to any documents or communications of the Debtor's or Committee's professionals (whether written or oral) related to the Liquidating Trust Assets, will vest with the Liquidating Trust.  All bank accounts established by the Debtor will be transferred to and held in the Liquidating Trust on behalf of the Beneficiaries, subject to the

provisions of the Plan and this Liquidating Trust Agreement.  The Debtor and the Liquidating Trustee are authorized to take all necessary actions to effectuate the foregoing.

1.2     Title to Assets

1.2.1     Pursuant to the Confirmation Order, within seven (7) days of the Effective Date, the Debtor shall transfer the Liquidating Trust Assets to the Liquidating Trust for the benefit of the Beneficiaries.  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, all assets and properties transferred to the Liquidating Trust pursuant to the Plan shall vest in the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtor shall have no interest in or with respect to such Liquidating Trust Assets or the Liquidating Trust.

1.2.2     For federal income tax purposes, all parties (including, without limitation, the Trustee and the Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtor to the Liquidating Trust as a transfer of such assets by the Debtor to the holders of Allowed Class 3 Claims, Allowed Class 4 Claims, and Allowed Class 5 Claims entitled to distributions under the Plan and the Confirmation Order, followed by a transfer by such holders to the Liquidating Trust.  Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

1.2.3     To any extent not effectuated by the Confirmation Order, the Debtor shall execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate), and the Debtor shall take or cause to be taken such further action as may reasonably be necessary or appropriate, to vest or perfect in or confirm to the Liquidating Trust title to and possession of the Liquidating Trust Assets.

1.3     Valuation of Assets

The Liquidating Trust, to the extent that the Trustee deems it necessary or appropriate, may conduct a good faith valuation of the Liquidating Trust Assets, and shall make such valuation available to the Beneficiaries by filing a report of such valuation with the Bankruptcy Court promptly after its completion.  The valuation shall be used consistently by all parties (including the Liquidating Trustee and the Beneficiaries) for federal income tax purposes.  Any dispute regarding the valuation of the Liquidating Trust Assets shall be resolved by the Bankruptcy Court.

1.4     Claims Against the Liquidating Trust Assets

The Liquidating Trust Assets shall be subject to the claims of the Trustee, its Professionals (as defined *infra*) and Non-Professionals (as defined *infra*) and U.S. Trustee fees. The Liquidating Trustee shall be entitled to reimburse such persons out of any available cash in the Liquidating Trust, for reasonable compensation and actual reasonable out-of-pocket expenses, and against and from any and all loss, liability, expense or damage, which each may sustain in good faith and without willful misconduct, gross negligence, fraud or, solely in the

case of the Liquidating Trustee, breach of fiduciary duty other than negligence, in the exercise and performance of any of the powers and duties of the Liquidating Trustee.

## ARTICLE II
## APPOINTMENT OF THE LIQUIDATING TRUSTEE

Barry A. Chatz is hereby appointed to serve as the initial Liquidating Trustee under the Plan and hereby accepts this appointment and agrees to serve in such capacity, effective upon the date of this Liquidating Trust Agreement. Any successor Liquidating Trustee shall be appointed as set forth in **Section 4.6** in the event any Liquidating Trustee is removed or resigns pursuant to this Liquidating Trust Agreement, or if such Liquidating Trustee otherwise vacates the position.

## ARTICLE III
## DUTIES AND POWERS OF THE LIQUIDATING TRUSTEE

3.1    Generally

The Liquidating Trustee shall be responsible for administering the Liquidating Trust Assets and taking actions on behalf of, and representing, the Liquidating Trust. The Liquidating Trustee shall have the authority to bind the Liquidating Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity of Liquidating Trustee and not individually.

3.2    Scope of Authority

The responsibilities and authority of the Liquidating Trustee shall include, without limitation: (a) collecting and liquidating the Liquidating Trust Assets and distributing the Liquidating Trust Assets to the Beneficiaries in accordance with the Plan, the Confirmation Order and this Liquidating Trust Agreement; (b) facilitating the prosecution or settlement of objections to, or estimations of, Claims in accordance with, but subject to the limitations set forth in, the Plan; (c) analyzing, prosecuting and settling Litigation Claims; (d) in accordance with **Section 11.1**, filing all required tax returns and paying taxes and all other obligations on behalf of the Liquidating Trust from funds held by the Liquidating Trust; (e) filing Quarterly Reports; (f) providing periodic reports to the Bankruptcy Court and other parties-in-interest on the status of the Claims resolution process, the status of the prosecution of Litigation Claims, distributions to Beneficiaries and the financial status of the Liquidating Trust; (g) performing such administrative, ministerial, and other functions reasonably appropriate to the Debtor's orderly liquidation, including but not limited to, such actions as may be associated with the filing of all required tax returns and the dissolution of the Debtor under Iowa law; and (h) carrying out such other responsibilities not specifically set forth herein as may be vested in the Liquidating Trustee pursuant to the Plan, this Liquidating Trust Agreement, any Bankruptcy Court order or as may otherwise be necessary and proper to carry out the provisions of the Plan and the Confirmation Order. The Liquidating Trustee shall consult with the Oversight Committee in performing those actions more fully described in Section 14.2.

3.3    Fiduciary Obligations to the Liquidating Trust and Beneficiaries

The Liquidating Trustee's actions as Liquidating Trustee will be held to the same standard as a trustee of a trust under Iowa law.  His or her fiduciary obligations to the Liquidating Trust and its Beneficiaries are the same fiduciary obligations that the trustee of a trust owes to that trust and its beneficiaries under Iowa law.

3.4    Powers

In connection with the administration of the Liquidating Trust, except as otherwise set forth in this Liquidating Trust Agreement, the Plan or the Confirmation Order, the Liquidating Trustee is hereby authorized to perform those acts necessary to accomplish the purposes of the Liquidating Trust, without further authorization from the Bankruptcy Court.  Without limiting, but subject to, the foregoing, the Liquidating Trustee is expressly authorized, but not required, unless otherwise provided in this Liquidating Trust Agreement and subject to the limitations contained herein, in the Plan and in the Confirmation Order, to:

(a)    hold legal title (on behalf of the Liquidating Trust as Liquidating Trustee, but not individually) to the Liquidating Trust Assets;

(b)    effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan;

(c)    protect and enforce the rights to the Liquidating Trust Assets vested in the Liquidating Trust by the Plan and the Confirmation Order by any method deemed appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(d)    invest funds (in the manner set forth in **Section 3.8**), make distributions, and pay taxes and other obligations owed by the Liquidating Trust from funds held by the Liquidating Trustee and/or the Liquidating Trust in accordance with the Plan and the Confirmation Order;

(e)    prosecute, defend, compromise, adjust, arbitrate, abandon or otherwise deal with and settle, in accordance with the terms set forth herein and in the Plan and Confirmation Order, all actions arising under state law or the Bankruptcy Code, specifically, but not limited to, Litigation Claims; provided, however, that the Liquidating Trustee shall not be required to obtain approval from the Bankruptcy Court to the extent such matters are limited to a claim or cause of action where the amount demanded or claimed is, in the aggregate, less than or equal to $50,000 (a "*De Minimis Claim or Cause of Action*");

(f)    determine, compromise and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

(g)    file, if necessary, any and all tax and information returns with respect to the Liquidating Trust and pay taxes properly payable by the Liquidating Trust, if any, commensurate with the Liquidating Trust's classification as a grantor trust pursuant to Treas. Reg. § 1.671-4(a);

49

(h)     make all tax withholdings and make tax elections by and on behalf of the Liquidating Trust;

(i)     send annually to each Beneficiary a separate statement stating the Beneficiary's share of income, gain, loss, deduction or credit and instruct all such Beneficiaries to report such items on their federal tax returns;

(j)     in reliance upon the information used to prepare the Claims List (as defined *infra*), maintain on the Liquidating Trustee's books and records, a register evidencing the beneficial interest herein held by each Beneficiary;

(k)     administer, reconcile, compromise, estimate and/or resolve Claims in accordance with, but subject to the limitations set forth in, the Plan (including the filing of any objections to such Claims as appropriate); provided, however, that the Liquidating Trustee shall not be required to obtain approval from the Bankruptcy Court to the extent such matters are limited to a De Minimis Claim or Cause of Action;

(l)     establish such reserves for Disputed Claims, taxes, assessments, Professional fees and other expenses of administration of the Liquidating Trust as may be necessary and appropriate for the proper operation of matters incident to the Liquidating Trust;

(m)     make distributions as provided for in this Liquidating Trust Agreement, the Plan and the Confirmation Order;

(n)     open and maintain bank accounts on behalf of or in the name of the Liquidating Trust;

(o)     pay expenses and make disbursements necessary to preserve, liquidate and enhance the Liquidating Trust Assets;

(p)     purchase such insurance coverage as the Liquidating Trustee deems necessary and appropriate with respect to the liabilities and obligations of the Liquidating Trustee (in the form of an errors and omissions policy, fiduciary policy or otherwise);

(q)     purchase such insurance coverage as the Liquidating Trustee deems necessary and appropriate with respect to real and personal property which may be or may become Liquidating Trust Assets;

(r)     retain and pay Professionals and Non-Professionals as provided for in **Article X** of this Liquidating Trust Agreement to assist the Liquidating Trust and/or the Liquidating Trustee with respect to its responsibilities to the extent permitted by this Liquidating Trust Agreement, the Plan and the Confirmation Order;

(s)     take such actions as are necessary, appropriate or desirable to close or dismiss the Cases;

(t)     take such actions as are necessary, appropriate or desirable to terminate the existence of the Debtors to the extent not already effectuated pursuant to the Plan;

50

(u)     terminate and dissolve the Liquidating Trust pursuant to and in accordance with the terms of the Plan and this Liquidating Trust Agreement; and

(v)     assume such other powers as may be vested in or assumed by the Liquidating Trust pursuant to the Plan or Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan, the Confirmation Order or this Liquidating Trust Agreement.

3.5     <u>General Authority of the Liquidating Trustee</u>

Unless specifically stated otherwise herein, the Liquidating Trustee shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction authorized in this Liquidating Trust Agreement or specifically contemplated in the Plan and the Confirmation Order.

3.6     <u>Limitation of Liquidating Trustee's Authority; No On-Going Business</u>

The Liquidating Trustee shall have no power or authority except as set forth in this Liquidating Trust Agreement, in the Plan or in the Confirmation Order.  For federal tax purposes, the Liquidating Trustee shall not be authorized to engage in any trade or business with respect to the Liquidating Trust Assets except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  The Liquidating Trustee shall take such actions consistent with the prompt orderly liquidation of the Liquidating Trust Assets as required by applicable law and consistent with the treatment of the Liquidating Trust as a liquidating trust under Treas. Reg. § 301.7701-4(d), to the extent such actions are permitted by this Liquidating Trust Agreement.

3.7     <u>Other Activities of the Liquidating Trustee</u>

The Liquidating Trustee shall be entitled to be employed by third parties while serving as Liquidating Trustee for the Liquidating Trust; <u>provided</u>, <u>however</u>, that such employment shall not include actions or representations of parties that are adverse to the Liquidating Trust.

3.8     <u>Investment and Safekeeping of Liquidating Trust Assets</u>

All monies and other assets received by the Liquidating Trust shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Beneficiaries, but need not be segregated from other Liquidating Trust Assets.  The Liquidating Trustee shall promptly invest any such monies in the manner set forth in this **Section 3.8**, but shall otherwise be under no liability for interest or income on any monies received by the Liquidating Trust hereunder and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received by the Liquidating Trustee.  Investment of any monies held by the Liquidating Trust shall be administered in accordance with the Liquidating Trustee's general duties and obligations hereunder and in view of the Liquidating Trustee's general fiduciary duties under Iowa law.  The rights and powers of the Liquidating Trustee to invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof or any income earned by the Liquidating Trust, shall be limited to the right and power to:  (a) invest such Liquidating Trust Assets (pending

51

distributions in accordance with the Plan and the Confirmation Order) in (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (b) deposit such assets in demand accounts at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "*Permissible Investments*"); provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("*IRS*") guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

3.9    Authorization to Expend Liquidating Trust Assets

The Liquidating Trustee may expend assets of the Liquidating Trust to the extent necessary to:  (a) satisfy and discharge liabilities and to maintain the value of the Liquidating Trust Assets during liquidation; (b) pay Liquidating Trustee's Expenses (including, but not limited to, any taxes imposed on the Liquidating Trust, and fees and expenses in connection with litigation or compensation of the Liquidating Trustee in accordance with **Section 4.1** below); (c) satisfy other liabilities incurred or assumed by the Liquidating Trust (or to which the Liquidating Trust Assets are otherwise subject) in accordance with this Liquidating Trust Agreement, the Plan or the Confirmation Order; and (d) make distributions to Beneficiaries on account of their Liquidating Trust Interests in accordance with this Liquidating Trust Agreement, the Plan and the Confirmation Order.

**ARTICLE IV**
**LIQUIDATING TRUSTEE**

4.1    Compensation of the Liquidating Trustee

The Liquidating Trustee shall be entitled to receive, but is not required to accept, reasonable compensation for services rendered on behalf of the Liquidating Trust.  All compensation and other amounts payable to the Liquidating Trustee shall be paid out of the Liquidating Trust Assets.  The Liquidating Trust shall reimburse the Liquidating Trustee for its actual reasonable out-of-pocket expenses incurred including, without limitation, postage, telephone and facsimile charges upon receipt of periodic billings.  All reimbursement for expenses payable to the Liquidating Trustee shall be paid from the Liquidating Trust Assets in priority over any distributions to Beneficiaries to be made under the Plan.  If the Liquidating Trust Assets are insufficient to fully satisfy the amounts payable to, or other obligations owing to, the Liquidating Trustee, the Beneficiaries shall be required to disgorge their Pro Rata share of any interim distributions received from the Liquidating Trust, until all such amounts have been fully paid and all such obligations have been fully satisfied.  If the Liquidating Trustee dies or becomes disabled, then such former Liquidating Trustee (or his or her estate, successor or assigns) shall be entitled to any remaining unpaid compensation and reimbursement due hereunder.

4.2     Term of Service

The Liquidating Trustee shall serve until the earliest of:  (a) the completion of all the Liquidating Trustee's duties, responsibilities and obligations under this Liquidating Trust Agreement and the Plan; (b) termination of the Liquidating Trust in accordance with this Liquidating Trust Agreement; and (c) the Liquidating Trustee's death, resignation or removal.

4.3     No Bond

The Liquidating Trustee shall serve without bond.

4.4     Removal

A majority of the Beneficiaries may at any time, for cause, petition the Bankruptcy Court for the removal of the Liquidating Trustee; provided, however, that the Liquidating Trustee may not be removed until a successor Liquidating Trustee has been named.  "Cause" shall include, without limitation:  (a) the undue prolongation of the duration of the Liquidating Trust and of distributions of the Liquidating Trust Assets to the Beneficiaries; (b) gross negligence, fraud or willful misconduct (as determined by a Final Order) in connection with the affairs of the Liquidating Trust;  (c) a physical and/or mental disability that substantially prevents the Liquidating Trustee from performing the duties of a Liquidating Trustee hereunder; or (d) breach of fiduciary duty or an unresolved conflict of interest.  Removal shall be effective on the date specified in the order approving the removal.

4.5     Resignation

The Liquidating Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the parties entitled to notice under **Section 13.10** hereof.  The resignation will be effective on the later of:  (a) the date specified in the notice; (b) the date that is thirty (30) days after the date the notice is delivered; and (c) the date the successor Liquidating Trustee accepts his or her appointment as such.

4.6     Appointment of Successor Liquidating Trustee

4.6.1   In the event the Liquidating Trustee resigns pursuant to this Liquidating Trust Agreement, the resigning Liquidating Trustee shall designate a successor Liquidating Trustee.  Any successor Liquidating Trustee appointed hereunder shall execute an instrument accepting such appointment and shall deliver such acceptance to the Bankruptcy Court. Thereupon, such successor Liquidating Trustee shall, without any further act, become vested with all of the properties, rights, powers, trusts and duties of his or her predecessor in the Liquidating Trust with like effect as if originally named herein; provided, however, that the resigning Liquidating Trustee shall, nevertheless, when requested in writing by the successor Liquidating Trustee, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Liquidating Trustee all the estates, properties, rights, powers and trusts of the removed or resigning Liquidating Trustee.

53

4.6.2    In the event the Liquidating Trustee is removed for cause or vacates the position due to death or incapacity (or the resigning Liquidating Trustee fails to timely designate a successor Liquidating Trustee pursuant to **Section 4.6.1** hereof), the Bankruptcy Court shall appoint a successor Liquidating Trustee as soon as practicable, but in any event within thirty (30) days after the occurrence of the vacancy.

4.7    Liquidating Trust Continuance

The resignation or removal of the Liquidating Trustee will not terminate the Liquidating Trust or revoke any existing agency created pursuant to this Liquidating Trust Agreement or invalidate any action theretofore taken by the Liquidating Trustee.

## ARTICLE V
## LIQUIDATING TRUST BENEFICIARIES

5.1    Identification of Beneficiaries

The beneficial interests of each Beneficiary in the Liquidating Trust shall be recorded and set forth in the Claims List maintained by the Liquidating Trustee.

5.2    Beneficial Interest Only

The ownership of a beneficial interest in the Liquidating Trust shall not entitle any Beneficiary or the Debtors to any title in or to the Liquidating Trust Assets or to any right to call for a partition or division of such Liquidating Trust Assets or to require an accounting, except as specifically provided herein.

5.3    Ownership of Beneficial Interests Hereunder

Each Beneficiary shall own a beneficial interest in the Liquidating Trust Assets equal in proportion to the pro rata share of such Beneficiary's Allowed Claim in accordance with the Plan.

5.4    Evidence of Beneficial Interest

Ownership of a beneficial interest in the Liquidating Trust Assets shall not be evidenced by any certificate, security or receipt or in any other form or manner whatsoever, except as maintained on the Claims List.

5.5    Limitation on Transferability

It is understood and agreed that the beneficial interests in the Liquidating Trust shall be non-assignable during the term of this Liquidating Trust Agreement except by operation of law. An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Liquidating Trustee, and the Liquidating Trustee may continue to pay all amounts to or for the benefit of the assigning Beneficiary until receipt of proper notification and proof of assignment by operation of law. The Liquidating Trustee may rely upon such proof without the requirement of any further investigation. Any notice of a change of beneficial

54

interest ownership as permitted by operation of law shall be forwarded to the Liquidating Trustee by registered or certified mail pursuant to the notice provisions set forth in **Section 13.10** hereof. The notice shall be executed by both the transferee and the transferor, and the signatures of the parties shall be acknowledged before a notary public and as required by Bankruptcy Rule 3001(e). The notice must clearly describe the interest to be transferred. The Liquidating Trustee may conclusively rely upon such signatures and acknowledgments as evidence of such transfer without the requirement of any further investigation.

5.6     Conflicting Claims

If any conflicting claims or demands are made or asserted with respect to the Liquidating Trust Assets, or if there is any disagreement between the assignees, transferees, heirs, representatives or legatees succeeding to all or a part of the Liquidating Trust Assets resulting in adverse claims or demands being made in connection with such assets, then, in any of such events, the Liquidating Trustee shall be entitled to refuse to comply with any such conflicting claims or demands. In so refusing, the Liquidating Trustee may elect to make no payment or distribution with respect to the Liquidating Trust Assets that are the subject of the claims or demands involved, or any part thereof, and to refer such conflicting claims or demands to the Bankruptcy Court, which shall retain jurisdiction over resolution of such conflicting claims or demands. In so doing, the Liquidating Trustee shall not be or become liable to any of such parties for its refusal to comply with any of such conflicting claims or demands, nor shall the Liquidating Trustee be liable for interest on any funds that it may so withhold. The Liquidating Trustee shall be entitled to refuse to act until either: (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court; or (b) all differences have been resolved by a valid written agreement among all of such parties and the Liquidating Trustee.

**ARTICLE VI**
**PROVISIONS REGARDING DISTRIBUTIONS**

6.1     Timing and Methods of Distributions

6.1.1     Generally. The Liquidating Trustee, on behalf of the Liquidating Trust, or such other entity as may be designated by the Liquidating Trustee, on behalf of the Liquidating Trust, will make all distributions to the Beneficiaries as set forth in, and as required by, this Liquidating Trust Agreement, the Plan and the Confirmation Order. Unless the entity or Person receiving a payment agrees otherwise, the Liquidating Trustee, in its sole discretion, will make any payment in Cash to be made by the Liquidating Trust by check drawn on a domestic bank or by wire transfer from a domestic bank.

6.1.2     Allocation and Priority of Distributions. After payment of all unpaid Liquidating Trustee's Expenses, the Liquidating Trustee in its good faith judgment and based on available Liquidating Trust Assets, shall distribute the proceeds received by the Liquidating Trust from time to time from the sale or other disposition of the Liquidating Trust Assets, net of the reasonable or necessary costs of such sale or other disposition (the "*Net Trust Proceeds*") to holders of Allowed Class 3 Claims, Allowed Class 4 Claims and Allowed Class 5 Claims as follows: (a) first, Pro Rata distributions of the Net Trust Proceeds from the Liquidating Trust by the Liquidating Trustee on account of the Liquidating Trust interests held by the holder of Class

55

3 Claims until such time that distributions to holders of Allowed Class 3 Claims have been made in an amount equal to the total of the Allowed Class 3 Claims; (b) second, Pro Rata distributions of the Net Trust Proceeds from the Liquidating Trust by the Liquidating Trustee on account of the Liquidating Trust interests held by the holder of Class 4 Claims until such time that distributions to holders of Allowed Class 4 Claims have been made in an amount equal to the total of the Allowed Class 4 Claims; and (c) third, Pro Rata distributions of the Net Trust Proceeds from the Liquidating Trust by the Liquidating Trustee on account of the Liquidating Trust interests held by the holder of Class 5 Claims.  For the avoidance of doubt, Allowed Class 4 Claims shall not receive any distribution until Allowed Class 3 Claims have been paid in full and Allowed Class 5 Claims shall not receive any distribution until Allowed Class 4 Claims have been paid in full.  The Liquidating Trustee may withhold from amounts distributable to any entity any and all amounts, determined in the Liquidating Trustee's reasonable discretion to be required by any law, regulation, rule, ruling, directive or other government equivalent of the United States or of any political subdivision thereof, or to otherwise facilitate the administration of the Liquidating Trust.

6.1.3   <u>Distributions by the Liquidating Trustee</u>.  Subject to the provisions of this **Article VI**, the Liquidating Trustee shall distribute to the holders of Allowed Class 3 Claims, Allowed Class 4 Claims and Allowed Class 5 Claims, all net cash income (including as cash for this purpose, all cash equivalents) from time to time at such time intervals as decided by the Liquidating Trustee (but within a reasonable time after creation of a Disputed Claims Reserve (as defined *infra*) determined to be sufficient to make Pro Rata distributions on Disputed Claims and to pay the Liquidating Trustee's Expenses in full), pursuant to the terms of the Plan and the Confirmation Order.  The Liquidating Trustee may cause the Liquidating Trust to retain an amount of net cash proceeds or net cash income reasonably necessary to maintain the value of its assets, as set forth in, and to effectuate the provisions of, the Plan and the Confirmation Order. The Liquidating Trustee may withhold from the amount distributable from the Liquidating Trust at any time to any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity (each, a "*Person*") (except with respect to the IRS) such sum or sums as may be sufficient to pay any tax or taxes or other charge or charges that have been or may be imposed on such Person or upon the Liquidating Trust with respect to the amount distributable or to be distributed under the income tax laws of the United States or of any state or political subdivision or entity by reason of any distribution provided for in this Liquidating Trust Agreement, whenever such withholding is required by any law, regulation, rule, ruling, directive or other governmental requirement, and the Liquidating Trustee may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this **Section 6.1.3**.  Notwithstanding the foregoing, but without prejudice to the Liquidating Trustee's rights hereunder, such Person shall have the right with respect to the United States, or any state, or any political subdivision of either, to contest the imposition of any tax or other charge by reason of any distribution hereunder.

6.1.4   <u>Claims List</u>.  The Liquidating Trustee shall compile a list of all Claims scheduled by the Debtor and/or filed against the Debtor as of such date, the addresses of all such holders as of a record date that is not more than fifteen (15) days prior to the date of the list, the designation and amount of each such Claim as disputed or not disputed, fixed or contingent and liquidated or unliquidated, and, to the extent ascertainable from the Debtor's books and records,

56

the Employer or Taxpayer Identification Number as assigned by the IRS for each holder (the "*Claims List*").  The Liquidating Trustee will utilize the Claims List in calculating and making distributions from the Liquidating Trust as provided herein; provided, however, that the Claims List shall be adjusted from time to time by the Liquidating Trustee as necessary to maintain its accuracy.  The Liquidating Trustee shall also revise the Claims List from time to time upon receipt of notice from a Beneficiary notifying the Liquidating Trustee of a change of address or stating that its Claim has been transferred to a new Beneficiary, that the new Beneficiary has complied with any applicable provisions of Bankruptcy Rule 3001(e) (and providing evidence thereof) and setting forth the name and address of such new Beneficiary.  The Liquidating Trustee shall establish the revised Claims List that is to be used in conjunction with any particular distribution no less than fourteen (14) days prior to the date of such distribution.  Nothing herein shall impair or otherwise affect the Liquidating Trustee's right to object to the Allowance of Claims as provided in **Section 7.1**.

6.2   Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to holders of record of Liquidating Trust interests shall be made at the address of each such holder set forth on the Claims List.

6.3   No Post-Petition Interest on Claims

Except as expressly provided in the Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or as required by applicable bankruptcy law, post-petition interest will not accrue on account of any Claim and the Liquidating Trustee will not distribute post-petition interest on account of any Claim.

6.4   No Post-Confirmation Date Interest on Claims

Post-Confirmation Date interest will not accrue on account of any Claim, unless otherwise ordered by the Bankruptcy Court, and the Liquidating Trustee will not distribute post-Confirmation Date interest on account of any Claim.

6.5   Undeliverable Distributions

If any distribution with respect to a Liquidating Trust Interest is returned to the Liquidating Trustee as undeliverable, no further distributions shall be made to such holder, unless the Liquidating Trustee is notified in writing of the Liquidating Trust Interest holder's current address.  Upon receipt of the notification, the Liquidating Trustee will remit all missed distributions to the Liquidating Trust Interest holder without interest.   All claims for undeliverable distributions must be made on or before the first anniversary of the Confirmation Date of the Plan.  If a claim is not made within that time, all unclaimed distributions will revert to the Liquidating Trust and be distributed Pro Rata to the remaining Beneficiaries of the Liquidating Trust according to the priorities set forth in this Liquidating Trust Agreement.  Nothing contained in the Plan, the Confirmation Order or this Liquidating Trust Agreement shall require the Liquidating Trustee to attempt to locate any Beneficiary.

6.6    Lapsed Distributions

Any distribution that has not cleared within ninety (90) days of the date of the distribution will lapse.  With respect to any lapsed distributions, the lapsed distribution will revert to the Liquidating Trust and be distributed to the remaining Beneficiaries of the Liquidating Trust according to the priorities set forth in this Liquidating Trust Agreement.

6.7    Compliance with Tax Requirements/Allocation

To the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan and the Confirmation Order shall be subject to such withholding and reporting requirements.  For tax purposes, distributions received in respect of Liquidating Trust Interests will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

6.8    Fractional Dollars; *De Minimis* Distributions

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under this Liquidating Trust Agreement, the Plan or the Confirmation Order would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.  The Liquidating Trustee shall not be required to make any interim distribution of less than Fifty Dollars ($50) with respect to any Liquidating Trust Interest.  To the extent that any interim distribution is not paid to a Beneficiary on the grounds that it amounts to less than Fifty Dollars ($50), the amount of such withheld distribution shall be reserved for addition to any future distribution or as the final distribution to such Beneficiary, and may be made at that time if the total distribution is at least Fifty Dollars ($50).

6.9    Setoffs

The Liquidating Trustee may, pursuant to sections 502(d) or 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Beneficiary and the distributions to be made pursuant to the Plan and the Confirmation Order on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Liquidating Trust may hold against the Beneficiary; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a waiver or release by the Liquidating Trust or the Debtor's estate of any such claims, rights and causes of action that they may possess against such Beneficiary.

6.10    Preservation of Debtor's Subordination Rights

All subordination rights and claims relating to the subordination by the Debtor or its estate of the Allowed Class 3 Claims, Allowed Class 4 Claims and Allowed Class 5 Claims of any party shall remain valid and enforceable by the Liquidating Trust, unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise, and may be asserted by the Liquidating Trustee as necessary or appropriate.

58

## ARTICLE VII
## PROCEDURES FOR RESOLUTION OF DISPUTED,
## CONTINGENT AND UNLIQUIDATED CLAIMS

7.1    Objections to Claims; Prosecution of Disputed Claims

The Liquidating Trustee, on behalf of the Liquidating Trust, may file objections to Claims, even if such Claims were scheduled by the Debtor as undisputed, liquidated and non-contingent. The Liquidating Trustee shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Bankruptcy Court. The Liquidating Trustee shall file objections to Claims no later than 60 days after the Effective Date (unless extended by an order of the Bankruptcy Court). Notwithstanding the deadline to file objections to Claims provided in the Plan, the Liquidating Trustee may file objections to Claims within ninety (90) days of the filing of an amended Claim. Nothing herein or in the Plan shall limit or otherwise affect the right of any party-in-interest under section 502(a) of the Bankruptcy Code to object to any Claim.

7.2    Estimation of Claims

The Liquidating Trustee, on behalf of the Liquidating Trust, may at any time request that the Bankruptcy Court estimate any contingent or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor, the Committee or the Liquidating Trustee previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or Disputed Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trust may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

7.3    Disputed Claims

7.3.1    If the Liquidating Trustee or other party-in-interest has objected to a Claim, distributions will be withheld only with respect to the amount actually in dispute, and such objection shall not affect payments or distributions under the Plan on the undisputed portion of the Claim.

7.3.2    The Liquidating Trustee shall maintain, in accordance with the Liquidating Trustee's powers and responsibilities under the Plan, the Confirmation Order and this Liquidating Trust Agreement, a reserve for any distributable amounts required to be set aside on account of Disputed Claims (the "*Disputed Claims Reserve*").

7.3.3    Once a Disputed Claim becomes an Allowed Claim, the Liquidating Trustee shall, as soon as practicable following the entry of a Final Order regarding the allowance of such Claim, and to the extent of the allowance of such Claim, distribute to the holder thereof, from the Disputed Claims Reserve, such amount of Liquidating Trust Assets as would have been distributed to such holder if the allowed portion of its Claim had been an Allowed Claim on the Confirmation Date, less such holder's share of any taxes paid or payable by the Disputed Claims Reserve.  If a Disputed Claim becomes disallowed, in whole or part, the Liquidating Trustee shall reallocate the disallowed amount previously set aside in the Disputed Claims Reserve in connection with such Disputed Claim among the Beneficiaries and the Disputed Claims Reserve on behalf of the Disputed Claims not yet resolved, as applicable, all to be distributed pursuant to **Article VI** of this Liquidating Trust Agreement.

## ARTICLE VIII
## LIABILITY AND EXCULPATION PROVISIONS

8.1    Standard of Liability

In no event shall the Liquidating Trustee, the Oversight Committee or the Liquidating Trust, or their respective Professionals, Non-Professionals or representatives, be held personally liable for any claim asserted against the Liquidating Trust or the Liquidating Trustee, or any of their Professionals, Non-Professionals or representatives.  Specifically, the Liquidating Trustee, the Liquidating Trust and their respective Professionals, Non-Professionals or representatives shall not be liable for any negligence or any error of judgment made in good faith with respect to any action taken or omitted to be taken in good faith.   Notwithstanding the foregoing, the Liquidating Trust or the Liquidating Trustee, or any of their Professionals, Non-Professionals or representatives may be held personally liable to the extent that the action taken or omitted to be taken by each of the same or their respective Professionals, Non-Professionals or representatives is determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct, fraud or, solely in the case of the Liquidating Trustee, breach of fiduciary duty other than negligence.  Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, fraud or a breach of fiduciary duty.

8.2    Reliance by Liquidating Trustee

Except as otherwise provided in **Article III** hereof:

(a)    the Liquidating Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, installment, opinion, report, notice, request, consent, order or other paper or document reasonably believed by him or her to be genuine and to have been signed or presented by the proper party or parties except as otherwise provided in the Plan or the Confirmation Order; and

(b)    the Liquidating Trustee shall not be liable for any action reasonably taken or not taken by him or her in accordance with the advice of a Professional retained pursuant to **Article X**, and persons dealing with the Liquidating Trustee shall look only to the Liquidating Trust Assets to satisfy any liability incurred by the Liquidating Trustee to such person in

60

carrying out the terms of this Liquidating Trust Agreement, and the Liquidating Trustee shall have no personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Liquidating Trustee are determined by a Final Order to be solely due to the Liquidating Trustee's own gross negligence, willful misconduct, fraud or breach of fiduciary duty, other than negligence.

8.3    Exculpation

8.3.1    From and after the Effective Date, the Liquidating Trustee and its Professionals, Non-Professionals and representatives shall be and hereby are exculpated by all Persons, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon said parties pursuant to or in furtherance of this Liquidating Trust Agreement, the Plan, the Confirmation Order or any order of the Bankruptcy Court or applicable law or otherwise, except only for actions taken or not taken, from and after the Effective Date only to the extent determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct, fraud or, solely in the case of the Liquidating Trustee, breach of fiduciary duty, other than negligence.

8.3.2    No holder of a Claim or other party-in-interest will be permitted to pursue any claim or cause of action against the Liquidating Trustee or its Professionals, Non-Professionals or representatives for making payments in accordance with the Plan or the Confirmation Order or for implementing the provisions of the Plan or the Confirmation Order. Any act taken or not taken by the Liquidating Trustee with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct or fraud or, solely in the case of the Liquidating Trustee, a breach of fiduciary duty, other than negligence.

8.4    Indemnification

The Liquidating Trust shall indemnify, defend and hold harmless the Liquidating Trustee and its respective Professionals, Non-Professionals and representatives from and against any and all claims, causes of action, liabilities, obligations, losses, damages or expenses (including reasonable attorneys' fees and expenses) occurring after the Effective Date, other than to the extent determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct or fraud or, solely in the case of the Liquidating Trustee, breach of fiduciary duty, other than negligence, to the fullest extent permitted by applicable law.

**ARTICLE IX**
**ADMINISTRATION**

9.1    Purpose of the Liquidating Trust

The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trust shall, in an expeditious but orderly manner, liquidate and convert to cash the Liquidating Trust Assets,

make timely distributions to the Beneficiaries and not unduly prolong the duration of the Liquidating Trust.

9.2      Books and Records

9.2.1    Maintenance of Books and Records.    The Liquidating Trustee shall maintain, with respect to the Liquidating Trust and the Beneficiaries, books and records relating to the assets and income of the Liquidating Trust and the payment of expenses of and liabilities of, claims against or assumed by, the Liquidating Trust in such detail and for such period of time as the Liquidating Trustee determines may be necessary to make full and proper accounting in respect thereof in accordance with **Article IX** hereof and to comply with applicable provisions of law.    Except as otherwise provided herein, in the Plan, or in the Confirmation Order, nothing in this Liquidating Trust Agreement requires the Liquidating Trust to file any accounting or seek approval of any court with respect to the administration of the Liquidating Trust, or as a condition for making any payment or distribution out of the Liquidating Trust Assets.    Subject to all applicable privileges, the Beneficiaries shall have the right, in addition to any other rights they may have pursuant to this Liquidating Trust Agreement, under the Plan and the Confirmation Order, or otherwise, upon thirty (30) days' prior written notice delivered to the Liquidating Trustee, to request a reasonable inspection (as determined by the Liquidating Trustee) of such books and records; provided, however, that, if so requested, such Beneficiary shall:  (a) first enter into a confidentiality agreement satisfactory in form and substance to the Liquidating Trustee;  (b) make such other reasonable arrangements as requested by the Liquidating Trustee; and (c) bear all costs and expenses of such inspection.

9.2.2    Quarterly Reports.    Within thirty (30) days after the conclusion of every calendar quarter during the term of this Liquidating Trust Agreement following the Effective Date, the Liquidating Trustee shall file a Quarterly Report with the Bankruptcy Court.    The Quarterly Report shall set forth:  (a) all distributions to Beneficiaries during the calendar quarter; (b) a summary of the Liquidating Trust deposits and disbursements during the calendar quarter; and (c) a summary of the Liquidating Trust Assets.    The first Quarterly Report shall cover the period of the Effective Date through and including September 30, 2015 and shall be due on or before October 30, 2015.

9.3      Security Interests

The Liquidating Trustee, its respective Professionals and Non-Professionals and the U.S. Trustee are hereby granted a first-priority lien on, and security interest in, the Liquidating Trust Assets to secure the payment of all amounts owed to, accrued or reserved on account of, to be retained by or otherwise due hereunder to each of the above.    The Liquidating Trustee shall cause the Liquidating Trust to take such actions and execute such documents as the Liquidating Trustee, its respective Professionals and Non-Professionals and the U.S. Trustee deem appropriate to perfect the security interests granted hereunder.    The Liquidating Trustee is authorized to execute and deliver all documents on behalf of the Liquidating Trust to accomplish the purposes of this Liquidating Trust Agreement, the Plan and the Confirmation Order.

9.4    Compliance with Laws

Any and all distributions of Liquidating Trust Assets shall comply with all applicable laws and regulations, including, but not limited to, applicable federal and state tax and securities laws.

## ARTICLE X
## PROFESSIONALS AND NON-PROFESSIONALS

10.1    Retention of Professionals and Non-Professionals

10.1.1 Retention of Professionals. The Liquidating Trustee, upon the later to occur of the Effective Date and acceptance by the Liquidating Trustee of its appointment in accordance with the Plan and this Liquidating Trust Agreement, shall have the right to retain its own professionals without any further approval by any court or otherwise including, without limitation, legal counsel, accountants, experts, advisors, consultants, investigators, appraisers, real estate brokers, auctioneers and other professionals as the Liquidating Trustee deems appropriate (collectively, the "*Professionals*"). Such Professionals shall be compensated in accordance with **Section 10.3** hereof. The Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, counsel and financial advisors of any party in the Case for efficiency.

10.1.2 Retention of Non-Professionals. The Liquidating Trustee, upon the later to occur of the Effective Date and acceptance by the Liquidating Trustee of its appointment in accordance with the Plan and this Liquidating Trust Agreement, shall have the right to retain non-professionals without any further approval by any court or otherwise including, without limitation, employees, independent contractors or other agents as the Liquidating Trustee deems appropriate (the "*Non-Professionals*"). Such Non-Professionals shall be compensated in accordance with **Section 10.3** hereof. The Non-Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, employees, independent contractors and agents of the Debtors or the Committee.

10.2    Retention of Liquidating Trustee's Legal Counsel

The initial Liquidating Trustee has chosen to retain _____ as its counsel. Such retention is made pursuant to this **Article X** without any further approval by any court. _____ is a Professional as that term is used herein, and shall be compensated in accordance with **Section 10.3** hereof.

10.3    Compensation of Professionals and Non-Professionals

Each Professional and Non-Professional shall submit monthly invoices to the Liquidating Trustee for its fees and expenses incurred in connection with services requested by, and provided to, the Liquidating Trustee. The Liquidating Trustee may pay the reasonable fees and expenses of such Professionals and Non-Professionals as an expense of the Liquidating Trust (together with the fees and expenses of the Liquidating Trustee, the "*Liquidating Trustee's Expenses*") without application to the Bankruptcy Court, subject to the following procedure: Each

Professional and Non-Professional shall serve its fee invoice (which shall contain detailed time entries) upon the Liquidating Trustee no more frequently than once a month.  The Liquidating Trustee shall have until fourteen (14) days after its receipt of an invoice (the "*Objection Deadline*") to review such invoice and deliver to the applicable Professional or Non-Professional, any objections thereto.  Any objection to an invoice (each an "*Objection*") must: (a) be in writing; and (b) set forth the precise nature of the Objection and the amount of objectionable fees and expenses at issue.  If no Objection is timely filed, served and received in respect of an invoice, then the Professional or Non-Professional shall be entitled to payment from the Liquidating Trust on such invoice.  If a timely Objection is filed, the Professional or Non-Professional shall be entitled to payment from the Liquidating Trust of only that portion of the invoice that is not the subject of the Objection, and the Liquidating Trustee and the affected Professional or Non-Professional may attempt to resolve on a consensual basis that portion of the invoice that is the subject of the Objection.  If the parties are unable to reach a resolution of the Objection, the affected Professional or Non-Professional may file a request for payment of the disputed amount with the Bankruptcy Court and serve such request on the Liquidating Trustee on regular notice, and the Liquidating Trustee or the affected Professional or Non-Professional may request, by motion, that the Bankruptcy Court adjudicate and rule on the Objection.

## ARTICLE XI
## TAXES

### 11.1    Tax Returns and Payments

The Liquidating Trustee will be responsible for:  (a) the preparation and timely filing of all required federal, state and local tax returns for the Liquidating Trust and the Debtors; (b) the timely payment of any taxes shown on such returns as owing by the Liquidating Trust or the Debtor (as applicable) from the applicable Liquidating Trust Assets; and (c) the preparation and timely distribution to the Beneficiaries of any necessary federal, state or local information returns.  The Liquidating Trustee will retain all tax returns and supporting documentation until the expiration of the applicable statute of limitations.  The Liquidating Trustee may request an expedited determination of the taxes owed by the Debtor, the Liquidating Trust or any Disputed Claims Reserve under section 505(b) of the Bankruptcy Code for any tax return for which such determination may be requested.

### 11.2    Liquidating Trust

The Liquidating Trustee will file tax returns pursuant to Treas. Reg. § 1.671-4(a) on the basis that the Liquidating Trust is a grantor trust that is a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and related regulations.  Pursuant to such provisions, for federal income tax purposes, the Liquidating Trustee will allocate to the Beneficiaries their applicable shares of any income or loss of the Liquidating Trust Assets, and such Beneficiaries will be subject to tax on the Liquidating Trust Assets' taxable income on a current basis.  As soon as reasonably practicable after the close of each calendar year, the Liquidating Trustee will send each affected Beneficiary a statement setting forth such Beneficiary's share of the Liquidating Trust's income, gain, deduction, loss and credit for the year and will instruct the Beneficiary to report all such items on his, her or its tax return for such year and pay any tax due with respect thereto.

11.3    Disputed Claims Reserve

The Liquidating Trustee will file all applicable tax and other returns and statements for the Disputed Claims Reserve in accordance with the requirements for discrete trusts taxed pursuant to section 641, *et seq.* of the Internal Revenue Code or as "disputed ownership funds" within the meaning of Treas. Reg. § 1.468B-9(b)(1), as applicable.  In addition, the Liquidating Trustee will pay from the applicable Liquidating Trust Assets on a current basis any taxes owed on any net income or gain of such Disputed Claims Reserve.

11.4    Tax Withholding and Reporting; Liability for Taxes

The Liquidating Trustee (and its designees) will comply with all applicable tax withholding and reporting requirements imposed on it or on the Liquidating Trust by any governmental unit, and all distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements.  The Liquidating Trustee (and its designees) will be authorized to take any actions that may be necessary or appropriate to comply with such tax withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanism the Liquidating Trustee believes is reasonable and appropriate, including requiring holders of Claims to submit appropriate tax and withholding certifications.  To the extent any Claim holder fails to submit appropriate tax and withholding certifications as required by the Liquidating Trustee, such Claim holder's distribution may, in the Liquidating Trustee's reasonable discretion, be deemed undeliverable and be subject to the provisions of the Plan and this Liquidating Trust Agreement with respect to undeliverable distributions.  Each Person or entity receiving (or deemed to receive) a distribution pursuant to the Plan will have sole responsibility for the payment of any taxes imposed on it.

## ARTICLE XII
## TERMINATION OF THE LIQUIDATING TRUST

12.1    Duration and Extension

The Liquidating Trust will terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that on or prior to the date six (6) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust for a finite period if it is necessary to the liquidating purpose thereof. Multiple extensions may be obtained so long as Bankruptcy Court approval is obtained at least six (6) months prior to the expiration of such extended term; provided, however, that prior to requesting any such extension, the Liquidating Trustee must receive an opinion of counsel or a favorable ruling from the IRS that any further extension would not adversely affect the status of the trust as a grantor trust for federal income tax purposes.

12.2    Termination Upon Distribution of All Liquidating Trust Assets

The Liquidating Trust will terminate and the Liquidating Trustee will have no additional responsibility in connection therewith except as may be required to effectuate such termination under relevant law and except as described in **Section 12.4** hereof, upon the latest of:  (a) the payment of all costs, expenses and obligations incurred in connection with administering the

Liquidating Trust; (b) the distribution of all remaining Liquidating Trust Assets; (c) the closure or dismissal of the Cases; and (d) the completion of any necessary or appropriate reports, tax returns or other documentation determined by the Liquidating Trustee, in its reasonable discretion, to be necessary, appropriate or desirable, in each case pursuant to and in accordance with the Plan, the Confirmation Order and this Liquidating Trust Agreement.

### 12.3    Diligent Administration

The Liquidating Trustee shall:  (a) not unduly prolong the duration of the Liquidating Trust; (b) at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Liquidating Trust Assets; (c) effect the distribution of the Liquidating Trust Assets to the Beneficiaries in accordance with the terms hereof; and (d) endeavor to terminate the Liquidating Trust as soon as practicable and without derogating from the Plan or this Liquidating Trust Agreement.  Prior to and upon termination of the Liquidating Trust, the Liquidating Trustee shall distribute the Liquidating Trust Assets to the Beneficiaries in accordance with their distribution rights under the Plan and the Confirmation Order, subject to the provisions set forth herein.  If any distributions of the Liquidating Trust are not duly claimed, the Liquidating Trustee shall dispose of all such distributions in accordance with the Plan, the Confirmation Order and this Liquidating Trust Agreement.

### 12.4    Other Termination Procedures

Upon termination of this Liquidating Trust, the Liquidating Trustee will file a written notice with the Bankruptcy Court disclosing the Liquidating Trust's termination.  Notwithstanding the foregoing, after the termination of the Liquidating Trust, the Liquidating Trustee will have the power to exercise all the rights, powers and privileges herein conferred solely for the purpose of liquidating and winding up the affairs of the Liquidating Trust.  Except as otherwise provided under the Plan or this Liquidating Trust Agreement, for a period of five (5) years after the distribution of all of the Liquidating Trust Assets, the Liquidating Trustee will retain the books, records and files that have been delivered to or created by the Liquidating Trustee, at which time the Liquidating Trustee may dispose of such books, records and files in any manner that the Liquidating Trustee deems appropriate.  Except as otherwise specifically provided herein, after termination of this Liquidating Trust Agreement, the Liquidating Trustee shall have no further duties or obligations hereunder.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

### 13.1    Intention of Parties to Establish a Grantor Trust

This Liquidating Trust Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

### 13.2    Preservation of Privilege

In connection with the rights, claims and Causes of Action that constitute the Liquidating Trust Assets, any attorney-client privilege, work-product privilege or other privilege or immunity

attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, the Debtor and the Committee, on the one hand, and the Liquidating Trustee, on the other hand, are authorized to take all necessary actions to effectuate the transfer of such privileges.  For the avoidance of doubt, neither the Liquidating Trustee nor the Liquidating Trust shall be treated as a successor to the Debtor or its estate for any purpose.

13.3     Cooperation

Pursuant to the Confirmation Order, the Debtor will provide the Liquidating Trustee with access to or copies of such of the Debtor's books and records as the Liquidating Trustee shall reasonably require for the purpose of performing its duties and exercising its powers under this Liquidating Trust Agreement, the Plan or the Confirmation Order.  All third parties in possession of the Debtor's books and records shall provide the Liquidating Trustee with similar cooperation, and the Liquidating Trustee shall have the right to seek appropriate relief from the Bankruptcy Court or any other court with jurisdiction over the matter to the extent that a third party unreasonably refuses to cooperate with the Liquidating Trustee's requests.

13.4     Payment of Statutory Fees

Following the transfer of all Liquidating Trust Assets to the Liquidating Trust on and after the Effective Date and through the date that a final decree is entered in the Case, the Liquidating Trust shall be obligated to pay any U.S. Trustee fees associated with the Case pursuant to 28 U.S.C. § 1930(a)(6).

13.5     Prevailing Party

In the event of a dispute regarding the provisions of this Liquidating Trust Agreement or the enforcement thereof, the prevailing party shall be entitled to collect any and all costs, expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

13.6     Implied Authority of the Liquidating Trustee

No person dealing with the Liquidating Trust shall be obligated to inquire into the authority of the Liquidating Trustee in connection with the protection, conservation or disposition of Liquidating Trust Assets.

13.7     Confidentiality

The Liquidating Trustee, its employees, Professionals and Non-Professionals (each a "*Confidential Party*" and collectively the "*Confidential Parties*") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any entity to which any of the Liquidating Trust Assets relate; provided, however, that such information may be disclosed if: (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; (b) was available to the Confidential Parties on a non-confidential basis prior to its disclosure to the Confidential Parties pursuant to this Liquidating

67

Trust Agreement; (c) becomes available to the Confidential Parties on a non-confidential basis from a source other than their work in connection with the Debtor or the Liquidating Trust, provided that the source is not also bound by a confidentiality agreement with the Debtor or the Liquidating Trust; or (d) such disclosure is required of the Confidential Parties pursuant to legal process including but not limited to subpoena or other court order or other applicable laws or regulations.   In the event that any Confidential Party is requested to divulge confidential information pursuant to subparagraph (d), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Liquidating Trustee to allow the Liquidating Trustee sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Liquidating Trustee in making any such objection, including, but not limited to, appearing in any judicial or administrative proceeding in support of the Liquidating Trustee's objection to such disclosure.

13.8     Governing Law; Submission to Jurisdiction; Service of Process

This Liquidating Trust Agreement shall be governed by and construed in accordance with the laws of the State of Iowa, without giving effect to rules governing the conflict of law. The Bankruptcy Court will have exclusive jurisdiction over any dispute arising out of or in connection with the transactions contemplated by this Liquidating Trust Agreement.   The parties to this Liquidating Trust Agreement consent to the exclusive jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) and irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of the venue of any such dispute in the Bankruptcy Court or that any such dispute brought in the Bankruptcy Court has been brought in an inconvenient forum.   This Liquidating Trust Agreement is subject to any order or act of the Bankruptcy Court applicable hereto.  Process may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.   Without limiting the foregoing, each party to this Liquidating Trust Agreement agrees that service of process on that party may be made upon the designated Person or entity at the address provided in **Section 13.10** hereof and will be deemed to be effective service of process on that party.

13.9     Severability

If any provision of this Liquidating Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Liquidating Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

13.10    Notices

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered via personal delivery, first-class mail (unless registered or certified mail is required), facsimile or  electronic mail to the addresses as set forth below, or such other addresses as may be filed with the Bankruptcy Court:

**Liquidating Trustee**:

        Barry A. Chatz
        Arnstein & Lehr LLP
        120 South Riverside Drive
        Suite 1200
        Chicago, IL 60606
        Telephone:  (312) 876-6670
        Facsimile:  (312) 876-6241
        E-Mail:  bachatz@arnstein.com

        with a copy to:
        mailto:

        _____
        _____
        _____
        _____
        Telephone:  _____
        Facsimile:  _____
        E-Mail:  _____

13.11    Notices if to a Beneficiary

      Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended to the name and address set forth on the Claims List.

13.12    Headings

      The Article and Section headings contained in the Liquidating Trust Agreement are solely for the convenience of reference and shall not affect the meaning or interpretation of this Liquidating Trust Agreement or of any term or provision hereof.

13.13    Counterparts and Facsimile Signatures

      This Liquidating Trust Agreement may be executed in counterparts and a facsimile or other electronic form of signature shall be of the same force and effect as an original.

13.14    Amendment or Waiver

      Any substantive provision of this Liquidating Trust Agreement may be materially amended or waived by the Liquidating Trustee, with the approval of the Bankruptcy Court upon notice and an opportunity for a hearing; provided, however, that no change may be made to this Liquidating Trust Agreement that would adversely affect the federal income tax status of the Liquidating Trust as a "grantor trust," if applicable.  Technical or non-material amendments to or waivers of portions of this Liquidating Trust Agreement may be made by the Liquidating Trustee

without the approval of the Bankruptcy Court, as necessary, to clarify this Liquidating Trust Agreement or to enable the Liquidating Trust to effectuate the terms of this Liquidating Trust Agreement.

13.15    Intervention

On the Effective Date, and without requirement of obtaining any order of the Bankruptcy Court, the Liquidating Trustee shall be deemed to have intervened or substituted as plaintiff, moving, defendant or additional party, as appropriate, in any adversary proceeding, contested matter, Claim objection or other motion that was filed prior to the Effective Date, where the subject matter of such action involves any Disputed Claim, any Liquidating Trust Asset or any Claim, to the extent such Claim impacts the Liquidating Trust Assets.

# ARTICLE XIV
## OVERSIGHT COMMITTEE<u>Creation of the Oversight Committee</u>

Simultaneously with the creation of the Creditor Trust, a committee (the "*Oversight Committee*") comprised of three members (the "*Members*"), which shall be appointed by the Committee. The Oversight Committee shall perform an advisory role in the administration of the Liquidating Trust and shall carry out such other responsibilities as may be required or permitted under this Liquidating Trust Agreement or under the Plan.  The initial Members of the Oversight Committee are Fred Richards of Johnson Brothers Liquor Co., Taylor Ricketts of PepsiCo, Inc. and Laure Guisinger of Homes, Murphy & Associates.   These Members of the Oversight Committee will serve, not as individuals, but as representatives of their respective organizations. Each Member of the Oversight Committee shall serve until the earlier of:  (a) his or her death or resignation; (b) his or her removal pursuant to **Section 14.5** of the Liquidating Trust Agreement; and (c) the termination of the Liquidating Trust.  To any extent a Member of the Oversight Committee has a conflict of interest with respect to any matter being handled by the Liquidating Trustee, such Member of the Oversight Committee shall recuse themselves and be recused from any such discussions in accordance herewith and any by-laws governing operation of the Oversight Committee approved by the Liquidating Trustee.

14.2    Role of the Oversight Committee

The Oversight Committee shall monitor, and the Liquidating Trustee Trustee shall consult with the Oversight Committee in connection with, the administration of the Liquidating Trust by the Liquidating Trustee.   The Oversight Committee may provide advice or recommendations with respect to any action to be taken by the Liquidating Trustee in connection therewith, including, without limitation:  (a) the arrangement of any sale, transfer or other disposition of Liquidating Trust Assets; (b) the investment of any proceeds of Liquidating Trust Assets in Permitted Investments; (c) the conduct and settlement of litigation with respect to any Disputed Claims and any Litigation Claim (other than with respect to a De Minimis Claim), or otherwise; and (d) the making of any distributions in respect of Allowed Claims.  Further, the Oversight Committee may from time to time issue written directives to the Liquidating Trustee with respect to any of the foregoing, which shall be complied with by the Liquidating Trustee. All decisions of the Oversight Committee, and all actions, directives, approvals and consents of the Oversight Committee required or contemplated hereunder, shall be effective upon a majority

vote of the Members thereof.  In taking or failing to take any action hereunder, the Liquidating Trustee may rely upon a written statement (including signatures by counterpart facsimile or approval by electronic transmission) by such majority of the Oversight Committee.  Neither the Oversight Committee nor its Members shall exercise any control or authority over the Liquidating Trust or the Liquidating Trust Assets that is inconsistent with the purposes or provisions of this Liquidating Trust Agreement.

14.3    Compensation of the Oversight Committee

The Oversight Committee shall not be compensated for services rendered to the Liquidating Trust.  However, the Oversight Committee Members shall be reimbursed from the Liquidating Trust Assets for all reasonable out-of-pocket expenses incurred by serving on the Oversight Committee, except fees and expenses of professionals retained by individual Oversight Committee Members.

14.4    Resignation of Member

An Oversight Committee Member may resign by giving not less than fifteen (15) days' prior written notice thereof to the parties entitled to notice under **Section 13.10** hereof.  From and after the date of its resignation from the Oversight Committee, the resigning Oversight Committee member shall have no further rights or obligations under this Liquidating Trust Agreement.

14.5    Removal of Member

14.5.1  Removal for Disability.  Subject to Bankruptcy Court approval, a Member of the Oversight Committee may be removed by a unanimous vote of all other Members of the Oversight Committee upon a finding that such Member is unable to perform his or her duties due to illness or other physical or mental disability.

14.5.2  Removal for Cause.  Subject to Bankruptcy Court approval, a Member of the Oversight Committee may be removed for cause by a unanimous vote of all other Members of the Oversight Committee.  "Cause" shall include, without limitation:  (a) fraud or willful misconduct in connection with the affairs of the Liquidating Trust; or (b) breach of fiduciary duty or an unresolved conflict of interest.

14.6    Replacement of Member

In the event that an Oversight Committee Member resigns or is removed as an Oversight Committee Member in accordance with this **Article XIV**, the Liquidating Trustee shall select a replacement Member.

14.7    Reliance by Oversight Committee Members

The Oversight Committee Members may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Oversight Committee Member has no reason to believe to be other than genuine and to have been signed or presented

71

by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Oversight Committee Members may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein. The Oversight Committee Members may consult with any counsel employed by the Liquidating Trust or by the Oversight Committee.

14.8    Meetings of the Liquidating Trustee and the Oversight Committee

14.8.1  Regular Meetings of the Liquidating Trustee and the Oversight Committee. Meetings of the Liquidating Trustee and the Oversight Committee are to be held with such frequency and at such place as the Oversight Committee may determine in its sole discretion.

14.8.2  Special Meetings of the Liquidating Trustee and the Oversight Committee. Special meetings of the Liquidating Trustee and the Oversight Committee may be held whenever and wherever called for either by the Liquidating Trustee or at least two Members of the Oversight Committee.

14.8.3  Notice of, and Waiver of Notice for, Liquidating Trustee and Oversight Committee Meetings. Notice of the time and place (but not necessarily the purpose or all of the purposes) of any regular or special meeting will be given to the Creditor Trustee and/or the Members of the Oversight Committee in person or by telephone, mail, electronic mail or facsimile transmission. Notice to the Liquidating Trustee and the Members of the Oversight Committee of any such meeting will be deemed given sufficiently in advance when: (a) if given by mail, the same is deposited in the United States mail at least ten (10) calendar days before the meeting date, with postage thereon prepaid; (b) if given by electronic mail or facsimile transmission, the same is transmitted at least one (1) business day prior to the convening of the meeting; or (c) if personally delivered (including by overnight courier) or given by telephone, the same is handed, or the substance thereof is communicated over the telephone to the Liquidating Trustee and/or the Members of the Oversight Committee or to an adult member of his/her office staff or household, at least one (1) business day prior to the convening of the meeting. The Liquidating Trustee and any Member of the Oversight Committee may waive notice of any meeting and any adjournment thereof at any time before, during or after it is held, as provided by law. Except as provided in the next sentence below, the waiver must be in writing, signed by the Liquidating Trustee or the applicable Member or Members of the Oversight Committee entitled to the notice and filed with the minutes or records of the Liquidating Trust. The attendance of the Liquidating Trustee or a Member of the Oversight Committee at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

14.8.4  Manner of Participation in Liquidating Trustee and Oversight Committee Meetings. The Liquidating Trustee or any Member of the Oversight Committee may participate in a regular or special meeting by, or conduct the meeting in person or through the use of conference telephone, videoconference or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place)

for the holding thereof.  The Liquidating Trustee or any Member of the Oversight Committee participating in a meeting by this means is deemed to be present in person at the meeting. Any Professional retained by the Liquidating Trustee may attend any regular or special meeting.

14.8.5  Manner of Acting.  Any Member of the Oversight Committee who is present and entitled to vote at a meeting of the Oversight Committee when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Committee, unless:  (a) such member of the Oversight Committee objects at the beginning of the meeting (or promptly upon his/her arrival) to holding it or to the transaction of any business at the meeting; (b) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (c) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention before the adjournment of the meeting.  The right of dissent or abstention is not available to any member of the Oversight Committee who votes in favor of the action taken.

14.9    Oversight Committee Action Without a Meeting

Any action required or permitted to be taken by the Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Oversight Committee as evidenced by one or more written consents describing the action taken, signed by all Members of the Oversight Committee and recorded in the minutes or other transcript of proceedings of the Oversight Committee and the Liquidating Trustee.

14.10    Dispute Resolution

In the event of a dispute between the Liquidating Trustee and the Oversight Committee, or between Members of the Oversight Committee, involving an allegation that either party has failed to act in a manner consistent with the Plan or this Liquidating Trust Agreement, the parties shall meet and confer and attempt to reach a consensual resolution of the dispute.  Should a consensual resolution not be reached, the Liquidating Trustee or the Oversight Committee or any of its Members may seek appropriate relief from the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to resolve such disputes.  This **Section 14.10** shall also apply to any disputes relating to recusal pursuant to **Section 14.1** of this Agreement.

14.11    Confidentiality of Information and Conflicts of Interest

The Liquidating Trustee shall have authority to exclude any Oversight Committee Member from any deliberations, or withhold any information from any Oversight Committee Member, regarding matters affecting the Liquidating Trust or Liquidating Trust Assets in which such excluded Member is encumbered by a conflict of interest that has been disclosed or otherwise becomes known to the Creditor Trustee.  The non-conflicted Oversight Committee Members may overrule the Liquidating Trustee's decision to exclude or withhold information from a conflicted Oversight Committee Member by unanimous vote of any non-conflicted Oversight Committee Members; provided, however, that the Liquidating Trustee shall not be liable to the Oversight Committee or the Liquidating Trust in any way for any statements made or actions taken by such conflicted Oversight Committee Member following such overruling by the Oversight Committee, and the Creditor Trust shall hold the Creditor Trustee harmless for any

claims that may arise as a result of such conflicted Oversight Committee Member's statements and actions. Any Oversight Committee Member that is excluded from deliberations or denied access to information under this **Section 14.11** may challenge the Creditor Trustee's determination in accordance with the dispute resolution procedure set forth in **Section 14.10** of this Liquidating Trust Agreement.

14.12    Limitation of Liability and Indemnification of the Oversight Committee

14.12.1 The Members of the Oversight Committee shall not be personally liable to the Liquidating Trust or to any Beneficiary (or any successor of such entities) except for such of their own respective acts as shall constitute willful misconduct or fraud as determined by a Final Order. The Members of the Oversight Committee and any officers, employees, professionals and agents of any Member of the Oversight Committee, shall be defended, held harmless and indemnified and shall be entitled to advancement of their expenses; provided, however, that such Member shall be obligated to repay any amounts advanced hereunder if a court of competent jurisdiction shall determine by a Final Order that such Member violated its standard of care hereunder.

14.12.2 The obligation of the Liquidating Trust to indemnify the Members of the Oversight Committee and their respective officers, employees, professionals and agents hereunder, and any such Person's rights to be compensated and to be reimbursed for its reasonable out-of-pocket expenses and disbursements, shall constitute indebtedness of the Liquidating Trust. In acting hereunder, any Member of the Oversight Committee acts in its representative and not individual capacity. All Persons having any claim against any Member of the Oversight Committee or their agents by reason of the transactions contemplated hereby shall look only to the Creditor Trust Assets for payment or satisfaction thereof.

14.12.3 The indemnification and exculpation provisions hereunder shall supplement and augment those provisions set forth in the Plan.

**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Liquidating Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

**LIQUIDATING TRUSTEE**

By: _____,
not individually, but solely as trustee of the Liquidating Trust

Date:_____

**FOODS, INC. d/b/a DAHL'S FOODS**

By:_____

Its:_____

Date:_____

**OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
FOODS, INC. d/b/a DAHL'S FOODS**

By:_____

Its:_____

Date:_____

**EXHIBIT G**

Schedule of Allowed Class 3 General Unsecured Claims

| EXHIBIT G - Allowed General Unsecured Claims | |
|---|---|
| **Creditor** | **Amount Allowed** |
| Accent Tag & Label, Inc. | $ 215.66 |
| ADO-Import | $ 11,425.12 |
| ADP Inc. | $ 12,956.51 |
| Advanced Surfaces, LLC | $ 54,637.70 |
| Advantage Tape Advertising, Inc. | $ 1,386.00 |
| Aerial Bouquets, Balloons, & Accessories | $ 51.15 |
| Agelity Inc. | $ 136.00 |
| Air Filter Sales & Services Inc. | $ 12,156.50 |
| Airgas Carbonic/Dry Ice | $ 26.77 |
| Airgas USA, LLC | $ 5,228.94 |
| Alliance Harsha Advertising | $ 3,222.00 |
| Alternative Banking Company | $ 91.25 |
| Altoona Herald | $ 18.00 |
| American Bottling Co. | $ 32,735.11 |
| Amerigas-Baxter IA | $ 88.10 |
| Ames Lock & Security | $ 101.65 |
| Anda, Inc. | $ 19,964.21 |
| Anderson Erikson Dairy Co. | $ 224,030.65 |
| Ankeny Sanitation | $ 5,730.23 |
| Anna's Allergen Free, Inc. | $ 124.93 |
| Aramark Uniform | $ 6,514.99 |
| Arctic Glacier USA, Inc. | $ 21,245.81 |
| Atlantic Bottling Company | $ 13,254.26 |
| Atlantic Prescription Services | $ 918.44 |
| Bags & Bows | $ 175.82 |
| Baker Electric, Inc. | $ 403.31 |
| Bakery N LLC | $ 1,111.24 |
| Batteries Included | $ 3,773.42 |
| Beattie Produce | $ 15,295.48 |
| Bill Doran Company | $ 704.49 |
| Bimbo Bakeries, USA | $ 44,083.32 |
| Bio Scrip | $ 111.02 |
| Bishop Engineering | $ 1,172.50 |
| Bloomberg BNA | $ 1,316.94 |
| Bob Brown Chevrolet | $ 2,623.88 |
| Boet Je Foods Inc. | $ 291.72 |
| Bottling Group, LLC | $ 27,992.83 |

| | | |
|---|---|---|
| Brick Gentry P.C. | $ | 167.75 |
| Bullmoose Bakery Supplies, Inc. | $ | 18,670.30 |
| Burtek Dry Ice LLC | $ | 653.00 |
| Cable Tech, Inc. | $ | 2,887.92 |
| Capital City Equipment Co. | $ | 411.95 |
| Capital Sanitary Supply Co. | $ | 14,218.68 |
| Carbon's Golden Malted | $ | 595.00 |
| Carla Horner; Graphic Designer | $ | 562.50 |
| Chestnut Signs | $ | 2,797.50 |
| Chicago Importing Co. | $ | 439.14 |
| Chocolaterie Stam | $ | 193.20 |
| Cisco Systems Capital Corp. | $ | 115,001.12 |
| City of Ames, Iowa | $ | 11,743.10 |
| City of Clive | $ | - |
| City of Des Moines | $ | 5,800.00 |
| Claeys Candies, Inc. | $ | 438.00 |
| Claims Recovery Group as Assignee of Blue Rhino | $ | 51,707.50 |
| Claims Recovery Group as Assignee of Des Moines Bacon Company | $ | 1,356.20 |
| Claims Recovery Group as Assignee of Dupey Equipment Co. | $ | 16,564.33 |
| Claims Recovery Group as Assignee of Ferrellgas | $ | 3,383.61 |
| Claims Recovery Group as Assignee of Hoodz of Central Iowa | $ | 7,144.50 |
| Claims Recovery Group as Assignee of JL Creations | $ | 2,174.78 |
| Claims Recovery Group as assignee of Kehe Distributors | $ | 29,308.50 |
| Claims Recovery Group as assignee of Lawson Enterprises, Inc. | $ | 525.00 |
| Claims Recovery Group as Assignee of Martin Brothers Distributing Co., Inc. | $ | 56,030.48 |
| Claims Recovery Group as Assignee of Michael Foods, Inc. | $ | 47,920.51 |
| Claims Recovery Group as Assignee of Onnen Company | $ | 1,083.69 |
| Claims Recovery Group as Assignee of Produce Ltd. | $ | 2,941.75 |
| Claims Recovery Group as Assignee of Russell Stover Candies | $ | 16,722.51 |
| Claims Recovery Group as Assignee of Santa Maria Vineyard Winery | $ | 1,298.08 |
| Claims Recovery Group as assignee of Storey-Kenworthy Company | $ | 9,467.64 |
| Claims Recovery Group, as Assignee of Adhesive Label | $ | 695.94 |
| Claims Recovery Group, as Assignee of ATEB Inc. | $ | 4,435.20 |
| Claims Recovery Group, as Assignee of Berres Brothers Coffee | $ | 2,396.87 |
| Claims Recovery Group, as Assignee of CLS Distributors LLC | $ | 1,144.50 |
| Claims Recovery Group, as Assignee of Color FX LLC | $ | 3,833.00 |
| Claims Recovery Group, as Assignee of Continuum Retail Energy Services | $ | 18,770.25 |
| Claims Recovery Group, as Assignee of D.M. Merchandising, Inc. | $ | 2,736.00 |

| | | |
|---|---|---|
| Claims Recovery Group, as Assignee of Dakota Drug, Inc. | $ | 513,797.25 |
| Claims Recovery Group, as Assignee of Dakota News, Inc. | $ | 73,003.45 |
| Claims Recovery Group, as Assignee of Door County Coffee & Tea Co. | $ | 9,100.50 |
| Claims Recovery Group, As Assignee of Friedrichs Coffee | $ | 1,242.00 |
| Claims Recovery Group, as Assignee of Hamco-Walker Paper | $ | 798.66 |
| Claims Recovery Group, as Assignee of Iowa Basketball LLC | $ | 20,500.00 |
| Claims Recovery Group, as Assignee of Iowa State Fair | $ | 120,348.00 |
| Claims Recovery Group, as Assignee of JTC Promotions, Inc. | $ | 7,155.00 |
| Claims Recovery Group, as Assignee of Landlocked Seafoods, Inc. | $ | 17,592.45 |
| Claims Recovery Group, as Assignee of M & M Sales Co. | $ | 8,619.58 |
| Claims Recovery Group, as Assignee of Marick, Inc. | $ | 697.36 |
| Claims Recovery Group, as Assignee of Metro Waste Authority | $ | - |
| Claims Recovery Group, as Assignee of Old Dutch Foods, Inc. | $ | 81,557.72 |
| Claims Recovery Group, as Assignee of Rotella's Italian Bakery | $ | 13,934.93 |
| Claims Recovery Group, as Assignee of Springer Professional Home Services | $ | 8,094.22 |
| Claims Recovery Group, as Assignee of Summerset Winery | $ | 1,253.50 |
| Claims Recovery Group, as Assignee of Telesupport Inc. | $ | 1,908.00 |
| Claims Recovery Group, as Assignee of Pan-O-Gold Baking Co. | $ | 46,813.83 |
| CO2 Technologies | $ | 63.60 |
| Coastal Nursery | $ | 136.80 |
| Collection Bureau - Little Falls | $ | 44.36 |
| Commerce & Industry Insurance Company | $ | - |
| Community Greetings | $ | 1,628.50 |
| Control Installations of Iowa dba Automatic Door Group | $ | 9,017.77 |
| Crown Equipment Corporation | $ | 57.24 |
| Crystal Clear Water Co. | $ | 36,614.98 |
| Customized Retail Solutions | $ | 20,161.69 |
| Dakota Security | $ | 581.46 |
| Dan Griggs Images, Inc. | $ | 378.00 |
| Dave Tanner Distributing, LLC | $ | 11,190.22 |
| Deals Orchard | $ | 22.50 |
| Dejong Greenhouses | $ | 17,035.88 |
| Dejong Hardware | $ | 1,317.75 |
| Dell Marketing, L.P. | $ | 2,214.47 |
| Delta Dental | $ | 5,661.70 |
| Des Moines Feed Company | $ | 314.72 |
| Des Moines Stamp Mfg. Co. | $ | 3,455.74 |
| Design Design Inc. | $ | 829.28 |
| Dickinson, Mackman, Tyle & Hagen | $ | 31,060.39 |

| | | |
|---|---|---|
| Diversified Distributing | $ | 179.05 |
| Doors, Inc. | $ | 108.12 |
| Dr. MyCommerce, Inc. | $ | 48.45 |
| Duerson Corporation | $ | 1,369.18 |
| Ebert Honey | $ | 134.94 |
| Electrical Engineering and Equipment | $ | 187.60 |
| Embassy Club | $ | 302.51 |
| Emedon Lockbox | $ | 15,825.90 |
| Enterprise FM Trust; Enterprise Fleet Management | $ | 2,880.50 |
| ET Video Inc. | $ | 2,703.17 |
| F & A Food Sales, Inc. | $ | 29,798.60 |
| Fair Harbor Capital as Assignee for Gateway Market | $ | 14,376.28 |
| Fair Harbor Capital as Assignee for Perishable Distributors of Iowa, Ltd. | $ | 2,889.23 |
| Farmers Best Seed & Grain Farms, Inc. dba Farmers Best Gourmet Popcorn | $ | 1,303.80 |
| Farmers Brothers Coffee | $ | 5,245.05 |
| Farner Bocken Co. | $ | 26,417.34 |
| FedEx | $ | 405.99 |
| Fessler Carbonic Gas | $ | 327.68 |
| Fixture Finders, LLC | $ | 4,100.00 |
| Flavorx Inc. | $ | 168.45 |
| Flynn Wright | $ | 837.75 |
| FMS | $ | 3,873.57 |
| Food Handling Equipment, Inc. | $ | 103.94 |
| From the Earth Farm | $ | 77.80 |
| G & K Services | $ | 11,591.82 |
| Gannett Satellite Information Network, Inc. - Des Moines Register | $ | 20,841.00 |
| Geneva Foods LLC | $ | 390.00 |
| Global Wines Iowa | $ | 2,565.00 |
| Goji Gourmet, LLC | $ | 396.00 |
| Golden Ground, Inc. | $ | 87.00 |
| Goodwin Tucker Group | $ | 469.26 |
| Graybar Electric Company | $ | 1,433.33 |
| Grayslake Eastwood (E. 33rd) | $ | 365,409.00 |
| Graziano Brothers, Inc. | $ | 929.90 |
| Gruma Corporation dba Mission Foods | $ | 39,756.00 |
| Hallmark Marketing Co. LLC | $ | 11,668.30 |
| Harbor Seafood | $ | 16,625.00 |
| Heartland Creamery | $ | 1,401.92 |
| Heartland Flagpoles | $ | 495.30 |

| | | |
|---|---|---|
| Hi Mountain Jerky Inc. | $ | 674.22 |
| Hiland Dairy | $ | 40,059.69 |
| Hobart Service | $ | 4,529.96 |
| Holiday Inn Hotel/Suites NW | $ | 100.00 |
| Howard Weeks | $ | 459.00 |
| HTP Pharmaceuticals | $ | 264.93 |
| Hussman Services Corporation | $ | 128,016.24 |
| Huston Delivery Service | $ | 139.00 |
| Image Solutions | $ | 237.87 |
| Interstate All Battery Center | $ | 171.62 |
| Iowa Audio Video | $ | 936.68 |
| Iowa Beer & Liquor Control | $ | 23,713.95 |
| Iowa Beverage System, Inc. | $ | 2,875.22 |
| Iowa Choice Harvest | $ | 4,886.65 |
| Iowa Department of Revenue | $ | 93,451.85 |
| Iowa Des Moines Supply, Inc. | $ | 97,516.18 |
| Iowa Fire Equipment | $ | 521.10 |
| Iowa Pharmacy Association | $ | 5,500.00 |
| Iowa Sun Control Inc. | $ | 867.47 |
| Iowa Water Management | $ | 4,770.00 |
| Ivie & Associates, Inc. | $ | 2,266.00 |
| J & B Group | $ | 827.50 |
| Jack Guttman, Inc. dba Bakery Crafts | $ | 1,483.47 |
| Jan Handley dba Hilltop Ministries | $ | 418.33 |
| Jasper Winery | $ | 8,073.80 |
| Jelly Belly Candy Company | $ | 2,392.85 |
| Johnson Bros/Iowa Wine & Beverage | $ | 12,758.78 |
| Johnston Lions Club | $ | 155.00 |
| Johnston Water Department | $ | 1,978.62 |
| Just Tomatoes Company | $ | 178.80 |
| JW Perry | $ | 20.00 |
| Kellogg Company | $ | 14,913.86 |
| KLK Holdings, Inc. dba Level 10 | $ | 50,882.45 |
| Kness Mfg. Co., Inc. | $ | 257.89 |
| Koehler & Dramm | $ | 43,289.35 |
| Kone, Inc. | $ | 426.69 |
| Kurtz Hardware | $ | 65.01 |
| La Casa Ltd. | $ | 327.00 |
| La Rue Coffee | $ | 259.68 |

| | | |
|---|---|---|
| Lathrop & Gage | $ | 3,133.50 |
| Leanin' Tree | $ | 10,327.62 |
| Lifepics | $ | 2,876.24 |
| Liquidity Solutions, Inc. as Assignee of Do-Biz Foods, LLC | $ | 1,724.80 |
| Liquidity Solutions, iNc. as assignee of Glazer's Wholesale | $ | 18,089.93 |
| Liquidity Solutions, Inc. as assignee of Lewright Meats Inc. | $ | 1,335.47 |
| Liquidity Solutions, Inc. as assignee of Penta Partners, LLC | $ | 16,496.82 |
| Liquidity Solutions, Inc. as Assignee of Topline - Iowa | $ | 20,693.79 |
| Liquidity Solutions, Inc., as  assignee of Netherland Bulb Company | $ | 1,599.00 |
| Liquidity Solutions, Inc., as assignee of Rochester Armored Car Co., Inc. | $ | 27,201.79 |
| Madison County Winery | $ | 149.40 |
| Mama Bosso Pizza | $ | 10,493.73 |
| Mariposa Farms, Inc. | $ | 7,587.16 |
| Marlin Business Bank - leased equipment | $ | 2,650.92 |
| Mayflower Distributing Co. | $ | 221.11 |
| McGladrey, LLP | $ | 49,800.00 |
| MCS Trucking LLC | $ | 2,764.50 |
| McWilliams Apple Orchard | $ | 4,322.00 |
| Medco Lab, Inc. | $ | 41.00 |
| Merck Sharp & Dohme Corp. | $ | 13,639.68 |
| Mercy West Lakes Pharmacy | $ | 13.72 |
| MidAmerican Energy Co. | $ | 241,987.05 |
| Mid-Iowa Solid Waste Equipment Co., Inc. | $ | 2,644.59 |
| Midwest Automatic Fire Sprinkler Company | $ | 1,355.82 |
| Midwest Best Water Inc. | $ | 12,683.80 |
| Midwest Carwash Systems | $ | 3,997.18 |
| Midwest L & I Inc. | $ | 1,043.04 |
| Midwest Solid Waste, Inc. | $ | 5,730.23 |
| Miller Spreads | $ | 4,687.50 |
| Mondelez Global LLC | $ | 64,554.02 |
| Mr. Gus Farms | $ | 114.00 |
| National Health Information Network, Inc. (NHIN) | $ | 4,565.48 |
| Nelson Electric | $ | 3,116.50 |
| Nestle Direct Store Delivery | $ | 72,067.82 |
| Office Depot | $ | 84.67 |
| Orgill Inc. | $ | 536.62 |
| Overhead Door Company of Des Moines, Inc. | $ | 212.15 |
| Parmed Pharmaceuticals | $ | 1,161.64 |
| Pasquale's Food Service Inc. | $ | 8,725.90 |

| | | |
|---|---|---|
| Payne Publishers | $ | 3,880.17 |
| PC by Design, LLC | $ | 1,179.19 |
| PDX, Inc. | $ | 39,044.73 |
| Penske Truck Leasing | $ | 1,671.48 |
| Pepperidge Farm Inc. | $ | 391.63 |
| Performance G2 | $ | 22,624.00 |
| Picket Fence Creamery, LLC | $ | 579.00 |
| Pike Mechanical | $ | 1,754.40 |
| POS Supplies | $ | 381.00 |
| Postal Service | $ | 70.65 |
| Prairie Capital Advisors Inc. | $ | 37,544.55 |
| Prairie Meadows | $ | 948.20 |
| Prairie Moon Winery | $ | 343.50 |
| Premier A&B Service | $ | 146.28 |
| Principal Life Insurance Company | $ | 37,975.69 |
| Professional Fiduciary Service | $ | 6,250.00 |
| Promex Ltd. | $ | 988.90 |
| PSS World Medical, Inc. | $ | 222.63 |
| Pugs Inc. | $ | 515.81 |
| R.U. Nuts Company, Inc. | $ | 3,509.94 |
| Randy Shanks dba Shanks Window Cleaning | $ | 2,558.54 |
| Rash Pro | $ | 80.00 |
| RGIS, LLC | $ | 26,276.14 |
| Richtman's Printing | $ | 596.78 |
| Rug Doctor | $ | 14,787.42 |
| Russ Davis Wholesale Inc. | $ | 20.85 |
| Ryko Solutions Inc. | $ | 9,098.73 |
| Sacks | $ | 970.00 |
| Schmidt's Homey Farm | $ | 73.50 |
| Schwan's Consumer Brands | $ | 11,009.58 |
| Seneca Companies | $ | 3,356.61 |
| Sheeder Cloverleaf Dairy, LLC | $ | 8,183.78 |
| Shred-It | $ | 5,699.84 |
| Shullsburg Creamery II, LLC | $ | 78,181.33 |
| Sinwell, David | $ | 43,181.20 |
| Slim D's Inc. | $ | 144.60 |
| Smith Sewer Service, Inc. | $ | 6,750.50 |
| Sparboe Farms, Inc. | $ | 17,814.48 |
| Speck Plumbing Inc. | $ | 94.48 |

| | | |
|---|---|---:|
| Staples Advantage | $ | 291.40 |
| Staples Print Solutions | $ | 2,321.80 |
| Staples Technology Solutions | $ | 4,046.46 |
| Stone City Distribution | $ | 1,516.80 |
| Stone Cliff Winery | $ | 1,440.28 |
| Stonehouse Marketing Svcs. | $ | 814.33 |
| Stonewall Kitchen | $ | 3,357.80 |
| Strategic Custom Solutions, Inc. | $ | 2,600.00 |
| Strauss Lock Company | $ | 2,450.99 |
| Super Lube Service Center | $ | 134.92 |
| Superior Lighting Inc. | $ | 23,212.81 |
| Sweet Honey, Inc. | $ | 6,940.00 |
| Tassel Ridge Winery | $ | 1,865.54 |
| Taste of Brasil, LLC | $ | 961.20 |
| Taste of Pella Distributing | $ | 126.00 |
| The Chocolate Shop | $ | 68.28 |
| Thrifty Drug Stores, Inc. | $ | 338,515.88 |
| Tiger Direct, Inc. | $ | 2,885.85 |
| Todd's BBI | $ | 1,459.18 |
| Tomra of North America - reverse vending machine lease | $ | 37,367.08 |
| Tres Mentes | $ | 294.00 |
| TruGreen Chemlawn | $ | 9,783.80 |
| Trustwave Holdings, Inc. | $ | 7,070.00 |
| Two Point Conversions, Inc. | $ | 3,000.00 |
| Two Rivers Glass & Door Inc. | $ | 763.20 |
| Tyco Integrated Security - 159 | $ | 8,947.91 |
| Tyco Integrated Security - 160 | $ | 915.24 |
| United Natural Foods | $ | 699.64 |
| US Cellular | $ | 1,533.75 |
| Vander Ploeg Bakery | $ | 938.00 |
| Vaxserve | $ | 5,342.37 |
| Verena Street Coffee | $ | 15,960.85 |
| Verizon Wireless | $ | 185.48 |
| Voss Distributing | $ | 21,438.62 |
| Waste Management | $ | 1,883.48 |
| Wellpartner, Inc. | $ | 2,009.74 |
| | $ 4,714,602.87 | |

**EXHIBIT H**

Allowed 503(b)(9) Claims

| EXHIBIT H - Allowed 503(b)(9) Claims* | |
| --- | --- |
| **Creditor** | **Amount Allowed** |
| Accent Tag & Label | $0.00 |
| Advantage Tape Advertising, Inc. | $1,238.00 |
| Alliance Harsha Advertising | $16,264.44 |
| Anderson Erikson Dairy Co. | $159,072.46 |
| Arctic Glacier USA Inc. | $1,638.36 |
| Atlantic Bottling | $47,657.14 |
| Baker Electric, Inc. | $0.00 |
| Bankers Leasing Company | $0.00 |
| Bill Doran Company | $0.00 |
| Bimbo Bakeries, USA | $27,604.88 |
| Bottling Group, LLC | $81,683.08 |
| Bullmoose Bakery Supplies, Inc. | $2,088.54 |
| City of Ames, Iowa | $0.00 |
| Claims Recovery Group as Assignee of Friedrich's Coffee | $64.80 |
| Claims Recovery Group as Assignee of Metro Waste | $1,680.00 |
| Control Installations of Iowa dba Automatiac DoorGroup | $0.00 |
| Crystal Clear Water Co. | $7,483.20 |
| Dakota Drug, Inc. | $569.56 |
| Des Moines Stamp Mfg. Co. | $0.00 |
| Do-Biz Foods, LLC | $0.00 |

| | |
|---|---|
| Doll Distributing, LLC | $5,264.46 |
| Door County Coffee & Tea Co. | $506.60 |
| Dr. Pepper Snapple | $52,000.00 |
| Dupey Equipment, Co. | $2,389.54 |
| Fair Harbor Capital, LLC as Assignee of Gateway Market | $5,592.64 |
| Fair Harbor Capital, LLC as assignee of Perishable Distributors of Iowa, Ltd. | $11,893.68 |
| FMS, Financial Management Services, Inc. | $0.00 |
| FMS, Financial Management Services, Inc. | $0.00 |
| Frito-Lay North America, Inc. | $20,394.83 |
| Goji Gourmet LLC | $0.00 |
| Gruma Corporation dba Mission Foods | $0.00 |
| Holmes Murphy & Associates | $0.00 |
| Hussmann Services Corporation | $0.00 |
| Iowa Beverage Systems, Inc. | $25,866.80 |
| Iowa Des Moines Supply | $47,194.48 |
| J&B Group | $0.00 |
| Johnson Bros/Iowa Wine & Beverage | $116,785.51 |
| Johnson Bros/Iowa Wine & Beverage | $0.00 |
| Keck, Inc. | $309,198.83 |
| KLK Holdings, Inc. dba Level 10 | $5,183.25 |

| | |
|---|---|
| Koehler & Dramm | $10,418.45 |
| Lawson Enterprises, Inc. | $0.00 |
| M & M Sales Company | $4,089.94 |
| Madison County Winery | $0.00 |
| Mariposa Farms, Inc. | $2,543.89 |
| Midwest Carwash Systems | $0.00 |
| Millers Spreads | $0.00 |
| Overhead Door Company of Des Moines, Inc. | $0.00 |
| Pan-o-Gold Baking Co. | $28,428.15 |
| Picket Fence Creamery, LLC | $0.00 |
| Rotella's Italian Bakery | $10,024.38 |
| Sacks | $75.00 |
| Schwan's Consumer Brands | $8,694.08 |
| Shullsburg Creamery II, LLC | $39,472.42 |
| Sparboe Farms, Inc. | $21,692.67 |
| Strategic Custom Solutions | $0.00 |
| Voss Distributing | $4,975.30 |
| Wellpartner, Inc. | $0.00 |
| | $1,079,729.36 |